UNITED STATES DISTRICT COURT

for the

District of Minnesota

| | |
|---|---|
| Everest Stables, Inc., a Minnesota corporation and Jeffrey Nielsen, | ) ) ) |
| Plaintiffs, | ) |
| v. | ) Civil Action No. |
| | ) |
| Porter, Wright, Morris, & Arthur LLP, and Christopher D. Cathey, | ) ) ) |
| Defendants. | ) ) |

## INDEX OF EXHIBITS TO PLAINTIFF'S COMPLAINT

Exhibit A:  First Amended Complaint
*Everest Stables, Inc., v. Foley & Mansfield LLP and Thomas W. Pahl*
Court File No.  27-CV-18-8745

Exhibit B:  First Amended Complaint
*Jeffrey L. Nielsen v. Dorsey & Whitney, LLP, George Eck and Peter M. Lancaster*
Court File No.:  27-CV-17-16371

Exhibit C:  Second Amended Complaint
*Everest Stables, Inc., v. William Rambicure, Jr., et al and Zurich American Insurance*
Court File No.:  3:15-CV-00576-GNS

UNITED STATES DISTRICT COURT

for the

District of Minnesota

| | | |
|---|---|---|
| Everest Stables, Inc., a Minnesota corporation and Jeffrey Nielsen, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. |
| Porter, Wright, Morris, & Arthur LLP, and Christopher D. Cathey, | ) ) ) | |
| Defendants. | ) | |

COMPLAINT – EXHIBIT A

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

Case Type: Malpractice

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

| | |
|---|---|
| Everest Stables, Inc., ) | |
| ) | |
| Plaintiff, ) | Case No. _____ |
| ) | |
| v. ) | |
| ) | |
| Foley & Mansfield, LLP and ) | **FIRST AMENDED COMPLAINT** |
| Thomas W. Pahl, ) | **(JURY TRIAL DEMANDED)** |
| ) | |
| Defendants. ) | |

Plaintiff Everest Stables, Inc. ("Everest"), by its undersigned attorneys, for its First Amended Complaint for legal malpractice against defendants Foley & Mansfield, LLP ("Foley") and Thomas W. Pahl ("Pahl") (Foley and Pahl are collectively, "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.      This is an action for professional negligence, breach of fiduciary duty, breach of contract, fraud and negligent misrepresentation against the Defendants. While representing Everest in various legal matters, Defendants' negligent actions and omissions caused disastrous results for Everest.  Instead of providing sound and competent legal advice and strategy, Defendants mishandled winning cases, mislead Everest numerous times in the process,  and caused millions of dollars in damages.  The legal work was so far below the standard of care that, in one case, not only did Everest's claims get dismissed in their entirety, Everest ended up paying the opposing party a five-figure judgment for attorney's fees and costs.  This result was unfathomable given the strength of Everest's case and its reliance upon the advice of counsel and expectation that Defendants would handle this case properly.

EXHIBIT A

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

## PARTIES, JURISDICTION AND VENUE

2.      Everest is a Minnesota corporation with its principal place of business located in Stillwater, Minnesota.  Everest is a thoroughbred horse breeding and racing company owned by Jeffrey Nielsen. (Everest and Jeffrey Nielsen shall be collectively referred to as "Everest").

3.      Foley is a Minnesota limited liability partnership with its principal place of business located at 250 Marquette Avenue, Suite 1200, Minneapolis, Hennepin County, Minnesota.  Foley is a national law firm with 12 offices located throughout the United States. Foley is subject to the jurisdiction of this Court.

4.      Pahl is a resident of Minnesota and is an attorney licensed to practice law in Minnesota, California and Wisconsin.  He is a partner at Foley and currently Chair of Foley's Commercial Litigation Practice Group.

5.      On Foley's website, Pahl represents that he practices out of Foley's Minneapolis and Oakland, California, offices.  However, Pahl's primary office is located at 250 Marquette Avenue, Suite 1200, Minneapolis, Hennepin County, Minnesota, which is also Foley's main office.  Pahl became licensed to practice law in Minnesota in 1994 and is subject to the jurisdiction of the Minnesota courts.

6.      Venue is proper in this Court because the Defendants' principal place of business is in Hennepin County, Minnesota.  Further, Everest entered into an agreement with Defendants in Hennepin County, Minnesota for legal services to be performed by Defendants primarily at their offices in Hennepin County, Minnesota.

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

## BACKGROUND FACTS

7.     On Foley's website, Pahl holds himself out to the public as an attorney who focuses his practice on general business litigation and employment disputes. He claims that he handles product liability, toxic tort, and mass tort litigation and also claims to have "a niche practice representing owners and operators of equine breeding and racing enterprises."

8.     Pahl also represents that he has extensive litigation and trial skills and advertises that he has handled cases on a national basis. Pahl also asserts that his bachelor's degree in finance and accounting and his experience give his clients an advantage – particularly clients involved in "high-stakes litigation." Pahl also holds himself out as an aggressive defender of his clients' interests.

9.     Pahl is actively involved in training Foley's young attorneys by "serving as an instructor and trial mentor on professional development, best practices, and client service."

10.     Similar to the marketing rhetoric on Pahl's firm bio, Foley holds itself out to the public as "TOUGH ADVOCATES. TRUSTED ADVISORS."

11.     Speaking on behalf of the firm, J. Scott Wood, Managing Partner of Foley's Seattle office, boasts that Foley's "clients expect responsive, cost-effective and vigorous representation – we listen, we engage, and we work hard every day to earn the right to serve them."

12.     Thus, as it relates to client service and the handling of cases, Defendants hold themselves out as aggressive lawyers who listen to their clients' needs and follow best practices to handle cases in a competent, responsive and cost-effective manner. Yet as will become clear in this Complaint, Defendants did not follow best practices in handling Everest's cases, fallowing woefully below the standard of care and proximately caused Everest millions in damages.

3

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

## DEFENDANTS' DUTIES TO THEIR CLIENT

13.     Under Rule 1.1 of the Minnesota Rules of Professional Conduct, an attorney has a duty to provide competent representation to his client. This duty includes, among other things, inquiry into and analysis of the factual and legal elements of the claims in a case.

14.     Under Rule 1.2(a) of the Minnesota Rules of Professional Conduct, "a lawyer shall abide by a client's decisions concerning the objectives of representation and as required by Rule 1.4, shall consult with the client as to the means by which they are to be pursued. A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation.

15.     Rule 1.3 of the Minnesota Rules of Professional Conduct requires an attorney to "act with reasonable diligence and promptness in representing a client." As the Comment to Rule 1.3 notes, "A lawyer should pursue a matter on behalf of a client despite opposition, obstruction, or personal inconvenience to the lawyer, and take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor. A lawyer must also act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf." In addition to acting with reasonable diligence and promptness, "A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client." *See* Rule 3.2 of the Minnesota Rules of Professional Conduct.

16.     Rule 1.4 of the Minnesota Rules of Professional Conduct requires an attorney to "reasonably consult with the client about the means by which the client's objectives are to be accomplished...keep the client reasonably informed about the status of the matter...[and] shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

17.     Under Rule 2.1 of the Minnesota Rules of Professional Conduct, a lawyer is

4

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

required to render candid, straightforward advice to a client, expressing the lawyer's honest assessment of the case and may do so in whichever form honesty permits.

18.     Further, a lawyer has a duty to "inform themselves about the facts of their clients' cases and the applicable law and determine that they can make good faith arguments in support of their clients' positions." *See* Comment to Rule 3.1.

19.     Against this ethical backdrop, Defendants undertook litigation on behalf of Everest that was not handled in conformity with the foregoing duties to their client.

**Everest Hires Defendants as Lead Counsel in its Equine Litigation**

20.     In the summer of 2009, Defendants began representing Everest as co-counsel in connection with certain lawsuits, including: (a) the lawsuit against Crestwood Farm Bloodstock and Pope McLean Sr. ("McLean Sr.") pending in the U.S. District Court for Eastern District of Kentucky, Case Nos. 5:09-cv-00317 and 5:10-cv-00072 (the "Crestwood Litigation");[1] and (b) the lawsuit against Julio Canani and others which was pending in the U.S. District Court for the Central District of California, Case No. 2:09-cv-09446 (the "Canani Litigation").[2] After orally agreeing at the outset of the representation, the parties eventually memorialized the agreed upon terms of their attorney-client relationship on or about May 31, 2011, when Foley and Everest entered into a contingent fee agreement (the "Fee Agreement"). A true and correct copy of the Fee Agreement is attached hereto as Exhibit A and incorporated herein.

21.     Pursuant to their initial agreement and the Fee Agreement, Defendants agreed to act as lead counsel for Everest in the Crestwood litigation.

---

[1] Everest initiated the Crestwood Litigation in the U.S. District Court for the District of Minnesota. Shortly after Everest filed in federal court in Minnesota, Crestwood filed in the Eastern District of Kentucky. After dueling motions to dismiss were filed in each of the district courts, the Minnesota case was later transferred to the Eastern District of Kentucky where the cases were thereafter consolidated.

[2] The Canani Litigation will be discussed later in this Complaint.

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

22.    Initially, Dorsey & Whitney ("Dorsey") and George Eck ("Eck"), a partner at Dorsey, represented Everest.  However, Pahl persistently solicited Everest to replace Eck as lead counsel for the case in place of Eck by luring Everest with a contingency arrangement that would allow Defendants to secure one-third [3]of Everest's multi-million dollar recovery.  In his effort to divert the retention from Dorsey, Pahl boasted that Eck was an old school "belt and suspenders attorney" and that was not what was needed for the complicated cases Pahl sought to obtain from Everest.  The irony of Pahl's overconfident statements would come back to haunt Everest because it lost all of its claims in the Crestwood Litigation and received a woefully inadequate jury verdict in the Canani Litigation through Pahl's beltless and suspenderless representation.

23.    Ordinarily, Defendants do not handle cases on a contingent fee basis, rather, they normally handle cases on an hourly basis.  However, in the Crestwood Litigation, Defendants were proponents of the contingent fee arrangement because they expected a huge return due to the extensive 7-figure damages Everest claimed against Crestwood.

24.    Prior to Pahl's offer to Everest to handle the Crestwood Litigation on a contingent fee basis, Foley required Pahl to obtain firm consent to this alternative fee arrangement.  Thus, in mid-2009, Pahl represented to his partners at Foley that the firm should take the Crestwood Litigation on a contingent fee basis because the case was worth millions and was a good investment risk.  Based on Pahl's assurances that the Crestwood Litigation would be successful and result in a huge return for the firm, Foley agreed to allow Pahl to handle the case on a contingency.

25.    The Fee Agreement consisted of a contingency arrangement whereby Foley would receive 25% of any recovery via settlement 30 days before the Trial Date (as that term is defined therein).  After 30 days before the Trial Date, the contingent fee increased to $33^{1/3}$% of any

---

[3] Or 25% of any recovery via settlement 30 days before the trial date. *See* ¶ 25 *infra.*

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

recovery. The Fee Agreement also provided that Everest would receive a credit for legal work performed by Eck, and Kentucky attorneys and local counsel William Rambicure ("Rambicure") and Richard Clay. In addition, if the matter was settled at least 30 days before the Trial Date, Everest had the option of converting the fee arrangement to hourly. So that Everest could evaluate whether to convert the contingent arrangement to hourly billing, Foley was required to send monthly billing statements for the time and costs incurred.

26.    Despite repeated requests from Nielsen to Pahl, Pahl and Foley breached the Fee Agreement by rarely sending the monthly statements to Nielsen as required by its terms. When Pahl and Foley actually did send the statements to Nielsen (after repeated requests), they were grossly inflated with numerous timekeepers billing dozens of hours to the file, many of whom Nielsen was unfamiliar with or why they were involved in his cases. Thus, Pahl fraudulently induced Everest into a fee contract with terms and conditions that he had no intention of abiding by and put his self-interest ahead of Everest.

### Background of the Crestwood Litigation

27.    On September 9, 2009, Everest commenced the Crestwood Litigation against Pope McLean Sr. ("McLean Sr.") and his company, Crestwood Farm Bloodstock LLC ("Crestwood") in Federal Court in Minnesota.

28.    Crestwood operates a thoroughbred horse farm in Central Kentucky. The relationship between Everest and Crestwood began in 1993 when Everest began boarding its horses at Crestwood. Crestwood's services and duties included boarding and caring for horses, breeding horse, buying and selling horses, consigning horses to public auction and marketing horses for sale. Crestwood's services also included promoting, negotiating, buying and selling contracts and financial interests on behalf of Everest.

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

29.     Over the years, Crestwood was rewarded for its services with increased revenues from Everest.  As Everest's trust in Crestwood grew, so did the number of horses that Everest boarded with Crestwood.  For example, by 2004, Everest had 167 thoroughbred horses boarded at Crestwood; in 2005, 190; in 2006, 179; in 2007, 207; and in 2008, Everest had 172 thoroughbreds boarded at Crestwood and in Crestwood's care, custody and control.  Over a 15-year period, Crestwood earned approximately $10,000,000 in fees from Everest.  Indeed, in some years, Everest provided Crestwood with 75% of its total revenue.

30.     In late 2008, Nielsen decided to commence an orderly reduction of Everest's horse business (the "Reduction").  Nielsen intended that the Reduction be performed in a manner that would protect and maximize the value of Everest's assets in the process.  Everest chose Crestwood to manage and act as its agent consistent with the 2005 agreement of McLean Sr. and Mark McLean to act as such.

31.     The Reduction involved over 145 horses, including extremely valuable horses like "ISLAND FASHION" and other notable horses.  The process of selling this large number of horses was new for Crestwood and Everest and it contemplated Everest transferring to Crestwood title of the majority of the horses that Crestwood boarded for Everest.  This involved millions of dollars in equine assets and Everest had to place a tremendous amount of trust in Crestwood. Accordingly, Everest believed that a written agreement was necessary to memorialize the duties and obligations between Everest and Crestwood in executing the Reduction.

32.     Nielsen engaged the services of Rambicure, a Kentucky lawyer, who had represented Everest on several prior occasions.  Based on earlier conversations, Rambicure often spoke of his extensive legal experience and expertise in the equine field.

33.     Crestwood and Everest ultimately negotiated and entered into a Purchase and Sale

8

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

Agreement dated November 4, 2008 (the "Agreement"). A true and correct copy of the Agreement is attached hereto as Exhibit B and incorporated herein. The business terms of the Agreement included a transfer of title for nearly all of Everest's horses to Crestwood. According to the details set out in the Agreement, Crestwood would sell the horses by various methods (such as public auction), provide a portion of the proceeds to Everest, and retain a commission.

34.     The trust implicit in transferring ownership of Everest's horses to Crestwood and execution of the Reduction made it necessary to memorialize the agency and fiduciary relationship duties owed by Crestwood to Everest under the Agreement. As such, Everest needed it to be clear that Crestwood would need to act in the utmost good faith and loyalty and in Everest's best interests – hallmarks of a fiduciary relationship. Everest required Crestwood to cooperate with Everest to adjust strategies, remove certain horses from sales, and set reserves on certain horses to protect and maximize their values. Everest relied on Rambicure to prepare the Agreement consistent with its goal to ensure that an agency and fiduciary relationship was established. Rambicure understood that his job in drafting the Agreement was "to protect [his] client from somebody taking advantage of them." (Rambicure Deposition, July 7, 2011, Exhibit C hereto, 41:5-6.)

35.     Thus, the language Rambicure drafted to provide for the agency and fiduciary relationship between Everest and Crestwood is set forth in section 7 of the Agreement, which states in pertinent part:

> **CRESTWOOD'S DUTIES AND RESPONSIBILITIES:**
> Crestwood shall exercise all commercially reasonable efforts, with the utmost good faith, for and on behalf of both Crestwood and Everest, to properly prepare the Subject Horses for sale, and to market, offer for sale and to sell the Subject Horses, either at public auction or in private sales, in order to maximize the sales prices for each such horse.

9

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

36.     Rambicure drafted this provision with full knowledge of Everest's objectives and requirements. In fact, when asked about the words "utmost good faith," Rambicure would later testify in the Crestwood Litigation (under oath):

> Q.     And what were you intending to convey by the use of those words in this paragraph?
>
> A.     Well, "utmost good faith," I mean, that's pretty standard fiduciary kind of language. At least, in my mind, we wanted to ensure that Crestwood was acting at all times as a fiduciary to Everest, with – with the idea of getting these horses prepared, marketed, and sold in order to maximize the sales price.
>
>     ***And that was at least the driving part of this, was we wanted the fiduciary duties to be inherent – not only inherent, but stated in this agreement.***

(See Exhibit C hereto, 50:4-13 (emphasis added).)

37.     Things drastically changed between Everest and Crestwood after the Agreement was executed. Crestwood had a much different interpretation of the Agreement and no longer believed that it was bound by a fiduciary or agency relationship. Crestwood immediately began engaging in behavior inconsistent with a fiduciary or agency relationship or anything remotely similar to Crestwood's previous conduct with Everest.

38.     In the weeks leading up to the January 2009 Keeneland sale, Crestwood refused to cooperate and assist Everest in setting dollar reserves to protect ISLAND FASHION, one of Everest's most prized thoroughbreds,[4] and the other horses, so that those horses would not be sold for a fraction of their value during the disastrous economic downturn that occurred shortly after the Agreement was signed.

---

[4] Island Fashion was the most high-profile and successful of the hundreds of horses Everest owned in its 30 years in the thoroughbred business. The horse made over $2 million on the race track.

10

27-CV-18-8745

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

39.     Crestwood kept Everest at bay for weeks. Then, on the morning of the sale, Crestwood threatened that if Everest chose to protect itself by setting reserves on its horses, Everest would have to pay Crestwood hundreds of thousands of dollars in commissions, if RNAs resulted, even though there would be no sale proceeds to Everest.  See Exhibits D and E attached hereto.

40.     During the January 2009 public auction, Everest vehemently objected to Crestwood's conduct. Crestwood ignored these objections.  In fact, McLean Sr. advised Nielsen that the Agreement allowed Crestwood the exclusive right to determine what was commercially reasonable and what was not and that Everest Stables was now Crestwood's property.  As just one example, over Everest's objections, Crestwood allowed ISLAND FASHION to sell for just $950,000 – a price that Crestwood knew was woefully low.[5]

41.     To underscore the millions of dollars that this sale cost Everest, ISLAND FASHION's foal sold just a few months later for over $600,000.  The buyer of this acclaimed horse announced to the media after its sale that he bid on ISLAND FASHION when he realized that he might be able to buy it for "not very much money."[6]

42.     Thus, it quickly became apparent to Everest that, while it was attempting to strategize, protect, and maximize the value of its horses, Crestwood never had any intention to cooperate, assist, or be an agent for Everest (as discovery later confirmed). Crestwood, relying on its interpretation of the Agreement, felt empowered to grab as much money as it could get from

---

[5] Just weeks before the execution of the Agreement, McLean Sr. had estimated in writing that ISLAND FASHION was worth between $3 million and $5 million. ISLAND FASHION was also insured for $2 million. In fact, Crestwood had previously demanded that the Agreement allow it to be named as an additional insured on Everest's policy.
[6] Discovery later revealed emails between Crestwood personnel joking about the low purchase price the buyer had been able to attain.

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

Everest's assets as quickly as possible while providing no protection or assistance to Everest

whatsoever. For example:

- Crestwood refused to properly market and prepare certain groups of horses claiming that dozens of Everest horses were culls and not worthy of Crestwood's efforts for normal sales preparation or training.

- Crestwood refused to name, break, train, prepare horses for sale or do anything else to maximize a horse's sale value even though such behavior was contrary to Everest's past course of conduct, industry standards, and common sense.

- Crestwood disregarded Everest's demands for necessary veterinary care and treatment, contrary to Everest's prior practice.

- Crestwood loaded and transported an infirm and distressed horse out-of-state resulting in its death.

- Despite Everest's objections, Crestwood put up horses for public auction even though they had deformities, health problems, visible swelling, and scars from recent surgery.

- Crestwood completely disregarded Everest's requests and demands and dumped Everest's horses to friends, partners, and the public at prices that benefited those parties and damaged Everest.

- Crestwood recommended and urged Everest to sell certain horses to their friends and partners at a fraction of their values.

- Crestwood was even able to claim that the Agreement suspended the agency and fiduciary obligations set out in previous contracts between Crestwood and Everest as well as similar duties contemplated by the Keeneland Sales Company by-laws to which both parties had historically adhered.

- Crestwood announced to its friends, partners, and the public that Everest would not be placing reserves and protecting its horses at public auction. This announcement completely ignored Everest's express instructions to the

27-CV-18-8745

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

> contrary and created the inference that Everest was
> conducting a "fire sale."

- Crestwood failed to give Everest notice of interest
  expressed or offers received from third parties regarding
  certain horses

- Crestwood allowed horses to be sold to friends at auctions
  that had privately offered dollar amounts in excess of the
  price that these friends then paid for the horses at public
  auctions and did so without any protective measures to
  secure at least the price offered privately demonstrating
  how Crestwood worked to curry favors with friends and
  clients at Everest's expense

- Crestwood threatened that Crestwood and its cohorts would
  conspire to ruin Everest's reputation if Everest challenged
  Crestwood's assertion that it was *not* Everest's fiduciary
  agent.

Crestwood's actions described above cost Everest millions of dollars in damages.

43.    Crestwood's improper conduct in executing the Reduction continued to cost

Everest millions. In September 2009, Crestwood put the STORM CAT/ISLAND FASHION

filly[7] (the "STORM CAT filly") up for auction. This time Everest sent a separate agent (in

addition to Crestwood) to the auction, in order to prevent Crestwood from selling the filly too

cheaply given that Crestwood had publicly marketed the Everest horses with no protection in the

depths of the worst financial crisis since the Great Depression.

44.    Crestwood had by now made it crystal clear to Everest that if it RNA'd[8] this horse

to protect its value, Crestwood would again claim its right to earn a large commission while

providing no proceeds to Everest. Relying on the advice of Foley's local counsel, Rambicure,

Everest set a reserve of $1.5 million live money, meaning Everest would provide the last bid until

---

[7] Like ISLAND FASHION, Everest retained title to the STORM CAT/ISLAND FASHION filly (now known as
CHASE THE STORM).
[8] Reserve not attained.

13

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

the live bid reached $1.5 million. The last live bid was $875,000 resulting "in no sale" yielding Everest no proceeds.

45.    Crestwood contended that Everest's conduct in setting a reserve to nullify the sale of the STORM CAT filly was a breach of the Agreement that deprived Crestwood of the 25% commission it would have earned on the net proceeds from the sale of the horse. In order to offset its ostensible lost commission, Crestwood retained $219,513.89 of the sales proceeds that were owed to Everest from other horses sold under the Agreement.

46.    Consequently, on September 9, 2009, Everest filed suit against Crestwood and McLean Sr. in the U.S. District Court for the District of Minnesota, Case No. 09-2436-MJD-JSM (the "Minnesota Action"). Everest brought multiple claims against Crestwood including breach of contract, breach of fiduciary duty, fraud, and unjust enrichment. Each cause of action arose from the conduct described above relating to the Reduction and the Agreement, as well as with respect to Crestwood's management of the stallion PETIONVILLE, which Everest owned and boarded at Crestwood from 1997 to 2009.

47.    As stated earlier, Crestwood filed suit against Everest in the Eastern District of Kentucky shortly after the Everest filed the Minnesota Action. Crestwood was successful in obtaining an order transferring the Minnesota Action to the Eastern District of Kentucky. Getting the Crestwood Litigation transferred to its hometown of Lexington, Kentucky, emboldened Crestwood because it believed it had a distinct hometown advantage against Everest, an out-of-state owner. Brazenly, Crestwood even sent one of its attorneys to Rambicure's office on October 4, 2009, to threaten that if Everest continued with its lawsuit, Crestwood would assemble several prominent individuals in horse racing to ruin the reputation of Everest and Nielsen in the industry. *See* Exhibit F, attached hereto and incorporated herein.

14

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

48.    Notwithstanding Crestwood's threats, Everest proceeded with the Crestwood Litigation. As a result, Crestwood made good on its threats by producing several witnesses whom demeaned Everest and its stallion PETIONVILLE, distorted statistics, and lied about their actual contacts and communications with Nielsen and his consultant, Tim Nelson.

49.    Everest's claims for fraud and breach of an implied contract regarding PETIONVILLE were based on the circumstances surrounding Everest's rejection of an offer from a third party, Taylor Made Farm, to purchase PETIONVILLE for $6.5 million. Nielsen explained to McLean Sr. that he was interested in selling PETIONVILLE and dozens of other horses because he was embroiled in a major condemnation action wherein the government intended to seize a major family asset through fraudulent means. Nielsen's battle would be so intense and prolonged he needed to weigh his future involvement in the horse business versus his focus on the government attack. The decision to reject the offer was based upon fraudulent advice from McLean Sr. advising Everest not to sell the horse.

50.    Everest alleged that McLean Sr. discouraged Everest from accepting the offer because $6.5 million was an insufficient price and that PETIONVILLE was positioned to increase in value. McLean Sr. pressured Everest not to sell PETIONVILLE and promised that Crestwood would concentrate its efforts to elevate PETIONVILLE'S value beyond what Taylor Made Farm had offered. Based upon McLean Sr.'s representations, Everest declined the $6.5 million offer.

51.    Everest also asserted that Crestwood breached an oral agreement to work hard to increase PETIONVILLE's value and that Crestwood had instead intentionally destroyed the value of PETIONVILLE to prevent Everest from selling the stallion and hundreds of other Everest horses.

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

52.    Pahl attempted to obtain a preliminary injunction[9] representing to Everest that Everest had the legal right to move for a preliminary injunction in order to retrieve the $219,513.89, when he knew that the motion had no chance of successfully enjoining Crestwood from retaining the $219,513.89 that it believed it was owed over the non-sale of the STORM CAT filly. This fraudulent act was futile, unsuccessful, and caused Everest costs and expenses coupled with false reliance on legal strategies which misdirected the case's progress and contributed to Pahl's evolving strategy of abandoning obvious and necessary legal actions and putting his own financial interests above Everests.

53.    After losing the preliminary injunction, Crestwood and Everest engaged in extensive discovery that took approximately one year to complete. Thereafter, on August 1, 2011, the parties each filed competing motions for summary judgment.

54.    Crestwood's motion for summary judgment sought a dismissal of all of Everest's claims and a judgment for the $219,513.89 being withheld from Everest. Crestwood's motion also sought attorney's fees and costs pursuant to the Agreement.

55.    Crestwood's summary judgment motion was based on several arguments including: (a) Everest's claim for breach of express and implied covenants of good faith and fair dealing does not exist under Kentucky law except in the insurance context; (b) Everest does not have any evidence that an alleged breach by Crestwood actually damaged Everest by decreasing PETIONVILLE's value and that, to the extent PETIONVILLE's value was diminished, it was caused by factors beyond Crestwood's control;[10] (c) there is no evidence that Crestwood breached

---

[9] This procedural error was destined to fail for two basic reasons: (a) Everest would never have been able to show irreparable harm because it was seeking sales proceeds that Crestwood withheld in the amount of $219,513.89 thereby demonstrating that there was an adequate remedy at law – money; and (b) because injunctive relief is designed to preserve the status quo, which at the time meant Crestwood was holding the money, an order directing Crestwood to turnover $219,513.89 would completely change the status quo. Defendants' motion was really a motion for prejudgment attachment disguised as a motion for preliminary injunction.

[10] This theory was based upon two expert reports that Crestwood tendered with its summary judgment motion.

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

the Agreement; (d) Crestwood complied with its contractual obligations under the Agreement to sell the subject horses at public or private sale without reserve; (e) based upon its expert reports, Crestwood acted consistent with industry standards and in a commercially reasonable manner; (d) the PETIONVILLE fraud claim fails because there was no evidence that McLean Sr. knew his alleged representation were false, thereby rendering it an unenforceable promise about a future event; (e) Everest cannot prove damages regarding PETIONVILLE because it submitted no evidence of its horse's value; and (f) Crestwood did not owe a fiduciary duty to Everest – the duties were defined by the Agreement.

56.    Pahl filed Everest's brief in opposition to Crestwood's motion for summary judgment on August 23, 2011.  In the opposition brief, Pahl attempted to rebut Crestwood's motion for summary judgment and create genuine issues of material fact for trial, but there were many glaring deficiencies and material negligent acts that would ultimately prove fatal to Everest's claims.    For example, Pahl did not provide any evidence of damages for PETIONVILLE'S alleged diminished value or damages related to an alleged breach of the Agreement despite the retention of an expert equine appraiser, an owner (Nielsen) with over 30 years of buying and selling thoroughbred horses, and having an insurance valuation on PETIONVILLE.

57.    Pahl also did not retain or provide any third party expert testimony or expert testimony from Nielsen to rebut the opinions of Crestwood's experts that PETIONVILLE'S value was hampered by factors outside Crestwood's control.  Further, Pahl did not rebut the experts' opinions that Crestwood conducted the sales of the subject horses consistent with industry standards and consequently acted in a commercially reasonable manner.

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

58.    In opposing Crestwood's summary judgment motion, Pahl also continued to advance the flawed argument that the Agreement created a fiduciary and agency relationship between Crestwood and Everest with respect to the Reduction. Pahl asserted that the language in Section 7 of the Agreement demonstrated the existence of Crestwood's fiduciary duties to Everest. Pahl argued that the terms acting "with utmost good faith" to "maximize the sales price for the Subject Horses for the mutual benefit" of the parties created "heightened duties and obligations" supporting "the conclusion, certainly the inference, in favor of fiduciary duties." Pahl's arguments were inconsistent with black letter Kentucky law and were destined to fail. Language that requires one party to act for the mutual benefit of itself and the other party does not create a fiduciary obligation. Rather than conducting proper legal research and understanding Kentucky law from the outset of the case, Defendants foolishly relied on the incorrect opinion of Rambicure, their local Kentucky counsel. Had Defendants performed basic legal research, Defendants would have known at the outset of the case that a fiduciary relationship involves an undertaking by one party to act primarily for the benefit of another. *See Crestwood Farm Bloodstock v. Everest Stables, Inc.*, 751 F.3d 434, 442 (6th Cir. 2014). As drafted, Section 7 of the Agreement did nothing to create a fiduciary relationship between Crestwood and Everest. Pahl's failure to research and understand Kentucky agency and fiduciary law had a detrimental impact on the strategy and handling of the Crestwood Litigation.

59.    Another negligent act that Pahl made at the time he opposed Crestwood's summary judgment motion was the introduction of several new "additional facts" that, in Pahl's opinion, would cause the District Court to deny summary judgment. Pahl learned these "additional facts" in discovery and he should have timely asserted these "additional facts" and the claims based thereon in an amended complaint. The "additional facts" were related to: (a)

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

STORM BOOT a horse that that Crestwood managed and both Everest and Crestwood each owned fractional shares pursuant to a syndication agreement; (b) a horse named DIXIELAND HEAT, another horse in the care of Crestwood that Everest owned shares of; (c) the 2007 MAIN SQUEEZE colt, where McLean Sr. lied to Nielsen about the horse's physical condition in order to get Everest to sell the horse for $1,000 to a third party that partnered with McLean Sr.'s sons to buy the horse and then flip it for $15,000; (d) a veterinarian kickback scheme; (e) a credit card scheme to earn credit card points that should have gone to Everest or Nielsen; and (f) Crestwood's settlement of potential legal claims with a third party horse buyer involving free PETIONVILLE seasons without Everest's knowledge or consent.

60.    Although Pahl raised these "additional facts" in Everest's opposition to Crestwood's Motion for Summary Judgment, he failed to plead them as additional claims in the Third Amended Complaint. Pahl also did not move for leave to amend the complaint to assert new claims based on these "additional facts" within a reasonable time once he became aware of them. Not surprisingly, Crestwood pointed out in its reply memorandum that the "additional facts" were irrelevant because they were not plead in Everest's Third Amended Complaint.[11] Even after Crestwood highlighted Pahl's failure to plead these "additional facts" in Everest's Third Amended Complaint, Pahl did nothing to bring these claims before the Court in a timely manner.

61.    Crestwood's summary judgment motion also challenged Everest on the $6,500,000 fraud claim regarding PETIONVILLE, which was Everest's largest claim. Crestwood noted that, among other things, there was no evidence that, at the time he made them, McLean Sr. knew that

---

[11] The District Court later agreed with Crestwood's position when it denied Pahl's untimely motion for leave to file a Fourth Amended Complaint.

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

the promises which led Everest to decline Taylor Made Farm's offer were false or that he had no intention of performing them.

62.    In response, Pahl asserted that Crestwood had taken on $1.3 million in additional debt to acquire 400+ acres of land in August 2004, just months before Nielsen advised McLean Sr. of the 2005 Taylor Made Farms offer that led Everest to consider selling PETIONVILLE. Other than producing a mortgage securing the real estate loan, Pahl did not produce any lending documents that would have exposed Crestwood's motive for persuading Everest not to sell PETIONVILLE. Pahl failed to diligently pursue any lending documents or accounting records to support this $6.5M claim. Pahl also failed to take key depositions of Crestwood's bankers/loan officers and accountant in order to prove Everest's claims.

63.    Nonetheless, near the close of discovery, McLean Sr. gave a second deposition in the Crestwood Litigation where he inadvertently divulged that Crestwood had pledged some of the horses that were subject to the Agreement as collateral for a $300,000 bridge loan illuminating Crestwood's dire cash condition. On September 6, 2011, after learning this, Nielsen emailed Pahl the following:

> Tom,
>
> I now believe that the loan documents and appraisal are very important and Crestwood believes they can not [sic] afford to let us see them.
>
> I suggest the following:
>
> 1.    Chris can do a UCC search with the Secretary of State which would have lien/collateral information.
> 2.    File a motion to enforce subpoena.
> 3.    Demand that the branch facility Crestwood utilized be directly searched as opposed to the out-of-state home office.
> 4.    Tell P&C [sic] that our next step would be to contact a bank examiner and file a motion for contempt.

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

Jeff

A true and accurate copy of the foregoing email is attached hereto as <u>Exhibit G</u> and incorporated herein.

64.    Later that same day, after Pahl refused Nielsen's request, Nielsen contacted Rambicure and asked him to run a UCC search to see what information could be obtained regarding the Crestwood loan. Rambicure's son and associate attorney, Chris Rambicure, located a May 24, 2004, UCC Financing Statement (the "UCC") showing that McLean Sr. pledged 100% of PETIONVILLE, DIXIELAND HEAT, THE NAME'S JIMMY and EXPLICIT to National City Bank of Kentucky ("National City") as collateral for a loan. A true and accurate copy of the UCC is attached hereto as <u>Exhibit H</u> and incorporated herein. McLean Sr. had no any ownership interest in PETIONVILLE and he did not own 100% of the other horses listed in the UCC, despite his contrary representations to National City and the public in the UCC.

65.    Despite Nielsen's September 6, 2011, request, Pahl ignored the UCC and did nothing to follow up on obtaining any loan documents from National City. As a result, Nielsen followed up with Pahl on September 29, 2011, to urge him to pursue the loan documents related to the UCC and engage Rambicure to contact National City at the branch level and secure the loan documents related to McLean Sr. and/or Crestwood. Rambicure had informed Nielsen that he had a prior experience with National City where it had given him difficulties in obtaining a loan file. Nielsen made it clear to Pahl, "This is critical evidence for me, and critical to have for trial." A true and accurate copy of Nielsen's September 29, 2011, email to Pahl is attached hereto as <u>Exhibit I</u> and incorporated herein.

66.    Nielsen was correct. At the time Chris Rambicure discovered the UCC, Crestwood and Everest were still in the midst of summary judgment motion practice. The UCC

27-CV-18-8745

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

and the loan documents from National City were critical evidence for opposing Crestwood's summary judgment motion as it galvanized Everest's $6.5M fraud claim by providing the motive for McLean Sr. to lie to Nielsen, conceal the bank fraud and pledging of collateral McLean Sr. did not own, and discourage Everest from selling PETIONVILLE. Based on the UCC, McLean Sr. had to lie to Nielsen in order to conceal obvious bank fraud, possible criminal charges, additional claims from Everest such as conversion and fraud by omission, and imminent insolvency when Everest moved its entire stock of horses and the public learned of McLean Sr. fraudulently pledging his customer's property.

67.    Pahl did nothing with this critical evidence despite Nielsen's repeated requests. Instead, Pahl fraudulently represented to Everest that it was too late to introduce this critical document when he knew it was not. He should have immediately brought the UCC to the court's attention by moving for leave to file a fourth amended complaint to assert new claims and a motion for leave to supplement Everest's memorandum in opposition to Crestwood's summary judgment motion. Further, Pahl should have utilized this UCC as a basis to re-open discovery so that Crestwood and the McLeans could be deposed on the UCC, any loan documents related thereto and on the issue of wrongfully pledging PETIONVILLE and other horses as collateral for loans. Had Pahl moved to re-open discovery, the District Court would have allowed it because Pahl would have exposed Crestwood's obvious bank fraud, conversion of Everest's equine assets, and the motive that would have supported a successful fraudulent concealment claim against Crestwood. Instead, Pahl willfully ignored his client's instructions, knowingly misrepresented that it was too late to introduce the UCC, failed to pursue critical discovery such as loan officer depositions and appraisers that valued Everest's horses that Crestwood wrongfully pledged as collateral, all of which caused Everest millions in damages.

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

68.     If there was ever a "smoking gun" in the Crestwood Litigation, the UCC was it and Pahl inexplicably did nothing with it.  Pahl knowingly misrepresented to Everest that he had completed all discovery, including expert reports, and that he did not need to do any further discovery.  He boasted that "he was going to defeat Crestwood, and was ready to try the case in two weeks."  In reality, however, Pahl knew that his statements to Everest and Nielsen were false and that more discovery was needed to prosecute the case against Crestwood despite misleading Everest into believing that the case was on solid ground and ready for trial.  Everest believes and therefore avers that that Pahl did not want to put anymore time into the Crestwood Litigation due to pressure from his firm on the mounting internal litigation costs resulting from the massive amounts of hours by timekeepers in the firm without any prospects of settlement that would bring immediate cash into the firm.  As the Defendants approached the end of their fiscal year in 2011, Everest believes and therefore avers that Pahl shifted his attention away from the Crestwood Litigation because it was not generating cash and instead focused his efforts on hourly clients that would improve his cash collections to the detriment of Everest's case against Crestwood.

69.     Reluctantly, at Everest's insistence, Pahl begrudgingly tried a mock jury trial in November of 2011.  At the mock jury trial, Pahl presented Everest's claims against Crestwood, including those claims that were based on the "additional facts" described in Everest's opposition to Crestwood's motion for summary judgment, even though Pahl had not moved for leave to add those additional claims to Everest's complaint.  By presenting these claims and additional facts at the mock trial, Pahl mislead Everest into believing these claims were viable and before the Court and were worth over $700,000 in damages.[12]  Pahl also used the services of a cheaper, inexperienced associate attorney in his office to present the defense case which made the defense

---

[12] These damages were in addition to the Petitionville damages of $6.5 million and the November 4 Agreement damages in the amount of $2.9 million.  In all, Pahl presented a damages case to the mock jury in excess of $9 million.

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

case appear much weaker to the mock jury. This inexperienced associate attorney, while cheaper than a seasoned litigator, was visibly nervous and unprepared to present the defense case. As such, the mock jury results were flawed, unreliable and Pahl erred by failing to advise Everest of such. In addition, Pahl never presented the UCC to the mock jury to determine its reaction to McLean Sr.'s obvious bank fraud and conversion of Everest's equine assets, which was extremely negligent. Pahl's handling of the mock jury process rendered it a waste of time and Everest's money.

70.    On March 30, 2012, the District Court granted summary judgment in favor of Crestwood and McLean Sr. and denied Everest's cross-motion for partial summary judgment. All claims that Everest asserted in the Crestwood Litigation were dismissed with prejudice.

71.    In its decision, the District Court held that Everest's claims were not supported by expert testimony or other evidence. For example, with respect to its claim for breach of the Agreement, the District Court criticized Everest for alleging that Crestwood breached the Agreement by selling horses to affiliated parties, but provided no legal analysis or evidence of damages. Everest provided no evidence as to what types of marketing and sales efforts are typical for the thoroughbred industry. As a result, the breach of contract claim based upon allegations of selling horses to affiliated parties failed. However, the evidence could have been obtained, but Pahl failed to obtain it. For example, despite Nielsen's repeated requests, Pahl never deposed Don Ackel the insider and Crestwood partner, that acquired 23 Everest horses for a mere $20,000 (including three for free).

72.    The District Court also held that Everest's claims under the Agreement alleging that Crestwood failed to sell horses in a commercially reasonable manner also failed because Everest failed to present expert testimony or other evidence demonstrating what Crestwood and

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

McLean Sr. did wrong and how their actions departed from industry norms or commercially reasonable practices. In addition, Everest's allegations of not using commercially reasonable efforts failed because Everest failed to provide any legal analysis supporting its commercially reasonable assertions.

73.    Defendants' legal analysis and discussion section in its opposition memo to Crestwood's motion for summary judgment failed to cite to specific evidence to support its claim that Crestwood breached the Agreement. While the District Court may have "pieced together Everest's various factual allegations and considered whether the claims survive summary judgment," Pahl should have presented specific evidence rebutting Crestwood's motion for summary judgment, not require the Court to piece together Everest's factual assertions. Ultimately, Pahl failed to make the showing required under FED. R. CIV. P.56, negligently leaving Everest to rely upon the District Court to save Everest's case from summary judgment.

74.    But the District Court provided no refuge from Pahl's negligent legal work. For example, the District Court found that Everest provided no evidence regarding what types of marketing and sales efforts are normal for the Reduction that Everest entrusted Crestwood to perform. No evidence was offered as to how Everest might have improved the sale prices of its horses. This was yet another failure to provide proper expert testimony, such as from a stallion manager, necessary to controvert the testimony that Crestwood's experts provided to demonstrate that Crestwood acted in a commercially reasonable manner. Everest put forth no rebuttal testimony or any other evidence to show that Crestwood's actions were not commercially reasonable.

75.    The expert testimony that Pahl did submit was criticized by the District Court as "preliminary" and because it only provided that a certain group of horses were worth $100,000 as

27-CV-18-8745

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

opposed to evidence that Crestwood failed to use commercially reasonable means to sell this group of horses. Pahl also failed to introduce evidence showing how Crestwood could have improved the value of all the horses it sold such as expert testimony that it is standard in the industry to name, train, break and otherwise prepare two-year old horses for sale to maximize their value.

76.    After two years of litigation with extensive discovery taken, and faced with a summary judgment motion wherein Crestwood sought a dismissal of all of Everest's multi-million dollar claims, the District Court's opinion exposed Pahl for failing to produce any evidence that Crestwood did anything wrong or improper in the sale of Everest's horses, despite having ample opportunity to do so

77.    The District Court also found that Everest's opposition to Crestwood's summary judgment motion was also unavailing with respect to the PETIONVILLE claim. Pahl offered nothing more than Nielsen's statement that Crestwood took no efforts to market PETIONVILLE seasons after February 2005. But the District Court pointed out that it had no evidence as to the efforts made prior to February 2005 or any expert testimony or other evidence as to what is effective and commercially reasonable marketing or how Crestwood's actions regarding PETIONVILLE departed from industry norms. The District Court also held that Everest produced no evidence indicating definite and certain terms to support breach of express contract claim.

78.    The District Court also exposed the negligent way in which Pahl presented Everest's breach of implied contract claim regarding PETIONVILLE. The Court held that Everest's claim was "impermissibly vague" because Everest had neither defined the "next level" nor identified what Crestwood could or should have done to take PETIONVILLE there. Indeed

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

the District Court combed the record and found no allegations that Crestwood breached the implied management agreement other than allegations that it failed to effectively market and sell PETIONVILLE seasons. But, no evidence was offered to show prior sales efforts or third-party evidence regarding proper marketing or lack thereof, Everest's complaints to Crestwood regarding improper marketing, and no evidence of effective marketing or industry norms regarding marketing.

79.    The District Court also held that Everest failed to support its fraud claim based on the allegation that Crestwood "had no intentions of performing on [its] promise [that] Crestwood would increase their efforts to sell third-party seasons for PETIONVILLE" with any evidence that Crestwood had no intentions of performing on its promise, or any evidence that Crestwood did not perform on its promise.  The Court noted that a claim for fraud may be based upon the nonperformance of a promise, if the promise is made for the purposes of accomplishing deceit. *See Evola Realty Co. v. Westerfield*, 251 S.W.2d 298, 300-01 (Ky. 1952).  But, Pahl did not present any evidence demonstrating Crestwood made the promise to accomplish deceit, even though he had compelling evidence, such as the UCC, to demonstrate Crestwood's motive and deceit.  Furthermore, because Pahl never moved the Court for leave to amend its complaint to assert a separate fraud by omission claim based on the UCC, the Court was easily able to dispose of Everest's existing fraud claim because of the weakness of the evidence Pahl placed before the Court.

80.    Indeed, the only evidence that Everest asserted was that PETIONVILLE's seasons dropped 85% from 2005 to 2006, but offered no evidence as to why they dropped such as Crestwood's acquiring financial interests in new competing stallions and Crestwood's obvious conflict of interest in making PETIONVILLE and other Everest horses more valuable and

27-CV-18-8745

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

attractive for sale. Crestwood, on the other hand, offered unrebutted expert testimony that this drop in sales was caused by factors unrelated to Crestwood. Everest offered no expert testimony or other evidence on what Crestwood did, or did not do, that caused the drop in sales.

81.     The District Court also dismissed the common law breach of fiduciary and agency duties claim regarding PETIONVILLE. The Court found that Everest produced no evidence that Nielsen's reliance on Crestwood was reasonable and objective. Further, the District Court criticized Everest for the lack of facts showing that Nielsen believed that Crestwood was Everest's agent and fiduciary or that demonstrated that their business relationship imposed a duty for Crestwood to act as a fiduciary to Everest.

82.     The Court also dismissed the breach of fiduciary duty claim under the Agreement because there was no evidence that the business relationship between Crestwood and Everest imposed a duty on Crestwood to act in Everest's interest. The Court cited Section 7 of the Agreement by stating that Crestwood was acting for itself and Everest – language that indicates a mutual benefit rather than language that puts Everest's interests over Crestwood's.

83.     After losing the case on summary judgment, Pahl told Nielsen that he would take full responsibility for the loss to Crestwood and he would inform the District Court that it was his negligence that caused the loss in order to vacate the summary judgment decision. However, Pahl never intended to fulfill his promise nor did he do so. In order to placate Everest, Pahl assured Nielsen that he would move for leave to file a fourth amended complaint to assert the claims based on the "additional facts" raised in Everest's opposition memo to Crestwood's summary judgment motion and should have been filed months before the District Court decided the case against Everest. However, Pahl's motion was a desperate exercise in futility costing Everest both time and money because the District Court would never have vacated the summary judgment

28

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

decision based on the additional claims raised in the proposed Fourth Amended Complaint
because they were distinct from the issues raised on summary judgment. Further, Pahl again
failed to raise the UCC at this stage, which was the only conceivable hope to expose the bank
fraud and motives of Crestwood and McLean Sr., and save Everest's case from defeat.[13]

84.    Pahl's failure to timely and properly assert the claims based upon the "additional
facts" learned in discovery cost Everest thousands of dollars. For example, with respect to the
stallion STORM BOOT, Nielsen purchased a 15% interest in STORM BOOT, whose career
Crestwood managed. Crestwood's duties with respect to the promotion and management of
STORM BOOT were largely the same as they were with PETIONVILLE. For example,
Crestwood solicited and sold stallion service contracts for STORM BOOT. Over the years, and
pursuant to the written stallion management agreements, Crestwood acted as the agent and
manager in collecting stud fees for STORM BOOT and provided accounting and distributions to
Everest.

85.    Through documents Crestwood produced late in discovery and in deposition,
Everest learned that Crestwood charged Nielsen and Everest for Nielsen's own ownership shares
in STORM BOOT's syndication, even though the agreements between Nielsen and Crestwood
called for Nielsen to receive six "free nominations[14]" to STORM BOOT.

86.    In early 2002, Nielsen told McLean Sr. that he was intent on listing all 6 of his
shares in STORM BOOT valued at $900,000 with a third party broker. McLean Sr. asked that
Nielsen instead use him as his agent and allow him to spread the sales out so as not to flood the
market and cause the share value to diminish for him and the remaining shareholders, to which

[13] Pahl also failed to file a motion under FRCP 59(e) asking the Court to reconsider its summary judgment decision based on the recently discovered UCC.
[14] A nomination is the right to breed a mare to a particular stallion. Crestwood charged Nielsen (or Everest) for these "free" breedings.

29

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

Nielsen agreed. Shortly thereafter, McLean Sr. presented a buyer to Nielsen, an individual purportedly interested in purchasing only a portion of Nielsen's interest in the stallion. Unbeknownst to Nielsen, however, and undisclosed by McLean Sr. (his agent), was that McLean Sr. secretly struck his own deal with this same buyer to purchase a percentage of McLean Sr.'s own interest in STORM BOOT. In other words, McLean Sr. did not sell all of Nielsen's interest in STORM BOOT as he agreed to do, but instead lined his own pockets by selling a portion of his interest in STORM BOOT to the very same buyer without disclosing this to Nielsen. McLean Sr. continued to insist that he ultimately had the right to approve or disapprove share sales as a syndicate manager. He continued to claim that he was the logical agent to arrange for the sale of Everest shares. McLean Sr. never sold another of Everest's shares clearly putting his own interest above Everests. This breach of fiduciary duty claim cost Everest at least $570,000 in damages, plus interest.

87.     Pahl also failed to bring a fraud claim against Crestwood relating to insurance for STORM BOOT. Prior to STORM BOOT'S death, Crestwood informed Everest that STORM BOOT'S physical condition was sufficiently good and Nielsen would be justified in avoiding that year's mortality premium after the many years of regular mortality premiums Everest had paid. Relying on McLean Sr.'s advice, Everest elected not to renew the policy for that year. However, upon information and belief, McLean Sr. did pay the premium and when the horse soon after died from a condition that McLean Sr. intentionally downplayed in their discussions, McLean Sr. collected thousands of dollars in insurance proceeds that rightfully should have gone to Everest.

88.     Another claim that Pahl failed to bring was in connection with a stallion named DIXIELAND HEAT. At McLean Sr.'s recommendation and suggestion, Nielsen purchased an ownership interest in DIXIELAND HEAT, which was another stallion standing at stud at

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

Crestwood. Through documents produced by Crestwood late in discovery, Nielsen came to learn that other syndicate owners in DIXIELAND HEAT had voiced complaints about Crestwood's performance of its duties for the promotion and management of the stallion. Even though Crestwood was the agent and therefore was responsible for management of DIXIELAND HEAT, Crestwood failed to disclose this information Everest or Nielsen. Had Crestwood been forthcoming with this information, Nielsen would have taken actions to not only protect his investment in the horse (by selling all or part of his interest), but also in due consideration for Crestwood's continued management and handling of Everest's own stallion PETIONVILLE.

89. In 2004, Crestwood shipped the stallion DIXIELAND HEAT, first to Louisville, then to Texas. Crestwood, in its capacity as agent in the management of DIXIELAND HEAT, never disclosed to Nielsen that it had taken such actions nor explained why such actions were taken. Without such disclosures, Nielsen had no opportunity to protect his investment in DIXIELAND HEAT by selling his ownership shares or taking other action before the horse was moved out of Kentucky. By moving DIXIELAND HEAT from Kentucky, Crestwood caused the horse's diminution in value and cost Everest thousands of dollars in damages. Everest's investment in DIXIELAND HEAT became worthless.

90. In addition, Everest owned a horse, a 2007 colt out of MAIN SQUEEZE, which was boarded and cared for by Crestwood. Crestwood entered the 2007 MAIN SQUEEZE colt into the October 2008 Fasig-Tipton sale as Everest's agent. From the sales ground and for the first time, McLean Sr. told Nielsen that the horse was crooked, had poor conformation, and would never race.

91. McLean Sr. orchestrated a zero bid for the 2007 MAIN SQUEEZE colt at the Fasig-Tipton sale. Following the sale, McLean Sr. called Nielsen and told him that the horse's

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

physical condition and conformation were such that it was never going to be useful as a racehorse but that a third-party had approached McLean, Sr. privately and offered $1,000 to secure the colt as a pleasure horse and the horse would have a safe home. Based upon McLean Sr.'s representations about the colt's physical condition (i.e, that it was unfit to race), Nielsen agreed to sell the colt for $1,000 to this third-party.

92.    Unbeknownst to Everest, McLean Sr. and his two sons, Pope Jr. and Marc, orchestrated the scam and became silent partners with the buyer (whom discovery revealed was a Crestwood employee) in the 2007 MAIN SQUEEZE colt. Shortly thereafter, despite McLean Sr.'s earlier representations about the colt and its physical condition, the colt was named, broken, trained, and sold for $15,000 with each of the McLean sons receiving 25% of the profits. McLean Sr. never disclosed to Everest that his sons acquired ownership interests in the colt or that they obtained a profit from the sale of the colt.

93.    During discovery in the Crestwood Litigation, Everest received records and documents showing Hagyard Davidson & McGee ("Hagyard"), the veterinary clinic used by Crestwood, was making regular monthly payments to Crestwood. Further discovery and depositions revealed multiple "special" arrangements between Crestwood and Hagyard, neither of which were ever disclosed to Everest .

94.    As an initial matter, the relationship between Crestwood and Hagyard was anything but arm's length. For example, discovery in the Crestwood Litigation revealed that Crestwood and Hagyard were business partners in various landlord-tenant relationships[15] in rental property. Neither Crestwood nor Hagyard ever revealed this cozy business relationship to Everest.

95.    In addition, Crestwood and Hagyard had a "rebate" agreement under which

---

[15] The veterinarians at Hagyard were living in property the McLeans owned.

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

Crestwood got paid a "rebate" (or kickback) from Hagyard based on the volume of veterinary services purchased for the horses entrusted to Crestwood's care. This arrangement had apparently been in place since at least 2003 and perhaps even earlier. However, no one from Crestwood or Hagyard ever disclosed this special rebate program to Everest. Crestwood and Hagyard were aware of the impropriety of this kickback scheme because Hagyard secured a representation and warranty from Crestwood that it would make full disclosure to its clients (like Everest) regarding the billing arrangements. Of course, Crestwood did no such thing and Pahl's failure to timely raise the claim allowed Crestwood to get away with its improper kickback scheme at Everest's expense. Also Hagyard and Crestwood later claimed they had destroyed or abandoned years of contracts and only a single year was produced in Crestwood's discovery. Despite Crestwood's expert claiming that this kickback scheme was common in the Lexington equine circles, he was unwilling or unable to identify another farm that engaged in such schemes at the expert's deposition. Pahl's negligence in not filing the claims cost Everest in excess of $50,000 in damages.

96.    Everest has also learned that Hagyard and Crestwood had a separate discount pricing arrangement whereby Crestwood paid only a discounted price for Hagyard's veterinarian services while Crestwood charged its customers (like Everest) the high rate/price. Thus, Crestwood overbilled and received payment from Everest for the higher veterinary charges without passing the special discounted pricing/savings onto Everest while at the same time, Crestwood received the collateral benefits of reduced veterinary charges for its own horses (which did not generate a sufficient volume of business to merit a discount from Hagyard without the business from work on the horses owned by Crestwood's clients). On information and belief, at some point, Everest paid up to 75% of the veterinarian bills that Crestwood manipulated.

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

97.    Information obtained from Crestwood late in the discovery process also revealed another scheme to usurp and exploit financial benefits from Everest. While Everest boarded its horses at Crestwood, Nielsen requested and inquired about paying the Crestwood and Hagyard bills with Everest's credit card. McLean Sr. knowingly and falsely informed Nielsen that Hagyard did not accept credit card payments. However, discovery revealed that despite McLean Sr.'s representations, Crestwood paid for many services (such as Hagyard's veterinary bill) by use of credit cards in order to accumulate membership rewards for the benefit of the McLeans. With Everest's routinely prompt payment, Crestwood was able to use its credit card to pay Hagyard bills (and avail itself of a 30 day "float" period), amass thousands of dollars in rewards benefits, and pay the credit card charge in full with Everest's timely payments without accumulating any interest. Everest had the ability to engage any of several Lexington veterinary clinics and locate its horses at any number of breeding farms. Crestwood's fraud and misrepresentation here caused Everest significant damages  and the ability to make the best choices for its business.  Pahl did nothing to pursue these claims related to the veterinarian, including failing to depose Hagyard representatives and Crestwood's accountant that would have proven Everest's claim against Crestwood.

98.    After the District Court exposed the myriad of negligent acts in Pahl's handling of the Crestwood Litigation, Defendants appealed Everest's claims to the Sixth Circuit Court of Appeals.  Despite Nielsen's repeated requests for Foley to replace Pahl with competent appellate counsel, Foley refused. Pahl attend the Sixth Circuit Court of Appeals totally unprepared and was ridiculed not only by opposing counsel, but also by members of the appellate panel. For example, at the hearing, Pahl could not properly identify the STORM CAT filly, claimed not to know if Everest retained ownership of that filly, claimed not to know the reserve price the filly was

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

bought back at, and incredibly likened Crestwood's implied duties regarding PETIONVILLE to Crestwood's duties regarding the separate horses under the November 4 Agreement, which had nothing to do with PETIONVILLE. Pahl's continued negligence doomed all chance for Everest to obtain a reversal of the District Court's decision and for Everest to maintain its claims against Crestwood. Not surprisingly, the Sixth Circuit affirmed the District Court's decision in favor of Crestwood.

99.    As set forth above, Defendants mishandled the Crestwood Litigation in numerous respects, constituting malpractice that proximately caused Everest to lose well over $9M in damages.

### Pahl and Foley Mishandle the Canani Litigation

100.    The Fee Agreement also covered the litigation Everest brought against Julio Canani ("Canani"), a California-based trainer who had trained Everest's horses for over 18 years.

101.    On December 23, 2009, Pahl and Foley filed suit for Everest against Canani in the U.S. District Court for the Central District of California, Case No. 2:09-cv-09446 (the "Canani Litigation"). Everest's claims against Canani were for fraud, breach of fiduciary duty, unjust enrichment, and violation of the California Business and Professions Code ("CBPC") § 19525. The claims were related to certain misrepresentations that Canani made to Everest in connection with the physical condition of several of Everest's horses that caused Everest to sell its horses for substantially less than their true fair market value.

### Background of the Canani Litigation

102.    In late October 2008, after the 2008 Breeder's Cup race, Nielsen told Canani that he intended to move Everest's remaining horses in Southern California to the East Coast for several reasons, including to consolidate operations, save on costs, improve the training and

35

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

longevity of its horses, and increase its options for racing, claiming and selling horses.

103.    Canani began training TWO STEP SALSA as a Thoroughbred racehorse in 2007.

104.    In his capacity as Everest's trainer and agent, Canani raced TWO STEP SALSA as a three year-old in 2008 and the horse proved to be very successful at the track. For example, TWO STEP SALSA won the Grade III Lazaro Barrera Memorial Handicap at Hollywood Park on May 18, 2008, and the Affirmed Handicap Grade III at Hollywood Park on June 15, 2008, and became recognized internationally as a racehorse of high quality and value.

105.    As a result of TWO STEP SALSA's success in graded stakes races, various third parties contacted Canani with interest in purchasing the horse, which Canani referred to Everest as he was required to do. From June to August 2008, Everest received offers for prices ranging from $1,700,000 to $2,000,000 from Middle Eastern interests intent on racing the horse in the March 2009 Dubai World Cup. Before responding to the offers, Everest consulted with Canani, as the trainer, who informed Everest that TWO STEP SALSA was in good health and condition. Canani told Nielsen that he wanted to take TWO STEP SALSA to the Dubai World Cup himself where he would compete for a $1,000,000 purse. As a result of Canani's advice and request to keep the horse, Everest elected not to sell TWO STEP SALSA at that time.

106.    After TWO STEP SALSA nearly won the Breeder's Cup Dirt Mile race, Everest was contacted by a buyer, Antonio Avila ("Avila"), who first offered $750,000, then offered $1,200,000 for TWO STEP SALSA. Nielsen informed Canani of these offers. Canani then told Everest that TWO STEP SALSA had a physical condition that would not compromise the horse's immediate race career, but would cause the horse not to pass a veterinary exam and that all Middle Eastern interest had dried up. Nielsen now knows that this information was intentionally false and given to prevent Nielsen from selling TWO STEP SALSA before Canani could take it

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

to Dubai. As a result of the uncertainty regarding TWO STEP SALSA's physical condition, Everest agreed to sell TWO STEP SALSA to Avila for $1,400,000, subject to a veterinary exam satisfactory to Avila, which Nielsen felt was ethically necessary to allow Avila the ability to make an informed decision.

107. To Nielsen's surprise based on what he knew from Canani, TWO STEP SALSA passed the veterinary exam without any problem and the sale closed to Avila. After the sale, Everest confronted Canani about the inconsistencies between his statements regarding the condition of TWO STEP SALSA and the veterinary exam. Canani denied any wrongdoing and assured Everest that he had its best interest in mind. Troubled by these events, but having no solid evidence, Nielsen opted to honor a verbal agreement he had made to pay Canani a 5% or $70,000 commission upon the sale.

108. Everest later learned through discovery in the Canani Litigation that Avila was a straw man for an undisclosed buyer, Godolphin Racing, LLC ("Godolphin"), which is owned by the Ruler of Dubai.[16] Everest joined Avila and Godolphin as defendants[17] to the Canani litigation in the second amended complaint, alleging that those two parties conspired to defraud Everest in connection with the sale of TWO STEP SALSA to Avila for a price substantially lower than what Everest would have sold the horse for had Everest known that a Middle Eastern was the ultimate buyer and was actually the same Middle Eastern interest that had offered $2,000,000 just a few months prior.

109. Discovery also demonstrated that Godolphin had a pre-approved sale price of $1,860,000 with Avila being enticed to deceive Nielsen in return for pocketing any difference in purchase price he was able to secure by lying about the identity of the real buyer and for Avila's

---

[16] According to Godolphin's website, www.godolphin.com, Godolphin was founded by United Arab Emirates Vice President, Prime Minister and Ruler of Dubai, H.H. Sheikh Mohammed bin Rashid Al Maktoum.
[17] Avila and Godolphin were joined to the Canani Litigation in the second amended complaint.

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

48 hours of involvement. As this dark drama played out, TWO STEP SALSA was shipped to Dubai and won the $1,000,000 Dubai Mile with ease.

110. Despite the new theory against Avila and Godolphin, Everest continued to maintain in the Canani Litigation that had Everest been told the true physical condition of TWO STEP SALSA by Canani, he would not have sold TWO STEP SALSA to Avila and Godolphin for $1,400,000.

111. On January 14, 2011, Godolphin moved to dismiss the second amended complaint. The District Court swiftly granted Godolphin's motion on February 25, 2011.

112. In reaching its decision to dismiss the second amended complaint against Godolphin, the District Court noted the inconsistency between Everest's theory against Canani regarding TWO STEP SALSA and the theory against Avila and Godolphin, to wit:

> Plaintiff contends that if he had known Godolphin was the real buyer of Two Step Salsa, he would not have sold the horse for $1.4 million. (Id. at ¶ 55.) He does not provide any additional factual enhancement to this assertion, or attempt to reconcile it with his allegation that he sold Two Step Salsa only after Canani reiterated his concerns about the horse's health (Id. at ¶ 45.)

113. The District Court reached the conclusion that Everest failed to plead a proper fraud claim against Godolphin because Everest failed to plead the "who, what, when, where, and how" required by FRCP 9(b). The District Court also found that Everest's claim that it would not have sold TWO STEP SALSA had it known about Godolphin's relationship with Avila "is controverted by [Everest's] allegation that it sold the horse because Nielsen believed the horse had health issues. In light of this allegation, [Everest] cannot plausibly claim that he justifiably relied on Avila's purported misrepresentations in selling the horse below its market value."

114. Despite the District Court's implausibility ruling, Pahl prepared and filed a third amended complaint on March 17, 2011, seeking to cure the deficiencies that led to the dismissals

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

of Godolphin and Avila. In seeking to cure the "who, what, when, where, and how" required by FRCP 9(b), Pahl added page after page of deposition testimony in the third amended complaint. This additional detail, however, was an exercise in futility, because Pahl ignored the District Court's ruling and instead proceeded with advancing the same flawed theories against Godolphin and Avila, only with additional detail.

115.    Naturally, Godolphin and Avila subsequently moved to dismiss the third amended complaint. The District Court granted their motions based upon the same reasoning that caused the court to dismiss the Second Amended Complaint against Godolphin and Avila, to wit:

> [Everest] alleges that what motivated it to sell the horse was Nielsen's belief that the horse's health was compromised. [Everest] also alleges Neilsen [sic] believed a Middle Eastern buyer would have paid more than any other buyer even though the horse's health was compromised. If these allegations are true, it is inexplicable that [Everest] sold the horse to Avila at all. Under these circumstances it is implausible that the buyer's country of origin was material to [Everest] when it sold Two Step Salsa.
>
> Because the Court finds that the underlying tort supporting [Everest's] aiding, abetting, and conspiracy claims against Godolphin[18] is not plausible, it dismisses those claims.

116.    Had Pahl and Foley bothered to perform basic legal research, they would have known that their agency liability theory regarding Avila and Godolphin was flawed. Under the Restatement (Second) of Agency § 304 (1958), "A person with whom an agent contracts on account of an undisclosed principal can rescind the contract if he was induced to enter into it by a representation that the agent was not acting for a principal and if, as the agent or principal had notice, he would not have dealt with the principal." *Id.* Thus, if the agent (Avila) knew that the other party (Everest) would not have dealt with the principal (Godolphin) had the principal's identity been truthfully disclosed, then such misrepresentation would be material. *See id.*

---

[18] The court granted Avila's motion to dismiss in a separate order dated July 19, 2011, for the same reasons it granted Godolphin's motion to dismiss on April 29, 2011.

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

*comment.* However, the rule stated in § 304 does not apply if the agent knows that the other party to the contract would be willing to deal with the principal but for whom he hopes to obtain better terms than he may otherwise obtain if the principal's identity were known. *See id.* This is precisely the situation with the TWO STEP SALSA transaction involving Everest, Avila, and Godolphin.

117.    Accordingly, because Pahl asserted repeatedly in the amended pleadings that if Everest had known Godolphin was Avila's principal, Everest would have negotiated a higher price, Everest had no claim because Everest still would  have dealt with Godolphin.  Thus, because Avila was concealing Godolphin's identity in the hopes of obtaining a more favorable deal for himself and Godolphin, § 304 would bar any claim by Everest for fraud or fraudulent concealment because Avila's misrepresentation about who was actually buying the horse would not be material to Everest's decision to sell the horse.  In other words, because Avila lied to Everest to obtain a better deal than he might have negotiated with Everest had he disclosed that Godolphin was the true buyer, Everest's claims against Avila and Godolphin had no chance of success.  Had Pahl researched the law of undisclosed principals in California or the Eighth Circuit, he would have known this and not continued to pursue meritless claims on Everest's behalf.

118.    Accordingly, Pahl should have simply pled that Canani lied to Everest about the horse's physical condition and that Canani's intentional misrepresentation caused Everest to sell the horse for far less than it was worth.  In fact, the fair market value of TWO STEP SALSA was at least $1,860,000 when passing a vet test (which it did) as evidenced by Godolphin's contract with Avila.  Pahl's failure to properly research, plead and prosecute the TWO STEP SALSA claim against Canani cost Everest at least $530,000, which consists of $460,000 in purchase price

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

and a $70,000 commission that Canani procured by fraud.

Canani's Misrepresentations Regarding the
Sale of Additional Everest Horses

119.    A few days after the sale of TWO STEP SALSA, Nielsen told Canani that he was intent on moving Everest's remaining horses to the East Coast to consolidate operations, save on costs, improve training and the longevity of his horses, and increase Everest's options for racing, claiming and selling horses versus Southern California.

120.    Canani responded to Nielsen by telling him that now several horses may not be worth moving because they had trouble coming out of their stalls due to soreness, bad backs, and other ailments. Canani said he might be able to package the horses for sale to a specific buyer who was later identified as David Milch ("Milch"), a television producer.

121.    Canani called the next day and informed Everest that Milch offered $150,000 for six of the eight horses that Canani presented for sale to Milch.[19] Everest initially rejected the offer because it was too low. Canani persisted, telling Everest that Milch's proposal was his best chance to package and sell the horses at a favorable price due to their physical condition. Relying on Canani's advice and representations regarding the physical condition of the horses, Everest agreed on November 12, 2008, to sell the horses for $150,000 to Tarma Corporation, an entity that Canani told Everest that Milch owned.

122.    Two days later, Canani and Everest completed the sale of two more horses, ISLAND HOP and VOODOO'S VISION, for $70,000 to Tarma Corporation. Like with the other six horses sold to Tarma Corporation, Canani drove Everest's price down by using the horses' alleged compromised physical condition for justification. Everest believes and therefore avers that Canani re-sold ISLAND HOP privately just a few months later for $150,000. Inexplicably,

---

[19] ALL MAN, CATANA PEREZ and CLUE ME IN for $25,000 each, DITTO THIS for $20,000, MINI DO for $40,000 and STAND TALL for $15,000.

41

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

Pahl never filed a separate damage claim on ISLAND HOP despite Nielsen informing Pahl of this information.

123.    Everest later learned that within minutes of the sales to Tarma Corporation, Canani entered MINI DO and STAND TALL in races valuing the horses at substantially greater values than he had just convinced Everest to accept. Canani never informed Everest that these races were available for Everest's horses to enter, much less that they were physically able to race. For example, Canani entered MINI DO in a race valued much higher than her sale price despite telling Everest that she had an injured back and could not even exit a starting gate due to the injury.

124.    Later, after watching several of the former horses run under different owners' names, all trained by Canani, Everest learned that Canani was the sole owner and operator of Tarma Corporation. If Everest had not been lied to regarding the true identity of the buyer, and that Canani was actually purchasing the horses for himself, Everest would not have relied on Canani's representations about the physical condition of the horses and would not have sold the horses at prices well below their actual market value.

125.    Everest also learned that Canani, through Tarma Corporation, sold DITTO THIS for $60,000, which Canani had bought shortly before the sale for $20,000 through his fraudulent scheme. As a result, Canani profited $40,000 through fraud and misrepresentation.

126.    Canani, through Tarma Corporation, sold CATANA PEREZ to one of Canani's other clients, Tom Metzer, on November 13, 2008, for $45,000. As a result, Canani profited an additional $20,000 through fraud and misrepresentation.

127.    On November 19, 2008, Roger Licht[20] ("Licht") faxed an offer to purchase LADY LUMBERJACK and SILENT STALK for $350,000 on behalf of an undisclosed buyer. These

---

[20] Nielsen and Everest had never heard of Roger Licht before receiving the November 19, 2008 offer.

42

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

were the last two horses that Everest had with Canani and Everest believed the purchase price was only a fraction of the horses' market value. Nielsen called Licht, told him the offer was far less than what he had valued them, and politely declined the offer. To build credibility with Nielsen, Licht informed Nielsen that he was an attorney and former chairman of the California Horse Racing Board.

128.    Nielsen was curious as to how Licht learned of the two horses and their potential availability and asked Licht if Canani was involved. Licht admitted that he knew Canani but denied that Canani had any involvement with the offer and informed Nielsen that he learned of the horses from his trainer, an individual that Nielsen did not know.

129.    After the call with Licht, Nielsen had a call with Canani wherein he informed Canani that he was moving these last two horses to another trainer. In that call, Canani informed Nielsen about a previously undisclosed injury to LADY LUMBERJACK, which consisted of a chronic knee problem that had persisted for months and which could prevent her from further racing or passing a veterinarian's exam.

130.    Based on the representations of Canani and Licht, Everest agreed to sell LADY LUMBERJACK and SILENT STALK to Licht for a combined $350,000. The sale was completed on November 24, 2008.

131.    Within days of the sale, and after informing Everest that she was compromised and unfit to race, Canani entered LADY LUMBERJACK into the November 29, 2008 race at Hollywood Park with Licht listed as the owner and Canani as the trainer. Canani never informed Nielsen and Everest that LADY LUMBERJACK was fit to race or of his plans to enter her into the race. LADY LUMBERJACK ran well at Hollywood Park, finishing second by a head.

132.    Shortly after the race, Nielsen learned that Canani and Licht were marketing

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

LADY LUMBERJACK for sale. Mike Allen, manager for Everest's California boarding farm, Tommy Town Thoroughbreds, LLC, informed Nielsen that Canani offered to sell LADY LUMBERJACK to Tommy Town for $500,000. Licht received an offer from Southern Equine Stables for $535,000. Allen called Nielsen again and informed him that Canani was now offering LADY LUMBERJACK for $550,000.

133.   In April 2009, Licht sold 95% of his interest in LADY LUMBERJACK to Milch for $332,000. This resulted in a profit of $132,500 which was split between Canani (75%) and Licht (25%).

134.   On December 11, 2008, Licht sold SILENT STALK to Joseph Scardino and Anthony Fanticola, who are both Canani clients, for $200,000, resulting in a profit of $50,000, which was split between Canani (75%) and Licht (25%).

135.   Based upon the numerous misrepresentations of Canani and Licht, Everest asserted in the Canani Litigation that, had Canani and Licht told Everest the truth about LADY LUMBERJACK and SILENT STALK, and about their connection, Everest would have never sold LADY LUMBERJACK and SILENT STALK for $350,000.

### The Canani Litigation Heads to a Jury Trial

136.   The case proceeded to a jury trial against Canani and Licht on June 19, 2012.

137.   Prior to trial, however, Canani moved in limine to exclude Everest from offering Nielsen's lay opinion regarding the true fair market value of the horses. This testimony was critical because it demonstrated that Canani misrepresented the horses' physical condition so that Everest would sell them at below-market prices and enable Canani to "flip" them to buyers at higher prices for his own personal gain.

138.   On October 6, 2011, the District Court granted Canani's motion in limine and

44

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

excluded Everest from offering lay opinion testimony on the value of the various horses trained by Canani and sold to Licht, Godolphin, and others. A copy of the October 6, 2011, order is attached hereto as Exhibit J and incorporated herein.

139.    The District Court's opinion was based on Rule 701 of the Federal Rules of Evidence which states that a lay witness may provide opinion testimony as long as it is rationally based on the witness's perception, is helpful to clearly understanding the witness's testimony or determining a fact in issue, and is not based on scientific, technical, or other specialized knowledge within the scope of Rule 702 which governs expert testimony. However, the Court found that Nielsen's opinion testimony on the value of his horses was based on specialized knowledge within the purview of expert testimony under Rule 702:

> Nielsen himself explains that he gained his knowledge of thoroughbred valuation based on 25 years in the breeding and racing business and his professional experience selling hundreds of horses. Permitting Nielsen to offer valuation testimony as a lay witness would "do exactly what Rule 701(c) prevents: circumvent Rule 702 by offering expert testimony as lay opinion.

(internal citations omitted). Because Pahl did not disclose Nielsen as an expert witness, the District Court ordered that he could not testify at trial on the fair market value of the horses that he sold based on Canani's fraudulent scheme.

140.    The District Court's ruling and Pahl's related negligence preventing Nielsen from offering valuation testimony of the horses at issue at trial proved to be disastrous for Everest's damages claims against Canani and Licht.

141.    The jury trial began on June 19, 2012 and lasted seven days. On June 28, 2012, the jury returned a verdict in favor of Everest and against Canani and Licht on nearly all claims asserted against them. Without expert testimony of the value of the subject horses, the jury was left to speculate as to the fair market value of the horses that Everest sold to Canani. As a result,

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

the jury awarded only $48,750 in compensatory damages[21] jointly and severally against Canani and Licht as follows:

- LADY LUMBERJACK    $0
- SILENT STALK            $6,250
- ALL MAN                     $20,000
- CATANA PEREZ          $0
- DITTO THIS               $10,000
- MINI DO                     $5,000
- VOODOO'S VISION      $0
- STAND TALL              $7,500

142.    $48,750 in compensatory damages was woefully inadequate for the horses identified in the preceding paragraph. Had Pahl disclosed Nielsen as an expert or retained and disclosed a separate valuation expert to testify at trial, the jury would have awarded compensatory damages well in excess of $48,750. The jury would not have failed to award Everest damages for LADY LUMBERJACK, CATANA PEREZ, AND VOODOO'S VISION. Pahl's conduct fell below the standard of care and proximately caused Everest thousands in compensatory damages.

143.    The jury apportioned the compensatory damages award 75% to Canani and 25% to Licht. The jury also awarded $50,000 in punitive damages against Canani[22] and Licht[23] as follows: (a) $37,500 against Canani; and (b) $12,500 as to Licht meant to punish them for their egregious acts.

144.    However, the jury's punitive damages award did not stand. At trial and then after the conclusion of the trial, Canani and Licht moved for judgment as a matter of law asking the Court to vacate the punitive damages verdict because Pahl failed to examine the defendants on

---

[21] Because Pahl gave the jury nothing for them to base their verdict on, the damages that the jury awarded to Everest had no conceivable connection to the prices that Canani flipped the horses for within days of his fraudulent acquisition from Everest.

[22] The California Horse Racing Board ("CHRB") subsequently suspended Canani from horse racing from October 26, 2015 to November 30, 2016 for his "conduct detrimental to racing" arising from the judgment in the Canani Litigation. After the suspension ended, Canani applied to the CHRB for a trainer's license and was denied a license on June 26, 2017, effectively ending his career as a horse trainer.

[23] Licht turned in his owner's license to the CHRB rather than face the suspension that befell Canani.

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

their financial condition as required by California law.

145.    On October 17, 2012, the District Court vacated the jury's punitive damage award because, under California law, a punitive damages award cannot stand unless the trial record contains meaningful evidence of a defendant's financial condition. A copy of the Court's October 17, 2012, order is attached hereto as Exhibit K and incorporated herein. Pahl's negligence in failing to examine the defendants on their financial condition was clearly erroneous, fell below the standard of care, and proximately caused Everest $50,000 in damages.

146.    Everest had been wronged by the persons closest to Everest's multi-million dollar thoroughbred racing and breeding business. In order to right the wrong that Everest had experienced at the hands of Crestwood, Canani and others acting in concert with them, Everest needed competent, trusted, and vigorous legal representation that Defendants assured that they would deliver in the high-stakes litigation described above. Instead, Pahl and Foley provided incompetent and negligent legal representation that directly and proximately caused Everest to lose millions of dollars in damages.

## COUNT I - Professional Malpractice/Negligence

147.    Everest realleges paragraphs 1 through 146 above as if fully rewritten herein.

148.    At all times relevant to this action, Defendants formed an attorney-client relationship with Everest for the Crestwood Litigation and Canani Litigation that Defendants commenced on Everest's behalf.

149.    Defendants breached their legal and professional duties to Everest for several reasons, including, but not limited to:

- failing to handle the representation of Everest in the Crestwood Litigation and Canani Litigation (the "Litigation") as described above in a competent manner;

47

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

- failing to conduct proper research in the Litigation;

- failing to handle the prosecution of the Litigation with prompt diligence and in an expeditious manner so that the client's interests were not impaired;

- pursuing claims and procedural maneuvers and tactics that lacked basis in law or fact;

- failing to name and disclose expert testimony needed to establish Everest's claims and damages;

- failing to utilize key evidence in order to defeat Crestwood's motion for summary judgment and win at trial;

- failing to bring all claims in a timely manner so that the Court could hear all the claims and Everest could recover damages against Crestwood;

- failing to pursue necessary discovery, including deposing material witnesses to prove its claims against Crestwood, including veterinarians, loan officers, appraisers, insurance agents, Jockey Club and Breeder's Cup officials, including bankers that would expose the fraudulent concealment of Everest's horses that McLean pledged as collateral for a loan, and provide the evidence that the District Court stated was lacking to support Everest's claims against Crestwood;

- failing to examine the defendants in the Canani Litigation which resulted in a loss of $50,000 in punitive damages;

- failing to provide Everest with truthful and candid legal advice and deceiving Everest regarding the readiness of the case for trial, lack of need for further discovery, the ability to bring the UCC before the court, the damages claims before the Court, the need for and success of the preliminary injunction, and the promise to admit fault to the District Court to unwind the summary judgment decision; and

- the failure to honor appropriate and reasonable requests from Everest to pursue discovery and claims in a thorough and timely manner.

150.    The foregoing acts described above fell below the applicable standard of care for a Minnesota attorney and directly and proximately caused Everest damages in an amount in excess of $50,000.00, the exact amount to be proven at trial, together with attorney's fees, interest and

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

costs.

## COUNT II – Breach of Contract

151.    Everest restates paragraphs 1 through 146 above as if fully rewritten herein.

152.    Defendants and Everest entered into a binding contract for legal services related to the Crestwood Litigation and Canani Litigation.

153.    Defendants have an implied contractual duty to perform their legal services in good faith and to deal fairly with Everest as their client.

154.    Defendants also have a legal duty to perform their legal services to Everest in a competent and professional manner.

155.    Defendants materially breached their contract with Everest, by, among other things, engaging in conduct described in the foregoing paragraphs, including, without limitation, the following:

- failing to handle the representation of Everest in the Litigation as described above in a competent manner;

- failing to conduct proper research in the Litigation;

- failing to prosecute the Litigation with prompt diligence and in an expeditious manner so that the client's interests were not impaired;

- pursuing claims and procedural maneuvers and tactics that lacked basis in law or fact;

- failing to name and disclose expert testimony needed to establish Everest's claims and damages;

- failing to utilize key evidence in order to defeat Crestwood's motion for summary judgment and win at trial;

- failing to bring all claims in a timely manner so that the Court could hear all the claims and Everest could recover damages against Crestwood;

- failing to pursue necessary discovery, including deposing

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

material witnesses to prove its claims against Crestwood, including veterinarians, loan officers, appraisers, insurance agents, Jockey Club and Breeder's Cup officials, including bankers that would expose the fraudulent concealment of Everest's horses that McLean pledged as collateral for a loan, and provide the evidence that the District Court stated was lacking to support Everest's claims against Crestwood;

- failing to examine the defendants in the Canani Litigation which resulted in a loss of $50,000 in punitive damages.

- failing to provide Everest with truthful and candid legal advice and deceiving Everest regarding the readiness of the case for trial, lack of need for further discovery, the ability to bring the UCC before the court, the damages claims before the Court, the need for and success of the preliminary injunction, and the promise to admit fault to the District Court to unwind the summary judgment decision; and

- the failure to honor appropriate and reasonable requests from Everest to pursue discovery and claims in a thorough and timely manner.

156.    The foregoing acts described above fell below the applicable standard of care for a Minnesota attorney and directly and proximately caused Everest damages in an amount in excess of $50,000.00, the exact amount to be proven at trial, together with attorney's fees, interest and costs.

## COUNT III – Breach of Fiduciary Duty

157.    Everest restates paragraphs 1 through 146 above as if fully rewritten herein.

158.    Under Minnesota law, an attorney is under a legal duty to represent the client with undivided loyalty, to preserve client confidences, and disclose any material matters bearing upon the representation of these obligations.    Further, an attorney must impart to the client any information the attorney has that affects the client's interests.

159.    Defendants breached their fiduciary duty to Everest by, among other things:

- failing to handle the representation of Everest in the Litigation as described above in a competent manner;

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

- failing to conduct proper research in the Litigation;

- failing to prosecute the Litigation with prompt diligence and in an expeditious manner so that the client's interests were not impaired;

- pursuing claims and procedural maneuvers and tactics that lacked basis in law or fact;

- failing to name and disclose expert testimony needed to establish Everest's claims and damages;

- failing to utilize key evidence in order to defeat Crestwood's motion for summary judgment and win at trial;

- failing to bring all claims in a timely manner so that the Court could hear all the claims and Everest could recover damages against Crestwood;

- failing to pursue necessary discovery, including deposing material witnesses to prove its claims against Crestwood, including veterinarians, loan officers, appraisers, insurance agents, Jockey Club and Breeder's Cup officials, including bankers that would expose the fraudulent concealment of Everest's horses that McLean pledged as collateral for a loan, and provide the evidence that the District Court stated was lacking to support Everest's claims against Crestwood;

- failing to examine the defendants in the Canani Litigation which resulted in a loss of $50,000 in punitive damages;

- failing to provide Everest with truthful and candid legal advice and deceiving Everest regarding the readiness of the case for trial, lack of need for further discovery, the ability to bring the UCC before the court, the damages claims before the Court, the need for and success of the preliminary injunction, and the promise to admit fault to the District Court to unwind the summary judgment decision; and

- failing to provide Everest with truthful and candid legal advice and deceiving Everest regarding the readiness of the case for trial, lack of need for further discovery, the ability to bring the UCC before the court, the damages claims before the Court, the need for and success of the preliminary injunction, and the promise to admit fault to the District Court to unwind the summary judgment decision; and

- the failure to honor appropriate and reasonable requests from

27-CV-18-8745

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

Everest to pursue discovery and claims in a thorough and timely manner.

## COUNT IV – Fraud

160.    Everest restates paragraphs 1 through 146 above as if fully rewritten herein.

161.    Pahl deceived Everest regarding the readiness of the case for trial, lack of need for further discovery, the ability to bring the UCC before the Court and that the damages claims regarding the "additional facts" were before the Court and viable.

162.    Pahl also misrepresented to Nielsen that he would admit fault to the District Court to unwind the summary judgment decision, but failed to do so.

163.    Pahl also fraudulently induced Everest into a fee contract with no intentions of abiding by.

164.    Everest relied on Pahl's misrepresentations to its detriment. Everest's reliance was reasonable and foreseeable.

165.    As a direct and proximate result of Pahl's fraud, Everest has been damaged in an amount in excess of $50,000, the exact amount to be proven at trial.

## COUNT V – Negligent Misrepresentation

166.    Everest restates paragraphs 1 through 146 above as if fully rewritten herein.

167.    Defendants supplied false information to Everest to guide it in its legal and business transactions described in the foregoing paragraphs.

168.    Defendants failed to use reasonable care and competence in communicating the information to Everest.

169.    Everest relied on the false information that Defendants supplied to its detriment.

170.    Everest's reliance was justified and Everest has suffered damages in excess of $50,000.00, the exact amount to be proven at trial, together with attorney's fees, interest and

27-CV-18-8745

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

costs.

WHEREFORE, Everest prays for judgment against the Defendants for the following relief:

a.    Compensatory damages against Defendants in an amount in excess of $50,000.00, the exact amount to be proven at trial;

b.    Treble damages pursuant to Minn. Stat. 481.07 and 481.071;

c.    Forfeiture of fees paid to Defendants;

d.    Such other relief as the Court deems just and equitable, including interest, costs and attorney's fees.

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

Respectfully submitted,

Daniel Gray Leland (0389027)
LELAND CONNERS PLC
2050 Canadian Pacific Plaza
120 South Sixth Street
Phone: (612) 339-7898
Facsimile: (612) 677-3323
E-mail: dan@lelandconners.com
*Attorney for Plaintiff Everest Stables, Inc.*

Of counsel:

Christopher D. Cathey
Porter, Wright, Morris & Arthur LLP
250 E. Fifth St., Suite 2200
Cincinnati, OH 45202
(513) 369-4214 direct dial
(513) 421-0991 facsimile
ccathey@porterwright.com
*Co-counsel for Plaintiff Everest Stables, Inc.*

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

## JURY DEMAND

EVEREST HEREBY REQUESTS A JURY TRIAL OF ALL CLAIMS IN THIS ACTION PURSUANT TO RULE 38 OF THE MINNESOTA RULES OF CIVIL PROCEDURE.

Dated May 16, 2018

Respectfully submitted,

Daniel Gray Leland (0389027)
LELAND CONNERS PLC
2050 Canadian Pacific Plaza
120 South Sixth Street
Phone: (612) 339-7898
Facsimile: (612) 677-3323
E-mail: dan@lelandconners.com
*Attorney for Plaintiff Everest Stables, Inc.*

Of counsel:

Christopher D. Cathey
Porter, Wright, Morris & Arthur LLP
250 E. Fifth St., Suite 2200
Cincinnati, OH 45202
(513) 369-4214 direct dial
(513) 421-0991 facsimile
ccathey@porterwright.com
*Co-counsel for Plaintiff Everest Stables, Inc.*

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

## ACKNOWLEDGMENT

I hereby acknowledge that costs, disbursements, and reasonable attorneys' and witness fees may be awarded pursuant to Minn. Stat. § 549.211 to the party against whom the allegations in this pleading are asserted.

Dated: May 16, 2018

Daniel Gray Leland
LELAND CONNERS PLC

27-CV-18-8745

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

# Exhibit A

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

185 New England Place Suite 280
Stillwater, MN 55082
Phone: 651/342-1212
Fax: 651/342-1195

**Everest Stables Inc.**



| To: | Tom Pahl | From: | Jeff Nielsen |
|---|---|---|---|
| | **PERSONAL AND CONFIDENTIAL** | | |
| | **ATTORNEY/CLIENT PRIVILEDGE** | | |
| Fax: | 612/338-8690 | Date: | August 1, 2011 |
| Phone: | | Pages: | 9 total |
| Re: | Engagement Agreement | CC: | |

☐ Urgent    x For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

Comments:

Please see attached final signed agreement.

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

# FOLEY & MANSFIELD
### PLLP
**Attorneys at Law**

Chicago · Detroit · Los Angeles · Miami · Minneapolis · New York · St. Louis · San Francisco

THOMAS W. PAHL
612-371-8517
tpahl@foleymansfield.com

May 31, 2011

**BY EMAIL**

Mr. Jeffrey Nielsen
Everest Stables, Inc.
105 New England Place
Suite 280
Stillwater, MN 55082

**Re:    Everest's Engagement of Foley & Mansfield, PLLP**

Dear Jeff:

    I write to memorialize the terms of our agreement for you and Everest Stables, Inc. ("Everest") to engage Foley & Mansfield, PLLP ("F&M") in the following matters:

### 1.    Crestwood Farm/Pope McLean

    You have engaged F&M to defend against the claims raised by Pope McLean Sr. and Crestwood Farm ("Crestwood"), including any subsequent appeals thereof, and to prosecute Everest's claims against Crestwood, including any subsequent appeals taken thereof. F&M will receive attorneys' fees on a contingency basis according to the following schedule:

    a.    Twenty-five percent (25%) of the Gross Amount Recovered (as defined below) from Crestwood if the matter settles on or before the thirtieth day preceding the Trial Date (as defined herein), less a credit for attorney's fees which Everest has actually paid to Dorsey & Whitney, Rambicure and Miller and Richard Clay (you have indicated that the sum is $185,050.53 through December 31, 2009 with an additional $26,559.39 paid in 2010 and 2011, which we will discuss below). The contingent fee payable to F&M under this paragraph shall be reduced by the amount of total attorneys' fees which Everest has actually paid to Dorsey & Whitney, Rambicure and Miller, and Richard Clay in connection with the Crestwood matter. The Trial Date, as used in this portion of the engagement letter, shall mean the date indicated by the Federal District Court of Kentucky as the start of the Trial in this matter (under the current Scheduling Order from the Kentucky Court, trial is scheduled to commence on January 9, 2012). If the Crestwood/Pope McLean matter settles on or before the thirtieth day preceding the Trial Date, you may (as an alternative to paying 25% of the Gross Amount 

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

# FOLEY & MANSFIELD
### PLLP

Mr. Jeffrey Nielsen
May 31, 2011
Page 2

Recovered) elect to pay F&M its hourly fees at the rates of $295/hour for partners; $225/hour for associates; and $175/hour for paralegals. We will send you regular monthly updates on the billing and time entries for the Crestwood/Pope McLean Sr. matter. .

b.    If the Crestwood/Pope McLean matter proceeds and is not resolved before the thirtieth day preceding the Trial Date, F&M will receive attorneys' fees on a contingency basis of 1/3 (i.e., 33-1/3%) of the Gross Amount Recovered less a credit for attorney's fees Everest has actually paid to Dorsey & Whitney, Rambicure and Miller and Richard Clay (you have indicated that sum is $185,050.53 through December 31, 2009 with an additional $26,559.39 paid to in 2010 and 2011, which we will discuss below). The contingent fee payable to F&M under this paragraph shall be reduced by the amount of total attorneys' fees which Everest has actually paid to Dorsey & Whitney, Rambicure and Miller, and Richard Clay in connection with the Crestwood matter. You do not have the right or the option to convert to an hourly basis if the matter does not settle or resolve itself before the thirtieth day preceding the Trial Date.

c.    Subject to the provisions below, you will pay or reimburse F&M for all costs and disbursements incurred in the prosecution or defense of the above described claims, which items will be billed to you on a monthly basis. Costs include charges for automated legal research, photocopying, long-distance telephone, facsimile transmissions, deposition transcripts, experts' fees, postage, mileage and other travel-related costs, and filing and recording fees. If the Crestwood/Pope McLean matter settles, resolves by verdict and payment, or we otherwise effectuate a Gross Amount Recovered, the costs and disbursements which you have paid to F&M will be repaid back to you first before calculating the F&M contingency fee portion (above described). In the event you opt to convert to an hourly basis and pay F&M its hourly fees, then you do not have the right to repayment of the costs and disbursements paid under this paragraph for this matter.

d.    You acknowledge and agree that F&M has the sole and unfettered right and opportunity to hire or fire any local or co-counsel as it deems appropriate for the Crestwood/Pope McLean matter. F&M will be responsible for the payment of the local or co-counsel fees and costs as of December 1, 2009; as noted above, you have previously paid $26,559.39 to Dorsey & Whitney for its bills in 2010 and 2011 and the sum of $26,559.39 will be "applied" against the outstanding costs and disbursements we would otherwise bill you under item (c) above until such time as the balance is zero. After reimbursement of the $26,559.39 is complete, we will forward our monthly bills for costs and disbursements for payment as provided above in paragraph c.

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

# FOLEY & MANSFIELD
PLLP

Mr. Jeffrey Nielsen
May 31, 2011
Page 3

e. For purposes of the Crestwood/Pop McLean matter only, the "Gross Amount Recovered" shall refer only to financial proceeds received from a settlement and resolution of all claims and counterclaims by voluntary settlement or satisfaction of any judgments of either or both of the civil actions now pending in federal court in Kentucky or financial proceeds that result from collection of any judgment against Crestwood arising from the civil actions against and with Crestwood/Pope McLean. For purposes of the Crestwood/Pope McLean matter only, "Gross Amount Recovered" does not include voluntary payments that have been made or will be made by Crestwood to Everest arising from transactions and matters that have arisen from or will arise from the November 4, 2008 Agreement. Any and all past and future payments to Everest for mutually-negotiated sales of horses subject to the November 4, 2008 Agreement are not subject to this contingency fee arrangement and are not considered to be part of any "Gross Amount Recovered" for calculating F&M's contingent fees. In the event that Crestwood would secure a judgment against Everest for an award of attorneys' fees, F&M agrees that the amount of such award of attorneys' fees shall be deducted from the Gross Amount Recovered as defined herein. It is the clear intent of the parties that the Gross Amount Recovered from Crestwood is limited to any money in fact paid by Crestwood to Everest or any other like-kind consideration paid by Crestwood to Everest as part of a final resolution of the civil actions by judgment or settlement; provided, however, that if Everest shall receive non-monetary consideration as part of the settlement or judgment, then the parties to this engagement shall first attempt to place a fair value upon the non-monetary consideration for purposes of calculating the contingency fee amount and, failing a mutual agreement as to such valuation, the parties agree to hire an appraiser to value the non-monetary consideration or to sell and liquidate the non-monetary consideration for determination of the amount. For purposes of this paragraph, Everest and F&M agree that the amount of $25,000 shall and will be the amount recoverable and payable to F&M for attorneys' fees related to the recovery of the $219,513.89 sum currently withheld from Everest by Crestwood associated with the RNA transaction for the 2008 filly by STORM CAT/ISLAND FASHION, provided, however, that the said amount of $25,000 payable to F&M in this matter shall be proportionately reduced in the event that any award of the court reduces said sum of $219,513.89 currently withheld from Everest by Crestwood by any offsets or deductions. By way of example, if the court reduced Everest's recovery of the sum of said $219,513.89 by costs and/or expenses which total 10% of said sum ($21,951.39), the amount payable to F&M for attorneys' fees related to this recovery would also be proportionately reduced by the same ten (10%) percent ($2,500.00).

f. F&M shall notify you promptly and immediately of any settlement communications it receives from the attorneys for Crestwood/Pope McLean. You have the right and authority to reach a decision on the resolution on such terms as you believe are reasonable and fair; provided, however, that you shall discuss such matters with F&M, specifically me, before you reach such resolution, if any.

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

# FOLEY & MANSFIELD
### P.L.L.P.

Mr. Jeffrey Nielsen
May 31, 2011
Page 4

    g.    The decision to appeal shall be made jointly by you and me, after due consideration of the facts and circumstances relating to such rulings, orders or judgment.

**2.**     <u>Julio Canani</u>

    You have engaged F&M to prosecute claims against Julio Canani d/b/a Tarma Corporation, including any subsequent appeals thereof, as well as the more recent and new claims against A.C. Avila and Godolphin Racing LLC (based on new discovery and information) (together, these claims will be referred to below and herein as "Canani"). F&M will receive attorneys' fees for these claims on a contingency basis according to the following schedule:

    a.    Twenty-five percent (25%) of the Gross Amount Recovered from Canani and Avila/Godolphin if the matter settles on or before the thirtieth day before the Trial Date (as defined below), less a credit for attorney's fees you actually paid to Dorsey & Whitney and Rambicure and Miller (which amount does not and will not exceed $11,467.82). The contingent fee payable to F&M under this paragraph shall be reduced by the amount of total attorneys' fees which Everest has actually paid to Dorsey & Whitney and Rambicure and Miller in connection with the Canani matter. The Trial Date, as used in this portion of the engagement letter, shall mean the date indicated by the Federal District Court for the District of California as the start of the Trial in this Canani matter (currently the trial in the Canani case has been postponed indefinitely). If the Canani matter settles on or before the thirtieth day preceding the Trial Date, you may (as an alternative to paying 25% of the Gross Amount Recovered) elect to pay F&M its hourly fees at the rates of $295/hour for partners; $225/hour for associates; and $175/hour for paralegals. We will send you regular monthly updates on our billing and time entries.

    b.    If the Canani matter proceeds and is not resolved or settled on or before the thirtieth day preceding the Trial Dates described in subparagraph 2(a) above, F&M will receive attorneys' fees on a contingency basis of 1/3 (i.e., 33-1/3%) of the Gross Amount Recovered, less a credit for attorney's fees paid to Dorsey & Whitney and Rambicure and Miller (which amount will not exceed $11,467.82). The contingent fee payable to F&M under this paragraph shall be reduced by the amount of total attorneys' fees which Everest has actually paid to Dorsey & Whitney and Rambicure and Miller in connection with the Canani matter. You do not have the right or the option to convert to an hourly basis if the Canani matter does not settle or resolve itself before the thirtieth day preceding the Trial Date. 

    c.    For purposes of the Canani matter, the "Gross Amount Recovered" shall refer only to financial proceeds received from a settlement of the civil action now pending in federal court in California against Canani or financial proceeds that result from collection of any judgment against Canani arising from the civil action against Canani. It is the clear intent of the parties that the Gross Amount

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

**FOLEY & MANSFIELD**
PLLP

Mr. Jeffrey Nielsen
May 31, 2011
Page 5

Recovered from Canani is limited to any money in fact paid by Canani (or any other co-defendant yet to be identified and named) or any other like-kind consideration paid by Canani (or any other co-defendant yet to be identified and named) to Everest as part of a final resolution of the civil action by judgment or settlement; provided, however, that if Everest shall receive non-monetary consideration in settlement or judgment, then the parties to this engagement shall first attempt to place a fair value upon the non-monetary consideration for purposes of calculating the contingency fee amount and, failing a mutual agreement as to such valuation, the parties agree to hire an appraiser to value the non-monetary consideration or to sell and liquidate the non-monetary consideration for determination of the amount.

d.    You will pay for or reimburse F&M for all costs and disbursements incurred in the prosecution of these claims on a monthly basis. Costs include charges for automated legal research, photocopying, long-distance telephone, facsimile transmissions, deposition transcripts, experts' fees, postage, mileage and other travel-related costs, and filing and recording fees. If the Canani matter settles, resolves by verdict and payment, or we otherwise effectuate a Gross Amount Recovered, the costs and disbursements which you have paid to F&M will be repaid back to you first before calculating the F&M contingency fee portion (above described). In the event you opt to convert to an hourly basis and pay F&M its hourly fees, then you do not have the right to repayment of the costs and disbursements paid under this paragraph for this matter.

e.    You acknowledge and agree that F&M has the sole and unfettered right and opportunity to hire or fire any local or co-counsel as it deems appropriate for the Canani matter. F&M is responsible for any local counsel fees associated with the Canani matter.

f.    F&M shall notify you promptly and immediately of any settlement communications it receives from the attorneys for Canani. You have the right and authority to reach a decision on the resolution on such terms as you believe are reasonable and fair; provided, however, that you shall discuss such matters with F&M and me before you reach such resolution, if any.



g.    The decision to appeal shall be made jointly by you and me, after due consideration of the facts and circumstances relating to such rulings, orders or judgment. F&M and Everest acknowledge that they have already agreed that an appeal shall be made concerning the claims against Godolphin and Avila.

3.    **Chris Foley, M.D.** You have engaged F&M to prosecute claims of malpractice and professional negligence against Dr. Christopher Foley ("Foley"), including any subsequent appeals thereof. F&M will receive attorneys' fees for claims against Foley on a contingency basis according to the following schedule:

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

# FOLEY & MANSFIELD
PLLP

Mr. Jeffrey Nielsen
May 31, 2011
Page 6

a.   Twenty-five percent (25%) of the Gross Amount Recovered from Foley and/or
     his insurance carrier if the matter settles before the thirtieth day preceding the
     Trial Date, less a credit for attorney's fees you actually paid to Dorsey & Whitney
     for work in connection with the Dr. Foley matter (which amount does not and will
     not exceed $4,789). The contingent fee payable to F&M under this paragraph
     shall be reduced by the amount of the total attorneys' fees which Everest has
     actually paid to Dorsey & Whitney in connection with the Dr. Foley matter. The
     Trial Date for the Foley matter shall mean the first date of Trial scheduled by a
     Minnesota court pursuant to a scheduling order issued from that Court. If the
     matter settles on or before the thirtieth day preceding the Trial Date, you may (as
     an alternative to paying 25% of the Gross Amount Recovered) elect to pay F&M
     its hourly fees at the rates of $295/hour for partners; $225/hour for associates; and
     $175/hour for paralegals.

b.   If the Foley matter proceeds and is not resolved or settled before the thirtieth day
     preceding the Trial Date, F&M will receive 1/3 (33-1/3%) of the Gross Amount
     Recovered from Foley and/or his insurance carrier, less a credit for attorneys' fees
     you actually paid to Dorsey & Whitney for work in connection with the Dr. Foley
     matter (which amount does not and will not exceed $4,789). The contingent fee
     payable to F&M under this paragraph shall be reduced by the amount of the total
     attorneys' fees which Everest has actually paid to Dorsey & Whitney in
     connection with the Dr. Foley matter. You do not have the right or the option to
     convert to an hourly basis if the Foley matter does not settle or resolve itself
     before the thirtieth day preceding the Trial Date.

c.   You will pay for or reimburse F&M for all costs and disbursements incurred in
     the prosecution or defense of these claims on a monthly basis. Costs include
     charges for automated legal research, photocopying, long-distance telephone,
     facsimile transmissions, deposition transcripts, experts' fees, postage, mileage and
     other travel-related costs, and filing and recording fees. If the Foley matter settles,
     resolves by verdict and payment, or we otherwise effectuate a Gross Amount
     Recovered, the costs and disbursements which you have paid to F&M will be
     repaid back to you first before calculating the F&M contingency fee portion
     (above described). In the event you opt to convert to an hourly basis and pay
     F&M its hourly fees, then you do not have the right to repayment of the costs and
     disbursements paid under this paragraph for this matter.

d.   You acknowledge and agree that F&M has the sole and unfettered right and
     opportunity to hire or fire any local or co-counsel as it deems appropriate for the
     Foley matter. F&M is responsible for any local counsel fees associated with the
     Dr. Foley matter.

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

FOLEY & MANSFIELD
PLLP

Mr. Jeffrey Nielson
May 31, 2011
Page 7

e.    The sum of $4,789 will be deducted from any Gross Recovery in the Dr. Foley matter first and paid as reimbursement to Everest/you for the sum paid to Dorsey & Whitney for its work in connection with this matter.

f.    The current anticipated date for filing a complaint against Dr. Foley is expected to be September 1, 2011 but the parties hereto recognize that there may be a strategic advantage to withhold the filing of such complaint in light of the already-existing and pending claims against Canani and Crestwood described above.

g.    The decision to appeal shall be made jointly by you and me, after due consideration of the facts and circumstances relating to such rulings, orders or judgment.

4.    **Everest's Claims Against Foley & Mansfield, PLLP**

You, for yourself and on behalf of Outdoor Advertising Investments, LLC, have indicated that you do not intend to pursue claims for professional malpractice or negligence against F&M and its attorneys in connection with the matter of Outdoor Advertising Investments LLC, as assignee from Michael Investments v. Eller Media, Inc. d/b/a Clear Channel, subject to the following covenant and representation on the part of F&M: F&M will provide a vigorous and zealous defense and representation without any charges whatsoever of any attorneys' fees or costs to you, Jeffrey L. Nielsen, or any other affiliated person, company, assignee, including but not limited to, Timothy J. Nelson, Redhorse Real Estate, Inc., Outdoor Advertising Investments, LLC, Michael Investments, or any buyer, potential buyer, assignee or otherwise of the subject leasehold interest and billboard interest easement. This obligation of vigorous and zealous representation without charge extends to any matters, civil actions, claims, counterclaims, administrative and regulatory matters, hearings and any other proceedings that reasonably relate to the subject leasehold interest and billboard interest easement, including but not limited to, any action commenced by or counterclaims asserted by Eller Media Inc. or Clear Channel or any assignee or party holding any interest arising from the sale and/or transfer and/or, if appropriate, termination of the leasehold interest to any third parties. F&M's obligation of vigorous and zealous representation extends to representation of the plaintiff in any action – whether it is a declaratory action or other – that relates in any way to the leasehold interest and billboard interest easement.

If you are in agreement with the above, please indicate so in the space provided below. Thank you. We look forward to working with you.

Very truly yours,

THOMAS W. PAHL

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

## FOLEY & MANSFIELD
PLLP

Mr. Jeffrey Nielsen
May 31, 2011
Page 8

### AGREEMENT AND ACCEPTANCE

I have read, understand and agree to the preceding terms and conditions.

Dated: _November 2-8_, 2011

_____
Jeffrey J. Nielsen, for himself and on behalf
of Everest Stables, Inc. and Outdoor
Advertising Investments LLC

27-CV-18-8745

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

# Exhibit B

Case 3:15-cv-00576-GNS-CHL   Document 8-2   Filed 07/16/15   Page 2 of 16 PageID #: 169
CASE 0:09-cv-02436-MJD-JSM   Document 18-1   Filed 10/26/09   Page 1 of 19



EXHIBIT
A

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT, made and entered into effective this 1st day of November, 2008, by and between Everest Stables, Inc., 100 Village Center Drive, North Oaks, MN 55127, a Minnesota corporation (hereinafter referred to as "Everest") and Crestwood Farm Bloodstock LLC, a Kentucky limited liability company, 3933 Spurr Road, Lexington, KY 40511 (hereinafter referred to as "Crestwood").

NOW THEREFORE, in consideration of the mutual promises and agreements as hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Everest and Crestwood hereby agree as follows:

1. TRANSFER/TITLE. As soon as practicable after execution of this Agreement, Everest shall execute and deliver to Crestwood the applicable Jockey Club Certificates of Foal Registration, breeding certificates and such other documents as may appear to be reasonably necessary to transfer the ownership of and the registration papers for the thoroughbred horses identified in Exhibit Numbers 1, 2, 3, 4, 5, and 6 attached hereto (except for ISLAND FASHION, in foal to GHOSTZAPPER, and the 2008 STORM CAT/ISLAND FASHION filly) (hereinafter referred to as the "Subject Horses") out of Everest's name and into Crestwood's name, effective as of November 1, 2008 (the "Effective Date" of this Agreement).

Notwithstanding the foregoing, the parties agree that Everest shall retain title and ownership to ISLAND FASHION, in foal to GHOSTZAPPER, and to the 2008 STORM CAT/ISLAND FASHION filly, from the Effective Date of this Agreement through the sale of said horses at public auction or otherwise.

Subject to the foregoing paragraph, Everest represents and warrants to Crestwood that Crestwood will receive clear ownership and title to each of the Subject Horses, free and clear of any liens and/or encumbrances, except for all unpaid stallion service obligations associated with or arising from the Subject Horses described on the Exhibits upon which the Subject Horses are identified, which will either be the responsibility of Everest or, in the case of the ELUSIVE QUALITY stallion service obligation, will be deducted from auction sales proceeds by Keeneland Association Inc. (hereinafter "Keeneland").

2. RESPONSIBILITY FOR EXPENSES. Except as otherwise provided herein, and subject to the terms and conditions of this Agreement, from and after the Effective Date of this Agreement, Crestwood shall be considered to be and shall be the owner of, and shall assume sole responsibility for and shall pay, and shall indemnify and hold Everest harmless from any and all claims relating to, any and all out-of-pocket expenses of any kind or nature relating to or associated with the Subject Horses, including, but not limited to board expenses, farrier/blacksmith expenses, veterinary expenses, vanning or transportation expenses, sales preparation expenses, and sales entry expenses, subject to the following additional terms, conditions and agreements. Although Everest shall retain title and ownership of ISLAND FASHION, in foal to GHOSTZAPPER, and the 2008 STORM CAT/ISLAND FASHION filly from the Effective Date through their sale at public auction or otherwise in accordance with this Agreement, Crestwood shall nevertheless be solely responsible for any and all such out-of-pocket expenses for said horses, from and after the Effective Date through their sale, including certain casualty

1

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

insurance premium expenses, as provided in Section 18 herein.

3. **CONSIGNMENT TO KEENELAND SALE.** The parties hereto agree that Crestwood shall consign for sale and shall offer for sale and shall sell at the Keeneland January, 2009 Mixed Sale, the following horses:

A. The twenty-one (21) thoroughbred broodmares identified in Exhibit No. 1 hereto (i.e. – the "A" Group mares). The parties acknowledge that DANZIGS FASHION has been deleted from Exhibit No. 1, and the parties agree that both DANZIGS FASHION and DANZIGS FASHION's 2009 foal shall be consigned for sale, offered for sale, and sold at the Keeneland November 2009 Breeding Stock Sale, and the net sale proceeds for each said horse shall be split 50% to Everest and 50% to Crestwood. Crestwood shall assume responsibility for and shall pay all out-of-pocket expenses of any kind and nature, including any 2009 stallion service expenses for stallions other than PETIONVILLE, with respect to DANZIGS FASHION and DANZIGS FASHION's 2009 foal, from and after November 1, 2008.

B. The eighteen (18) thoroughbred broodmares identified in Exhibit No. 2 hereto (i.e. – the "B" Group mares);

C. The forty-four (44) thoroughbred yearling horses identified in Exhibit No. 4 hereto (i.e. – the Everest foals of 2007). Crestwood may in its discretion determine that up to twenty (20) of the Subject Horses described on Exhibit 4 should not be sold in the 2009 Keeneland January Mixed Sale because their sales proceeds are not anticipated to exceed 75% of their carrying costs to the time of sale; provided, however, that no such Subject Horse shall be one whose stallion service fee was $5,000 or more with the exception of PETIONVILLE. In such event, Crestwood may decide not to sell such Subject Horse(s) in such sale. If Crestwood so decides, the following additional terms shall arise in respect of each such Subject Horse: (a) Crestwood, promptly following its decision to not enter or withdraw the Subject Horse from the sale, shall notify Everest of such decision; (b) Everest shall have the option for a period of 10 calendar days following its receipt of notice of withdrawal from Crestwood to reacquire the Horse from Crestwood, without financial consideration to Crestwood; (c) If such option is not exercised by Everest, Crestwood shall either (1) attempt to sell privately or (2) give away such Subject Horse otherwise on the terms described in Section 6 hereof. Should Everest choose to exercise its option to reacquire Subject Horses under subsection (b) above, Crestwood shall take such action as is necessary to transfer title to the Subject Horse to Everest and Everest shall thereafter bear all carrying costs for boarding and keeping the Subject Horse at Crestwood or such other location as Everest deems appropriate. Other than the (up to) twenty (20) horses that Crestwood may, pursuant to the foregoing, remove from the 2009 Keeneland January Mixed Sale, any other horses proposed to be removed from said sale shall only be removed by mutual written agreement of Everest and Crestwood.

D. The thoroughbred horse identified in Exhibit No. 6 hereto (FAME AND FASHION, a two-year-old Gr/Roan filly by PETIONVILLE out of DANZIGS FASHION).

4. **CONSIGNMENT TO PUBLIC AUCTION SALE.** The parties hereto further agree that

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

Crestwood shall consign for sale and shall offer for sale and sell at recognized 2009 Kentucky public auction sale(s), as mutually agreed and determined between Everest and Crestwood, the forty-one (41) thoroughbred weanling horses identified in Exhibit No. 5 hereto (i.e. – the Everest foals of 2008). Crestwood may in its discretion determine that up to twenty (20) of the Subject Horses described on Exhibit 5 should not be sold in the 2009 Keeneland September Yearling Sale because their sales proceeds are not anticipated to exceed 75% of their carrying costs to the time of sale; provided, however, that no such Subject Horse shall be one whose stallion service fee was $5,000 or more with the exception of PETIONVILLE. In such event, Crestwood may decide not to sell such Subject Horse(s) in such sale. If Crestwood so decides, the following additional terms shall arise in respect of each such Subject Horse: (a) Crestwood, promptly following its decision to not enter or withdraw the Subject Horse from the sale, shall notify Everest of such decision; (b) Everest shall have the option for a period of 10 calendar days following its receipt of notice of withdrawal from Crestwood to reacquire the Horse from Crestwood, without financial consideration to Crestwood; (c) if such option is not exercised by Everest, Crestwood shall either (1) attempt to sell privately or (2) give away such Subject Horse otherwise on the terms described in Section 6 hereof. Should Everest choose to exercise its option to reacquire Subject Horses under subsection (b) above, Crestwood shall take such action as is necessary to transfer title to the Subject Horse to Everest and Everest shall thereafter bear all carrying costs for boarding and keeping the Subject Horse at Crestwood or such other location as Everest deems appropriate. Other than the (up to) twenty (20) horses that Crestwood may, pursuant to the foregoing, remove from recognized 2009 Kentucky public auction sale(s), any other horses proposed to be removed from said sale(s) shall only be by mutual written agreement of Everest and Crestwood.

5.  **PRIVATE SALE OR DISPOSITION OF CERTAIN HORSES.** The parties hereto further agree that Crestwood shall sell or otherwise dispose of privately, the twenty (20) thoroughbred broodmares identified in Exhibit No. 3 hereto (the "C" Group mares). The terms and conditions of such sales shall be determined by mutual agreement between Everest and Crestwood. The parties acknowledge that the following Everest horses are already consigned for sale by Crestwood at the November 2008 Keeneland Sale: JUST A WISH, SISTER GIRL BLUES '08, BALLDO '08, BIRDS NEST, IN TRIPLACATE, and IT'S SILENT. The parties agree that if any of said horses fail to sell at said November 2008 Keeneland Sale, such horses shall be added to Exhibit No. 3 and shall be sold or otherwise disposed of privately by Crestwood under all the same terms and conditions applicable to the horses on Exhibit No. 3 under this Agreement.

6.  **ALTERNATIVE FOR PRIVATE SALE BY MUTUAL AGREEMENT.** The parties specifically understand and agree, with respect to each of the horses identified in Exhibit Numbers 4, 5, and 6 hereto, that Everest and Crestwood may, by mutual, written agreement signed by both Everest and Crestwood, agree to make other arrangements for the ultimate sale or disposition of any such horse.

7.  **CRESTWOOD'S DUTIES AND RESPONSIBILITIES.** Crestwood shall exercise all commercially reasonable efforts, with the utmost good faith, for and on behalf of both Crestwood and Everest, to properly prepare the Subject Horses for sale, and to market, offer for sale and to sell the Subject Horses, either at public auction or in private sales, in order to maximize the sales prices for each such horse. For all horses to be sold at public auction, Crestwood agrees and covenants that each horse shall be sold with no reserve, RNA, or buyback price. Crestwood shall sell, at auction or by private sale, only to unaffiliated third parties. The parties agree that in the event any Subject Horse is either unsold after auction or attempts to privately sell hereunder, title to such Subject Horse shall remain with Crestwood without additional consideration.

3

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

**2. PURCHASE PRICE.** The purchase price(s) for the Subject Horses shall be determined as follows:

A. As the purchase price for each of the horses identified on Exhibit No. 1, Everest shall be entitled to and shall be paid by Crestwood seventy-five percent (75%) of the net sales proceeds for each such individual horse offered for sale and sold at the January 2009 Keeneland Mixed Sale. For purposes of this Agreement, the term "net sales proceeds" for any of the Subject Horses selling at public auction shall mean the "fall of the hammer" sales price for such such horse, after deduction of the thoroughbred auction company's standard sales commission, without any credits or offsets whatsoever. Provided, however, that with respect to the sale of ISLAND FASHION, in foal to GHOSTZAPPER, the net sales proceeds will be divided after the amount of the 2008 GHOSTZAPPER stallion season expense and tax has been credited to Everest. With respect to the sale of ISLAND FASHION, in foal to GHOSTZAPPER, the parties further agree that any net sales proceeds exceeding $2 Million shall be paid 100% to Everest. With respect to the 2008 GHOSTZAPPER/DOWNTOWN BLUES stallion season, and the 2008 ARCH stallion season, Everest shall be responsible to pay for said seasons, including tax. Such payment of the purchase price(s) by Crestwood to Everest shall be conditioned upon and shall occur promptly following Crestwood's receipt of such proceeds from Keeneland or other purchaser(s) of the Subject Horse(s).

B. As the purchase price for each of the horses identified on Exhibit Numbers 2, 4, 5, and 6, Everest shall be entitled to and shall be paid by Crestwood fifty percent (50%) of the net sales proceeds for each such individual horse offered for sale and sold at the January 2009 Keeneland Mixed Sale, or such other recognized thoroughbred public auction, as applicable under this Agreement. Provided, however, that Everest shall be entitled to and shall be paid by Crestwood seventy-five percent (75%) of the net sales proceeds for the 2008 filly, STORM CAT/ISLAND FASHION, listed on Exhibit No. 5, and any net sales proceeds for said filly exceeding $1 Million shall be paid 100% to Everest. Provided, further, that with respect to the 2008 Colt, ELUSIVE QUALITY/DOWNTOWN BLUES and the 2008 Filly, ELUSIVE QUALITY/FLASH OF FASHION identified on Exhibit No. 5, if and when the net sales proceeds exceeds $100,000 for each or either horse, the net sales proceeds of either such horses exceeding $100,000 shall be paid 50% to Everest and 50% to Crestwood, after deduction by Keeneland of the Elusive Quality stallion season expense and tax. Such payment of the purchase price(s) by Crestwood to Everest shall be conditioned upon and shall occur promptly following Crestwood's receipt of such proceeds from Keeneland, other public auction companies, or private purchaser(s) of the Subject Horse(s), as applicable.

C. As purchase price for any horse from Exhibit Numbers 3, 4, 5, or 6 sold privately, by mutual agreement of the parties, as provided herein, Everest shall be entitled to and shall be paid by Crestwood fifty percent (50%) of the net sales proceeds received for each individual horse (except that Everest shall be entitled to and shall be paid seventy-five percent (75%) of the net sales proceeds received for the 2008 STORM CAT/ISLAND FASHION filly, as described above). For purposes of this Agreement, the parties agree that the "net sales proceeds" for any of the Subject Horses sold privately shall mean the sales proceeds for any such horse, reduced by the amount of the sales commission, if any, payable to an unaffiliated third party, consistent with the provisions of Paragraph 12 below. Such payment of purchase price(s) by Crestwood to Everest shall be conditioned upon and shall occur promptly following Crestwood's receipt of such proceeds from the private purchaser(s) of the Subject Horse(s).

D. Notwithstanding the foregoing, Crestwood shall be entitled to offset from amounts payable under subsections A through C above, any undisputed board bills or other undisputed maintenance expenses or reimbursable fees or expenses due and payable to it by Everest at the time such payments are

4

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

to be made under such sections.

9. **PAYMENT.** Crestwood shall be required to fully account for and pay Everest's portion of the net sales proceeds from the auction sales of any of the Subject Horses, calculated with respect to each individual horse pursuant to Paragraph 8 above, without any credit or offset whatsoever, except as provided herein with respect to certain stallion season expenses, within five (5) business days following Crestwood's receipt of the applicable net sales proceeds from the public auction sales company. Crestwood shall be required to fully account for and pay Everest's portion of the sales proceeds from the private sale or disposition of any of the Subject Horses, with respect to each individual horse, within five (5) business days following Crestwood's receipt of the applicable sales proceeds for such horse. It is the intention of the parties that the sale or other disposition of each individual horse under this Agreement shall be treated and accounted for as a separate sale transaction. The parties agree and acknowledge that the private sale of any of the Subject Horses shall be all-cash transaction(s), and that each private sale shall be properly documented with a Bill of Sale or other similar documents identifying the horse being sold, the sale price, the date of sale, the buyer and seller, the identity of any third party/agent, the amount of any commission or other compensation payable to any third party/agent, and other customary information.

10. **RISK OF LOSS, POSSESSION.** Crestwood agrees that it shall take possession of the Subject Horses as of November 1, 2008, at their current location at Crestwood Farm in Lexington, Kentucky. As of said date, all risk of loss shall pass from Everest to Crestwood, except with respect to ISLAND FASHION, in foal to GHOSTZAPPER, and the 2008 STORM CAT/ISLAND FASHION filly, as otherwise provided in Section 1 above.

11. **DISCLAIMER OF WARRANTIES. EVEREST MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO ANY OF THE SUBJECT HORSES, SPECIFICALLY AND WITHOUT LIMITATION, EVEREST MAKES NO WARRANTIES THAT ANY OF THE SUBJECT HORSES ARE SUITABLE FOR RACING OR BREEDING PURPOSES.**

12. **COMMISSION.** Other than the standard thoroughbred sales company commissions, the parties represent and warrant to each other that no sales fees or commissions are or will be owing or payable to anyone in connection with this sale transaction, and the parties indemnify and hold each other harmless from any claims for sales fees or commissions from any parties. Crestwood represents and warrants that other than receiving its share of sales proceeds from the public auction or private sale of the Subject Horses, it will not charge or be entitled to any sale or consignment fee or commission. Notwithstanding the foregoing, Crestwood, in its sole discretion, may in any private sale of a Subject Horse pay a sales commission of up to 10% to any third party associated with the transaction, provided that such third party is not affiliated with Crestwood. In such event, Crestwood shall account in reasonable detail to Everest as to payment of same, including the identity of the recipient(s) of any such commissions.

13. **ACCOUNTING.** Crestwood shall promptly (within 48 hours) notify Everest of the sale or disposition of each of the Subject Horses. In addition, not later than the tenth (10th) day of each calendar month, Crestwood shall provide to Everest a full accounting of the horses sold or otherwise disposed of

5

CASE 0:21-cv-02289-JWB-JFD    Doc. 1-1    Filed 10/15/21    Page 75 of 316
27-CV-18-8745

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

Case 3:15-cv-00576-GNS-CHL    Document 8-2    Filed 07/16/15    Page 7 of 16 PageID #: 174
CASE 0:09-cv-02436-MJD-JSM    Document 18-1    Filed 10/26/09    Page 6 of 19

during the previous month (and the horses remaining unsold), with information including the name of each horse sold or disposed of, the type of disposition, the date of sale or disposition, the sale price of each horse, the date of receipt of the sales price, and the name and address of each buyer/transferee. Crestwood shall also provide prompt written confirmation to Everest of the nomination of and acceptance of any of the Subject Horses to the Keeneland January 2005 sale or other recognized public auctions, as applicable under this Agreement. Upon request, Crestwood shall provide Everest copies of Bills of Sale and/or other documents pertaining to sale or disposition of any of the Subject Horses.

14. **FACSIMILE.** The parties hereto agree that a facsimile of a counterpart of this signed Agreement constitutes an original counterpart and shall be a valid and binding document for all legal and other purposes.

15. **COUNTERPARTS.** This Agreement may be executed in multiple counterparts by the parties hereto. All of such counterparts shall be construed as if all signatures were appended to one document.

16. **MERGER.** This Agreement contains the entire agreement of the parties and any prior or concurrent written or oral understandings are deemed merged into this Agreement.

17. **GOVERNING LAW.** The terms of this Agreement shall be enforced and construed in accordance with the laws of the Commonwealth of Kentucky.

18. **INSURANCE.** Everest acknowledges that Crestwood shall be under no obligation to obtain insurance of any kind on the Subject Horses or renew any existing policy on a Subject Horse. Everest agrees and covenants to maintain its existing casualty insurance coverage on ISLAND FASHION, in foal to GHOSTZAPPER. Crestwood shall reimburse Everest the pro rata cost of insurance premiums necessary to maintain said existing casualty insurance coverage from the Effective Date until said horse is sold at public auction or otherwise. In the event of a casualty loss of said horse prior to its sale, Crestwood shall pay Everest such additional sums as are necessary so that Crestwood has paid Everest a total of twenty-five percent (25%) of the total of all insurance premiums required to collect the total insurable value upon such loss, and, accordingly, Crestwood shall be entitled to receive from Everest the sum of 25% of the insurance loss proceeds received by Everest and Everest shall be entitled to retain 75% of the insurance loss proceeds received by Everest. In no event shall Everest be required to pay to Crestwood more than 25% of the insurance loss proceeds received by Everest.

19. **BINDING EFFECT.** This Agreement shall be binding upon the parties hereto, their heirs, personal representatives, successors and assigns.

20. **ATTORNEY'S FEES.** In the event of any action or proceeding to declare or enforce the terms of this Agreement, the prevailing party or parties shall be entitled to recover its or their reasonable attorney's fees and other costs, in addition to any other relief to which it may be entitled.

/
/
/
/
/
/

6

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

IN WITNESS WHEREOF, the parties have executed this Agreement as of the dates indicated below.

EVEREST STABLES, INC.

By: _____    DATE: 11/4/09

Jeffrey L. Nielsen

Its:  President

CRESTWOOD FARM BLOODSTOCK LLC

By: _____    DATE: 11/4/08

Pope McLean

Its: _____

7

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

# EXHIBIT 1

A Breeze
Bayou Boots
Big Shoes
Cat News
Cayman Sunset
Foreign Fashion
Downtown Blues
Flash of Fashion
Harbor Blues
Isla Cazuera
Island Escape
Island Fashion

Out of Step
Purely Excessive
Quiet Whisper
Royal Deception
Sister Girl Blues
Six Zeros
Tight Kitty
Two To Waltz
Unmingled
White Angelize

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

## EXHIBIT 2

| | |
|---|---|
| Il Gruia | Forest Cat |
| Automatic Appeal | Jungle Storm |
| Backrage | Mini Bee |
| Bailide | Rapid Boat |
| Boot Um Bart'e | Snowshack Lady |
| Chantid Mide | Storm Storm |
| Discreet Account | Terrura |
| Dreams and Desires | Taurus Moon |
| Enthusiastic | Voodoo's Sister |
| Follow the Clues | |

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

Case 3:15-cv-00576-GNS-CHL    Document 8-2    Filed 07/16/15    Page 11 of 16 PageID #: 178

CASE 0:09-cv-02438-MJD-JSM    Document 18-1    Filed 10/26/09    Page 11 of 19

**EXHIBIT 4**

## EVEREST STABLES - YEARLINGS

| Horse Name | Horse Type | Sire | Dam | Color | Sex | DOB |
|---|---|---|---|---|---|---|
| Abbreviated Career '07 | Yearling | Pationville | Abbreviated Career | Bay | Colt | 4/5/2007 |
| Airlift '07 | Yearling | Service Stripe | Airlift | Bay | Filly | 3/29/2007 |
| Annual Report '07 | Yearling | Pationville | Annual Report | Dk B/Br | Filly | 3/15/2007 |
| Bodinaga '07 | Yearling | Pationville | Bodinaga | Bay | Filly | 5/22/2007 |
| Bayou Boots '07 | Yearling | Pationville | Bayou Boots | Chestnut | Filly | 5/3/2007 |
| Boot Um Bertie '07 | Yearling | Pationville | Boot Um Bertie | Dk B/Br | Colt | 4/28/2007 |
| Cat News '07 | Yearling | Pationville | Cat News | Chestnut | Colt | 4/19/2007 |
| Cayman Sunset '07 | Yearling | Pationville | Cayman Sunset | Dk B/Br | Filly | 5/21/2007 |
| Derecke Fashion '07 | Yearling | Pationville | Derecke Fashion | Gr/Roan | Filly | 3/11/2007 |
| Downtown Blues '07 | Yearling | Ghostzapper | Downtown Blues | Bay | Colt | 2/25/2007 |
| Dreams and Desires '07 | Yearling | Pationville | Dreams and Desires | Chestnut | Filly | 2/8/2007 |
| Elegante Chica '07 | Yearling | Pationville | Elegante Chica | Chestnut | Filly | 2/5/2007 |
| Enthusiastic '07 | Yearling | Pationville | Enthusiastic | Bay | Filly | 3/16/2007 |
| Forest Cat '07 | Yearling | Pationville | Forest Cat | Chestnut | Colt | 5/12/2007 |
| Haitian Vacation '07 | Yearling | Hold For Gold | Haitian Vacation | Chestnut | Colt | 4/21/2007 |
| Harbor Blues '07 | Yearling | Forestry | Harbor Blues | Bay | Filly | 1/26/2007 |
| ...shed '07 | Yearling | Pationville | Hushed | Chestnut | Filly | 2/7/2007 |
| Inflammatory '07 | Yearling | Pationville | Inflammatory | Chestnut | Colt | 5/2/2007 |
| Isla Cozzene '07 | Yearling | Pationville | Isla Cozzene | Chestnut | Colt | 4/11/2007 |
| Isla Mujeres '07 | Yearling | Maria's Mon | Isla Mujeres | Gr/Roan | Colt | 5/14/2007 |
| Just A Wish '07 | Yearling | Pationville | Just A Wish | Chestnut | Filly | 3/4/2007 |
| Karaoke Kid '07 | Yearling | Street Cry (Ire) | Karaoke Kid | Chestnut | Colt | 4/5/2007 |
| Latin Lust '07 | Yearling | Storm Boot | Latin Lust | Dk B/Br | Filly | 2/9/2007 |
| Look To Heaven '07 | Yearling | Pationville | Look To Heaven | Dk B/Br | Colt | 4/18/2007 |
| Mighty Might '07 | Yearling | Pationville | Mighty Might | Gr/Roan | Filly | 5/25/2007 |
| Minimum Security '07 | Yearling | Pationville | Minimum Security | Dk B/Br | Colt | 3/19/2007 |
| No No Perdomo '07 | Yearling | Pationville | No No Perdomo | Chestnut | Colt | 2/14/2007 |
| Out Of Step '07 | Yearling | Pationville | Out Of Step | Chestnut | Filly | 5/23/2007 |
| Peaceful Place '07 | Yearling | Pleasant Tap | Peaceful Place | Dk B/Br | Colt | 3/6/2007 |
| Quiet Whisper '07 | Yearling | Pationville | Quiet Whisper | Bay | Colt | 3/17/2007 |
| Regal Boot '07 | Yearling | Pationville | Regal Boot | Dk B/Br | Colt | 3/14/2007 |
| Salted With Fire '07 | Yearling | Pationville | Salted With Fire | Dk B/Br | Colt | 4/23/2007 |
| Sidonia '07 | Yearling | Pationville | Sidonia | Bay | Colt | 4/17/2007 |
| Silent Storm '07 | Yearling | Pationville | Silent Storm | Dk B/Br | Filly | 3/11/2007 |
| ...ewtrees '07 | Yearling | Pationville | Slewtrees | Dk B/Br | Filly | 3/6/2007 |
| ...strictor Sister '07 | Yearling | Pationville | Strictor Sister | Chestnut | Filly | 2/1/2007 |
| Taurus Moon '07 | Yearling | Pationville | Taurus Moon | Chestnut | Colt | 4/15/2007 |
| Two To Waltz '07 | Yearling | Pationville | Two To Waltz | Chestnut | Colt | 5/27/2007 |
| Vertical Ascent '07 | Yearling | Mizzen Mast | Vertical Ascent | Gr/Roan | Filly | 2/9/2007 |

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

## EVEREST STABLES - YEARLINGS

| | | | | | | |
|---|---|---|---|---|---|---|
| Voodoo's Sister '07 | Yearling | Pattonville | Voodoo's Sister | Chestnut | Colt | 2/23/2007 |
| White Amelia '07 | Yearling | Pattonville | White Amelia | Dk B/Br | Filly | 5/10/2007 |
| Wing It '07 | Yearling | Pattonville | Wing It | Chestnut | Colt | 4/4/2007 |
| Wings '07 | Yearling | Hold For Sale | Wings | Chestnut | Colt | 3/9/2007 |
| Wish For Gold '07 | Yearling | Pattonville | Wish For Gold | Dk B/Br | Filly | 2/28/2007 |

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

## EXHIBIT 5

### EVEREST STABLES - WEANLINGS

| Horse Name | Horse Type | Sire | Dam | Color | Sex | DOB |
|---|---|---|---|---|---|---|
| Abbreviated Career '08 | Weanling | Pettonville | Abbreviated Career | Bay | Colt | 4/27/20 |
| Badness '08 | Foal | Pettonville | Badness | Chestnut | Filly | 5/14/20 |
| Big Shoes '08 | Weanling | Giant's Causeway | Big Shoes | Bay | Colt | 3/15/20 |
| Boot Um Bertie '08 | Foal | Pettonville | Boot Um Bertie | Dk B/Br | Colt | 6/7/20 |
| Danzing Fashion '08 | Weanling | Pettonville | Danzing Fashion | Dk B/Br | Colt | 3/31/20 |
| Discreet Account '08 | Weanling | Pettonville | Discreet Account | Dk B/Br | Filly | 4/10/20 |
| Downtown Blues '08 | Weanling | Elusive Quality | Downtown Blues | Bay | Colt | 3/7/20 |
| Dreams and Desires '08 | Weanling | Pettonville | Dreams and Desires | Dk B/Br | Colt | 2/24/20 |
| Elegante Chica '08 | Weanling | Pettonville | Elegante Chica | Chestnut | Filly | 2/15/20 |
| Flash of Fashion '08 | Weanling | Elusive Quality | Flash Of Fashion | Bay | Filly | 3/12/20 |
| Forest Cat '08 | Foal | Pettonville | Forest Cat | Chestnut | Colt | 6/3/20 |
| Houston's Plano '08 | Weanling | Pettonville | Houston's Plano | Bay | Filly | 2/20/20 |
| Hushed '08 | Weanling | Pettonville | Hushed | Bay | Colt | 3/28/20 |
| Inflammatory '08 | Foal | Pettonville | Inflammatory | Chestnut | Colt | 6/6/20 |
| Isla Cozzene '08 | Foal | Pettonville | Isla Cozzene | Dk B/Br | Filly | 4/20/20 |
| Isla Mujeres '08 | Weanling | Pettonville | Isla Mujeres | Bay | Filly | 3/11/20 |
| Island Fashion '08 | Weanling | Storm Cat | Island Fashion | Dk B/Br | Filly | 2/4/20 |
| It's Silent '08 | Weanling | Pettonville | It's Silent | Dk B/Br | Colt | 2/8/20 |
| Just A Wish '08 | Foal | Pettonville | Just A Wish | Chestnut | Colt | 5/8/20 |
| Look To Heaven '08 | Foal | Pettonville | Look To Heaven | Bay | Colt | 4/13/20 |
| Mighty Might '08 | Weanling | Pettonville | Mighty Might | Dk B/Br | Colt | 3/27/20 |
| Mini Dee '08 | Foal | Pettonville | Mini Dee | Dk B/Br | Colt | 5/21/20 |
| Minimum Security '08 | Weanling | Pettonville | Minimum Security | Dk B/Br | Filly | 3/15/20 |
| No No Perdomo '08 | Foal | Pettonville | No No Perdomo | Dk B/Br | Filly | 5/10/20 |
| Out Of Step '08 | Foal | Pettonville | Out Of Step | Bay | Filly | 5/18/20 |
| Political Hostage '08 | Weanling | Pettonville | Political Hostage | Dk B/Br | Colt | 2/11/20 |
| Purely Excessive '08 | Foal | Pettonville | Purely Excessive | Dk B/Br | Colt | 4/20/20 |
| Quiet Whisper '08 | Foal | Pettonville | Quiet Whisper | Bay | Filly | 6/18/20 |
| Regal Boot '08 | Weanling | Pettonville | Regal Boot | Chestnut | Colt | 3/11/20 |
| Royal Deception '08 | Foal | Pettonville | Royal Deception | Dk B/Br | Filly | 4/17/20 |
| Salted With Fire '08 | Foal | Pettonville | Salted With Fire | Chestnut | Colt | 5/5/20 |
| Shawshank Lady '08 | Weanling | Pettonville | Shawshank Lady | Bay | Colt | 3/17/20 |
| Silent Storm '08 | Weanling | Pettonville | Silent Storm | Dk B/Br | Filly | 3/13/20 |
| Six Zeroes '08 | Weanling | Pleasant Tap | Six Zeroes | Dk B/Br | Filly | 3/19/20 |
| So Emotional '08 | Weanling | Pettonville | So Emotional | Chestnut | Colt | 4/1/20 |
| Stricter Sister '08 | Weanling | Pettonville | Stricter Sister | Chestnut | Filly | 3/2/20 |
| Taurus Moon '08 | Foal | Pettonville | Taurus Moon | Dk B/Br | Filly | 4/28/20 |
| Two To Waltz '08 | Foal | Pettonville | Two To Waltz | Chestnut | Colt | 6/16/20 |
| Untangled '08 | Weanling | Pettonville | Untangled | Chestnut | Colt | 5/24/20 |

27-CV-18-8745

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

Case 3:15-cv-00576-GNS-CHL    Document 8-2    Filed 07/16/15    Page 14 of 16 PageID #: 181

CASE 0:09-cv-02936-MJD-JSM    Document 15-1    Filed 10/26/09    Page 14 of 19

## EVEREST STABLES - WEANLINGS

| Vertical Ascent '08 | Foal | Pettenville | Vertical Ascent | Chestnut | Colt | 6/4/2008 |
| Voodoo's Sister '08 | Weanling | Pettenville | Voodoo's Sister | Dk B/Br | Colt | 3/12/2008 |

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

Case 3:15-cv-00576-GNS-CHL   Document 8-2   Filed 07/16/15   Page 15 of 16 PageID #: 182
CASE 0:09-cv-02436-MJD-JSM   Document 18-1   Filed 10/26/09   Page 15 of 19

**EXHIBIT 6**

**EVEREST STABLES - TWO YEAR OLDS**

| Ferns and Festion | 2 Yr Old | Polonaise | Outside Fashion | Garrison | Filly | 2/21/2006 |
|---|---|---|---|---|---|---|

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

Case 3:15-cv-00576-GNS-CHL   Document 8-2   Filed 07/16/15   Page 16 of 16 PageID #: 183
CASE 0:09-cv-02438-MJD-JSM   Document 18-1   Filed 10/26/09   Page 10 of 19

## EXHIBIT 3

E. Grove

| | |
|---|---|
| Magenta Chica | Minimum Security |
| Glitz | Ne No Perdono |
| Happy Hostage | Political Hostage |
| Held Hostage | Baked With Fire |
| Hushed | Shlonte |
| Jade | So Emotional |
| Inflammatory | Stinger Bater |
| Look to Harvest | Verbal Assault |
| Love at Lidah | Wing It |
| Mighty Might | Wish for Gold |

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

# Exhibit C

Case 3:15-cv-00576-GNS-CHL    Document 8-3    Filed 07/16/15    Page 2 of 33 PageID #: 185

William C. Rambicure - 7/7/2011
Crestwood Farm Bloodstock, LLC vs. Everest Stables, Inc., et al.

Page 1

WILLIAM C. RAMBICURE  -  7/7/11
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
at LEXINGTON

-----------------------------------------------------

CRESTWOOD FARM BLOODSTOCK, LLC,

          Plaintiff,

     vs.              Civil Action No. 5:09-CV-317-KKC

EVEREST STABLES, INC. and
JEFFREY L. NIELSEN,
          Defendants.

-----------------------------------------------------

EVEREST STABLES, INC.,
          Plaintiff,
     vs.              Civil Action No. 5:10-CV-72
LEWIS POPE McLEAN, SR., CRESTWOOD
FARM BLOODSTOCK, LLC, McLEAN
HOLDINGS, LLC and CRESTWOOD FARM,
LLC,

          Defendants.

-----------------------------------------------------

DEPOSITION
     The following is the deposition of
WILLIAM C. RAMBICURE, taken before Patricia K. Carl,
RPR, Notary Public, pursuant to Notice of Taking
Deposition, at 301 East Main Street, Lexington,
Kentucky, commencing at approximately 1:10 p.m.,
July 7, 2011.

                    *  *  *  *  *

Depo International, Inc.
(763) 591-0535 or (888) 591-9722 admin@depointernational.com

CASE 0:21-cv-02289-JWB-JFD    Doc. 1-1    Filed 10/15/21    Page 87 of 316
27-CV-18-8745

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

Case 3:15-cv-00576-GNS-CHL    Document 8-3    Filed 07/16/15    Page 3 of 33 PageID #: 186

William C. Rambicure  -  7/7/2011
Crestwood Farm Bloodstock, LLC vs. Everest Stables, Inc., et al.

**Page 2**

WILLIAM C. RAMBICURE - 7/7/11
APPEARANCES:

On Behalf of Everest Stables, Inc., and
Jeffrey L. Nielsen:
    Thomas W. Pahl, Esquire
    FOLEY & MANSFIELD, PLLP
    250 Marquette Avenue
    Suite 1200
    Minneapolis, Minnesota  55401
    (612) 338-8788
    tpahl@foleymansfield.com

On Behalf of Crestwood Farm Bloodstock, LLC:
    D. Barry Stilz, Esquire
    KINKEAD & STILZ
    National City Plaza
    301 East Main Street
    Suite 800
    Lexington, Kentucky  40507-1530
    (859) 296-2300
    bstilz@ksattorneys.com

* * * * *

**Page 3**

WILLIAM C. RAMBICURE - 7/7/11

DEPOSITION REFERENCE INDEX

EXAMINATION
    By Mr. Stilz  4

OBJECTIONS
    By Mr. Pahl  34

EXHIBIT INDEX

EXHIBIT NO. 264 MARKED, Purchase and Sale
    Agreement dated 12/1/02...........11
EXHIBIT NO. 265 MARKED, 11/4/08 e-mail series re:
    Burns/Crestwood Revised Agreement -
    11-04-08, 9:38 AM, MDT Draft..........31
EXHIBIT NO. 265 MARKED, 11/4/08 e-mail series re:
    Burns/Crestwood Revised Agreement..........44
EXHIBIT NO. 268 MARKED, Purchase and Sale Agreement
    and Bill of Sale..........51
EXHIBIT NO. 290 MARKED, 371.00's e-mail series re:
    Trading Sale Information..........53

**Page 4**

WILLIAM C. RAMBICURE - 7/7/11
PROCEEDINGS
    Whereupon, the deposition of WILLIAM C.
RAMBICURE was commenced at 1:10 p.m. as follows:

    WILLIAM C. RAMBICURE,
    after having been first duly sworn,
    deposes and says under oath as follows:
    * * *

EXAMINATION
BY MR. STILZ:
    Q.   Good afternoon, Mr. Rambicure.
    A.   Mr. Stilz.
    Q.   Thank you for coming today.  I know you
are appearing here pursuant to the notice of
deposition that we sent, and Mr. Pahl and I have an
agreement, a gentleman's agreement that it will be
treated as if you were subpoenaed for your protection
and everybody else's protection in this case.
    A.   Okay.
    Q.   I want to ask you several questions
today.  I'm not going to go through the normal spiel
that I would do with a normal witness because I assume
you have given a deposition before or at least

**Page 5**

participated in a deposition before.
    A.   I have been deposed before.  I have
taken lots of depositions.
    MR. PAHL:  Before we proceed much
further, I do want to make clear, as I think I also
indicated in an e-mail at some point, that Everest
Stables and Jeff Nielsen have not and are not
intending to waive the attorney-client privilege.  I
have conveyed that instruction to Mr. Rambicure.
    There may be instances where we get
close and I have told him to, if there is any
question, error to the side of either taking a break
or at least letting me offer some compromise solution
to a yes or a no, but no explanation.  And I just
wanted to make sure that you were aware of that in
advance.
    I'm not here as his counsel.  He is a
big enough and smart enough lawyer to act as his own
counsel, though there is some saying that seems to
mind when one does that.  But I am here to make sure
and to insure that the attorney-client privilege and
work product privileges are both protected.
BY MR. STILZ:
    Q.   I understand that, Mr. Pahl.  It's not

2 (Pages 2 to 5)

Depo International, Inc.
(763) 591-0535 or (800) 591-9722 admin@depointernational.com

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

Case 3:15-cv-00576-GNS-CHL    Document 8-3    Filed 07/16/15    Page 12 of 33 PageID #: 195

William C. Rambicure - 7/7/2011
Crestwood Farm Bloodstock, LLC vs. Everest Stables, Inc., et al.

Page 38

WILLIAM C. RAMBICURE - 7/7/11
1  was to receive a certain percentage from the sale of
2  ISLAND FASHION and the 2008 STORM CAT ISLAND FASHION.
3      A.  I understand that should these horses
4  be sold and should there be net proceeds from the sale
5  of them, that they would be entitled to their
6  percentage, yes.
7      Q.  And that percentage was 25 percent, Mr.
8  Nielsen received 75 percent up to a point and then in
9  resolved 100 percent I believe over a million dollars?
10     A.  I think it depends on which of the two
11 horses.
12     Q.  With regard to the 2008 STORM CAT?
13     A.  The 2008 STORM CAT as I recall it,
14 anything over a million dollars in net sale proceeds,
15 100 percent of that was to go to Everest. Up to that
16 our million was to be split 75/25, 25 going to
17 Crestwood.
18     Q.  Now, this document, this November 4th
19 agreement, Exhibit 205, called for Crestwood to pay
20 all expenses of these horses, correct, from November
21 4th, 2008, until they were sold?
22     A.  I believe that is correct. That was
23 kind of a fundamental underpinning of this agreement,
24 was that Crestwood would assume and pay all of the

Page 39

WILLIAM C. RAMBICURE - 7/7/11
1  out-of-pocket expenses associated with the care and
2  upkeep of these horses, all of the subject horses
3  under the terms of the agreement, and that they would
4  hold Everest and Mr. Nielsen harmless from those
5  expenses and costs.
6      Q.  And that included the expenses on the
7  two horses that were not transferred, title was not
8  transferred to them, is that correct?
9      A.  That is correct.
10     Q.  That including the ISLAND FASHION and
11 her 2008 STORM CAT?
12     A.  That is correct I guess the only other
13 point, I don't even know if I need to make it, all of
14 this was subject to the entire terms and conditions
15 and provisions of this agreement, which included, but
16 not limited to, Crestwood being required to exercise
17 all commercially reasonable efforts with utmost good
18 faith on behalf of both Everest and Crestwood to
19 properly prepare the horses for sale and market the
20 horses, and to market, offer for sale and to sell the
21 subject horses, either at public auction or in a private
22 sale, in order to maximize the sales price for each
23 such horse.
24     The agreement has to be read as a

Page 40

WILLIAM C. RAMBICURE - 7/7/11
1  whole.
2      Q.  I understand that. It was to each
3  party's benefit to maximize the sales price of these
4  particular horses, is that correct?
5      A.  Assuming that both sides are acting in
6  good faith, that is correct.
7      Q.  Do you have concerns that either party
8  were not acting in good faith?
9      A.  Not at the time that I was drafting the
10 agreement, but I think the underlying assumption was
11 that both parties would act with utmost good faith
12 towards the other, particularly given the length and
13 the dealings that they had, length of the history of
14 the relationship.
15     At the same time, as a drafter or
16 scrivener of an agreement, what you want to do is to
17 try to build in protections for your client in the
18 event that something that you don't really anticipate
19 happening happens. And so that was part of -- a big
20 part of the reasons for the language in paragraph 7.
21     And I don't know where it is right now,
22 Barry, but there were some other provisions about not
23 being able to sell to affiliated third parties, that
24 was also part of that. We are trying to be smart and

Page 41

WILLIAM C. RAMBICURE - 7/7/11
1  I think you have already seen my testimony on that
2  point from the injunction hearing. I don't think I
3  need to repeat it here. But you want to, you want to
4  protect your client from somebody taking advantage of
5  them.
6      Q.  I think your testimony at the
7  injunction hearing was that one of the reasons that
8  Section 7 is drafted the way it is, you were trying to
9  protect your client to insure there were sales
10 proceeds to be divided or from which he would get his
11 percentage interest?
12     A.  Particularly as to the horses where
13 title and ownership was being transferred over,
14 because if you look at the last sentence in paragraph
15 7, that basically Crestwood doesn't have to provide
16 any further consideration and title remains in them.
17     So with the exception of the two horses
18 that title wasn't transferred to, title and ownership
19 of all of these other horses with the exception of
20 ISLAND FASHION and her 2008 STORM CAT filly, were
21 being placed into Crestwood's name, and they were
22 effectively the owner of these horses from that day
23 forward, subject to the sales proceeds being divided.
24     But if, for instance, Crestwood had the

11 (Pages 38 to 41)

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

Case 3:15-cv-00576-GNS-CHL    Document 8-4    Filed 07/16/15    Page 2 of 34 PageID #: 218

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

5:09-CV-317, Crestwood Farms v. Everest Stables (May 28, 2010)

27-CV-18-8745

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

# Exhibit D

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

Case 3:15-cv-00576-GNS-CHL   Document 8-6   Filed 07/16/15   Page 2 of 3 PageID #: 254

From:           Pope McLean, Jr. [popeb@crestwoodfarm.com]
Sent:           Wednesday, December 03, 2008 6:18 PM
To:             Longenecker, David E.
Subject:        RE: RNA's

Thanks, I think we just need to think it through a bit more. Pope

-----Original Message-----
From: Longenecker, David E. [mailto:D.Longenecker@stns.com]
Sent: Wednesday, December 03, 2008 6:08 PM
To: Pope McLean, Jr.
Subject: RE: RNA's

I will take a look at the contract and be ready to talk tomorrow.

David

This wireless message sent via Xpress Mail with GoodLink.
www.cingular.com

-----Original Message-----
From: Pope McLean, Jr. [mailto:popejr@crestwoodfarm.com]
Sent: Wednesday, December 03, 2008 06:05 PM Eastern Standard Time
To: Longenecker, David E.
Subject: RNA's

David, Everest is now talking about possibly RNA'ing some of the mares that are being offered. The contract does not seem address this possibility at all, as we were negotiating in good faith that all horses entered would be sold without reserve. We think that in the event he buys back any horse, that he would be buying Crestwood out at that price. What is your view on this issue? I am sure that he is trying to find every possible loophole that he can right now. I will talk to you soon. Pope



Longe RNA Emails 000192

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

Case 3:15-cv-00576-GNS-CHL   Document 8-6   Filed 07/16/15   Page 3 of 3 PageID #: 255

Page 1 of 1

From:    Longenecker, David E.
Sent:    Thursday, December 04, 2008 9:40 AM
To:      'Pope McLean, Jr.'
Subject: RE: RNA's

The contract clearly contemplates and provides that the horses sold at auction are sold without reserve.  Section 7 says:
"For all horses to be sold at public auction, Crestwood agrees and covenants that each horse shall be sold with no reserve, RNA, or buyback price."

Section 7 continues: "The parties agree that in the event any Subject Horse is either outside other auction or attempts to privately sell hereunder, title to such Subject Horse shall remain with Crestwood without additional consideration.".

The horses sold without reserve under the contract.  If they go through and aren't sold, they remain property of Crestwood.

Everett is trying to change the contract and can't do what it wants without an amendment.  Based on what you're saying, I think we should respond that Crestwood will only agree to an amendment permitting Everett to set a reserve and get returned ownership of RNA-ed mares is if Everett agrees to pay Crestwood 50% of the reserve.

Let's discuss.

David

---

From: Pope McLean, Jr. [mailto:pope@crestwoodfarm.com]
Sent: Wednesday, December 03, 2008 9:09 PM
To: Longenecker, David E.
Subject: RNA's

David, Everett is now talking about possibly RNAing some of the mares that are being offered.  The contract does not seem address this possibility at all, as we were negotiating in good faith that all horses entered would be sold without reserve.  We think that in the event he buys back any horse, that he would be buying Crestwood out at that price.  What is your view on this issue?  I am sure that he is trying to find every possible loophole that he can right now.  I will talk to you soon.  Pope


No 335

Longe RNA Emails 000191

CSPOE00019D

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

# Exhibit E

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN



JANUARY 9, 2009

EVEREST STABLES, LLC
Attention: Jeffrey L. Neilsen

RE:   Purchase and Sale Agreement dated November 1, 2008 (the "Agreement")

Dear Jeffrey:  J_eff

Under the Agreement, the title to a number of Everest's horses was transferred to Crestwood Farm Bloodstock, LLC to be followed by the public or private sale of those horses. Everest retained title to certain other horses that would also be sold publicly or privately. The proceeds from the sale of these horses would be divided among Crestwood and Everest in accordance with sharing ratios described in the Agreement, with Crestwood receiving 25% of the sales price of certain horses and 50% of the sales price of others.

Under the Agreement, the horses were to be sold without reserve. You have informed us that Everest wishes to place a reserve price on certain of the horses entered for public sale. Doing so will require an amendment of the Agreement. Crestwood is willing to consider an amendment to the Agreement to permit reserves to be placed and proposes that, with respect to any such horse, should the reserve not be reached and title be transferred back to Everest, Crestwood will receive payment from Everest equal to the Crestwood's sharing percentage in respect of such horse multiplied by the price at the fall of the hammer.

You have additionally informed us that Everest or affiliate of Everest may buy back certain of the horses entered in public sale. Under the Agreement, buybacks by Everest or an affiliate of Everest are treated no differently than any other purchase. Crestwood is entitled to its sharing ratio on the purchase price, whether the price is determined by a bid from you or an independent third party. Please advise of any alternative arrangement Everest may propose in respect of such situation.

Very truly yours,

Pope McLean



Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

# Exhibit F

Case 3:15-cv-00576-GNS-CHL    Document 8-8    Filed 07/16/15    Page 2 of 4 PageID #: 260

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| Jeffrey L. Nielsen, individually, and Everest Stables, Inc., a Minnesota corporation, | ) ) ) | Court File No. 09-2436-MJD-JSM |
| Plaintiffs | ) ) ) | |
| vs. | ) ) | |
| Lewis Pope McLean, Sr., individually, and Crestwood Farm Bloodstock, LLC, a Kentucky limited liability company, McLean Holdings, LLC, a Kentucky limited liability company, and Crestwood Farm, LLC, a Kentucky limited liability company | ) ) ) ) ) ) ) ) ) | AFFIDAVIT OF WILLIAM C. RAMBICURE, ESQ. |
| Defendants | ) ) | |

The Affiant, William C. Rambicure, being duly sworn upon oath, state and declare as follows:

1. I respectfully submit this Declaration to the Court.

2. I am an attorney duly licensed to practice law in the State of Kentucky. My office is in Lexington Kentucky. I am a graduate of the University of Kentucky College of Law, having graduated in 1981. I am and have been a member of the bar of Kentucky since being admitted in 1981.

3. I am an attorney for Everest Stables, a Minnesota corporation and its principal, Jeff Nielsen.

1

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

Case 3:15-cv-00576-GNS-CHL    Document 8-8    Filed 07/16/15    Page 3 of 4 PageID #: 261

4. As an attorney and officer of the Court, I believe that I am duty bound to submit this Declaration to the Court in Minnesota. I think it is important that I do so to advise the court that I was told directly by an attorney for Crestwood Farm shortly after this lawsuit was filed that he was disappointed and surprised that Mr. Nielsen had filed this lawsuit, that Mr. Nielsen was a controlling individual who controlled all aspects of the relationship between Crestwood Farm and Everest, that Crestwood Farm and other third party witnesses would confirm that Mr. Nielsen was in essence a control freak, and that Crestwood had already lined up a laundry list of prominent horse industry witnesses to ruin Mr. Nielsen's reputation, all of whom would testify that Mr. Nielsen was an "a...hole." These statements took place at my office on Sunday, October 4, 2009, when an attorney representing Crestwood Farm appeared at my office unexpectedly and unannounced when I was preparing for depositions in another case.

5. I believe in reading the Crestwood Farm's pleadings and in studying their witness list that Crestwood Farm is intent upon doing just that, i.e., attempting to destroy Mr. Nielsen's reputation. In my opinion, justice would not be served by allowing local cronyism to interfere with the clear presentation of the facts.

Further the affiant sayeth naught.

William C. Rambicure

STATE OF KENTUCKY    )
                     )
COUNTY OF FAYETTE    )

Subscribed, sworn to and acknowledged before me by William C. Rambicure, this the ____ day of November, 2009.

2

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

Case 3:15-cv-00576-GNS-CHL    Document 8-8    Filed 07/16/15    Page 4 of 4 PageID #: 262

My commission expires: __11|7|2011__

Notary Public, State at Large, KY

3

27-CV-18-8745

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

# Exhibit G

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

Subject: Crestwood
From:    Jack Nielsen (jackjnielsen@yahoo.com)
To:      tpahl@foleymansfield.com;
Date:    Tuesday, September 6, 2011 11:33 AM


Tom,

I now believe that the loan documents and appraisal are very important and Crestwood believes they can not afford to let us see them.

I suggest the following:

1. Chris can do a UCC search with the Secretary of State which would have lien/collateral information.
2. File a motion to enforce subpoena.
3. Demand that the branch facility Crestwood utilized be directly searched as opposed to the out-of-state home office.
4. Tell P&C that our next step would be to contact a bank examiner and file a motion for contempt.

Jeff

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

**Subject:** FW: Everest/Crestwood
**From:** Bill Rambicure (rambicure@rlglex.com)
**To:** jackjnielsen@yahoo.com;
**Cc:** tpahl@foleymansfield.com; crambicure@rlglex.com;
**Date:** Tuesday, September 6, 2011 12:25 PM


Jeff:

   I sent the below email to Chris following our conversation to see what he could find via a quick, online database search at the Ky. Secretary of State's office.

William C. Rambicure
RAMBICURE LAW GROUP, PSC
219 East High Street
PO Box 34188
Lexington, KY 40588-4188
Tel: (859) 253-6713
Fax:(859) 233-7565
email: rambicure@rlglex.com

-----Original Message-----
From: Bill Rambicure
Sent: Tuesday, September 06, 2011 12:50 PM
To: Chris Rambicure
Subject: Everest/Crestwood

Chris:

Can you do an online search for UCC-1 financing statements at Ky Sec of State office to see if any of the Crestwood parties granted either PNC Bank or National City Bank a lien on any of the horses that were/are the subject of the November 4, 2008 agreement. Jeff just called and indicated that Pope inadvertently admitted at his deposition that Crestwood pledged the horses as collateral for an approx. $300K bridge loan in approx. January 2009. However, PNC is now claiming that it cannot locate any of these documents in response to subpoenas issued months ago before discovery closed. Crestwood claims it either previously produced these documents but now cannot locate them or that they do not have copies of any of the documents in their control. Jeff believes that the bank should have the documents but may be stonewalling. However, I shared with Jeff the experience we had in the Brittingham estate litigation in trying to get documents from PNC/Nat City, and that it's possible the documents may have gotten misplaced, misfiled, etc.

Sent from my iPhone

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

Subject:   FW: Everest/Crestwood
From:      Bill Rambicure (rambicure@rlglex.com)
To:        crambicure@rlglex.com;
Cc:        jackjnielsen@yahoo.com; tpahl@foleymansfield.com;
Date:      Tuesday, September 8, 2011 12:30 PM



Interesting. May be that Pope granted liens in either his share/fractional interest in Dixieland Heat and/or in his free annual breeding rights as manager of Petionville, but I'm sure Jeff will want to see these documents. However, I think for now he is much more interested in any pledges of all or any of the horses which were part of the November 2008 agreement after that agreement was struck

William C. Rambicure
RAMBICURE LAW GROUP, PSC
219 East High Street
PO Box 34188
Lexington, KY 40588-4188
Tel: (859) 253-6713
Fax:(859) 233-7565
email: rambicure@rlglex.com


-----Original Message-----
From: Chris Rambicure
Sent: Tuesday, September 06, 2011 1:07 PM
To: Bill Rambicure
Subject: RE: Everest/Crestwood



The search may take awhile, but I already turned up something interesting. I don't know if Tom and Jeff knew this, but National City (which I believe is now PNC) filed an amended financing statement relating to some loan with Pope adding an interest in Dixieland Heat, Petionville, and two other stallions in 2004. I'll send a more detailed e-mail with attachments once I complete this research.

Christopher B. Rambicure
Rambicure Law Group, PSC
219 E. High St.
PO Box 34188
Lexington, KY 40588-4188
(859) 253-6713 (Telephone)
(859) 233-7565 (Facsimile)
crambicure@rlglex.com

The above message is from an attorney. It may be confidential and contain information that is protected by the attorney-client privilege. If you believe you have received this message in error, please do not read it, reply to

27-CV-18-8745

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

this message to notify the sender, then delete the message.

-----Original Message-----
From: Bill Rambicure
Sent: Tuesday, September 06, 2011 12:50 PM
To: Chris Rambicure
Subject: Everest/Crestwood

Chris:



Can you do an online search for UCC-1 financing statements at Ky Sec of State office to see if any of the Crestwood parties granted either PNC Bank or National City Bank a lien on any of the horses that were/are the subject of the November 4, 2008 agreement. Jeff just called and indicated that Pope inadvertently admitted at his deposition that Crestwood pledged the horses as collateral for an approx. $300K bridge loan in approx. January 2009. However, PNC is now claiming that it cannot locate any of these documents in response to subpoenas issued months ago before discovery closed. Crestwood claims it either previously produced these documents but now cannot locate them or that they do not have copies of any of the documents in their control. Jeff believes that the bank should have the documents but may be stonewalling. However, I shared with Jeff the experience we had in the Brittingham estate litigation in trying to get documents from PNC/Nat City, and that it's possible the documents may have gotten misplaced, misfiled, etc

Sent from my iPhone

27-CV-18-8745

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

# Exhibit H

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Kathryn Aubrey

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Scott McCauley
National City Bank of KY
301 E. Main St.
Lexington, KY 40507

Filed by:        Kentucky Secretary of State
Filing number: 2002-1632703-08 action: 07
Filing date:    5/24/2004 4:30:00 PM
Status:         Active

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE #
2002-1632703-08

1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.

☐ DELETE name: Give record name to be deleted in item 6a or 6b.

☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:
6a. ORGANIZATION'S NAME

OR
| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| McLean | Lewis | Pope | |

7. CHANGED (NEW) OR ADDED INFORMATION:
7a. ORGANIZATION'S NAME

OR
| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 7d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☐ deleted or ☒ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

100% interest in DIXIELAND HEAT, 1990 thoroughbred stallion by Dixieland Band out of Evening Silk
100% interest in THE NAME'S JIMMY, 1989 thoroughbred stallion by Encino out of Dancing at Dawn
100% interest in PETIONVILLE, 1992 thoroughbred stallion by Seeking the Gold out of Vana Turns
100% interest in EXPLICIT, 1997 thoroughbred stallion by Distant View out of Elegant Victress

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.
9a. ORGANIZATION'S NAME
National City Bank of Kentucky

OR
| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

10. OPTIONAL FILER REFERENCE DATA

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 07/29/98)

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

# Exhibit I

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

Subject:  Crestwood and Bohnen

From:    Tim Nelson (timothynelson53@yahoo.com)

To:      tpahl@foleymansfield.com;

Cc:      jackjnielsen@yahoo.com;

Date:    Thursday, September 29, 2011 8:52 AM

Tom,

1. Bohnen. Based on recent developments the tactically prudent course is to appeal the DPPA. Wyatt would be fine for getting started on this.

2. Crestwood. I want you to engage co-counsel Rambicure to physically contact and engage the bank in securing Crestwood's loan file. He believes the file can probably be found at the branch Crestwood used. He also has prior experience with this bank and their balking at production. This is critical evidence for me, and critical to have for trial.

Jeff

27-CV-18-8745

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

# Exhibit J

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

Case 2:09-cv-09446-DSF-VBK  Document 148  Filed 10/06/11  Page 1 of 8  Page ID #:2603

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### MEMORANDUM

| | | | |
|---|---|---|---|
| Case No. | CV 09-9446 DSF (VBKx) | Date | 10/6/11 |

Title   Everest Stables, Inc. v. Julio Canani, et al.

Present: The Honorable   DALE S. FISCHER, United States District Judge

| Debra Plato | Not Present |
|---|---|
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:**   (In Chambers) Order DENYING Plaintiff's Motion in Limine 1 (Docket No. 128) and GRANTING Defendant Canani's Motion in Limine 1 (Docket No. 134)

### A.   Plaintiff's Motion in Limine 1

Plaintiff seeks to preclude Defendant Canani from introducing evidence of Plaintiff's sale of horses other than those listed in the Third Amended Complaint. Plaintiff argues that such evidence is irrelevant,[1] and that even if it is relevant, it should be excluded because its probative value is substantially outweighed by the risk of unfair prejudice, confusion, and waste of time.[2]

Plaintiff claims that Canani fraudulently misrepresented the physical condition of the horses that Plaintiff sold, and falsely informed Plaintiff that the sales Canani negotiated were the best offers Plaintiff could expect. Plaintiff claims that it suffered pecuniary damages as a result of Canani's conduct because it relied on the misrepresentations and sold its horses for less than it otherwise would have received.

---

[1] Evidence is "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

[2] Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

## MEMORANDUM

The evidence of other horse sales shows that Nielsen's health was deteriorating at the time of the sales, that he sought to downsize his holdings and sell his horses as quickly as possible in order to provide for his wife's financial well-being, and that he therefore chose to enter disadvantageous sales agreements. This evidence is relevant because it tends to show (1) that Plaintiff's decision to sell its horses was caused by his desire to liquidate his assets as quickly as possible, rather than by reliance on any representations by Canani, and (2) that the sales based on Canani's alleged misrepresentations did not cause pecuniary damage because Plaintiff would not have held out for more advantageous offers.[3] Thus, the evidence is probative of elements of Plaintiffs' claims for relief. See, e.g., Conroy v. Regents of Univ. of Cal., 45 Cal. 4th 1244, 1255 (2009) ("The elements of fraud . . . are (1) a misrepresentation, (2) with knowledge of its falsity, (3) with the intent to induce another's reliance on the misrepresentation, (4) justifiable reliance, and (5) resulting damage."). Also, the allegations in the Crestwood Complaint are not hearsay because they were made by Nielsen, who is an agent of Plaintiff as its owner and operator, and are therefore statements of a party opponent. Fed. R. Evid. 801(d)(2)(D) (providing that "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship," when offered against a party, are not hearsay).

Introducing this evidence is not likely to confuse the jury or waste time. Canani does not seek to establish every detail of Plaintiff's horse sales. Instead, he seeks to show that Nielsen was concerned about his health, and that this concern motivated the decision to sell Plaintiff's horses as quickly as possible, even if Plaintiff had to settle for disadvantageous deals. Although Plaintiff argues that it is "unfair" to draw inferences about the transactions in this matter based on other horse sales, the evidence would not have an "undue tendency to suggest decision on an improper basis," such as an "emotional" one. 2000 Advisory Comm. Notes, Fed. R. Evid. 403; see also United States v. Cruz-Garcia, 344 F.3d 951, 956 (9th Cir. 2003) ("The rule excludes only evidence where the prejudice is 'unfair' – that is, based on something *other* than its persuasive weight."). The Court concludes that any risk of unfair prejudice does not substantially outweigh the probative value of evidence of Plaintiff's other horse sales.

Plaintiff's motion is DENIED.

---

[3] The Court notes that Nielsen's decision to settle for the disadvantageous deal with McLean resulted, in part, from the impending auction deadline, and not just from Nielsen's concern about his deteriorating health. (See Def.'s Opp. Ex. B ¶¶ 69-70.) Although this renders the evidence less probative, it does not make it irrelevant.

Case 2:09-cv-09446-DSF-VBK   Document 148   Filed 10/06/11   Page 3 of 8   Page ID #:2605

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## MEMORANDUM

### B.    Defendant Canani's Motion in Limine 1

Defendant Canani seeks to preclude Nielsen from offering lay testimony regarding the valuation of the horses whose sale is at issue. Canani points out that Plaintiff failed to timely designate Nielsen as an expert on thoroughbred valuation.[4] He argues that such valuation depends on specialized knowledge, and therefore is not the proper subject of lay opinion testimony. To the extent Nielsen would testify as to what other buyers might have offered for Plaintiff's horses, Canani argues the testimony is speculative. Plaintiff responds that a property owner may provide lay testimony as to the value of his property, even if the testimony is based on specialized knowledge.

Under Federal Rule of Evidence 701, lay testimony "is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Subsection (c) was added in 2000 "to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." 2000 Advisory Comm. Notes, Fed. R. Evid. 701; see also Hirst v. Inverness Hotel Corp., 544 F.3d 221, 227-28 (3d Cir. 2008) ("As the Advisory Committee Note to Rule 701 makes clear, a party simply may not use Rule 701 as an end-run around the reliability requirements of Rule 702 and the disclosure requirements of the Rules of Procedure. Preventing such attempts is the very purpose of subsection (c)."). The amendment was "not intended to affect the 'prototypical example[s] of the type of evidence contemplated by the adoption of Rule 701 relat[ing] to the appearance of persons or things, identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, distance, and an endless number of items that cannot be described factually in words apart from inferences.'" Id. (alterations in original) (quoting Asplundh Mfg. Div. v. Benton Harbor Eng'g, 57 F.3d 1190, 1196 (3d Cir. 1995)).

The amended Rule 701 incorporates the distinctions from State v. Brown, 836 S.W.2d 530, 549 (Tenn. 1992), in which the Court explained that lay testimony "results from a process of reasoning familiar in everyday life," but that expert testimony "results from a process of reasoning which can be mastered only by specialists in the field." 2000 Advisory Comm. Notes, Fed. R. Evid. 701. The Advisory Committee provided two examples illustrating admissible evidence under the Rule. First, "most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser,

---

[4]  The Court required the parties to designate their experts by July 17, 2011.  (Docket No. 74.)

Case 2:09-cv-09446-DSF-VBK   Document 148   Filed 10/06/11   Page 4 of 8   Page ID #:2606

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## MEMORANDUM

or similar expert." Id. (citing Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153 (3d Cir.
1993)). Such testimony is not based on "experience, training or specialized knowledge
within the realm of an expert," but rather on "particularized knowledge that the witness
has by virtue of his or her position in the business." Id. Second, many courts permit a
witness to provide lay opinion testimony identifying a narcotic, "so long as a foundation
of familiarity with the substance is established." Id. (citing United States v.
Figueroa-Lopez, 125 F.3d 1241, 1246 (9th Cir. 1997); United States v. Westbrook, 896
F.2d 330 (8th Cir. 1990)).

Plaintiff asserts that Nielsen may provide valuation testimony without being
qualified as an expert because of his unique position as the owner of his horses. Federal
courts have held that "[a]n owner, because of his ownership, is presumed to have special
knowledge of the property and may testify as to its value." United States v. 10,031.98
Acres of Land, 850 F.2d 634, 636 (10th Cir. 1988) (citation omitted). These cases cite
the Advisory Committee Notes from Rule 702, which state, "[W]ithin the scope of the
rule are not only experts in the strictest sense of the word, e.g., physicians, physicists, and
architects, but also the large group sometimes called 'skilled' witnesses, such as bankers
or *landowners testifying to land values*." Advisory Comm. Notes, Fed. R. Evid. 702
(emphasis added). Based on this language, courts concluded that an owner testifying to
the value of property possessed "special knowledge," qualified as an expert, and was
therefore "entitled to the privileges of a testifying expert," such as the ability to rely on
hearsay. 10,031.98 Acres of Land, 850 F.2d at 636; see also, e.g., LaCombe v. A-T-O,
Inc., 679 F.2d 431, 434-35 (5th Cir. 1982) ("The opinion testimony of a landowner as to
the value of his land is admissible without further qualification. . . . [T]estimony by
LaCombe as to the value of the property was admissible despite the fact that he may have
been relying to some extent on hearsay." (internal quotation marks and citation omitted));
Kestenbaum v. Falstaff Brewing Corp., 514 F.2d 690, 698-99 (5th Cir. 1975).

Citing these cases, Plaintiff argues that Nielsen is "unfetter[ed] . . . from the
constraints of avoiding the use of 'specialized knowledge.'" (Pl.'s Opp. at 4.) This
contention is directly contradicted by the express language of Rule 701, as explained in
the Advisory Committee Notes. The Rule explicitly bars lay testimony that is "based on
scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed.
R. Evid. 701(c). Subsection (c) was adopted specifically to "eliminate the risk" that
expert testimony would be offered by a lay witness. 2000 Advisory Comm. Notes, Fed.
R. Evid. 701. With the exception of a non-binding district court case,[5] the supportive
cases Plaintiff cites in its Opposition predate Rule 701's amendment and are therefore

---

[5]  Plaintiff cites Fourth Inv. LP v. United States, 2011 WL 227564 (S.D. Cal. Jan. 21, 2011)
(citing Hornick v. Boyce, 280 Fed. App'x 770 (10th Cir. 2008)).

Case 2:09-cv-09446-DSF-VBK   Document 148   Filed 10/06/11   Page 5 of 8   Page ID #:2607

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### MEMORANDUM

unpersuasive.

    Numerous post-2000 cases have concluded that a witness, even the owner of property, may not offer lay testimony that is based on specialized knowledge.[6] See, e.g., James River Ins. Co. v. Rapid Funding, LLC, 648 F.3d 1134, 1141 (10th Cir. 2011) ("Mr. Miller's valuation testimony was expert opinion testimony based on technical or specialized knowledge and therefore inadmissible under Rule 701(c)."); Cunningham v. Masterwear Corp., 569 F.3d 673, 676 (7th Cir. 2009) (stating that an owner may testify as to the valuation of his property "either as a matter within his personal knowledge or, if he is an expert on property values, as an expert witness" (citations omitted)); Christopher Phelps & Assocs., LLC v. Galloway, 492 F.3d 532, 542 (4th Cir. 2007) (stating that lay opinion testimony as to the value of property "may appropriately be admitted if it is helpful to the jury; if it is based on the perception of the witness; and if it is not expert testimony under Federal Rule of Evidence 702"); Stoebner Holdings, Inc. v. Automobili Lamborghini S.P.A., 2007 WL 4230824, at *3 (D. Haw. Nov. 30, 2007) (permitting an owner's lay opinion testimony regarding valuation of property "[t]o the extent [it] is rationally based on his perception, helpful to the determination of a fact in issue, and not based on scientific, technical, or other specialized knowledge"); Servicios Aereos Del Centro S.A. De C.V. v. Honeywell Int'l, Inc., 2006 WL 2709836, at *1 & n.7 (D. Ariz. Aug. 23, 2006) (permitting a business's president to give lay opinion testimony, but not expert testimony, as to the value of jet engines). For example, in James River, the district court permitted a witness to give land valuation testimony as a lay witness after the court refused to qualify him as an expert. James River, 648 F.3d at 1138, 1141. The Tenth Circuit noted that the witness's testimony was based on his technical judgment and professional experience, rather than on common observations, and that landowner testimony is generally considered to be expert opinion under Rule 702. Id. at 1142-43 & n.1. Because the witness's testimony was based on specialized knowledge, the court held that it was inadmissible under Rule 701(c).[7] Id. at 1143-44.

---

[6] To the extent the non-binding authority cited by Plaintiff is to the contrary, the Court finds those cases unpersuasive and contrary to the express language of Rule 701. See Hornick, 280 Fed. App'x at 774 (relying on LaCombe and 10,031.81 Acres); Fourth Inv. LP, 2011 WL 227564, at *2 (relying on Hornick and pre-2000 cases).

[7] That the witness in James River was not a landowner does not render the case inapposite. The general rule that owners may testify as to property value does not supersede Rule 701(c)'s limitation on giving expert testimony. According to the Advisory Committee Notes, a business owner's valuation testimony is admissible as lay opinion specifically *because* it is not based on "specialized knowledge." 2000 Advisory Comm. Notes, Fed. R. Evid. 701. Post-2000 cases have recognized Rule 701(c)'s limitation in the context of owner testimony. See, e.g.,

27-CV-18-8745

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

Case 2:09-cv-09446-DSF-VBK   Document 148   Filed 10/06/11   Page 6 of 8   Page ID #:2608

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### MEMORANDUM

      Plaintiff's contention that Nielsen may offer lay testimony based on hearsay or second-hand information is also meritless. Plaintiff relies on pre-2000 cases, which concluded that landowners could testify based on hearsay because they were experts under Rule 702. Under the 2000 amendment to Rule 701, any testimony that qualifies as expert opinion under Rule 702 may not be offered as lay testimony under Rule 701. Fed R. Evid. 701(c). Numerous post-amendment cases discussing lay testimony have rejected Plaintiff's proposition. See, e.g., Cunningham, 569 F.3d at 676 (concluding that an owner could not offer lay opinion valuation testimony based on hearsay); Stoebner Holdings, 2007 WL 4230824, at *2 (excluding lay opinion valuation testimony to the extent it is based on hearsay).

      In distinguishing between lay and expert testimony, courts have looked to the Advisory Committee's explanation that lay testimony "results from a process of reasoning familiar in everyday life." United States v. White, 492 F.3d 380, 401 (6th Cir. 2007) (citation omitted) (collecting cases); see also James River, 648 F.3d at 1142 ("[A] person may testify as a lay witness only if his opinions or inferences . . . could be reached by any ordinary person." (citation omitted)); United States v. VonWillie, 59 F.3d 922, 929 (9th Cir. 1995) (explaining that testimony was appropriate lay opinion because the observations were "common" and required "a limited amount of expertise, if any"). "[K]nowledge derived from previous professional experience falls squarely within the scope of Rule 702 and thus by definition outside of Rule 701."[8] James River, 648 F.3d at 1142 (quoting United States v. Smith, 640 F.3d 358, 365 (D.C. Cir. 2011)). For example, in James River, the plaintiff sought to introduce lay opinion testimony as to the depreciation of land value. The court concluded that calculating depreciation required

---

Cunningham, 569 F.3d at 676 (stating that an owner may offer valuation testimony either based on personal knowledge, under Rule 701, or based on specialized knowledge, under Rule 702); Christopher Phelps, 492 F.3d at 542 (affirming the admission of an owner's lay opinion testimony as to valuation because it was "not expert testimony under Federal Rule of Evidence 702").

[8] Some federal cases state that a witness may offer lay opinion testimony that is based on "lay expertise a witness personally acquires through experience, often on the job." United States v. Maher, 454 F.3d 13, 24 (1st Cir. 2006); see also Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., Ltd., 320 F.3d 1213, 1218 (11th Cir. 2003). These cases are arguably consistent with the Tenth Circuit's decision in James River because the "lay expertise" involves common observations rather than specialized thought processes. See, e.g., Tampa Bay Shipbuilding, 320 F.3d at 1217-18, 1223 (concluding that a business superintendent could offer lay opinion regarding the reasonableness of charges because he had acquired knowledge of industry standards based on years of working in the business).

CASE 0:21-cv-02289-JWB-JFD    Doc. 1-1    Filed 10/15/21    Page 116 of 316
27-CV-18-8745
Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

Case 2:09-cv-09446-DSF-VBK   Document 148   Filed 10/06/11   Page 7 of 8   Page ID #:2609

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### MEMORANDUM

"professional experience" and "[t]echnical judgment" in choosing between different calculation methods, and was therefore "beyond the scope of lay opinion testimony." Id. at 1142 (distinguishing between testimony about elementary mathematical operations, such as taking an average, and testimony about lost business profits based on "sophisticated economic models"). In White, auditors testified regarding the complicated "structure and procedures inherent in the Medicare program, as well as their understanding of certain terms." White, 492 F.3d at 404. The testimony could not be considered lay opinion because "[a]n average lay person would be incapable of making sense of the various exhibits which the . . . witnesses helped to clarify and link together on the basis of the 'reasoning process' employed daily in their highly specialized jobs." Id.; see also United States v. Conn, 297 F.3d 548, 554 (7th Cir. 2002) ("[The witness] was not asked to summarize his observations in the form of an opinion; rather, he was asked to view Mr. Conn's firearms collection in light of his training and experience with firearms. Even a lay person familiar with firearms in general would not have the expertise to distinguish between firearms that are collector's items and firearms that are not.").

As Defendant Canani indicates, valuation of thoroughbreds is recognized as highly specialized and is frequently the subject of expert testimony. See, e.g., Fehlhaber v. Indian Trails, Inc., 286 F. Supp. 499 (D. Del. 1968); LeBlanc v. Underwriters at Lloyd's, London, 402 So.2d 292 (La. Ct. App. 1981). Nielsen's valuation testimony is based on specialized knowledge and professional experience outside the ambit of Rule 701. Even if an average juror possessed the information available to Nielsen – such as the pedigree of Nielsen's horses, or the types of tracks available for the horses to race on – the juror would not be able to generate an approximate valuation of the horses. Nielsen himself explains that he gained his knowledge of thoroughbred valuation based on 25 years in the breeding and racing business and his professional experience selling hundreds of horses. Permitting Nielsen to offer valuation testimony as a lay witness would "do exactly what Rule 701(c) prevents: circumvent Rule 702 by offering expert testimony as lay opinion." James River, 648 F.3d at 1143.

Nielsen may not testify as to his personal valuation of his horses. To the extent his valuation is based on other offers he claims to have received, the evidence is excluded to the extent that it relies on hearsay.

Defendant Canani's motion is GRANTED.

IT IS SO ORDERED.

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**MEMORANDUM**

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

# Exhibit K

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

Case 2:09-cv-09446-DSF-VBK   Document 269   Filed 10/17/12   Page 1 of 4   Page ID #:4621

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### MEMORANDUM

| | | |
|---|---|---|
| Case No. | CV 09-9446 DSF (VBKx) | Date    10/17/12 |

Title   Everest Stables, Inc. v. Julio Canani, et al.

| | |
|---|---|
| Present: The Honorable | DALE S. FISCHER, United States District Judge |

| | |
|---|---|
| R. Neal for Debra Plato | Not Present |
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:**   (In Chambers) Order GRANTING in part and DENYING in part Defendants' Renewed Motions for Judgment as a Matter of Law (Docket Nos. 250, 252)

The Court deems this matter appropriate for decision without oral argument. See Fed. R. Civ. P. 78; Local Rule 7-15. The hearing set for October 22, 2012 is removed from the Court's calendar.

## I.   INTRODUCTION

On June 19, 2012, the present action went to trial on claims of breach of fiduciary duty and agency duties, fraud, civil conspiracy, and unjust enrichment. On June 28, 2012, the jury returned a verdict in favor of Plaintiff Everest Stables, Inc., against Defendants Roger Licht and Julio Canani, doing business as Tarma Corporation, on all claims. (J. Special Verdict; Docket No. 248.) The jury awarded $48,750 in compensatory damages to Plaintiff for claims related to horses Silent Stalk, All Man, Ditto This, Mini Do, and Stand Tall. (Id. at 7.) The jury found Canani 75% liable and Licht 25% liable for damages in connection with Silent Stalk. (Id.) The jury further found that both Canani and Licht acted with malice, oppression, or fraud against Plaintiff, or in reckless disregard of Plaintiff's rights. (Id. at 7-8.) The jury imposed punitive damages in the amounts of $37,500 on Canani and $12,500 on Licht. (Id.) Canani and Licht moved during the trial for judgment as a matter of law (JMOL) on June 22, 2012. (Docket No. 194.) The Court took the motion under submission. (Id.) On August 21 and 24, 2012, Defendants filed the instant renewed motions for JMOL on two grounds. First, both Canani and Licht challenge the jury's punitive damage awards as improper

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**MEMORANDUM**

because Plaintiff failed to present evidence of their financial condition. Second, Licht
challenges the jury's findings of his liability for the claims of civil conspiracy to commit
fraud and breach of the covenant of good faith.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 50(b) governs renewed JMOL motions. The Rule
provides that a court may: "(1) allow judgment on the verdict . . . (2) order a new trial; or
(3) direct the entry of judgment as a matter of law." In ruling on a Rule 50 motion, the
court must view "the evidence in the light most favorable to the party in whose favor the
jury returned a verdict and draw all reasonable inferences in [its] favor." Lakeside-Scott
v. Multnomah Cnty., 556 F.3d 797, 802 (9th Cir. 2009). "Judgment as a matter of law is
proper when the evidence permits only one reasonable conclusion and the conclusion is
contrary to that reached by the jury." Ostad v. Oregon Health Sci. Univ., 327 F.3d 876,
881 (9th Cir. 2003). "Consequently, JMOL is appropriate when the jury could have relied
only on speculation to reach its verdict." Lakeside-Scott, 556 F.3d at 802-03.

## III.    DISCUSSION

### A.    Punitive Damages

Defendants move for JMOL because they assert Plaintiff failed to present evidence
of Defendants' financial condition. At trial, Plaintiff presented no evidence of
Defendants' financial condition other than the profits Defendants made from the
particular sales at issue. Plaintiff does not dispute this, but asserts that evidence of
Defendant's profits derived from unlawful activity standing alone is sufficient to sustain a
punitive damages award.

Under California law, "an award of punitive damages cannot be sustained on
appeal unless the trial record contains meaningful evidence of the defendant's financial
condition." Adams v. Murakami, 54 Cal. 3d 105, 109 (1991). "[A] plaintiff who seeks to
recover punitive damages must bear the burden of establishing the defendant's financial
condition." Id. at 123. The California Supreme Court explicitly left open the question of
what kind of evidence must be presented: "We decline at present, however, to prescribe
any rigid standard for measuring a defendant's ability to pay . . . . We cannot conclude
on the record before us that any particular measure of ability to pay is superior to all
others or that a single standard is appropriate in all cases." Id. at 116, n.7.

At least one California court has held that evidence of profits obtained by means of
fraud was sufficient to sustain a punitive damage award. Cummings Med. Corp. v.
Occupational Med. Corp., 10 Cal. App. 4th 1291, 1298-1301 (1992). However, at least

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

Case 2:09-cv-09446-DSF-VBK    Document 269    Filed 10/17/12    Page 3 of 4    Page ID #:4623

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## MEMORANDUM

two later decisions rejected the profits-only measure.  Robert L. Cloud & Assocs., Inc. v.
Mikesell, 69 Cal. App. 4th 1141, 1152 (1999)(holding evidence of profits is "inadequate
as it gives only the assets without the liabilities"); Kenly v. Ukegawa, 16 Cal. App. 4th
49, 57 (1993)(same).  This Court concludes that the California Supreme Court would
adopt the standard provided in Kenly and Cloud.  And the Ninth Circuit, citing Cloud and
Kenly, recently noted in an unpublished opinion that "[u]nder California law, imposition
of punitive damages requires consideration of the defendants' net worth." Sorayama v.
Robert Bane Ltd. Inc., 380 Fed. App'x 707, 708 (9th Cir. 2010).  Defendants' motions for
judgment as a matter of law are GRANTED on the issue of punitive damages.  The jury's
punitive damage award is VACATED.

### B.    Civil Conspiracy — Fraud Against Licht

Licht moves for JMOL on the jury's finding of liability for civil conspiracy
claiming "no known California decision has imposed fraud liability upon an agent for
failing to disclose a principal." (Def. Licht's Renewed Mot. for JMOL 10; Docket No.
250.)  Licht's argument misses the point.  The issue is not whether Licht failed to disclose
the principal during a commercial transaction, but rather whether he intentionally and
unlawfully affirmatively misrepresented an important or material fact to Plaintiff during
that transaction.  As to civil conspiracy, the question is whether Licht was aware that
Canani was planning to fraudulently induce Plaintiff to sell its horses and whether he
agreed with Canani to do the same.  Licht's assertion is simply irrelevant.

The Court properly instructed the jury on the required elements of fraud and civil
conspiracy as related to Licht.  "A jury is presumed to follow its instructions." Weeks v.
Angelone, 528 U.S. 225, 234 (2000).  The Court must assume the jury did as it was told
and found that Licht was liable for fraud and civil conspiracy because it found Plaintiff
proved all required elements by a preponderance of the evidence.  Licht does not attack
the jury instructions and does not allege that the jury disregarded the instructions.

The jury was provided with Instructions No. 22 and 23 (Docket No. 216), taken
from the model Judicial Council of California Civil Jury Instructions (CACI) 1900 and
1901, which clearly enumerate the requirements for establishing intentional
misrepresentation as fraud or deceit under California law.  The jury was also provided
with Instruction No. 29, taken from the model Judicial Council of California Civil Jury
Instructions (CACI) 3600, which clearly enumerates the requirements for establishing
liability for civil conspiracy under California Law. (Id. at 31-32.)  Based on these
instructions, the jury found that Licht "unlawfully conceal[ed] or misrepresent[ed] with
fraudulent intent the nature and extent of Canani's role and involvement in Licht's offer
and purchase of LADY LUMBERJACK or SILENT STALK" and that the unlawful
conduct caused damages to Plaintiff. (J. Special Verdict 5.)  The jury also found Licht

Filed in Fourth Judicial District Court
5/23/2018 12:42 PM
Hennepin County, MN

Case 2:09-cv-09446-DSF-VBK  Document 269  Filed 10/17/12  Page 4 of 4  Page ID #:4624

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### MEMORANDUM

liable for "conspir[ing] with defendant Canani to fraudulently induce Everest to sell the horses LADY LUMBERJACK or SILENT STALK at prices below the true value of each or either horse" and found that the conspiracy caused damage to Plaintiff. (Id. at 6.) Licht has failed to show that the jury was improperly instructed or that the evidence permits only one reasonable conclusion and the conclusion is contrary to that reached by the jury. Licht's motion on this issue is DENIED.

### C.    Breach of the Covenant of Good Faith

Licht claims that there can be no breach of the implied covenant of good faith and fair dealing in connection with his agreement to purchase Lady Lumberjack and Silent Stalk from Plaintiff because "there are no allegations that any of Mr. Licht's obligations under the contract were breached." (Def. Licht's Renewed Mot. for JMOL 12.) This is simply incorrect. Under California law, "breach of a specific provision of the contract is not a necessary prerequisite" for a breach of the covenant of good faith and fair dealing. Carma Developers (California), Inc. v. Marathon Dev. California, Inc., 2 Cal. 4th 342, 373 (1992).

The jury was given Instruction No. 28, based on Judicial Council of California Civil Jury Instruction (CACI) 325, which properly enumerated the requirements for breach of the covenant of good faith and fair dealing under California law. Based on these instructions, the jury found Licht liable for breaching the covenant of good faith and fair dealing. (J. Special Verdict 6.) The Court must assume the jury did as it was instructed and found that Licht was liable for breaching the covenant of good faith and fair dealing because it found Plaintiff proved all required elements. Licht does not attack the jury instructions and does not allege that the jury disregarded the instructions. Licht's motion is DENIED.

### IV.    CONCLUSION

For the reasons stated, Defendants' Renewed Motions for Judgment as a Matter of Law are GRANTED in part and DENIED in part.

IT IS SO ORDERED.

UNITED STATES DISTRICT COURT

for the

District of Minnesota

| | | |
|---|---|---|
| Everest Stables, Inc., a Minnesota corporation and Jeffrey Nielsen, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. |
| Porter, Wright, Morris, & Arthur LLP, and Christopher D. Cathey, | ) ) ) | |
| Defendants. | ) | |

COMPLAINT – EXHIBIT B

Case Type: Malpractice

STATE OF MINNESOTA                                DISTRICT COURT

COUNTY OF HENNEPIN                         FOURTH JUDICIAL DISTRICT

| | | |
|---|---|---|
| Jeffrey L. Nielsen, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 27-CV-17-16371 |
| v. | ) | Judge Bruce A. Peterson |
| | ) | |
| Dorsey & Whitney, LLP, | ) | |
| George G. Eck, and Peter M. Lancaster | ) | **FIRST AMENDED COMPLAINT** |
| | ) | **(JURY TRIAL DEMANDED)** |
| Defendants. | ) | |

Plaintiff Jeffrey L. Nielsen ("Nielsen"), by his undersigned attorneys, for his complaint

against defendants Dorsey & Whitney, LLP ("Dorsey"), George G. Eck ("Eck") (Dorsey and Eck

are collectively, "Defendants"), and Peter M. Lancaster ("Lancaster"), alleges as follows:

## NATURE OF THE ACTION

1.     This is an action for professional negligence, breach of fiduciary duty, fraud, and

breach of contract against the Defendants for acts and omissions relating to improper legal advice

that led to the commencement of numerous lawsuits that, unbeknown to Nielsen, were legally

flawed and unwinnable.  Instead of providing truthful legal advice, Defendants disregarded the

law in an effort to mislead their long-time client in filing litigation that was calculated to earn

Defendants thousands of dollars in legal fees.  In addition, Defendants ignored the instructions

and objectives of their client in order to initiate and prolong litigation that should have never been

filed at all.

EXHIBIT B

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

## PARTIES, JURISDICTION AND VENUE

2.      Nielsen is an individual that resides in Grant, Minnesota. He had been a client of Defendants for more than 30 years and a close personal friend of Eck for even longer.

3.      Dorsey is a Minnesota limited liability partnership with its principal place of business located at 50 South Sixth Street, Suite 1500, Minneapolis, Hennepin County, Minnesota. Dorsey is a global law firm with 19 offices located throughout the United States, Canada, Asia, and Europe. Dorsey is subject to the jurisdiction of the Minnesota courts.

4.      Eck is a resident of Minnesota and is an attorney licensed to practice law in Minnesota. He is a former partner at Dorsey and currently of counsel with the firm. He conducts his law practice from Dorsey's office located at 50 South Sixth Street, Suite 1500, Minneapolis, Hennepin County, Minnesota. Eck is subject to the jurisdiction of the Minnesota courts.

5.      Lancaster is a resident of Minnesota and is an attorney licensed to practice law in Minnesota. He is a partner at Dorsey and conducts his law practice from Dorsey's office located at 50 South Sixth Street, Suite 1500, Minneapolis, Hennepin County, Minnesota. Lancaster is subject to the jurisdiction of the Minnesota courts.

6.      Venue is proper in this Court because the Defendants' principal place of business is in Hennepin County, Minnesota. Further, Nielsen entered into an agreement for legal services with Defendants to be primarily performed by Defendants at their offices in Hennepin County, Minnesota.

## NIELSEN AND DEFENDANTS' LONGSTANDING RELATIONSHIP

7.      Nielsen is a successful entrepreneur that has practiced nationally for over 40 years.

8.      Throughout a substantial part of his career, Dorsey had counseled him in various business transactions and litigation. Over the course of their 30-plus year relationship, Eck had

27-CV-17-16371

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

represented Nielsen on numerous legal matters, primarily in litigation and was assisted by other

Dorsey attorneys when Nielsen had a legal matter than was outside of Eck's area of expertise.

Importantly, Nielsen had been close personal friends with Eck and had come to trust him and his

advice with no thought of deception or disloyalty.

9.    Defendants lengthy relationship with Nielsen came abruptly to a halt in June 2011,

which will be further described in the paragraphs that follow.  However, in the recent years

leading up to Defendants abrupt termination of the attorney-client and personal relationship,

Defendants saw Nielsen send significant work to other law firms.  Upon information and belief,

this was troubling to Defendants, especially at a time where Dorsey was experiencing significant

financial problems as a result of the financial crisis.

### DEFENDANTS HIT HARD TIMES

10.    Dorsey's firm revenue began declining sharply after 2008.  For example, in 2008,

firm revenue was at a high of $367 million, but then continued to decrease annually such that by

2012, Dorsey's revenue was $313.5 million, a five-year decline of $53.5 million.  During that

same time period, profits per partner decreased from $670,000 in 2008 to $515,000 in 2012.

11.    Dorsey's financial pressures caused it to implement numerous cost-cutting

measures in 2009, including cutting associate and senior associate salaries by at least 10%, and

restructuring the associate compensation structures.  Dorsey also laid off at least 55 administrative

and support staff in 2009, with the Minneapolis office being the hardest hit of the firm's offices.

12.    In 2010, Dorsey suspended its summer associate program and only made job offers

to approximately half of its summer associate candidates in 2009.

13.    By 2012, Dorsey's bloodletting continued, with an additional 20 staffers being let

go, including 12 in Minneapolis.  Dorsey was also at a five-year low in attorneys by 2012 of 531

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

as compared to 670 at the end of 2008 – a 21% decline. This attrition was a result of significant layoffs and departures of attorneys to Dorsey's competitors.

14.     Thus, during all relevant time periods of this Complaint, Dorsey was suffering from a substantial loss of revenue due to a decline in legal work and loss of revenue to other firms where attorneys had departed.

15.     As Dorsey's financial woes continued, Eck's practice was suffering as well.

16.     Eck, the former head of the firm's Minneapolis office, is touted on Dorsey's website as a highly-acclaimed commercial litigator having handled several multimillion dollar complex litigation cases.

17.     Included in Eck's list of cases are several for St. Paul-based developer Jerry Trooien ("Trooien") and his company JLT Group, Inc. ("JLT"). Trooien, a once high-profile client of Defendants in the real estate and airline industries, made up a significant portion of Eck's business.

18.     However, after the financial crisis and real estate crash, Trooien's businesses began unraveling. By October 2010, Trooien owed numerous creditors approximately $284 million. As a result, Trooien was forced to file a Chapter 11 Bankruptcy Petition. At the time of the filing, Trooien owed Dorsey $656,000. This unsecured sum, obviously uncollectible, which Eck allowed to accumulate for a lengthy period of time, caused a huge financial hit to Eck's practice at a time when Nielsen sought legal help regarding campaign signs in his neighborhood.

## CAMPAIGN SIGNS CREATE AN OPPORTUNITY

19.     The Fall of 2010 was campaign season in the State of Minnesota in anticipation of the November 2, 2010, General Election.

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

20.     As with any General Election, campaign signs proliferated around the State of Minnesota for the political candidates, including those at the local level.

21.     Nielsen's neighborhood on Knollwood Drive North in the City of Grant, Minnesota, was not spared the proliferation of election signs either. Knollwood Drive North is a peaceful, wooded, eight-lot neighborhood that is subject to state and local laws and homeowner declarations and restrictions that regulate many things, including signage.

22.     In the 2010 general election, certain local political candidates, including City Councilman Stephen Bohnen ("Bohnen"), had placed campaign yard signs on Knollwood Drive North.

23.     In September 2010, Nielsen observed Bohnen's campaign signs on the public right-of-way on Knollwood Drive North. Nielsen was displeased with the campaign signs that were placed on Knollwood Drive North and began taking steps to have them removed by local government officials.

24.     Nielsen asked his consultant, Tim Nelson ("Nelson"), to contact Washington County Public Works to remove the signs. Washington County informed Nelson that it had no jurisdiction over Knollwood Drive North and instead directed Nelson to contact Brad Hinseth ("Hinseth"), who they identified as the Road Commissioner for the City of Grant. However, Hinseth was an offender himself and refused to remove his signs from Knollwood Drive North.

25.     Having had the government officials refuse their duties, Nielsen contacted his attorneys, including Eck, regarding the sign issue. Attorney Pat O'Neill agreed to contact Hinseth on Nielsen's behalf, but Hinseth was again, unwilling to cooperate in removing the signs.

27-CV-17-16371

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

26.    Nielsen's attorneys advised Nielsen to either lay the offending signs down, undamaged, on the edge of the right-of-way for pickup or take them undamaged to Grant City Offices.

27.    In accordance with those instructions, Nielsen chose to lay the offending signs down on the edge of the right-of-way. The following morning, the political signs were gone from the right-of-way and Nielsen believed his problem was over.

28.    The signs were absent from Knollwood Drive North for several weeks until Bohnen decided to once again place his campaign signs on the right-of-way during the first week of October 2010.

29.    On October 4, 2010, at approximately 12:30 p.m., Nielsen removed Bohnen's sign and took it to Grant City Offices. Bohnen then placed his sign back on Knollwood Drive North. At approximately 4:30 p.m., on October 4, 2010, Nielsen removed the second sign and proceeded to take the sign to Grant City Offices a second time.

30.    On the way to Grant City Offices, Nielsen was tailgated by an unknown individual, who turned out to be Bohnen's campaign volunteer, Keith Mueller ("Mueller"). Unable to shake Mueller, Nielsen pulled into an empty, trailhead parking lot. Mueller pulled into the parking lot and blocked Nielsen's exit.

31.    Nielsen got out of his motor vehicle, approached Mueller's vehicle and asked what he wanted. In response, Mueller asked for directions, Nielsen directed him, Mueller thanked him and then left.

32.    After leaving the scene, Mueller called and reported the incident to Bohnen, who then reported the incident to the Washington County Sheriff's Department. Deputy Hyde was assigned to investigate the incident and called Bohnen back to get the details.

6

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

33.    Deputy Hyde later showed up at Nielsen's home on Knollwood Drive North to get his version of the incident. Deputy Hyde told Nielsen that he had a complaint about Nielsen being aggressive and abusive in a parking lot. Nielsen informed Deputy Hyde of his version of the events and that he was merely attempting to return the offensive campaign sign to Grant City Offices.

34.    During the interview with Deputy Hyde, Bohnen and his campaign manager, Bill David ("David"), pulled into Nielsen's driveway uninvited and interrupted the interview. Nielsen told Bohnen that he was acting illegally in placing his signs in the neighborhood and asked Bohnen to leave and not return. David handed some photographs to Deputy Hyde and then left.

35.    Deputy Hyde was annoyed at Bohnen's interruption and asked Nielsen if he wanted to file charges against Bohnen and/or Mueller. Nielsen said that it was not necessary as he believed the situation was over. Nielsen requested that Deputy Hyde follow up with routine checks for signs and Deputy Hyde agreed. Deputy Hyde informed Nielsen that there would not be any charges against anyone, he then shook Nielsen's hand, thanked him for his cooperation and left.

36.    Within 20 minutes of Deputy Hyde's departure, Nielsen saw that Bohnen had returned and placed two additional signs in the public right of way on Knollwood Drive North. The next morning, yet another Bohnen sign appeared on Knollwood Drive North and two more were placed across the terminus of Knollwood Drive North.

37.    Exasperated, Nielsen then contacted Eck to take care of the matter. Eck then wrote Bohnen an email demanding removal of the signs on October 5, 2010. A copy of the October 5, 2010, email is attached hereto as Exhibit A. In the email, Eck announced that he is "a litigation partner at Dorsey & Whitney LLP" and the "partner in charge of this matter." Eck asserted that

7

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

Bohnen put his "campaign signs in the easement and boulevard area of Knollwood Drive in a manner that violates the law." Eck further asserted to Bohnen that Bohnen's "actions are simply meant to send a message: that you want to offend the Nielsens, ignore the law, and make sure you establish your name and presence by invading someone else's special and scenic home and property." At the time of this email, Eck did not know the law governing political signs, despite his assertions to Bohnen otherwise. Bohnen, who ignored Eck's email, did nothing to remove the signs.

38.    On October 7, 2010, Eck received a memo summarizing the law governing political sign placement leading up to a general election from a colleague which contained a bullet point list discussing City and County regulations governing sign placement. The memo made clear that most of the stated local regulations regarding sign placement were preempted by state law during a general election year. Eck informed Nielsen of the research via email, but did not inform Nielsen of this research's impact on the viability of any contemplated legal action against Bohnen.

39.    On October 9, 2010, Nielsen asked Eck if there was any legal action that could be taken to solve and expedite a solution with the Bohnen campaign signs. Nielsen asked Eck if such legal action could be done quickly and inexpensively. Eck replied that it could.

40.    On Monday, October 11, 2010, Eck re-sent his October 5, 2010, email to Bohnen expecting a response. A copy of Eck's follow-up email to Bohnen is attached hereto as Exhibit B. Bohnen again ignored the email. Eck also sent Nielsen an email confirming that Nielsen had retained Dorsey to represent him on these issues. A copy of the retention email is attached hereto as Exhibit C.

8

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

41.    Later that day, Nielsen received a citation in the mail for theft, disorderly conduct, and illegally entering a right-of-way, charges that Deputy Hyde had specifically told him would not be filed. Nielsen called Eck for advice and assistance.

42.    Eck then sent a draft verified complaint for declaratory and injunctive relief against Bohnen to Nielsen that identified Nielsen as both an individual plaintiff and private attorney general. Later that day, Eck informed Nielsen that they do not have the ability to use the private attorney general statute to recover attorney fees, which was one of Nielsen's prerequisites to filing suit, and that the statute does not apply. He also informed Nielsen that they were researching whether Nielsen had any standing at all to sue the City of Grant and that "there appear to be very significant hurdles to any claim" but that his associate had not finished his research. Eck later advised Nielsen that it was necessary for him to sue each of his neighbors "to cover all of our bases." Nielsen flatly refused and stated to Eck that he did not believe that his neighbors had violated anything.

43.    A day after Nielsen received the criminal citation, Eck advised Nielsen that litigation plans would proceed. Eck advised Nielsen to file two lawsuits: (1) suit against Bohnen for declaratory relief, nuisance, trespass and intentional infliction of emotional distress, and a 42 U.S.C. § 1983 civil rights action against Washington County (the "Washington Co. Action"); and (2) a mandamus action (the "Mandamus Action") against the City of Grant, individual City Council Members, and the Washington County Public Works Department to enforce local zoning laws despite Eck's knowledge that individual City Council Members have immunity and Washington County Public Works Department had no jurisdiction over Knollwood Drive North and thus had done nothing wrong.

9

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

44.    Before authorizing Eck to initiate any litigation, Nielsen discussed with Eck his specific goals and criteria for filing any claims.  Nielsen discussed with Eck his reluctance to file lawsuits against government officials based on prior unpleasant experiences with governmental retaliation.  Nielsen's goals were simple.  They were to get the signs removed immediately and establish rulings that protected his neighborhood from violators in the future and get the criminal charges quickly dismissed.   Nielsen also discussed his criteria with Eck that he did not want to spend legal fees if he did not have a chance of prevailing and getting an attorney fee award.  Eck understood Nielsen's concerns and objectives and told Nielsen that filing claims was the only remedy to combat the actions of Bohnen and future violators and get a permanent resolution.

45.    Eck informed Nielsen that he needed to spend 6 hours researching the possible claims and damages, to which Nielsen agreed.  After taking the time to conduct the research, Eck informed Nielsen on October 14, 2016, that there are multiple viable claims against Bohnen, Mueller, the Washington County Sheriff's Department, Washington County Public Works Department, the City of Grant, and Grant City Council Members.  Nielsen made it clear to Eck that he would not sue unless each claim provided for the recovery of legal fees if he won and the §1983 action be filed in federal court given the bias issues inherent in suing a Sheriff or his Department in their own county.

## THE WASHINGTON CO. ACTION

46.    On October 15, 2010, Dorsey filed the Washington Co. Action, but not in federal court.  Defendants filed the action in Washington County District Court.

47.    Once Nielsen learned that the action was commenced in state court rather than federal court, he was shocked and angered because it was against Nielsen's instructions and the agreed upon strategy with Eck.  Eck acknowledged that it was error to file the Washington Co.

10

27-CV-17-16371

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

Action in Washington County, and blamed an associate for the error. Nonetheless Eck told Nielsen that it was too late to dismiss[1] and re-file in federal court. Eck assured Nielsen that filing the Washington Co. Action in state court would not adversely impact the outcome of the case.

48.    The Washington County Action, however, was doomed to fail, and Eck surely knew this. In addition to filing in the wrong forum, the claims were not legally sustainable, yet Eck pursued them anyway.

49.    For example, the Section 1983 claim against Washington Co. was brought against the entire Sheriff's Department without any factual basis to support the claim. Eck asserted that the Washington Co. Sheriff's Department filed criminal charges against Nielsen arising from the campaign signs in retaliation for Nielsen's strident criticism of Sheriff Hutton for failing to direct a proper investigation of a third party that had vandalized Nielsen's property. However, Nielsen never stated to Eck or believed that the entire Sheriff's Department (as opposed to Sheriff Hutton individually) had a policy or custom to retaliate against him which is a prerequisite to file a §1983 claim against a law enforcement agency. Nonetheless, Eck filed a bogus §1983 claim against the entire Sheriff's Department.

50.    Defense counsel, however, quickly exposed the ridiculousness of Eck's claim in its briefing supporting dismissal of Nielsen's case. Eck later tried to correct his folly by attempting to file an amended complaint, but the court declined to grant leave to assert the new claim against Sheriff Hutton for multiple reasons, not the least of which was that the new claim was barred by law.

51.    In addition, Eck also asserted a fraud claim against Bohnen and Mueller based upon the allegations that they made false statements to the Washington County Sheriff's

---

[1] Under Rule 41.01(a) of the Minnesota Rules of Civil Procedure, Eck could have filed a notice of dismissal without prejudice in the Washington Co. Action "before service by the adverse party of an answer" and re-filed in federal court.

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

Department to have criminal charges brought against Nielsen. This claim was not a proper claim to bring on behalf of Nielsen, however. If anything, the fraud was committed upon the Sheriff's Department, not Nielsen.

52.    Eck also brought malicious prosecution claims against Bohnen and Mueller along with a civil conspiracy claim based upon the underlying malicious prosecution tort. Those claims, like the other claims Eck filed on Nielsen's behalf, were improper because a plaintiff may not assert a malicious prosecution claim until the underlying criminal action is terminated in the plaintiff's favor. Here, the criminal case had just been filed and was not resolved in Nielsen's favor. Furthermore, Eck knew, or should have known, that prosecutorial discretion is generally a complete defense to a malicious prosecution claim.

53.    In early November 2010, Larry Schaefer ("Schaefer"), Mueller's attorney, moved to dismiss all of Nielsen's claims against Mueller. In response, Eck sent Nielsen a list of ideas about defending the motion:

> Making false statements to officers to have an innocent man charged must be actionable. It would be poor public policy to decide summarily that Mueller and Bohnen – who are clearly acting together to get Nielsen charged – are telling the truth and Nielsen is not. Making an innocent man wait until the criminal process runs its due course to seek civil justice is not required. That is not the law nor should it be the law.

Eck, however, was not telling the truth about the law, and misled Nielsen into believing that the claims asserted were viable, when they were not.

54.    In February 2011, Nielsen learned for the first time that he had little chance to recover damages for malicious prosecution. Nielsen had asked Eck for clarification of his recoverable damages on several prior occasions, but Eck had skirted the issue. As a result, Nielsen demanded to see a written analysis of his possible recovery, so Eck asked associate

12

27-CV-17-16371

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

Charles LaPlante ("LaPlante") to research whether Nielsen had any legally cognizable damages for malicious prosecution. LaPlante concluded that the vast majority of damages that Nielsen had claimed, except criminal defense fees, were unavailable. A copy of LaPlante's email to Eck is attached hereto as Exhibit D. After learning of LaPlante's conclusions, Nielsen was shocked that he would not be able to recover the vast majority of his legal fees and that he had "no reasonable or likely damage claim whatsoever." Had Nielsen been told the truth about the recovery he would actually be entitled to, he would never have authorized Eck to file the Washington Co. Action.

55.    Nielsen challenged Eck about LaPlante's research and past representations in a follow-up telephone call on or about February 7, 2011. Eck told Nielsen to disregard the negative research and assured Nielsen that his damages would not be so limited. This advice, however, was wrong, despite repeated requests from Nielsen for an explanation of how his damages would not be so limited. Eck knew his advice to Nielsen was wrong as evidenced by his failure to respond to Nielsen's numerous requests for an explanation.

56.    However, upon learning that his malicious prosecution claim had no value, Nielsen told Eck that any additional fees that Dorsey incurred from the litigation would be paid only by proceeds generated from Dorsey's "corrective remedial work," and even then, only after Nielsen was reimbursed the fee he had already paid for what Nielsen considered "flawed work."

## THE MANDAMUS ACTION

57.    On October 15, 2010, the same day the Washington Co. Action was filed, the Mandamus Action was commenced against the City of Grant, individual sitting City Council Members, and the Washington County Public Works Department.

58.    The Mandamus Action focused exclusively on Bohnen's campaign signs, not those of any other candidate. The Mandamus Action accused Bohnen of installing multiple campaign

13

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

signs that violated size, height, and setback requirements despite Eck's knowledge that most of

the local zoning laws were preempted by state law. The Mandamus Action sought a writ from the

court commanding the city and/or county to remove Bohnen's campaign signs or show cause why

they had not done so. Because the election was less than three weeks away, Eck promised

Nielsen that he would get an immediate hearing before the court.

59.    On October 18, 2010, three days after the Mandamus Action was served and filed,

Nick Vivien ("Vivien"), the attorney for the City of Grant, wrote Eck an email informing him of a

laundry list of flaws in the complaint. Vivien informed Eck that the Mandamus Action was

flawed for several reasons, including:

- Aside from a right of way owned or controlled within the City of Grant, Washington County has no jurisdiction over zoning within the City.

- The City has no jurisdiction or authority to enforce the private Protective Covenants associated with Mr. Nielsen's neighborhood.

- Nielsen's reliance on Section 32-418 of the Grant Code of Ordinances is misplaced because Minn. Stat. 211B.045 states that "whether or not the municipality has an ordinance that regulates the size or number of noncommercial signs, all noncommercial signs of any size may be posted in any number from 46 days before the state primary in a state general election year until ten days following the state general election."

- That the mandamus remedy against the City was improper because Grant Ordinance § 32-32 says the City may (as opposed to shall) institute action to prevent, restrain, correct or abate a violation of the zoning ordinance.

- The government officials named in the Mandamus Action were immune from civil liability.

Vivien concluded his email by threatening that the Mandamus Action be dismissed immediately

or face sanctions under Minn. Stat. 549.211 and Rule 11 of the Minnesota Rules of Civil

Procedure.

14

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

60.    In response to Vivien's email, Eck requested that LaPlante research the legitimacy

of Vivien's arguments and re-visit the entire filing. LaPlante informed Eck later that afternoon, in

an interoffice memo Nielsen was never supposed to see, that "we're very unlikely to win." A

copy of LaPlante's interoffice memo is attached hereto as Exhibit E. Eck obviously and for his

own reasons never informed Nielsen that he was very unlikely to win. In addition, the memo is

clear that LaPlante had previously told Eck that he "didn't know what the statutory hook was for

the 'private covenants are enforceable by the city' claim, and you told me to just include it

anyway."

61.    On two occasions after the Mandamus Action was commenced, the judge's staff in

the Mandamus Action left messages with Eck to schedule a hearing before the election occurred.

Eck never returned the judge's calls or took any effort to schedule a hearing before the election

and importantly, intentionally failed to inform Nielsen of the judge's contacts.

62.    On November 2, 2010, the general election occurred. Within 10 days thereafter,

all political signs were removed.

63.    Subsequently, on November 18, 2010, Vivien notified Eck that the election was

over and that the political signs were removed. Vivien asked Eck if Nielsen would voluntarily

dismiss the Mandamus Action since it was now moot. Instead of recommending dismissal of the

Mandamus Action, Eck decided to commence discovery on the City via a subpoena for the

production of documents in the Washington Co. Action. Accordingly, Eck had a document

subpoena from the Washington Co. Action served on the City of Grant on November 23, 2010.

### NIELSEN LOSES THE CRIMINAL CASE

64.    The criminal trial was set for March 28, 2011. Prior to the criminal trial, on March

17, 2011, Eck took the deposition of Deputy Hyde ("Hyde Deposition") in the Washington Co.

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

Action. The deposition of Deputy Hyde went very well for Nielsen. As a result, Nielsen asked

Eck to be lead counsel at his upcoming criminal trial.[2] Eck remarked to Nielsen that he should

"consider sending [the Hyde] depo transcript to Magnuson pointing out his case has been torn

apart." Thole then sent the Hyde Deposition transcript to prosecutor Magnuson.

65.    After the success of the Hyde Deposition, Eck opined to Nielsen that prosecutor

Magnuson would either dismiss all charges or the criminal case would surely be terminated in

Nielsen's favor.

66.    On March 28, 2011, the morning of the criminal trial, Magnuson allegedly asked

Thole, Eck's co-counsel, if Nielsen would accept a continuance for a dismissal. Under that offer,

if Nielsen stayed out of trouble for 12 months, the prosecution would dismiss the criminal

charges. Unfortunately for Nielsen, Thole relayed a different offer to him, which consisted of a

continuance for a dismissal specifically conditioned upon Nielsen dismissing all of his civil

lawsuits, not only against Mueller, but also Bohnen, and all governmental defendants. Nielsen

considered this offer to be unethical for a prosecutor to broker and consulted Eck. Eck confirmed

the ethical violation and advised Nielsen not to accept Magnuson's offer.

67.    Before the criminal jury trial began, Eck argued pretrial motions. In response to

the motions, the judge dismissed the theft charge as having no probable cause. The prosecutor

had already agreed to dismiss the right-of-way charges because they had no basis. The judge

ruled that the disorderly conduct charge should go to the jury.

68.    The remaining disorderly conduct charge was tried to a jury. During the course of

the trial, Nielsen and his wife testified on his behalf. However, despite the favorable deposition

testimony and Eck's attendance at trial to specifically interrogate Deputy Hyde and Sheriff

---

[2] Nielsen was also represented by a local Washington Co. criminal defense attorney, Eric Thole ("Thole"). Eck
assured Nielsen, however, that he [Eck] had the experience and competency to defend him in the criminal action.

16

27-CV-17-16371

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

Hutton, Eck failed to subpoena those officers to testify and they made themselves unavailable for trial.

69.    In addition to his failure to subpoena Deputy Hyde and Sheriff Hutton, Eck also failed to obtain critical exculpatory evidence from the prosecutor.  Under Rule 9.04 of the Minnesota Rules of Criminal Procedure, a criminal defendant has a right, upon request, to "any material or information within the prosecutor's possession and control that tends to negate or reduce the guilt of the accused as to the offense charged."  Eck failed to request the prosecutor's file pursuant to Criminal Rule 9.04, which would have uncovered critical emails that would have destroyed the credibility of the prosecution's complaining witness, Mueller.

70.    For example, the prosecutor's file contained an email from Mueller to the prosecutor, which stated:

> John, you called me after Nielsen's pre-trial and I'm trying to
> confirm that you have made contact with my attorney, Larry
> Schaefer *(contact information provided below)*.  Apparently Nielsen
> has a court date of March 31st at 8:30 AM; I want my attorney's
> input especially if a plea is arranged so I'm not prejudiced with any
> of his three suits against me.  Please advise…

(emphasis in original).  A true and accurate copy of Mueller's March 15, 2011 email is attached hereto as Exhibit F.

71.    Mueller's desperate attempt to influence the prosecutor to gain an advantage in the civil litigation against Nielsen continued just days later on March 18, 2011, when he again emailed the prosecutor:

> As I understand it, if he's convicted on DOC, his suits against me
> are dismissed.  Therefore, I urge you to do what you can to get a
> conviction even though I know in the grand scheme of things how
> trivial this charge might seem.

17

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

This email left know doubt as to Mueller's motive heading into the criminal trial at the end of the

month. A true and correct copy of Mueller's March 18 email is attached hereto as Exhibit G.

However, because Eck never obtained these critical emails, the jury never had the opportunity to

consider this pivotal evidence.

72.    Eck also failed to obtain the prosecutor's file via subpoena in the Washington Co.

Action because he agreed to a stay of discovery prior to the criminal trial. His agreement to the

discovery stay was contrary to Nielsen's instructions and the agreed upon strategy between Eck

and Nielsen.

73.    The jury found Nielsen guilty of disorderly conduct. One of the many glaring

errors made by Eck was failing to subpoena Deputy Hyde and Sheriff Hutton. Their testimony

would have exculpated Nielsen and to not call them was fatal to Nielsen's defense.

74.    Eck did not advise Nielsen of his right to appeal the conviction or otherwise

challenge it in a timely fashion. When Nielsen inquired about his appeal rights, Eck stated that he

did not know the deadline by which to appeal and would get back to him. By the time that Eck

got back to Nielsen, it was too late, as Nielsen's appeal time had run. By losing the criminal case,

and any chance to appeal, the Washington Co. Action was over. Eck, nonetheless, pushed his

client on.

## THE WASHINGTON CO. AND MANDAMUS ACTIONS WORSEN

75.    Even before the failure of the criminal trial, Nielsen began to doubt Eck's

assurances that the claims pled in the Washington County Action and the Mandamus Action were

viable. Nielsen contacted Nelson and Eck to solicit ideas about discontinuing the action or

correcting the pleadings to conform with what was appropriate at that time under available laws

and recovery consistent with his original goals in bringing litigation in the first place.

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

76.    On March 10, 2011, Nelson sent a memorandum to Nielsen outlining additional possible claims to bring in the Washington Co. Action. Nelson sent the memorandum to Eck a few days later. Nelson's memorandum discussed the elements of civil assault, abuse of process, malicious prosecution, and defamation claims as well as the damages recoverable. Nelson also commented on the existing claims in the Washington County Action. One comment that Nelson had in particular was that the "malicious prosecution claim should not have been brought unless/until original criminal charges were resolved in Nielsen's favor." Eck surely knew this before the Washington Co. Action was filed.

77.    Rather than verify the accuracy of Nelson's suggestions, Eck directed LaPlante to "prepare the Amended Complaint based upon Tim's research," despite Eck knowing that Nelson was not an attorney and that any information from Nelson was suggestion and not legal advice. Two days later, Eck signed and sent a proposed First Amended Complaint to opposing counsel in the Washington County Action. This proposed amended complaint added an abuse of process claim against Bohnen and Mueller and an assault claim against Mueller consistent with Nelson's comments. However, the malicious prosecution claim remained despite Nelson's observation that "it should not have been brought unless/until original criminal charges were resolved in Nielsen's favor."

78.    Even after losing the criminal trial, Eck continued to vigorously pursue the Washington Co. Action. On April 1, 2011, he propounded requests for production of documents to Washington County that sought, among other things, requests for the phone and email messages of Eck's co-counsel in the criminal matter, Thole, and prosecutor Magnuson, that included matters within the scope of the criminal action.

19

27-CV-17-16371

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

79.    A few days later, on April 4, 2011, Eck served deposition notices on Mueller,
Bohnen, Sheriff Hutton, and Magnuson. Mueller's counsel, Schaefer, refused to participate in
discovery and notified Eck that he intended to move for dismissal of the Washington Co. Action
and for sanctions.

80.    Eck, apparently unfazed by Schaefer's threats, served a subpoena *duces tecum* on
prosecutor Magnuson, seeking his entire criminal file, seeking to obtain any exculpatory evidence
related to the criminal action, despite not appealing or otherwise challenging the jury verdict in
the criminal action. Instead, Eck chose to pursue Nielsen's civil claims, without regard to their
viability after the verdict in the criminal action.

81.    None of the defendants in the Washington Co. Action stipulated to Eck's request
before the criminal trial to file an amended complaint. As a result, Eck circulated a second
amended complaint to defense counsel on April 13, 2011. This second amended complaint kept
the same claims as in the original verified complaint, but also added Sheriff Hutton as a party
defendant, who was improperly omitted from the original complaint.

82.    None of the defendants agreed to allow Eck to file a second amended complaint.
As a result, Eck moved for leave of court to file the second amended complaint on April 26, 2011.

83.    Before Eck moved for leave to file the second amended complaint, Mueller moved
for summary judgment and for additional relief under Minnesota's anti-SLAPP statute on April
15, 2011, exposing Nielsen to hundreds of thousands of dollars in damage. Eck never advised
Nielsen of the possibility of exposure under the anti-SLAPP statute before initiating litigation.
Mueller's attorney, Schaefer, also served a Rule 11 and Minn. Stat. § 549.211 safe harbor
sanctions letter that same day. After receiving Mueller's motion, Nielsen was shocked at the
content and asked Eck whether "Schaefer's claims are fantasy or proper." Eck did not respond.

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

84.     After one week and several unanswered phone calls, Nielsen emailed Eck again expressing that "Mueller's claims cause great concern about my reputation and pocketbook. Our very limited research suggests I am in a very bad way." Later that same day Nielsen asked Eck again whether Mueller's claims had any validity. By the end of the business day, Eck still had not responded with a substantive answer, but told Nielsen that he would review the matter over the weekend.

85.     The weekend passed, and Nielsen followed up with Eck on Monday, April 25, 2011, with a list of questions that began with the inquiry that Eck continued to avoid: "are Mueller's claims viable and sustainable?" Nielsen, concerned that the malicious prosecution claim was filed inappropriately, urged Eck to seek discovery to untangle and validate the claims Eck had filed. Eck agreed to push for more discovery and he described the defenses that would be used to combat Mueller's motions. But, Eck never answered the fundamental question posed by his client: "Are Mueller's claims viable and sustainable?" He did not respond because he knew, or should have known, that the claims he filed were not sustainable and he had exposed Nielsen to thousands of dollars in damage.

86.     As the Washington Co. Action worsened for Nielsen, the Mandamus Action also took a turn for the worse. On April 19, 2011, the City of Grant moved for sanctions and dismissal.

87.     The original purpose of the Mandamus Action was, as Eck had explained to Nielsen, to get an immediate response to resolve the campaign signs in his neighborhood – before the election took place. Eck promised Nielsen that a quick hearing would occur in the Mandamus Action. However, months later, Eck had still not obtained the quick hearing he had promised.

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

88.    After settlement discussions with the City of Grant failed, Nielsen suggested to Eck that he voluntarily dismiss the Mandamus Action reasoning, "why would you want to alienate the judge and continue on with something, that even me, not knowing the law, would consider long past due?" Eck never bothered to tell Nielsen that Judge Hannon's staff had attempted to contact him twice to set a hearing before the election and Eck never returned the calls. Nielsen learned about it in the City of Grant's briefing in its motion papers. Nielsen felt that Eck deceived him, describing Eck's conduct as "a terrible breach of trust."

89.    On June 17, 2011, the dismissal and sanctions hearing occurred in the Mandamus Action. It did not go well for Eck and his representation of Nielsen. Nielsen, obviously unhappy with the outcome, wrote Eck:

> The judge publicly characterized most or all of our pleadings as being trivial, futile, moot, frivolous, harassing, and deserving of her anger and sanctions. She eviscerated and made useless all of our claims out of hand, including our anti-SLAPP motion, which she had just received and had not even read.

Nielsen also noted to Eck that Judge Hannon would impose sanctions unless all claims in the Mandamus Action were voluntarily dismissed in three days. However, Nielsen stated to Eck that he had no intention of dismissing the claims unless "you and Dorsey tell me that the judge is in fact correct about our conduct." Rather than being honest and responding to his client, Eck instead chose to terminate the attorney-client relationship with Nielsen: "I will no longer represent you and no longer care to have any association with you. You should obtain other counsel immediately." While threats of sanctions were pending against Nielsen, Eck and Dorsey proceeded to withdraw as counsel in the litigation.[3]

---

[3] Rule 1.16(b)(1) of the Minnesota Rules of Professional Conduct says that an attorney may only withdraw as long as, "withdrawal can be accomplished without material adverse effect on the interests of the client."

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

90.    Ultimately, Dorsey paid the City of Grant $18,000 in monetary sanctions for inappropriately bringing the Mandamus Action, but failed to include Nielsen in its settlement discussions with the City of Grant or secure a release for Nielsen, Dorsey's long-time client – which again intentionally exposed Nielsen to monetary damages, including attorneys' fees and costs to defend the City of Grant's motion for sanctions.

## ECK FILES THE ILL-FATED FEDERAL ACTION JUST BEFORE ABANDONING HIS CLIENT

91.    On June 16, 2011, Eck filed a Complaint against Bohnen and Mueller in the United States District Court for the District of Minnesota, Case No. 0:11-cv-01580-JNE-TNL, under the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721, *et seq.* (the "Federal Action").

92.    The Federal Action against Bohnen was allegedly based on Bohnen unlawfully obtaining and disclosing Nielsen's personal information "from a motor vehicle record having obtained Plaintiff's license plate information from Defendant Mueller."

93.    Similarly, with respect to Mueller, the Federal Action alleged that he "disclosed and/or used personal information obtained from motor vehicle records in violation of law." Eck did not plead any other facts against Bohnen and Mueller to substantiate the DPPA claims against them.

94.    Within two weeks of filing the Federal Action, Bohnen and Mueller moved to dismiss the Federal Action for failure to state a claim upon which relief could be granted.

95.    In late August 2011, the U.S. District Court Judge agreed with Bohnen and Mueller and granted their motions to dismiss because the "bare-bones complaint" failed to satisfy federal pleading requirements and "contains no factual allegation and fails to address all of the elements of the cause of action." One of the glaring deficiencies in the Federal Action was that

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

the complaint, "entirely neglects one of the elements of the cause of action – the requirement that the purpose for obtaining, disclosing, or using the information be impermissible under the statute."

96.     Eck knew, or should have known, that the Federal Action was destined to fail because the complaint he prepared and filed lacked any factual specificity and failed to take into account the essential elements of the DPPA claim.  Furthermore, the cause of action arose back in October 2010, yet Eck failed to conduct any discovery, pursue a public data request for information or take any other action that would provide the evidence necessary to withstand a motion to dismiss for failure to state a claim and judicial scrutiny.  Eck's pleading, was so woefully vague, that it could only have been done in order to prolong more litigation and generate more attorney fees.

### THE AFTERMATH ONCE DORSEY AND ECK WITHDREW AS COUNSEL

97.     By the end of June 2011, Dorsey withdrew as counsel from the Bohnen-related cases.  Foley & Mansfield and Tom Pahl took over as Nielsen's counsel.

98.     On August 16, 2011, in the Washington Co. Action, Judge Tad Jude issued an order addressing all motions argued at a June 3, 2011, hearing just before Dorsey and Eck withdrew as counsel for Nielsen.  The order denied leave to add four additional claims Eck proposed against Washington County and Sheriff Hutton, including both an abuse of process claim and a 42 U.S.C. § 1983 claim the court recognized as being "Heck-barred" by the "hoary principle" that precludes convicted individuals from using the civil process to collaterally attack their convictions.  The order also dismissed three of the claims against Bohnen on the pleadings. The declaratory relief claim was dismissed as being moot because the election was over and the campaign signs had been down since November 12, 2010.  The court dismissed the malicious

24

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

prosecution claim because of Nielsen's criminal conviction. The civil conspiracy claim was dismissed because the underlying tort, malicious prosecution, was dismissed.

99.     Eck's request to add an abuse of process claim against Bohnen and Mueller was not addressed by Judge Jude, so it was arguably permitted, but the same amendment was denied with respect to the Washington County defendants for failure to state a claim.

100.    Shortly after the majority of claims in the Washington Co. Action were either denied or dismissed, Nielsen received a "final invoice" from Dorsey in late August 2011, which billed Nielsen for attorneys' fees and costs totaling $130,422.79.

101.    In response to the "final invoice," Pahl sent Eck a confidential letter on August 31, 2011, which assessed the poor legal work that Eck and Dorsey did on behalf of Nielsen. Pahl's criticisms of the work that Eck and Dorsey performed on behalf of Nielsen included:

- Ignored Nielsen's stated goals and objections in pursuit of legal fees;

- The claims pursued on Nielsen's behalf were faultily pled, faultily researched and faultily prosecuted or not prosecuted at all;

- Gave inaccurate and incomplete legal conclusions and advice repeatedly to Nielsen;

- Because of its flawed legal analysis, Dorsey's work was remedial and conducted in order to try and correct its flawed advice and work;

- The work Dorsey performed on behalf of Nielsen was dismissed and sharply criticized by several judges, evidencing further harm and damage to Nielsen, his reputation and his claims

- The defense of certain matters was mishandled, erroneous and negligent

- No discussions or disclosures were made to Nielsen about potential counterclaims for which Nielsen could be found liable;

- Dorsey's conduct caused Nielsen's new attorneys to spend time and monies correcting Dorsey's work.

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

A copy of Pahl's August 31, 2011, letter is attached hereto as Exhibit H and incorporated herein

by reference. Pahl closed his letter to Eck with the following message:

> Mr. Nielsen has expressed both to you and me, prior to his receipt
> of this "final invoice," his interest in not subjecting you or Dorsey
> & Whitney to further embarrassment. That desire is becoming
> increasingly difficult to maintain, given Judge Hannon's comments
> and open criticisms of your handling of the mandamus action, Judge
> Erickson's comments, findings and rulings in the D.P.P.A. claims,
> and Dorsey & Whitney's payment of attorneys' fees and costs to the
> City of Grant. Mr. Nielsen maintains hope that he can find
> acceptable resolutions to the problems which Dorsey & Whitney
> has led him into. Sending a "final invoice" like you did, did
> nothing but cause harm to Mr. Nielsen and compound Dorsey &
> Whitney's predicament.

102.    Pahl, in an effort to mitigate the harm that Defendants caused to Nielsen, began

seeking discovery in the Washington Co. Action. He subpoenaed Magnuson's criminal file for a

second time on October 14, 2011. Magnuson complied with the subpoena on June 26, 2012.

103.    On October 22, 2012, Charles Hawkins, an experienced criminal defense attorney

that Pahl recommended, moved for post-conviction relief, seeking to overturn Nielsen's

conviction based on three emails that Magnuson produced in response to the subpoena.

Magnuson's file was not used for any other purpose.

104.    The Washington Co. Action finally ended on May 23, 2014, when Nielsen's

attorney, Joseph Anthony[4], voluntarily dismissed the nuisance claim and the court dismissed the

abuse of process claim pursuant to Bohnen's motion to dismiss. However, the peril that

Defendants put Nielsen into was not over.

105.    Nielsen was embroiled in a lawsuit that Bohnen filed against Defendants Dorsey

and Eck, Foley & Mansfield, Pahl and Nielsen in Hennepin County on or about October 12, 2012,

seeking substantial damages against Nielsen for abuse of process, malicious prosecution, and civil

---

[4] Anthony replaced Pahl in the Washington Co. Action.

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

conspiracy for the flawed litigation that Eck commenced for Nielsen. *See Bohnen v. Dorsey Whitney LLP*, et al., Case No. 27-cv-12-20870 (the "Hennepin Co. Action"). In fact, each and every lawsuit that Defendants commenced on Nielsen's behalf was used against him in the Hennepin Co. Action.

106.    Bohnen asserted that the Washington Co. Action, the Mandamus Action, and the Federal Action were all commenced without any basis in law or fact and thus were brought for an improper purpose. For example, in the Mandamus Action, Bohnen used Eck's failure to follow his client's instructions and legal obligation to seek an immediate hearing on the Mandamus Action to allege that "Nielsen and the Dorsey Defendants never had any real intention of getting a judicial resolution of the legality of the placement of the 2010 Bohnen campaign signs." This, however, was never Nielsen's intention, but the Dorsey Defendants obviously never had any intention to seek a quick resolution of the Mandamus Action. Even with the court's staff attempting to contact Eck on multiple occasions to set a hearing, Eck did not follow through in obtaining the immediate relief Nielsen desired.

107.    Bohnen also sued Foley and Pahl in the Hennepin Co. Action, despite Nielsen's legal obligation to have counsel protect and mitigate the damage Dorsey and Eck caused. Bohnen's counsel recognized this legal obligation as evidenced by their decision to not sue attorney Joe Anthony ("Anthony") for representing Nielsen after Anthony replaced Pahl.

108.    Nielsen was forced to hire additional counsel, the Bassford Remele firm, to defend him in the Hennepin Co. Action due to the significant damages and attorney's fees that Bohnen sought arising from the flawed litigation that Eck and Dorsey filed.

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

109.    The Hennepin Co. Action ended in 2016, but only after Nielsen spent thousands of

dollars in legal expenses and settlement proceeds to resolve the Hennepin Co. Action with

Bohnen.  Dorsey also paid an undisclosed sum to settle the Hennepin Co. Action with Bohnen.

110.    The legal quagmire that Defendants led Nielsen into appeared to have ended.

However, shortly after Nielsen commenced this action against Dorsey, on November 1, 2016, the

Minneapolis Star Tribune, LLC ("Star Tribune")  moved the Court to unseal approximately 100

documents that had been filed under seal in the Hennepin Co. Action.  One of those documents

was the confidential settlement agreement between Nielsen and Bohnen (the "Settlement

Agreement").

111.    The Star Tribune, as the press, justified its need to obtain the Settlement

Agreement and other sealed documents by stating to the Court:

> Shortly thereafter, however, Bohnen attempted to revive his claims
> for malicious prosecution and abuse of process against Dorsey &
> Whitney, Eck, Foley & Mansfield, and Pahl based on information
> disclosed by Nielsen pursuant to a November 15 settlement
> agreement. *See* Doc. ID No. 162.  This settlement agreement
> apparently provided for payment of $125,000.00 to Bohnen by an
> insurer to settle all claims against Nielsen in this litigation. *See*
> Doc. ID No. 328 at 4.  Notably, the agreement afforded the insurer
> an opportunity to recover these sums if Nielsen's testimony
> provided under the settlement agreement aided Bohnen in
> successfully reviving Bohnen's claims against Dorsey & Whitney,
> Eck, Foley & Mansfield, and Pahl.  *Id.*

*See* Star Tribune Memorandum in Support of Motion to Intervene & Unseal

11/1/16.

112.    The Star Tribune knew the material portions of the Settlement Agreement referred

to in the foregoing paragraph because Dorsey improperly disclosed material portions of the

Settlement Agreement in its memorandum in opposition to Bohnen's motion to re-open claims.

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

113.    In the Hennepin Co. Action, Special Master Robert Lynn issued an order quashing the deposition of Tim Nelson "unless Plaintiff and Defendant Nielsen agree to, and provide a full copy of their settlement agreement to the Dorsey Defendants by 5:00 p.m., Wednesday, November 18, 2015."

114.    Mark Bradford, counsel for Nielsen in the Hennepin Co. Action, emailed Dorsey counsel Lancaster: "Peter, I am scheduled to speak with my client today at 11:30 AM. If the parties to the contract agree to produce it today, will you agree to maintain its confidentiality?"

115.    On November 18, 2015, Lancaster responds: "[I]f we felt the need to show it [the Settlement Agreement] to a judge through a filing, we can commit to doing so under standard protective order-type procedures."

116.    On November 18, 2015, Bradford emails Lancaster again with conditions for disclosure of Settlement Agreement, including: "the contract and its terms shall not be publicly filed; and filing with the court shall be under seal." Later that same day Lancaster responds, "This term is OK with us." Thereafter, Bohnen's counsel, Sharon Van Dyke, produces the Settlement Agreement to Lancaster in an email in which she confirms that Dorsey will treat the contract as confidential.

117.    Bohnen filed his motion to re-open discovery, vacate the judgment pursuant to Minn. R. Civ. P. 60.02(b), and reinstate claims ("Motion to Re-Open Claims") on or about February 11, 2016.

118.    On January 15, 2016, Judge Sipkins issued an order stating: "All documents filed by any party in connection with Plaintiff's motion to re-open discovery, vacate the judgment pursuant to Minn. R. Civ. P. 60.02(b), and reinstate claims may be filed as confidential under seal."

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

119. On April 1, 2016, Dorsey filed its opposition brief to Bohnen's Motion to Re-Open Claims. The opposition brief was filed in the public domain and not filed under seal.[5] On Page 4 of its opposition brief, Dorsey disclosed the material terms of the Settlement Agreement despite its agreement with counsel for Nielsen and Bohnen to keep the terms of the Settlement Agreement confidential.

120. Nielsen opposed the Star Tribune's motion to unseal the record and sought to mitigate the damage that Dorsey caused by reciting the material terms of the confidential Settlement Agreement. Ultimately, the Judge Sipkins issued an order unsealing the Settlement Agreement[6] over Nielsen's opposition.

121. On or about March 9, 2017, Nielsen asked the Court to reconsider its order unsealing the Settlement Agreement, which the Court declined to do.

122. Thereafter, Nielsen unsuccessfully pursued an appeal of the order unsealing the Settlement Agreement. As a direct and proximate result of Dorsey's conduct in disclosing the Settlement Agreement's material terms, Nielsen incurred substantial damages in the form of attorney's fees and costs, in an amount exceeding $35,000.

123. At this point, the damage Dorsey caused to Nielsen has been substantial. He was forced to spend significant dollars and time to defend sanctions motions and litigation due to the flawed claims that Eck intentionally counseled Nielsen to file and to defend Dorsey's improper disclosure of the Settlement Agreement.

## DEFENDANTS' DUTIES TO THEIR CLIENT

124. Under Rule 1.1 of the Minnesota Rules of Professional Conduct, an attorney has a

[5] Dorsey filed the Settlement Agreement under seal as part of Lancaster's Affidavit, but the damage was done in Dorsey's opposition brief where the material terms of the Settlement Agreement were disclosed.
[6] The order unsealing the documents filed under seal excluded from disclosure any documents that are subject to the attorney-client privilege or work product doctrine.

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

duty to provide competent representation to his client. This duty includes, among other things, inquiry into and analysis of the factual and legal elements of the claims in a case.

125.    Rule 11.02 of the Minnesota Rules of Civil Procedure requires an attorney representing a party to file pleadings and other papers certifying, among other things, "that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: (a) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; (b) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law; (c) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Minnesota Statute § 549.211 imposes this same duty upon attorneys that file pleadings with the courts.

126.    Rule 1.3 of the Minnesota Rules of Professional Conduct requires an attorney to "act with reasonable diligence and promptness in representing a client. As the Comment to Rule 1.3 notes, "Perhaps no professional shortcoming is more widely resented than procrastination. A client's interests often can be adversely affected by the passage of time or the change of conditions." In addition to acting with reasonable diligence and promptness, "A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client." *See* Rule 3.2 of the Minnesota Rules of Professional Conduct.

127.    Rule 1.4 of the Minnesota Rules of Professional Conduct requires an attorney to "reasonably consult with the client about the means by which the client's objectives are to be accomplished…keep the client reasonably informed about the status of the matter…[and] shall

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

128.    Rule 2.1 of the Minnesota Rules of Professional Conduct requires a lawyer to "exercise independent professional judgment and render <u>candid</u> advice." (emphasis added).  As the Comment to Rule 2.1 notes, "A client is entitled to straightforward advice expressing the lawyer's honest assessment."

129.    Rule 3.1 of the Minnesota Rules of Professional Conduct mandates that "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification, or reversal of existing law."  This rule implies "a duty not to abuse legal procedure.  *See* Comment to Rule 3.1.  Further, a lawyer has a duty to "inform themselves about the facts of their clients' cases and the applicable law and determine that they can make good faith arguments in support of their clients' positions."  *See id.*

**COUNT I - Professional Malpractice/Negligence**

130.    Nielsen realleges paragraphs 1 through 129 above as if fully rewritten herein.

131.    Nielsen and Defendants Dorsey and Eck had an attorney-client relationship that lasted for more than 30 years until it ended in June 2011.  At all times relevant to this action, Defendants Dorsey and Eck formed an attorney-client relationship with Nielsen for the Bohnen-related litigation that Defendants commenced on Nielsen's behalf.

132.    Defendants Dorsey and Eck breached their legal and professional duties to Nielsen for several reasons, including:

- failing to handle the representation of Nielsen in the various matters related to Bohnen as described above in a competent manner;

32

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

- failing to properly advise Nielsen on the legal viability of potential claims;

- filing claims on Nielsen's behalf that were groundless;

- ignoring the research and conclusions of subordinate attorneys;

- pursuing claims that had no legal basis solely to generate legal fees;

- failing to prosecute the Mandamus Action with prompt diligence and in an expeditious manner so that the client's interests were not impaired;

- failing to move for an immediate temporary restraining order and temporary injunction on the Mandamus Action;

- misrepresenting to Nielsen to ignore research and pursue claims that lacked basis in law or fact;

- failed to disclose to Nielsen his right to appeal and/or challenge the criminal verdict;

- failed to subpoena material witnesses in the criminal case thereby obstructing the successful defense of the criminal case and destroying the success of the civil claims that were dependent on the successful outcome of the criminal case;

- failed to advise Nielsen that he would be exposed to sanctions and claims for bringing litigation against Bohnen and others;

- failing to advise Nielsen on the potential exposure of counterclaims and/or sanctions motions under Minn. Stat. §§ 554.04, 554.045, 604A.34, Civil Rule 11 and common law claims for abuse of process and malicious prosecution;

- filing improper claims against improper parties.

- failing to maintain the confidentiality of the Settlement Agreement by disclosing material portions of it.

133.     As a direct and proximate result of Defendants' numerous breaches and acts of negligence and malpractice, Nielsen would not have commenced the Washington Co. Action and the Mandamus Action, would not have incurred thousands of dollars in legal fees, sanctions and

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

monetary settlement, and costs.

134.    As a direct and proximate result of Defendants' actions, Nielsen has been damaged in an amount in excess of $50,000.00, the exact amount to be proven at trial, together with attorney's fees, interests and costs.

## COUNT II – Breach of Contract

135.    Nielsen restates paragraphs 1 through 129 above as if fully rewritten herein.

136.    Defendants Dorsey and Eck and Nielsen entered into a binding contract for legal services related to the Bohnen matter.

137.    Defendants Dorsey and Eck have an implied contractual duty to perform their legal services in good faith and to deal fairly with Nielsen as their client.

138.    Defendants Dorsey and Eck also have a legal duty to perform their legal services to Nielsen in a competent and professional manner.

139.    Defendants Dorsey and Eck materially breached their contract with Nielsen, by, among other things, engaging in conduct described in the foregoing paragraphs, including, without limitation, the following:

- failing to handle the representation of Nielsen in the various matters related to Bohnen as described above in a competent manner;

- failing to properly advise Nielsen on the legal viability of potential claims;

- filing claims on Nielsen's behalf that were groundless;

- ignoring the research and conclusions of subordinate attorneys;

- pursuing claims that had no legal basis solely to generate legal fees;

- failing to prosecute the Mandamus Action with prompt diligence and in an expeditious manner so that the client's interests were not impaired;

27-CV-17-16371

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

- failing to move for an immediate temporary restraining order and temporary injunction on the Mandamus Action;

- misrepresenting to Nielsen to ignore research and pursue claims that lacked basis in law or fact;

- failed to disclose to Nielsen his right to appeal and/or challenge the criminal verdict;

- failed to subpoena material witnesses in the criminal case thereby obstructing the successful defense of the criminal case and destroying the success of the civil claims that were dependent on the successful outcome of the criminal case;

- failed to advise Nielsen that he would be exposed to sanctions and claims for bringing litigation against Bohnen and others;

- failing to advise Nielsen on the potential exposure of counterclaims and/or sanctions motions under Minn. Stat. §§ 554.04, 554.045, 604A.34, Civil Rule 11 and common law claims for abuse of process and malicious prosecution;

- filing improper claims against improper parties.

140.    As a direct and proximate result of Defendants' actions, Nielsen has been damaged in an amount in excess of $50,000.00, the exact amount to be proven at trial, together with attorney's fees, interests and costs.

## COUNT III – Breach of Fiduciary Duty

141.    Nielsen restates paragraphs 1 through 129 above as if fully rewritten herein.

142.    Under Minnesota law, an attorney is under a legal duty to represent the client with undivided loyalty, to preserve client confidences, and disclose any material matters bearing upon the representation of these obligations.  Further, an attorney must impart to the client any information the attorney has that affects the client's interests.

143.    Defendants Dorsey and Eck breached their fiduciary duty to Nielsen by, among other things:

- failing to handle the representation of Nielsen in the various

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

matters related to Bohnen as described above in a competent manner;

- failing to properly advise Nielsen on the legal viability of potential claims;

- filing claims on Nielsen's behalf that were groundless;

- ignoring the research and conclusions of subordinate attorneys;

- pursuing claims that had no legal basis solely to generate legal fees;

- failing to prosecute the Mandamus Action with prompt diligence and in an expeditious manner so that the client's interests were not impaired;

- failing to move for an immediate temporary restraining order and temporary injunction on the Mandamus Action;

- misrepresenting to Nielsen to ignore research and pursue claims that lacked basis in law or fact;

- failed to disclose to Nielsen his right to appeal and/or challenge the criminal verdict;

- failed to subpoena material witnesses in the criminal case thereby obstructing the successful defense of the criminal case and destroying the success of the civil claims that were dependent on the successful outcome of the criminal case;

- failed to advise Nielsen that he would be exposed to sanctions and claims for bringing litigation against Bohnen and others;

- failing to advise Nielsen on the potential exposure of counterclaims and/or sanctions motions under Minn. Stat. §§ 554.04, 554.045, 604A.34, Civil Rule 11 and common law claims for abuse of process and malicious prosecution;

- filing improper claims against improper parties.

144.    As a direct and proximate result of Defendants' numerous breaches of fiduciary duties, acts of negligence and malpractice, Nielsen would not have commenced the Washington Co. Action and the Mandamus Action, would not have incurred thousands of dollars in legal fees,

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

sanctions and monetary settlement, and costs.

145.    As a direct and proximate result of Defendants' actions, Nielsen has been damaged

in an amount in excess of $50,000.00, the exact amount to be proven at trial, together with

attorney's fees, interests and costs.

## COUNT IV - Fraud

146.    Nielsen restates paragraphs 1 through 129 above as if fully rewritten herein.

147.    An attorney is under a legal duty to not engage in conduct that involves dishonesty,

fraud, deceit or misrepresentation.

148.    Defendants Dorsey and Eck engaged in fraud, dishonesty, deceit and

misrepresentation by making numerous false representations to Nielsen as described in the

paragraphs above, with knowledge that the representations were false or, without knowledge of

the truth or falsity of the representations to Nielsen, with the intent that Nielsen rely on the false

representations.

149.    Specifically, on or about October 9, 2010, Eck told Nielsen that he would seek an

immediate injunctive relief hearing to expedite enforcement of the Bohnen campaign signs, yet

Eck never had any intention of following through with his promise to Nielsen.

150.    On or about October 14, 2010, Eck advised Nielsen that he had viable claims

against numerous parties and that he should commence the Washington Co. Action and

Mandamus Action as described in paragraphs 42 and 44 above, when Eck knew that these actions

were not legally viable after allegedly spending several hours doing research.

151.    On or about October 14, 2010, Eck told Nielsen that the litigation he commenced

on Nielsen's behalf would get the signs removed immediately and permanently and that Nielsen

would be able to recover his attorneys' fees and costs if successful, when he knew this was false.

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

152.    On or about October 15, 2010, Eck told Nielsen that it was too late to dismiss the Washington Co. Action and re-file in federal court, which he knew was false.

153.    In early November 2010, Eck misstated the law to Nielsen as described in paragraph 52 above, in order to intentionally mislead Nielsen into believing that the claims asserted on Nielsen's behalf were viable, when they were not.

154.    On or about February 7, 2011, Eck told Nielsen to ignore LaPlante's negative research and told Nielsen that his damages claims were not limited as LaPlante's research revealed. Eck's statements to Nielsen were intentionally false and misleading to Nielsen.

155.    Nielsen did in fact rely on the numerous false representations of Eck described in the foregoing paragraphs to his detriment, such reliance was reasonable, and Nielsen has suffered damages in excess of $50,000.00, the exact amount to be proven at trial, attorney's fees, interest and costs as provided by law.

## COUNT V – MINN. STAT. § 481.07

156.    Nielsen restates paragraphs 1 through 155 as if fully rewritten herein.

157.    Minnesota Statute § 481.07, which provides for penalties for attorney deceit or collusion, states that:

> An attorney who, with intent to deceive a court or a party to an action or judicial proceeding, is guilty of or consents to any deceit or collusion, shall be guilty of a misdemeanor; and, in addition to the punishment prescribed therefor, the attorney shall be liable to the party injured in treble damages. If the attorney permit any person other than a general law partner to begin, prosecute, or defend an action or proceeding in the attorney's name, the attorney giving such permission, and every person so using the name, shall forfeit $ 50 to the party against whom the action or proceeding is prosecuted or defended, recoverable in a civil action.

158.    Defendants Dorsey and Eck intended to deceive Nielsen and did so deceive him, by making numerous false representations to him as described in the foregoing paragraphs.

27-CV-17-16371

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

159.    Specifically, on or about October 9, 2010, Eck deceived Nielsen when he told Nielsen that he would seek an immediate injunctive relief hearing to expedite enforcement of the Bohnen campaign signs, yet Eck never had any intention of following through with his promise to Nielsen.

160.    On or about October 14, 2010, Eck deceived Nielsen by advising him that he had viable claims against numerous parties and that he should commence the Washington Co. Action and Mandamus Action as described in paragraphs 42 and 44 above, when Eck knew that these actions were not legally viable after allegedly spending several hours doing research.

161.    On or about October 14, 2010, Eck deceived Nielsen by telling him that the litigation he commenced on Nielsen's behalf would get the signs removed immediately and permanently and that Nielsen would be able to recover his attorneys' fees and costs if successful, when he knew this was false.

162.    On or about October 15, 2010, Eck deceived Nielsen when he told Nielsen that it was too late to dismiss the Washington Co. Action and re-file in federal court, which Eck knew was false.

163.    In early November 2010, Eck deceived Nielsen by misstating the law to Nielsen as described in paragraph 52 above, in order to intentionally deceive and mislead Nielsen into believing that the claims asserted on Nielsen's behalf were viable, when they were not.

164.    On or about February 7, 2011, Eck deceived Nielsen by telling him to ignore LaPlante's negative research and told Nielsen that his damages claims were not limited as LaPlante's research revealed. Eck's statements to Nielsen were intentionally false and deceitful to Nielsen.

165.    As a direct and proximate result of Defendants' deceitful actions, Nielsen is

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

entitled to treble damages pursuant to Minn. Stat. § 481.07 in an amount to be determined at trial.

## COUNT VI – MINN. STAT. § 481.071

166.    Nielsen restates paragraphs 1 through 165 as if fully rewritten herein.

167.    Minnesota Statute § 481.071, which provides for treble damages for attorney

misconduct, states that:

> Every attorney or counselor at law who shall be guilty of any deceit
> or collusion, or shall consent thereto, with intent to deceive the
> court or any party, or who shall delay the attorney's client's suit
> with a view to the attorney's own gain, shall be guilty of a
> misdemeanor and, in addition to the punishment prescribed by law
> therefor, shall forfeit to the party injured treble damages, to be
> recovered in a civil action.

168.    Defendants Dorsey and Eck intended to deceive Nielsen and did so deceive him,

by making numerous false representations to him as described in the foregoing paragraphs.

169.    Specifically, on or about October 9, 2010, Eck deceived Nielsen when he told

Nielsen that he would seek an immediate injunctive relief hearing to expedite enforcement of the

Bohnen campaign signs, yet Eck never had any intention of following through with his promise to

Nielsen.

170.    On or about October 14, 2010, Eck deceived Nielsen by advising him that he had

viable claims against numerous parties and that he should commence the Washington Co. Action

and Mandamus Action as described in paragraphs 42 and 44 above, when Eck knew that these

actions were not legally viable after allegedly spending several hours doing research.

171.    On or about October 14, 2010, Eck deceived Nielsen by telling him that the

litigation he commenced on Nielsen's behalf would get the signs removed immediately and

permanently and that Nielsen would be able to recover his attorneys' fees and costs if successful,

when he knew this was false.

172.    On or about October 15, 2010, Eck deceived Nielsen when he told Nielsen that it

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

was too late to dismiss the Washington Co. Action and re-file in federal court, which Eck knew was false.

173.    In early November 2010, Eck deceived Nielsen by misstating the law to Nielsen as described in paragraph 52 above, in order to intentionally deceive and mislead Nielsen into believing that the claims asserted on Nielsen's behalf were viable, when they were not.

174.    On or about February 7, 2011, Eck deceived Nielsen by telling him to ignore LaPlante's negative research and told Nielsen that his damages claims were not limited as LaPlante's research revealed. Eck's statements to Nielsen were intentionally false and deceitful to Nielsen.

175.    Defendants Dorsey and Eck have also violated Minn. Stat. § 481.071 by initiating and prolonging the Mandamus Action and the Washington Co. Action with a view toward their own financial gain as evidenced by, among other things, failing to seek an immediate hearing in the Mandamus Action, prolonging the litigation for several months after the General Election was over and the signs were removed, continuing the Washington Co. Action after Nielsen lost the criminal trial. Moreover, filing numerous lawsuits that were not grounded in law and fact with no possibility of success or to achieve Nielsen's goals also violate Minn. Stat. § 481.071 because they were done with a view toward Defendants' own financial gain.

176.    As a direct and proximate result of Defendants' actions in violation of Minn. Stat. § 481.071, Nielsen is entitled to treble damages pursuant to Minn. Stat. § 481.071 in an amount to be determined at trial.

### COUNT VIII – NEGLIGENCE AGAINST PETER LANCASTER

177.    Nielsen restates paragraphs 110 through 123 as if fully rewritten herein.

178.    Lancaster repeatedly informed Nielsen's counsel that he would keep the terms and

41

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

conditions of the Settlement Agreement confidential to compel disclosure of this Agreement.

179.    Specifically, on or about November 18, 2015, Lancaster explained that if Dorsey

ever felt the need to show the Settlement Agreement to a judge "[Dorsey and I] can commit to

doing so under standard protective order-type procedures."

180.    Further, on or about November 18, 2015, Lancaster promised that "the [Settlement

Agreement] and its terms shall not be publicly filed; and filing with the court shall be under seal"

to compel disclosure of the Settlement Agreement.

181.    Bohnen's counsel provided Lancaster with the Settlement Agreement relying on

Lancaster's promises to counsel for Nielsen and Bohnen to keep the Settlement Agreement, and

its terms, confidential.

182.    On or about April 1, 2016, Lancaster filed, on behalf of Dorsey, an opposition

brief to Bohnen's Motion to Re-Open Claims.  This brief was filed in the public domain and not

filed under seal.  Despite promising not to do so, Lancaster disclosed the material terms of the

Settlement Agreement on page 4 of this publicly-filed opposition brief.

183.    Lancaster had a legal duty to Nielsen not to disclose the Settlement Agreement.

Lancaster breached his legal duty to Nielsen by disclosing material terms of the Settlement

Agreement on or about April 1, 2016.

184.    As a direct and proximate result of Lancaster's negligence, Nielsen has been

damaged, as is detailed further below.

185.    As a direct and proximate result of Lancaster's negligent disclosure of the

Settlement Agreement, Nielsen has incurred thousands of dollars in attorney's fees and costs in an

attempt to keep the Settlement Agreement confidential.

186.    As a direct and proximate cause of Lancaster's negligence, Nielsen has been

27-CV-17-16371

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

damaged in an amount in excess of $35,000.00, the exact amount to be proven at trial, attorney's

fees, interest and costs as provided by law.

## JURY DEMAND

NIELSEN HEREBY REQUESTS A JURY TRIAL OF ALL CLAIMS IN THIS ACTION PURSUANT TO RULE 38 OF THE MINNESOTA RULES OF CIVIL PROCEDURE.

WHEREFORE, Nielsen prays for judgment against the Defendants for the following relief:

a.    Compensatory damages against Defendants Dorsey and Eck in an amount in excess of $50,000.00, the exact amount to be proven at trial;

b.    Compensatory damages against Defendant Lancaster in an amount in excess of $35,000.00, the exact amount to be proven at trial;

c.    Forfeiture of fees paid to Defendants Dorsey and Eck;

d.    Treble damages against Defendants Dorsey and Eck pursuant to Minn. Stat. §§ 481.07 and 481.071;

e.    Such other relief as the Court deems just and equitable, including interest, costs and attorney's fees.

Dated: December 12, 2017.

Respectfully submitted,

Daniel Gray Leland (0389027)
LELAND LAW PLLC
310 Fourth Avenue South, #5010
Minneapolis, MN 55415
Phone: (612) 206-3780
Facsimile: (612) 206-3780
E-mail: leland@lelandlawoffice.com
*Attorney for Plaintiff Jeffrey L. Nielsen*

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

Christopher D. Cathey (*pro hac vice*)
Porter, Wright, Morris & Arthur LLP
250 E. Fifth St., Suite 2200
Cincinnati, OH 45202
(513) 369-4214 direct dial
(513) 421-0991 facsimile
ccathey@porterwright.com
*Co-counsel for Plaintiff Jeffrey L. Nielsen*

## ACKNOWLEDGEMENT

The undersigned hereby acknowledges that costs, disbursements and reasonable attorneys'

and witness fees may be awarded pursuant to Minnesota Statutes § 549.211 to the party against

whom the allegations in this pleading are asserted.

Daniel Gray Leland #0389027
Dated December 12, 2017.

44

27-CV-17-16371

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

# EXHIBIT A

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

E-Mail Service from Mr. Jeff Nielsen's Attorney                    Page 1 of 1

Subj:    E-Mail Service from Mr. Jeff Nielsen's Attorney
Date:    10/6/2016 3:50:47 P.M. Central Daylight Time
From:    Thayer.Lynette@dorsey.com
To:      mncarman@aol.com
CC:      Eck.George@dorsey.com

Please see below message from George G. Eck.

By E-Mail Service
Mr. Bohnen:
I am a litigation partner with Dorsey & Whitney LLP. Dorsey & Whitney LLP has been retained by the Nielsens of 9211 Knollwood Drive N, Stillwater, MN 55082. I will be the partner in charge of this matter.

For the last week, you have put your campaign signs in the easement and boulevard area of Knollwood Drive in a manner that violates the law. Mr. Nielsen has been removing these signs and placing them at the Grant City Hall. He has done this in broad daylight with no attempt to disguise his actions. The signs have been placed at the city offices undamaged. This is the same procedure followed by Washington County and their personnel for campaign signs illegally placed throughout Washington County.

On information and belief, you had a person attempt to follow Mr. Nielsen on his last trip to City Hall yesterday. You, or that person, then contacted the Washington County Sheriff's Department and an officer came to the Nielsens' home. No citations were issued. At the end of the conversation between Mr. Nielsen and the officer, you and an unnamed party entered onto the Nielsens' property without permission and handed the officer a picture of Mr. Nielsen's Suburban SUV. You were informed at that time that your actions regarding the signs were in violation of law and a request was made that you not offend quiet and beautiful Knollwood Drive with signs again.

You are well aware that Knollwood Drive is a dead-end and cul-de-sac with only eight homes. But notwithstanding, you chose to reinstall two signs—not just one as before—within the restricted area almost immediately. Because the situation had been explained to you, and a simple request was made to not offend this small drive with signs—clearly non-essential as far as sign coverage for any candidate—we must conclude that your actions are simply meant to send a message: that you want to offend the Nielsens, ignore the law, and make sure you establish your name and presence by invading someone else's special and scenic home and property. It is bad enough that beautiful Grant Township is plastered and covered with every size and color of campaign signs.

Mr. Nielsen has made me aware this morning of your multiple sign locations that are in violation of law. Your signs on Knollwood Drive may well occasion others to compete with you for sign space. I am sure you can understand how offensive a stacking of signs would be on a private driveway to eight beautiful and private large acre homes. Before that occurs, I suggest an easier course of action. I suggest the following:

1. Remove your signs from Knollwood Drive as they cannot conceivably be doing your campaign any good at this point.
2. Use this letter as notice of your unauthorized trespass last night as required by law and be aware that the next unauthorized trespass will be an actionable offense and a violation of law.
3. Refrain from putting any campaign material of any kind in the Nielsens' mailbox or on their property. You do not have any authority or permission to post anything on the Nielsens' property or to deliver mailings to the Nielsens.
4. The Nielsens will agree not to trespass on your property, install signs on, around or about your property for any reason, and will not pursue any actions which offend the quiet enjoyment of your property by illegal means.

Mr. Bohnen, this letter is meant to address these problems in a positive and constructive manner and is a sincere portrayal of my clients' views and my knowledge. Mr. Nielsen does not have any interest in you, your campaign, nor does he have any favoritism toward any of your opponents. His views of their similar actions would be exactly the same as described herein. I am sure you will agree that people have the right to be proud of their street and neighborhood and certainly expect individuals running for office to respect property rights, laws, and the common decency requests that are being made herein.

In closing, I must note your following quotes:
"I will strive to keep Grant rural. I want to preserve Grant's rural heritage, character, and lifestyle."
"I will protect property owner's rights in the City of Grant."
We suggest that you act upon your promises immediately. Thank you.
You can e-mail me a response or call me at 612-340-2772.
George Eck

Friday, April 25, 2014 AOL: MNCARMAN

SB5476                                                   Exhibit 30

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

# EXHIBIT B

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

Subj: : **RE: E-Mail Service from Mr. Jeff Nielsen's Attorney**
Date: 10/11/2010 10:38:55 A.M. Central Daylight Time
From: Thayer.Lynette@dorsey.com
To: mncarman@aol.com
CC: Eck.George@dorsey.com, Wilson.Jonathan@dorsey.com

Please see below message from Attorney George Eck.

_____

From: Eck, George
Sent: Monday, October 11, 2010 9:59 AM
To: 'mncarman@aol.com'
Cc: Eck, George; Thayer, Lynette; Wilson, Jonathan
Subject: FW: E-Mail Service from Mr. Jeff Nielsen's Attorney


Mr. Bohnen:

We are disappointed that we have not received any response whatsoever to my email of October 5, 2010 (see below), nor have you made any attempt to comply with the governing laws regarding your signs.

We are therefore providing you with this written notice that unless you agree by 2 pm today (October 11) to comply with the law and remove all illegal signs we shall commence a private attorney general action against you for declaratory and injunctive relief requiring you, among other relief, to remove all illegal signs.

Very truly yours,

George Eck


_____

From: Thayer, Lynette
Sent: Tuesday, October 05, 2010 4:00 PM
To: 'mncarman@aol.com'
Cc: Eck, George
Subject: E-Mail Service from Mr. Jeff Nielsen's Attorney


Please see below message from George G. Eck.

**By E-Mail Service**
Mr. Bohnen:
I am a litigation partner with Dorsey & Whitney LLP. Dorsey & Whitney LLP has been retained by the Nielsens of 9211 Knollwood Drive N, Stillwater, MN 65082. I will be the partner in charge of this matter.

For the last week, you have put your campaign signs in the easement and boulevard area of Knollwood Drive in a manner that violates the law. Mr. Nielsen has been removing these signs and placing them at the Grant City Hall. He has done this in broad daylight with no attempt to disguise his actions. The signs have been placed at the city offices undamaged. This is the same procedure followed by Washington County and their personnel for campaign signs illegally placed throughout Washington County.

On information and belief, you had a person attempt to follow Mr. Nielsen on his last trip to City Hall yesterday. You, or that person, then contacted the Washington County Sheriff's Department and an officer came to the Nielsens' home. No citations were issued. At the end of the conversation between Mr. Nielsen and the officer, you and an unnamed party entered onto the Nielsens' property without permission and handed the officer a picture of Mr. Nielsen's Suburban SUV. You were informed at that time that your actions regarding the signs were in violation of law and a request was made that you not offend quiet and beautiful Knollwood Drive with signs

Friday, April 25, 2014 AOL: MNCARMAN

SB5478

Exhibit 32

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

again.

You are well aware that Knollwood Drive is a dead-end cul-du-sac with only eight homes. But notwithstanding, you chose to reinstall two signs—not just one as before—within the restricted area almost immediately. Because the situation had been explained to you, and a simple request was made to not offend this tiny drive with signs—clearly non-essential as far as sign coverage for any candidate—we must conclude that your actions are simply meant to send a message: that you want to offend the Nielsens, ignore the law, and make sure you establish your name and presence by invading someone else's special and scenic home and property. It is bad enough that beautiful Grant Township is plastered and covered with every size and color of campaign signs.

Mr. Nielsen has made me aware this morning of your multiple sign locations that are in violation of law. Your signs on Knollwood Drive may well occasion others to compete with you for sign space. I am sure you can understand how offensive a stacking of signs would be on a private driveway to eight beautiful and private large acre homes. Before that occurs, I suggest an easier course of action. I suggest the following:

1. Remove your signs from Knollwood Drive as they cannot conceivably be doing your campaign any good at this point.
2. Use this letter as notice of your unauthorized trespass last night as required by law and be aware that the next unauthorized trespass will be an actionable offense and a violation of law.
3. Refrain from putting any campaign material of any kind in the Nielsens' mailbox or on their property. You do not have any authority or permission to post anything on the Nielsens' property or to deliver mailings to the Nielsens.
4. The Nielsens will agree not to trespass on your property, install signs on, around or about your property for any reason, and will not pursue any actions which offend the quiet enjoyment of your property by illegal means.

Mr. Bohnen, this letter is meant to address these problems in a positive and constructive manner and is a sincere portrayal of my clients' views and my knowledge. Mr. Nielsen does not have any interest in you, your campaign, nor does he have any favoritism toward any of your opponents. His views of their similar actions would be exactly the same as described herein. I am sure you will agree that people have the right to be proud of their street and neighborhood and certainly expect individuals running for office to respect property rights, laws, and the common decency requests that are being made herein.

In closing, I must note your following quotes:
"I will strive to keep Grant rural. I want to preserve Grant's rural heritage, character, and lifestyle."
"I will protect property owner's rights in the City of Grant."
We suggest that you act upon your promises immediately. Thank you.
You can e-mail me a response or call me at 612-340-2772.
George Eck

SB5479

SLV-DECLARATION_242

27-CV-17-16371

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

# EXHIBIT C

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

10/11/2010                              Untitled Document

**From:** Eck.George@dorsey.com (Eck.George@dorsey.com)
**To:** jackjnielsen@yahoo.com;
**Date:** Mon, October 11, 2010 3:13:19 PM
**Cc:** Eck.George@dorsey.com; Wilson.Jonathan@dorsey.com; Thayer.Lynette@dorsey.com;
**Subject:** Engagement paragraph

Jeff:

I am sending this email as part of Dorsey & Whitney's standard file opening process.

I write to confirm that you have retained Dorsey & Whitney to represent you with the action against Steve Bohnen. Our services are solely for the benefit of you and Sue.

You do not need to respond to this email.

Thanks.

George Eck

CONFIDENTIAL                    NIELSEN 000014
SLV-DECLARATION_225

27-CV-17-16371

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

# EXHIBIT D

27-CV-17-16371

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

Page 1 of 3

### Thayer, Lynette

From:     Jack Nielsen [jackjnielsen@yahoo.com]
Sent:     Sunday, February 06, 2011 11:44 AM
To:       Eck, George
Cc:       Eck, George; Thayer, Lynette; Jeff Nielsen
Subject:  Re: Grant/Nielsen matter

George,

I did not see your 7:00 PM Friday email until a few minutes ago. We have agreed not to use emails to weigh in on our problems and I do not feel like dealing with this today or wedge in discussions when you are preoccupied with meetings tomorrow.

For now, let's just say that hearing last week that in fact I will not be able to recover the vast majority of my legal fees and now getting the jolt today that I have no reasonable or likely damage claim whatsoever was exactly that - a jolt. I will be trying to stay productive and use the time to figure out if we can possibly twist this into anything positive.

Jeff

From: "Eck.George@dorsey.com" <Eck.George@dorsey.com>
To: jackjnielsen@yahoo.com
Cc: Eck.George@dorsey.com; Thayer.Lynette@dorsey.com
Sent: Fri, February 4, 2011 7:00:21 PM
Subject: FW: Grant/Nielsen matter

Jeff

Sorry for the delay with this research.

Below is Charlie's email.

I apologize in advance, but I have 10 separate meetings on Monday but can discuss late in the day or over the noon hour.

George

From: LaPlante, Charles
Sent: Friday, February 04, 2011 1:04 PM
To: Eck, George
Subject: RE: Grant/Nielsen matter

Regarding Jeff's four categories of damages below:

Category 4 (harm to reputation) is definitely recoverable in a malicious prosecution action. But reputational harm must be proven objectively before damages can be awarded. Although I haven't found a Minnesota case directly addressing the issue, treatises unanimously say that the plaintiff's testimony standing alone (i.e., Jeff simply testifying that his reputation was damaged by Bohnen and Mueller) isn't enough to prove reputational harm for damages purposes. See, e.g., 52 Am. Jur. 2d Malicious Prosecution § 118. We'd need third-party testimony, news articles, etc. In order to recover. Note also that if we set out to prove that Jeff's reputation was in fact

2/7/2011

CONFIDENTIAL                          NIELSEN 000557
SLV-DECLARATION_426

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

Page 2 of 3

damaged, Bohnen and Mueller might attempt to find any skeletons Jeff may have in his closet -- basically, their defense may be to argue that Jeff had a bad reputation to begin with, so it wasn't damaged by the malicious prosecution. *See, e.g., Hlubek v. Pinske*, 67 N.W. 836, 940 (Minn. 1901) (In malicious prosecution action, trial court's refusal to admit evidence of plaintiff's bad reputation was error, and writing, "We have no doubt that [testimony about the plaintiff's bad reputation] was competent for defendant to show that fact, at least in mitigation of damages.")

Category 3 (attorneys' fees incurred in bringing the civil action) is out. The rule in Minnesota, as elsewhere, is that you don't get attorneys' fees without a statute or a contractual provision; there's no contract at issue here, and I haven't been able to find a single statute that would support a fee award from Bohnen and Mueller. Note, however, that if we prevail on the 1983 claim against Washington County, that portion of attorneys' fees spent on the 1983 claim would be recoverable from the County. To facilitate this, I think we should separately note whatever time we spend on the 1983 claim when we do bills.

Part of Category 2, the time Jeff spends on the prosecution of this case, appears to be out as well. I can do more digging on this if you like (i.e., expanding to other jurisdictions), but I didn't find anything in Minnesota law that would support an award of money to the plaintiff based on the amount of time the plaintiff spent prosecuting the lawsuit. From a damages theory standpoint, this seems like a logical conclusion: the proximate cause of a plaintiff's injury is the defendant's wrongful act, but the proximate cause of a plaintiff's time spent prosecuting a lawsuit is the plaintiff's decision to bring a lawsuit.

However, the amount of time Jeff spends defending the criminal case instead of at work may be recoverable, with proper proof of both the necessity of the time spent on the case and the value of his time. *See Virtue v. Creamery Pkg. Mfg.*, 142 N.W. 930, 939 (Minn. 1913) (reducing damages awarded to prevailing plaintiff in malicious prosecution action because "There is evidence that plaintiff Virtue expended considerable time in connection with the defense of the [underlying action]. The evidence is very vague and unsatisfactory as to the necessity of such expenditure of time, and there is no evidence as to the value of his time.")

Category 1 (family tension, mental anguish) should be recoverable. Humiliation has long been held recoverable in malicious prosecution actions, *Krienke v. Citizens Nat'l Bank*, 235 N.W. 24 (Minn. 1931), and today's treatises blend "humiliation" into the general category of "mental anguish" or "mental suffering." *See* 23 Minn. Prac. § 28:10. That said, the only mental anguish recoverable in this action is Jeff's alone, not that of his family members, who aren't parties to the case. Furthermore, to defend against the notion that they caused any family tension, Bohnen and Mueller would likely seek discovery of intimate details about Jeff's family life, hoping to show, for example, that there was pre-existing family tension. I know Jeff wanted to keep Sue out of this matter, but if we plead mental anguish caused by family discord as an item of damages, she may be unavoidably dragged in.

Charlie

----

From: Eck, George
Sent: Tuesday, February 01, 2011 12:45 PM
To: LaPlante, Charles
Cc: Eck, George; Thayer, Lynette
Subject: FW: Grant/Nielsen matter

Charles:

We are trying to figure out Jeff's potential damages against Mueller and Bohnen.
We know that he can claim fees in the criminal action (not the civil). Thanks for your research there.

We are trying to figure out what other recoverable damages exist by law with our claim for malicious prosecution (or if we have other causes that we should plead).

I told Jeff to write out what damages he has and he sent me this email.

2/1/2011

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

Page 3 of 3

Can you take 2-3 hours and see what the law supports.

Thanks,

George

---

**From:** Tim Nelson [mailto:timothynelson53@yahoo.com]
**Sent:** Tuesday, February 01, 2011 10:52 AM
**To:** Eck, George
**Cc:** Jack Nielsen
**Subject:** Grant/Nielsen matter

(sorry, hit send too soon on previous)

George,

The impacts on me from the malicious prosecution claims are the following:

1. Family tension, discord and stress.
2. Large amount of my business time and day diverted from normal business and financial pursuits to attend to this case.
3. Legal staff and consulting fees regarding defending and prosecuting these claims.
4. Damage to my business and personal reputation, based on false criminal charges.

Thanks,

Jeff

2/7/2011

**CONFIDENTIAL**          **NIELSEN 000559**

**SLV-DECLARATION_428**

27-CV-17-16371

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

# EXHIBIT E

27-CV-17-16371

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

. . .

**Wilson, Jonathan**

**From:** LaPlante, Charles
**Sent:** Monday, October 18, 2010 6:26 PM
**To:** Eck, George; Wilson, Jonathan; Ludmer, Ivan
**Subject:** RE: Mr. Nielsen v City of Grant et. Al.

Some responses, point-by-point:

1.  I believe this is what Washington County told Jeff, so not a surprise.

2.  If I recall correctly, I said I didn't know what the statutory hook was for the "private covenants are enforceable by the city" claim, and you told me to just include it anyway.

3.  Here is the full text of the relevant statute: "In any municipality, whether or not the municipality has an ordinance that regulates the size or number of noncommercial signs, all noncommercial signs of any size may be posted in any number from 46 days before the state primary in a state general election year until ten days following the state general election." As Judge Davis has noted, this preempts only the portions of the zoning ordinance relating to size and number. To the extent we seek enforcement of other ordinance requirements – notably, setback/location requirements – the statute does not preempt our action. *See Advantage Media, LLC v. City of Hopkins*, 379 F. Supp. 2d 1030, 1041 (D. Minn. 2005).

4.  We'll want to double-check with Pat O'Neil and Jeff's employee, but I believe that they called the city and were told Hineseth was the guy to talk to. The city's online directory mentions a "Planning Commission" chair, but says nothing about the zoning administrator being a party other than the Council (of which Hineseth is a member). (In fact, a plain reading of Section 32-31 of the Grant ordinances suggests that the Planning Commission and Zoning Administrator are two separate things, as the Zoning Administrator is automatically a non-voting, ex officio member of the Planning Commission.) Furthermore, the city's website clearly says that the Council's duties include considering various zoning issues like variances, etc.

5.  As you mention in your e-mail to Jeff, we've definitely complained about this before.

6.  Point 6 is the key here, and it's why we're very unlikely to win. Although the ordinance says the administrator "shall" enforce the law, it appears to give him complete discretion as to how he'll go about doing it. The city's most likely comparison here will be to the police department: yes, the police "shall" enforce the law, but you're never going to win a mandamus action seeking to get the police to shut down the crack house down the street, because the police have the discretion to allocate their enforcement resources in the way they see fit.

7.  Under Section 32-31(a) of the Grant ordinances, "[a]dministration of [the zoning ordinance] shall be by the city council until such time as it is necessary to establish the office of zoning administrator who shall be appointed by the city council and serve at its pleasure." If the Council has yet to name a zoning administrator, the Council is a necessary party to this action. Sure, if we were suing for money damages, they'd have immunity. But we aren't doing that, we're seeking to compel action, and the Council members, in their collective capacity as zoning administrator, are the party whose action we are seeking to compel. Now, if Vivian is saying that someone else has been named the zoning administrator, then we would indeed have to dismiss the complaint against the individual Council members. But he should have to tell us who that someone else is before we do it.

**From:** Eck, George
**Sent:** Monday, October 18, 2010 2:36 PM
**To:** Wilson, Jonathan; Ludmer, Ivan; LaPlante, Charles
**Subject:** FW: Mr. Nielsen v City of Grant et. Al.

10/18/2010

**CONFIDENTIAL**                              **NIELSEN 000522**
SLV-DECLARATION_380

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

FYI

Charlie, please advise.

---

**From:** Nick Vivian [mailto:NVivian@eckberglammers.com]
**Sent:** Monday, October 18, 2010 4:35 PM
**To:** Eck, George
**Subject:** RE: Mr. Nielsen v City of Grant et. Al.

Mr. Eck:

Thank you for your email. I am in receipt of Mr. Nielsen's Petition for Writ of Mandamus and am in the process of comprehensively reviewing the allegations. The City was surprised to receive the Petition without having first received a complaint to City Hall. Preliminarily, I have identified what appear to be a number of flaws in the Petition and bring the following to your immediate attention:

1.    Aside from right of way owned or controlled within the City of Grant, Washington County has no jurisdiction over zoning within the City.

2.    The City has no jurisdiction or authority to enforce the private Protective Covenants associated with Mr. Nielsen's neighborhood. Article 16 of the Declaration provides that "any person or persons owning any real estate situated in this subdivision shall be authorized to commence and pursue proceedings at law or in equity against the person or persons violating or attempting to violate any such covenant or restrictions, to prevent him or them from so doing and/or recover damages for such violation." The City does not own any property within the subdivision and is not authorized to enforce the Declaration. The Declaration may, however, be enforced by Mr. Nielsen against his neighboring property owners.

3.    Mr. Nielsen's reliance on Section 32-418 of the Grant Code of Ordinances is misplaced. While Section 32-418 regulates signs in Residential Districts, Minn. Stat. 211B.045 - Fair Campaign Practices provides, "In any municipality, whether or not the municipality has an ordinance that regulates the size or number of noncommercial signs, all noncommercial signs of any size may be posted in any number from 46 days before the state primary in a state general election year until ten days following the state general election." Accordingly, the City of Grant sign ordinance may not restrict the number or size of campaign signs during the election season.

4.    Mr. Nielsen's efforts to contact the City were not directed at the appropriate official. Mr. Hinseth is not the City official responsible for enforcement of ordinances regarding illegal signs. Rather, Mr. Hinseth is a Council member and candidate for political office and has is not the City's zoning official.

5.    The City has not refused to take action to enforce its ordinances. The Petition for Mandamus represents the first written communication to the City of Mr. Nielsen's complaint regarding Mr. Bohnen's campaign signs. If you believe otherwise, please forward evidence of prior written correspondence with the Grant City Clerk. The City's only employee is the City Clerk. It contracts for all other services. It operates on a complaint-driven enforcement system and would have investigated Mr. Nielsen's complaint had it been received by the City Clerk. If Mr. Nielsen has complaints regarding specific signs, please advise of the locations of the signs and the City Clerk initiate the process of reviewing and investigating Mr. Nielsen's complaint as it would any other citizen's complaint.

6.    City of Grant Ordinance Section 32-32 provides that in the event of a violation of Chapter 32 - Zoning, the City in addition to other remedies, may institute appropriate actions or proceedings to prevent, restrain, correct or abate such violation or threatened violation. Use of the term "may" creates a

10/18/2010

CONFIDENTIAL                    NIELSEN 000523
SLV-DECLARATION_381

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

discretionary responsibility making the mandamus remedy unavailable to Mr. Nielsen. Case law also clearly provides that the administration of a municipality's zoning code is a discretionary function which makes the mandamus remedy unavailable and protects public officials under the common-law doctrine of official immunity.

7.  As they are protected by the common-law doctrine of official immunity, the City of Grant Council Members named in Mr. Nielsen's Petition should be immediately dismissed from the legal action.  There is absolutely no good faith basis for naming the Council members individually.  Additionally, they are protected from liability the by the doctrine of official immunity which requires that they be dismissed in their official capacities as members of the Grant City Council.

As soon as I have had the opportunity to complete my review of Mr. Nielsen's Petition, I will be in contact.  Preliminarily, it appears Mr. Nielsen has no authority to compel the City of Grant to enforce any ordinance.  Further, even if there is such authority, Mr. Nielsen has failed to avail himself of all available remedies because he failed to appropriately file a written complaint with the proper City official.  However, even if he had properly filed a complaint, Minn. Stat. 211B.045 prevents the City from regulating the number and size of political signs that may be posted during the election season.  Given the lack of factual and legal support for Mr. Nielsen's Petition, the City will consider all options available in defense of the Petition, including a motion pursuant to Minn. Stat. 549.211 and Rule 11 of the Minnesota Rules of Civil Procedure seeking sanctions and attorneys fees if the Petition is not withdrawn.

The City of Grant looks forward to cooperatively and professionally resolving Mr. Nielsen's concerns in accordance with the City's process for addressing zoning complaints.  I will be in contact upon my complete review of the Petition.

- Nick

Nicholas J. Vivian

Eckberg, Lammers, Briggs, Wolff & Vierling, P.L.L.P.
Creditor's Rights * Business Transactions * Municipal Law

Telephone: 651.379.3060 or 715.386.3733
Fax: 651.439.2923

www.eckberglammers.com

This message and any attachments may contain information that is privileged, confidential, and exempt from disclosure under applicable law.  If you are not the intended recipient or are not authorized to receive for the recipient, you are hereby notified that dissemination, distribution or copying of this message and any attachments is strictly prohibited.  If you have received this message in error, please immediately advise the sender by reply e-mail and delete the message and any attachments.  Thank you.

From: Eck.George@dorsey.com [mailto:Eck.George@dorsey.com]
Sent: Monday, October 18, 2010 1:17 PM
To: Nick Vivian
Cc: Eck.George@dorsey.com; Thayer.Lynette@dorsey.com
Subject: Mr. Nielsen v City of Grant et. Al.

10/18/2010

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

Dr. Mr Vivian:

We represent Mr. Nielsen.

We sent you Friday afternoon as a professional courtesy both by fax and email a letter, together with a copy of the pleadings in both the mandamus action and the civil action. It is absolutely clear that 1) the City is littered with illegal signs placed by Mr. Bohnen and others, and 2) that the City has to date refused to enforce its laws. Therefore, in my letter of Friday, we demanded --yet again-- that the City enforce its laws and remove all illegal signs.

We have now formally served the City of Grant with all pleadings.

We trust and demand that the City will now take its obligations to enforce its laws seriously, and that therefore you will confirm immediately that your client will enforce the laws and remove all illegal signs within the City's jurisdiction. We do not want to involve the Court unnecessarily, and therefore we are making this written demand again today.

We want to be reasonable and work with the City through you. However, we will take action as necessary if the City refuses to act. Our actions will include seeking all injunctive, declaratory, and mandamus relief to the fullest extent allowed by law and equity. We think it is reasonable for you to advise us in writing by noon tomorrow whether or not the City will act.

We thank you for your anticipated professionalism in advising your client to enforce the law throughout the City by removing immediately the illegal signs. Based upon the restrictive covenants that govern Mr. Nielsen's neighborhood, we respectfully suggest that the City begin its removal of all illegal signs on Knollwood Drive North.

George Eck

10/18/2010

CONFIDENTIAL                    NIELSEN 000525
SLV-DECLARATION_383

27-CV-17-16371

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

# EXHIBIT F

27-CV-17-16371

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

# FOLEY & MANSFIELD
### PLLP
**Attorneys at Law**

Chicago • Detroit • Los Angeles • Miami • Minneapolis • New York • Oakland • St. Louis • Seattle

August 31, 2011

Thomas W. Pahl
(612) 338-8788
tpahl@foleymansfield.com

***Personal and Confidential***

George G. Eck, Esq.
Dorsey & Whitney LLP
Suite 1500
50 South Sixth Street
Minneapolis, MN 55402-1498

Re:    Jeffrey L. Nielsen v. Stephen Carl Bohnen and Keith Francis Mueller, and
       Washington County
       Our File No.: 1742-17

Dear George:

Yesterday, Jeffrey Nielsen received your firm's invoice dated August 24, 2011 and marked "final invoice." As you can imagine, this "final invoice" came as an utter shock to Mr. Nielsen. You have previously acknowledged the following and other material facts to Mr. Nielsen and others:

- Mr. Nielsen's initial stated goals and objections were ignored in Dorsey & Whitney's pursuit of fees.

- Claims you pursued on behalf of Mr. Nielsen were faultily pled, faultily researched, and faultily prosecuted or not prosecuted at all.

- Inaccurate or incomplete legal conclusions and advice were repeatedly given to Mr. Nielsen.

- After Mr. Nielsen's discovery, in early February 2011, of Dorsey & Whitney's conduct, Mr. Nielsen repeatedly stated his position that any fees incurred by Dorsey & Whitney would only be paid from proceeds generated from your corrective remedial work, after Mr. Nielsen was made whole on fees he had previously paid Dorsey & Whitney for its flawed work.

- Subsequently, on several occasions, Mr. Nielsen expressed his concern that Dorsey & Whitney would abandon him, similar to the Leonard Street & Deinard conduct by which Dorsey & Whitney sued LS&D for malpractice. Mr. Nielsen proceeded with the understanding that Dorsey & Whitney was in agreement to

Phone (612) 338-8788  Fax (612) 338-8690
www.foleymansfield.com
250 Marquette Avenue  Suite 1200  Minneapolis  MN  55401

**CONFIDENTIAL**

EXHIBIT
**1**
Bohnen v. Nielsen et al.

**NIELSEN 001122**

**SLV-DECLARATION_430**

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

**FOLEY & MANSFIELD**
PLLP

George G. Eck, Esq.
August 31, 2011
Page 2

remedy and correct its conduct without independently expecting additional
reimbursement from Mr. Nielsen, as opposed to the success of its corrective work.

- The billings from Dorsey & Whitney include time far in excess of specific
authorizations and approval given by Mr. Nielsen.

- Under the initial flawed legal analysis, Dorsey & Whitney's work was remedial,
necessary to correct its flawed advice and work, and to seek alternative claims to
allow financial recoveries of Mr. Nielsen's expenses. Even this, i.e., recovery of
expenses, was later recanted by subsequent research performed by Dorsey &
Whitney.

- The work which Dorsey & Whitney performed for Mr. Nielsen was subsequently
dismissed and sharply criticized by several judges, evidencing further harm and
damage to Mr. Nielsen, his reputation, and his claims.

- The defense of certain matters was mishandled, erroneous, and negligent.

- Specific representations were presented by you to Mr. Nielsen and others causing
Mr. Nielsen to follow Dorsey & Whitney's advice and continue with Dorsey &
Whitney's remedial efforts. Mr. Nielsen's reliance on your representations about
your personal dedication, support, and your obligations, specifically contrasted
with Leonard Street & Deinard's conduct, and compared with our firm's conduct
in the Clear Channel case, caused Mr. Nielsen to continue to trust that Dorsey &
Whitney would continue its representation and protect and promote Mr. Nielsen's
legal position and financial recovery.

- Issues of major import were not disclosed to Mr. Nielsen, which amplified Dorsey
& Whitney's prioritizing its own financial interest ahead of the safety and security
of its client.

- Multiple requests made to you by Mr. Nielsen to notify and fully disclose to other
senior partners or management at Dorsey & Whitney Mr. Nielsen's complaints
and those concerns were thereafter ignored.

- Throughout Dorsey & Whitney's engagement, and after Mr. Nielsen's realization
of Dorsey & Whitney's flawed work, Mr. Nielsen sought and got assurances from
you that Dorsey & Whitney would not sink him deeper into the involvement and
abandon him, nor bill him for work necessary to protect him from Dorsey &
Whitney's conduct.

- No discussion or disclosures were made to Mr. Nielsen about potential
counterclaims for which Mr. Nielsen might or could be found liable.

CONFIDENTIAL                    NIELSEN 001123

27-CV-17-16371

Filed in Fourth Judicial District Court
12/12/2017 11:11 AM
Hennepin County, MN

**FOLEY & MANSFIELD**
PLLP

George G. Eck, Esq.
August 31, 2011
Page 3

- The tendering of the anti-SLAPP claims to Mr. Nielsen's insurer was tardy and done without full consideration of the insurer's duty to defend those claims.

- Dorsey & Whitney's conduct has now caused Mr. Nielsen's new attorneys to spend time and monies correcting Dorsey & Whitney's work.

I close with this comment – following a 30-year relationship, both professional and personal, Mr. Nielsen is extremely disappointed to now learn that your words and promises to rectify the harm Dorsey & Whitney subjected him to were insincere. Mr. Nielsen has expressed both to you and me, prior to receipt of this "final invoice," his interest in not subjecting you or Dorsey & Whitney to further embarrassment. That desire is becoming increasingly difficult to maintain, given Judge Hannon's comments and open criticisms of your handling of the mandamus action, Judge Erickson's comments, findings and rulings in the D.P.P.A. claims, and Dorsey & Whitney's payment of attorneys' fees and costs to the City of Grant. Mr. Nielsen maintains hope that he can find acceptable resolutions to the problems which Dorsey & Whitney has led him into. Sending a "final invoice" like you did, did nothing but cause harm to Mr. Nielsen and compound Dorsey & Whitney's predicament.

Very truly yours,

Thomas W. Pahl

TWP:djb

cc:    Mr. Jeffrey L. Nielsen

**CONFIDENTIAL**                    **NIELSEN 001124**

SLV-DECLARATION_432

UNITED STATES DISTRICT COURT

for the

District of Minnesota

| | | |
|---|---|---|
| Everest Stables, Inc., a Minnesota corporation and Jeffrey Nielsen, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. |
| Porter, Wright, Morris, & Arthur LLP, and Christopher D. Cathey, | ) ) ) | |
| Defendants. | ) | |

COMPLAINT – EXHIBIT C

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

EVEREST STABLES, INC.,

           Plaintiff,

v.

WILLIAM C. RAMBICURE, JR.,
RAMBICURE LAW GROUP, PSC,
MILLER & WELLS, PLLC,

and

ZURICH AMERICAN INSURANCE
COMPANY,
*Serve statutory agent per KRS §304.3-230*
Office of the Secretary of State
Summons Branch
700 Capital Avenue, Suite 86
Frankfort, Kentucky 4061

Case No.    3:15-cv-00576-GNS

### SECOND AMENDED COMPLAINT

| ATTESTED |
|---|
| VANESSA L. ARMSTRONG, CLERK |
| U.S. DISTRICT COURT |
| W/D OF KENTUCKY |
| Date: Dec 11, 2017 |
| Name: crussell |
| **Deputy Clerk** |

           Defendants

Plaintiff, Everest Stables, Inc. ("Everest"), by its undersigned attorneys, for its complaint against defendants William C. Rambicure, Jr. ("Rambicure"), Rambicure Law Group, PSC ("Rambicure Law Group") and Miller & Wells, PLLC ("Miller Wells") and Zurich American Insurance Company ("Zurich") allege as follows:

### NATURE OF THE ACTION

1.      This is a professional malpractice action brought by Plaintiff Everest against Defendant Rambicure, his prior and current law firms, and his current law firm's former insurer, for acts and omissions relating to the preparation of an agreement between Everest and Crestwood Farm Bloodstock, LLC ("Crestwood"). Everest, an owner of thoroughbred horses for over thirty years, entered into an agreement with Crestwood to engage in an orderly reduction of

EXHIBIT C

Everest's substantial holdings for estate planning purposes. Crestwood had worked on various responsibilities and tasks for Everest as an agent and fiduciary, with hundreds of contracts committed to writing and others relying on a handshake over their lengthy sixteen year relationship. Everest believed that those written contracts did indeed bind and compel Crestwood to a standard and protect Everest from deception and damage. However, Everest's later discoveries revealed repeated deception, abuses, and damage. When Crestwood was afforded the opportunity of operating on a handshake, absent a written document, Crestwood consistently acted in its own self-interest and at great expense and damage to Everest, an absentee owner. Rambicure's negligent legal advice becomes glaring when that lengthy history of self-dealing is joined to Crestwood being given a free pass from agency and fiduciary duties to Everest by Rambicures's legal advice concerning the agreement with Crestwood and Crestwood's subsequent abandonment of Everest's interests altogether as soon as that agreement was signed.

2. To assure that the written agreement would provide for agency and fiduciary duties from Crestwood to Everest under Kentucky law, Everest retained and relied upon a Kentucky lawyer it had learned to trust, Rambicure of Rambicure Law Group. No other attorney was retained for this task. Although Everest could not have imagined Crestwood's history of deceit and deception at the time, Everest believed it important to codify the agency and fiduciary relationship and apply it to the new task of achieving the reduction given the scope of Everest's holdings and the importance of good faith, loyalty, and protecting those holdings. Rambicure, however, botched the job, which did not become evident to Everest until the rulings from multiple courts were issued. At that point Everest learned that not only did the agreement fail to provide for agency and fiduciary duties (contrary to what Rambicure told Everest), but it penalized Everest for taking its historical, customary and necessary steps to protect the value of

its horses at auction, steps that Rambicure assured Everest it could legally take (see attached email from Foley & Mansfield terminating Mr. Rambicure for cause, Exhibit 1 hereto).  The result of Rambicure's negligent advice was disastrous damage to Everest's business, in the millions of dollars, and to Everest's reputation.

## JURISDICTION AND VENUE

3.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between the plaintiffs and the defendants, and the amount in controversy exceeds the value of $75,000, exclusive of interest and costs.

4.     Pursuant to 28 U.S.C. § 1391, venue is proper in this court, because a substantial part of the events or omissions giving rise to the claims occurred in this District, and because Defendants are subject to personal jurisdiction in this District.

## THE PARTIES

5.     Plaintiff Everest is a corporation organized under the laws of the State of Minnesota, with its principal place of business in Stillwater, Minnesota.

6.     Defendant Rambicure is a citizen of the Commonwealth of Kentucky and maintains an office in Louisville, Kentucky.

7.     Defendant Rambicure Law Group at all relevant times was a personal service corporation organized under the laws of the Commonwealth of Kentucky, with its principal place of business in Kentucky.  Rambicure was a principal of Rambicure Law Group.

8.     Defendant Miller Wells is a corporation organized under the laws of the Commonwealth of Kentucky with its principal place of business in Louisville, Kentucky. Rambicure is currently an attorney with Miller Wells.

9.    Defendant Zurich is an insurance company organized under the laws of the State of New York, with its principal place of business in New York City, New York and is duly licensed to transact business in the Commonwealth of Kentucky and is a licensed insurer in the Commonwealth of Kentucky.

## FACTS

10.    Everest is a thoroughbred breeding and racing company owned by Jeffrey Nielsen ("Nielsen"). Beginning in 1993, Everest boarded its horses at Crestwood, owned by Pope McLean, Sr. ("McLean Sr."). Crestwood's services and duties included boarding, caring for, buying and selling horses, consigning horses to public auction and marketing, promotion, negotiating, and buying and selling contracts and financial interests on behalf of Everest. Crestwood performed these services as an agent and fiduciary to Everest, and was rewarded with increased revenues from Everest over time as Everest placed more trust in Crestwood by boarding additional horses within Crestwood year after year. For example, by 2004, Everest had 167 thoroughbred horses boarded at Crestwood; in 2005, 190; in 2006, 179; in 2007, 207; and in 2008, Everest had 172 thoroughbreds boarded at Crestwood and in Crestwood's control and charge. Over a 15-year period, Crestwood earned approximately $10,000,000 in fees, which is commensurate with Crestwood's agency and fiduciary role. In some years, Everest provided Crestwood with 75% of its total revenues. Because Crestwood's role, responsibility, and duties were obvious, Everest and Crestwood never executed a global written contract, but Crestwood and Everest had hundreds of independent written contracts over the sixteen-year period identifying Crestwood as Everest's agent.

11.    The trust relationship Everest afforded Crestwood was exemplified by Nielsen's appointment of McLean Sr. as agent in Nielsen's 2005 Will to execute an orderly reduction of

4

Everest's horse business in the event of Nielsen's death. McLean Sr., accustomed to an agency and fiduciary relationship with Everest, readily agreed to this appointment.

12.     In late 2008, Nielsen decided to commence an orderly reduction of Everest's horse business (the "Reduction"). Nielsen intended that the Reduction be performed in a manner that would protect and maximize the value of Everest's assets in the process. Nielsen wanted Everest's agent and fiduciary, Crestwood, to manage and execute the Reduction.

13.     The Reduction involved over 145 horses, including extremely valuable horses like "Island Fashion" and other notable horses. The process of selling this number of horses was not business as usual for Crestwood and Everest. This involved millions of dollars and the trust implicit in Everest passing title to Crestwood for so many horses was extraordinary and a written agreement to protect Everest was appropriate.

14.     Nielsen believed a contract with Crestwood was advisable and would require the services of a Kentucky lawyer. Nielsen had a long-time relationship with Rambicure, who had previously represented Nielsen and Everest. During these earlier representations, Rambicure often spoke of his extensive legal experience and expertise in the equine field. Rambicure led Nielsen to believe he was reliable, financially secure, and properly and appropriately insured to protect Everest's interests.

15.     Crestwood and Everest ultimately did negotiate and sign a contract, the Purchase and Sale Agreement executed November 4, 2008 (Exhibit 2 hereto) (the "Agreement"). The business terms included a transfer of title to nearly all of the subject horses from Everest to Crestwood. Crestwood would then sell the horses by various methods, providing a portion of the proceeds to Everest, and retain a commission, according to details set out in the Agreement. The transfer of ownership to Crestwood, which was a new and unique element of their 16- year

relationship, made the agency and fiduciary relationship with Crestwood critical to Everest. Although Nielsen had no financial stress at the time, given the dramatic global financial crisis then occurring, the enormity of the trust Everest was placing in Crestwood, and the expected duration of the contract, Nielsen needed to be able to rely on his agent and fiduciary to adjust strategies, remove certain horses from sales, and set reserves on certain horses to protect and maximize their values. Thus it was critical to Everest that the agency and fiduciary relationship required for this process and transaction not be left to assumption and interpretation but be directly codified in the Agreement.

16.     Nielsen relied on Rambicure for that fundamental element of the Agreement, which would be governed by Kentucky law. Nielsen is not a lawyer, much less a Kentucky lawyer, and Nielsen believed that only a Kentucky lawyer could assure that an agency and fiduciary relationship was established in the Agreement.

17.     Rambicure well understood this goal and the history between Crestwood and Everest. He knew that the structure of the Agreement (especially the transfer of title) made a fiduciary level of obligation essential. In his own words, Rambicure understood that his job was "to protect [his] client from somebody taking advantage of them." (Rambicure Deposition, July 7, 2011, Exhibit 3 hereto, 41:5-6.)

18.     Rambicure drafted the operative language of the Agreement on this very point, found in Section 7. The section reads in pertinent part:

> CRESTWOOD'S DUTIES AND RESPONSIBILITIES. Crestwood shall exercise all commercially reasonable efforts, with the utmost good faith, for and on behalf of both Crestwood and Everest, to properly prepare the Subject Horses for sale, and to market, offer for sale and to sell the Subject Horses, either at public auction or in private sales, in order to maximize the sales prices for each such horse.

Rambicure drafted this provision with full knowledge of Nielsen's objectives and requirements, as he testified later under oath when asked about the words "utmost good faith":

> Q.    And what were you intending to convey by the use of those words in this paragraph?
>
> A.    Well, "utmost good faith," I mean, that's pretty standard fiduciary kind of language. At least, in my mind, we wanted to ensure that Crestwood was acting at all times as a fiduciary to Everest, with – with the idea of getting these horses prepared, marketed, and sold in order to maximize the sales price.
>
> ***And that was at least the driving part of this, was we wanted the fiduciary duties to be inherent – not only inherent, but stated in this agreement.***

(Exhibit 4 hereto, 50:4-13 (emphasis added).)

19.    Originally, Section 7 of the Agreement required "best efforts" as well as "utmost good faith." Rambicure, however, agreed to Crestwood's suggestion to change "best efforts" to "commercially reasonable efforts." Rambicure advised Nielsen that this wording did not "significantly change what the parties were agreeing to." (*Id.* at 23:24-25.) Thus Nielsen, in reliance on Rambicure's advice and counsel, believed the "fiduciary duties" were "stated in this agreement" as Rambicure stated.

20.    In fact, under Kentucky law, the words "commercially reasonable efforts" *negated* the existence of a fiduciary duty. Furthermore, the Agreement said that the "commercially reasonable efforts" were "for and on behalf of both Crestwood and Everest," which under Kentucky law was inconsistent with the existence of fiduciary and agency obligations. Rambicure did not tell Nielsen, and Nielsen did not know, that these provisions in the Agreement had these effects and that the understanding of the Agreement that Nielsen had received from Rambicure was fundamentally and unconscionably incorrect and flawed, as multiple courts determined in litigation Everest initiated against Crestwood.

7

21.     Only later did Nielsen realize what Rambicure had done, after two courts ridiculed the contention that the Agreement created agency and fiduciary duties from Crestwood to Everest, citing the foregoing flaws in the drafting of Section 7 as a basis for their rulings. *See Crestwood Farm Bloodstock, LLC v. Everest Stables, Inc.*, 864 F. Supp. 2d 629, 640 (E.D. Ky. 2012) and *Crestwood Farm Bloodstock, LLC v. Everest Stables, Inc.*, 751 F.3d 434, 442 (6th Cir. 2014). In the Sixth Circuit opinion, the Court quoted the foregoing language and noted that Everest was represented by counsel – the clear implication being that if Everest had wanted a fiduciary duty, its lawyer could have made sure the Agreement said so. Nielsen, of course, reasonably believed at the time that this was what Rambicure had done.

22.     Because the Agreement provided for a relationship other than a fiduciary and agency one, Crestwood also was no longer governed by the agency and fiduciary obligations to Everest that it would have had under the by-laws and rules of the entities that run auctions of horses, and the contracts with those entities signed by both Crestwood and Everest. At thoroughbred auction houses such as the Keeneland Sales Company, these by-laws, rules and contracts provide for a principal-agent and fiduciary relationship between parties such as Crestwood and parties such as Everest – but not if an agreement between the parties creates a different relationship. Shockingly, Everest now knows the Agreement did create a different relationship; exactly the opposite of what Everest relied on Rambicure to do.

23.     In short, the Agreement not only failed to create a fiduciary or agency obligation from Crestwood to Everest as Nielsen instructed (and as Rambicure advised it would), and not only freed Crestwood from the fiduciary and agency relationship it had worked under with Everest over fifteen years, it vitiated the fiduciary and agency obligations that Crestwood would have had toward Everest under other rules and agreements. Everest literally would have been

better off with no agreement at all than with the Agreement as drafted in relevant part by Rambicure.

24.      Although these discoveries were completely unexpected, they highlight the critical nature of the need for the agency and fiduciary element in the Agreement. Discovery in the subsequent litigation revealed that Crestwood and the McLean family had in fact been deceptive, dishonest, and fraudulent in their dealings with Everest for many years before the Agreement.    Some of Everest's totally unsuspected and unexpected discoveries were: 1) accounting fraud; 2) a veterinarian kickback scheme; 3) agency fraud; 4) bartering Petionville stallion contracts owned by Everest to settle legal disputes and claims against Crestwood with no notice, permission, or compensation to Everest; 5) a credit card scam; 6) double dealing to benefit Crestwood and its cronies at Everest's direct expense; and 7) bank fraud using Everest's assets to collateralize their bank loans with no notice or permission from Everest. Crestwood provided UCC documents to the Kentucky Secretary of State claiming Crestwood's ownership of 100% of Everest's stallion Petionville and another stallion, Dixieland Heat (see Exhibit 5 hereto).    At the time of this fraud, Petionville was owned 100% by Everest and had an approximate value of $6 million. On information and belief, Crestwood used these fraudulent representations to secure hundreds of thousands, perhaps millions of dollars of bank loans for itself or other McLean family interests. Everest's discovery of this fraud at that time would have presented a desperate situation for the McLeans and destroyed the McLeans' business and reputation. The McLeans urgently needed to head off that discovery by dissuading Everest from executing a multi-million dollar sales contract for Petionville that would have unraveled the bank fraud and had major financial consequences for the McLeans. Rambicure's later legal advice for the Agreement actually provided latitude to the very family that had been systematically abusing

Nielsen and violating the law for years, to access Everest's assets with no agency or fiduciary duty obligations. Certain of those abuses may have implicated Crestwood in criminal activities, involved banking regulators, and perhaps criminal prosecution.

25. Rambicure's legal advice regarding the Agreement had catastrophic results for Nielsen and Everest. Crestwood, no longer bound by a fiduciary or agency relationship, immediately proceeded to engage in behavior that a fiduciary or agency relationship would have prohibited. This behavior included the following:

a. Crestwood refused to cooperate and assist Everest in setting dollar reserves to protect even one of Everest's horses from the disastrous economic downturn that occurred immediately after the Agreement was signed (see attached emails, Exhibits 6 and 7 hereto). Furthermore, Crestwood kept Everest at bay for weeks until the morning of the sale, then demanded that Everest pay Crestwood hundreds of thousands of dollars if Everest chose to protect itself, despite receiving no proceeds whatsoever.

b. While Nielsen was attempting to strategize, protect, and maximize the value of his horses, Crestwood never had any intent to cooperate, assist, or be an agent for Everest (as later discovery revealed). Crestwood, armed with the Agreement, only wanted to grab as much money as it could get from Everest's assets as quickly as it could and provide no protection or assistance to Everest whatsoever. (See Exhibits 6 and 7).

c. Crestwood refused to properly market and prepare certain groups of horses.

d. Crestwood refused to name, break, train, or sales prep horses in need of such action, contrary to Everest's past course of conduct, industry standards, and common sense to maximize their values.

10

e.    Crestwood disregarded Everest's demands for necessary veterinary care and treatment, contrary to its prior practice.

f.    Crestwood loaded infirm and distressed horses for transport out-of-state who ultimately died shortly after arrival at their destination.

g.    Crestwood put horses with deformities, health problems, and even swelling and scars from recent surgery through public auctions, despite Everest's objections.

h.    Crestwood completely disregarded Everest's requests and demands and dumped Everest's horses to friends, partners, and the public at prices that benefited those parties and damaged Everest.

i.    Crestwood recommended and urged Everest to agree to sell certain horses to their friends and partners at a fraction of their values.

j.    Crestwood was able to claim that the Agreement even suspended its agency and fiduciary obligations historically adhered to in the Keeneland Sales Company by-laws and contracts signed by both Crestwood and Everest.

k.    Crestwood announced to its friends, partners, and the public that Everest would not be placing reserves and protecting its horses at public auction, with the inference that Everest was conducting a fire sale, completely ignoring Everest's express instructions to the contrary.

l.    Crestwood failed to give notice to Everest of the interest or financial offers Crestwood received from third parties as to certain horses, to allow Everest to maximize the sales value of those horses.

11

m.    Crestwood allowed sales of horses to friends that had privately offered dollar amounts in excess of the price those same third parties paid for the horses at public auction, without any protective measures to secure at least the price offered privately.

n.    Crestwood threatened Nielsen that if he chose to challenge Crestwood's claim that they were not Everest's agent and fiduciary publicly, Crestwood and its cronies would band together and ruin Nielsen's reputation (see attached Rambicure affidavit, Exhibit 8 hereto) once again exposing the critical need of the agency and fiduciary duties with parties such as the McLeans. Once Everest filed its claims, Crestwood did indeed do just that. Crestwood gathered its cronies from the Lexington equine community to demean Everest and its horses' accomplishments and lie about their contacts with Everest. These attacks were made all the more egregious as contrasted with the lavish praise McLean Sr. had regularly provided to the public and national press every time he was afforded the opportunity to step into Everest's limelight as a self-appointed spokesperson for Everest.

o.    During the January 2009 public auction and faced with Nielsen's vehement objections to their conduct, McLean Sr. asserted to Nielsen that the Agreement allowed them to claim Crestwood's exclusive right to determine what commercially reasonable was.

26.    These acts described above combined to cost Everest millions of dollars of damages.

### Island Fashion

27.    One horse to which Everest retained title under the Agreement was Island Fashion. Island Fashion was the most high-profile and successful of the hundreds of horses Everest owned in 30 years in the thoroughbred business. The horse made over $2 million on the

race track. McLean Sr., just weeks before the execution of the Agreement, had estimated in writing that Island Fashion was worth between $3 million to $5 million. Island Fashion was insured for $2 million, and Crestwood had demanded that the Agreement allow it be named as an additional insured on Everest's policy.

28.     Crestwood offered Island Fashion for sale at auction in January 2009. Armed with the Agreement, Crestwood felt free to proceed as if it had no fiduciary or agency obligations to Everest, and acted accordingly. McLean Sr. after weeks and dozens of conversations in which Nielsen attempted to get Crestwood to cooperate, strategize, and deal with the protective measures Nielsen desperately needed, and just hours before the first horse sold, finally felt free to abandon any pretense of cooperation, loyalty, or appreciation to Nielsen and Everest for what they had provided the McLean family for years. The morning of the first day of the January scheduled auction, McLean Sr. sent Nielsen a communication stating that if Nielsen attempted to protect his horses, Crestwood would demand full compensation of hundreds of thousands of dollars, even though Everest would receive no proceeds (see Exhibit 7). Stunned, Nielsen then realized that Crestwood had no intention of protecting Island Fashion's or any of his horses' value and vehemently objected. The McLeans then publically proclaimed Nielsen to be in financial distress, that there would be no protection offered by Everest or Crestwood to protect the value of Everest's horses and Nielsen was being forced to financially "circle his wagons." The McLeans knew at that time that this slander of Nielsen and his financial situation was a lie, as documents later revealed not only their knowledge that Nielsen desperately wanted to protect the value of his assets, but also the later sworn testimony of McLean Sr. admitting he knew Nielsen had no financial difficulties whatsoever. Given how the Agreement was drafted, however, Crestwood knew it did not have to listen to Nielsen or act in

13

his best interests. Crestwood's conduct was an egregious example of what Rambicure had told Nielsen he was legally protected from under the terms of the Agreement.

29.     Crestwood allowed Island Fashion to sell for just $950,000 despite Nielsen's desperate objections. Additionally, to underscore the millions of dollars this sale cost Everest, Island Fashion's foal sold just a few months later for over $600,000. The buyer of this acclaimed horse announced to the media after its sale that he bid on Island Fashion when he realized that he might be able to buy the horse for a low price or, "not very much money." Discovery later revealed emails between Crestwood personnel joking about the low purchase price the buyer had been able to attain. The McLean family's resentment of Nielsen and his equine successes, which had remained hidden from Nielsen for years as Crestwood gobbled up revenues provided by Everest, was now revealed and later highlighted in their legal pleadings and defenses.

<u>**Storm Cat Filly**</u>

30.     Another horse to which Everest retained title under the Agreement was the Storm Cat/Island Fashion filly. Crestwood put this horse up for auction in September 2009. This time Everest sent a separate agent (in addition to Crestwood) to the auction, in order to prevent Crestwood from selling the filly too cheaply. Crestwood had by now made it crystal clear to Nielsen that if he RNA'd[1] this horse to protect his asset's value, Crestwood would again claim its right to earn a large commission while providing no proceeds to Everest. So prior to sending this agent and after previous assurances from Rambicure, Nielsen took the additional precaution of once again verifying with Rambicure that the Agreement allowed Everest to participate in the auction and set a reserve, that Nielsen would not be obligated to pay Crestwood a commission where no proceeds were available, and that Nielsen would not be in breach of anything in the

---

[1] Reserve not attained

Agreement or liable for any additional damage.[2]   Nielsen relied on Rambicure's advice. Otherwise, Nielsen obviously would not have sent the agent to the auction and would not have had the agent participate in the bidding without Rambicure telling him Everest was legally entitled to do this under the Agreement.

31.    At the auction, there was a third party bid of $875,000.  Everest's agent bid $900,000, after maintaining a minimum reserve of $1.5 million, and the sale failed.

32.    Crestwood then claimed that Everest violated Section 4 of the Agreement. Crestwood held back the proceeds from the sales of other horses in the amount it claimed as its lost commission on the Storm Cat filly, or $219,000.  When the issue went to litigation, the federal district court ruled so emphatically for Crestwood under the Agreement – and found the position advised by Rambicure so utterly lacking in merit – that it awarded Crestwood $272,000 in attorney's fees against Everest and Nielsen.

33.    In 40 years of business dealing with partners, clients, and contracts, Nielsen believes that neither he nor Everest had ever been successfully sued for breach of contract. Nielsen had a reputation for being someone who could be trusted to honor an agreement.  With the district court's public decision, however, Nielsen was found to have breached a contract so willfully that attorney's fees were awarded against him.  A reputation built over decades was thereby damaged – and the public nature of the decision assured that Everest's and Nielsen's rivals would publicize it, as they have – all because Nielsen followed Rambicure's advice.

---

[2] There is no doubt that Rambicure so advised Nielsen. *See, e.g.*, Ex. 3 at 37:15-21:

> Q:    I think it was your testimony that Everest or Mr. Nielsen wasn't prohibited from RNA'd at least the two horses that title was not transferred to, is that correct?

> A:    That is correct, those two horses being ISLAND FASHION and 2008 STORM CAT ISLAND FASHION filly.

34.     Had Rambicure given the correct advice, Everest would not have RNA'd the Storm Cat filly, the sale at $875,000 would have gone ahead, Crestwood would have taken its commission, Nielsen would not have been found to have breached the contract, Nielsen would not have been liable for Crestwood's attorney's fees, and Everest's reputation would have remained intact.

## Professional Malpractice Insurance

35.     As a result of Rambicure's failure to provide accurate legal advice, ultimately resulting in the loss of the case against Crestwood, Nielsen terminated Rambicure's retention in the Crestwood matter and all other matters on April 16, 2012. (See Exhibit 1)

36.     Due to his termination by Nielsen, Rambicure was on notice of the likelihood that Nielsen would take action against him and bring claims for professional malpractice.

37.     In or about June of 2012, Rambicure closed his practice, Rambicure Law Group, PSC, and joined Miller Wells. Concurrent with the closing of his practice, Rambicure allowed his policy of professional liability insurance to lapse and did not renew it because he relied on Miller Wells' representations that Rambicure would be covered by Miller Wells' professional liability policy, which would provide coverage to him for acts of malpractice committed before he joined that firm.

38.     Upon information and belief, at the time that Rambicure joined Miller Wells, Miller Wells maintained malpractice insurance sufficient to cover Everest's malpractice claims against Rambicure.

39.     Upon information and belief, at the time that Rambicure joined Miller Wells, Miller Wells was aware of Everest's claims against Rambicure.

40.     Upon information and belief, in or about October of 2013, Miller Wells switched insurers from its previous carrier to Zurich.

41.     Upon information and belief, the insurance policy issued on behalf of Miller Wells by Zurich in October of 2013 included a Prior Acts Exclusion Endorsement that purported to exclude coverage for Rambicure's acts prior to his June 1, 2012 start date at Miller Wells.

42.     On October 30, 2013, a Miller Wells attorney pled guilty to federal felony charges and was subsequently disbarred.

43.     Upon information and belief, the actions of the disbarred attorney had a strong negative impact on Miller Wells' insurability and, consequently, policy premiums.

<u>Bad Faith</u>

44.     On May 9, 2014, the Sixth Circuit Court of Appeals affirmed the district court's ruling against Everest in the underlying Crestwood litigation.

45.     On August 21, 2014, Everest formally put Rambicure on notice of Everest's intent to bring a formal malpractice claim against him.

46.     On or about October 8, 2014, Miller Wells tendered notice of Everest's claim to Zurich and specifically sought coverage for Everest's claim under the Zurich Policy.

47.     Zurich assigned Claim No. 9410470017 to the claim.

48.     On November 5, 2014, Zurich provided Everest with formal acknowledgment of Everest's claim and requested that Everest provide information and documentation in support of the claim.

49.     On November 19, 2014, Everest sent Zurich the requested information in support of Everest's claim.

50.     On December 17, 2014, after receiving no reply from Zurich, Everest sent a follow-up correspondence to Zurich inquiring regarding claim status. A copy of the inquiry correspondence was also sent to Mason Miller, managing member of Miller Wells.

51.     Mason Miller replied, stating that he had spoken with Zurich who had "made it clear... there was/is/won't be any coverage" and apologized because Zurich had "made [Everest] put the package [of supporting documentation] together for naught."

52.     Zurich replied later that same day, stating, "[t]here is no coverage for this matter under the Zurich Policy. I will be sending you a letter in the next week or so. Thanks."

53.     A letter explaining the basis for Zurich's coverage position would not actually come for another two years.

54.     On January 8, 2016 – fifteen months after the claim was submitted – Everest issued a subpoena to Zurich in an attempt to determine the status of its claim.

55.     After several follow up requests from Everest, Zurich finally responded to the subpoena on May 27, 2016.

56.     Zurich's May 27, 2016 response, however, was redacted and withheld certain documents for "privilege" resulting in Zurich's coverage decision remaining undisclosed.

57.     On August 4, 2016, Everest delivered a pointed letter to Miller Wells asking whether or not a coverage determination had ever been made.

58.     On October 6, 2016 – more than two months after Everest's request – Miller Wells responded, stating, "[w]e are working to confirm that it is Zurich's position that it will apply the [prior acts] exclusion in this case."

59.     On February 22, 2017 – more than *two years* after Everest's claim was submitted – Zurich finally provided a coverage opinion, stating, "*In consultation with its insured*, Miller

Wells, P.L.L.C., it was determined that there was no coverage under the policy for the claims in question by operation of the Prior Acts Endorsement… Based on this determination, on or about February 5, 2015, the claim was cancelled." [Emphases added.]

60.     Both Zurich and Miller Wells had known for two years that they had colluded to "cancel" Everest's claim and both intentionally misled Everest into believing that no final coverage decision had been made.

61.     Zurich's and Miller Wells' deception resulted in additional damages and undue prejudice to Everest.

62.     Upon information and belief, Miller Wells' deception was motivated, in part, by its compromised insurability caused by the indictment and disbarment of one of its attorneys.

## COUNT I - Professional Malpractice/Negligence

### Everest v. Rambicure and Rambicure Law Group

63.     Everest realleges the foregoing paragraphs as though fully restated herein.

64.     At all relevant times, there was an attorney-client relationship between Everest and defendants Rambicure and Rambicure Law Group, and those defendants were paid for their services.

65.     At the time Everest engaged defendants, Everest did not possess any expertise in Kentucky law and relied upon defendants to competently represent its interests in good faith and with undivided loyalty in their paid fiduciary capacity.

66.     Everest reasonably relied on defendants' express and implied representations, and trusted their advice.

67.     Everest further reasonably relied upon defendants to protect its rights in accordance with its goals, its instructions, and Kentucky law.

19

68.     By undertaking the role as counsel, defendants had a duty to represent Everest's interests thoroughly and competently, taking whatever steps were necessary to investigate, analyze, and fully determine Everest's options and advise Everest accordingly.

69.     Defendants breached their duty of care to Everest, by acting in the following respects, among others, as explained above:

a.      Failing to draft the Agreement in a way that provided for agency and fiduciary duties from Crestwood to Everest;

b.      Advising Everest that the Agreement did provide for agency and fiduciary duties from Crestwood to Everest;

c.      Drafting and approving the Agreement in a manner that negated agency and fiduciary duties, in contravention of Everest's instructions and contrary to the advice defendants gave Everest concerning the meaning and effect of the Agreement;

d.      Drafting and approving the Agreement in a manner that prevented Everest from protecting the value of its horses at auction; and

e.      Advising Everest that the Agreement permitted it to protect the value of its horses at auction by sending an agent with authority to RNA the horse, with no resulting liability to Crestwood.

f.      Failing to maintain adequate professional liability insurance as required by Kentucky Supreme Court Rule 3.024.

Everest expects to find more departures from the standard of care in the course of discovery.

70.     As a direct and proximate result of the defendants' breaches of the standard of care, Everest has sustained millions of dollars in compensable damages, in a precise amount to be proven at trial.

## COUNT II - Negligent Misrepresentation

### Everest v. Rambicure and Rambicure Law Group

71.     Everest realleges the foregoing paragraphs as though fully restated herein.

72.    Defendants Rambicure and Rambicure Law Group negligently made the following affirmative representations and/or representations by silence:

      a.    That under Kentucky law, the Agreement provided for an agency relationship and a fiduciary relationship running from Crestwood to Everest;

      b.    The Agreement was in accordance with Everest's requirements and instructions; and

      c.    That the Agreement permitted Everest to protect the value of certain horses at auction by RNA-ing the horse, without incurring liability to Crestwood.

73.    The foregoing representations by defendants were false representations.

74.    The foregoing representations by defendants dealt with past or present facts.

75.    The foregoing representations by defendants were material.

76.    The foregoing representations by defendants dealt with facts susceptible of knowledge, and the true facts were known or should have been known to defendants at the time the statements were made.

77.    The foregoing representations by defendants were made with intent to have Everest rely upon the representations.

78.    The foregoing representations by defendants induced Everest to act or rely to their detriment.

79.    As a direct and proximate result of the defendants' representations and omissions, Everest has sustained millions of dollars in compensable damages, in a precise amount to be proven at trial

### COUNT III - Breach of Fiduciary Duty

**Everest v. Rambicure and Rambicure Law Group**

80.    Everest realleges the foregoing paragraphs as though fully restated herein.

81.     Defendants Rambicure and Rambicure Law Group, as Everest's counsel, agreed to act as paid fiduciaries and, as such, had a duty to represent Everest in good faith and with undivided loyalty to its best interests.

82.     Defendants had superior knowledge of Kentucky law and had a relationship of trust and confidence with Everest.

83.     As set forth above, defendants breached their fiduciary obligations toward Everest, including their duty of care, their duty to maintain adequate professional liability insurance, and their duty to disclose material matters bearing upon the representation (such as the fact that the Agreement did not meet Everest's instructions and requirements) and undisclosed conflicts Rambicure had with accessories and potential co-defendants to Crestwood's conduct.

84.     As a direct and proximate result of the defendants' breaches of fiduciary duty, Everest has sustained millions of dollars in compensable damages, in a precise amount to be proven at trial.

### COUNT IV - Breach of Contract

### Everest v. Rambicure and Rambicure Law Group

85.     Everest realleges the foregoing paragraphs as though fully restated herein.

86.     Defendants Rambicure and Rambicure Law Group had an agreement to provide legal services for Everest.

87.     Defendants breached the agreement by failing to perform the services in a competent, professional manner and by failing to follow the instructions and requirements of Everest in advising terms of the Agreement.

88.     As a direct and proximate result of the defendants' breaches of contract, Everest has sustained millions of dollars in compensable damages, in a precise amount to be proven at trial.

**COUNT V – Breach of Contract**

**Everest v. Miller Wells**

89.     Plaintiff realleges the foregoing paragraphs as though fully restated herein.

90.     On or about April 16, 2012, Everest terminated Rambicure's retention as its attorneys in all matters, thus placing Rambicure on notice that Everest would likely bring a claim against him for professional malpractice.

91.     It is alleged upon information and belief that within months after receiving this notice, Rambicure began discussions with Miller Wells regarding Rambicure's possible employment with Miller Wells.

92.     On or about September 1, 2012, Rambicure joined Miller Wells, and it is alleged upon information and belief that Rambicure and Miller Wells entered into an employment agreement.

93.     It is alleged upon information and belief that as part of the employment agreement, Miller Wells agreed to provide Rambicure with professional liability insurance that would cover malpractice claims asserted against him during his employment at Miller Wells, including coverage for claims arising from acts and/or omissions which occurred prior to his employment at Miller Wells.

94.     In reliance upon Miller Wells' promise to provide him with insurance coverage which would cover claims arising from his prior practice, Rambicure allowed his prior policy of professional liability insurance to lapse and did not renew it.

95.     In agreeing to provide Rambicure with professional liability insurance which provided coverage for any claims arising from acts of alleged malpractice which occurred prior to his joining the firm, Miller Wells and Rambicure intended to benefit Rambicure's former clients who might bring such claims.

96.     As a former client of Rambicure, Everest was an intended beneficiary of Miller Wells' promise to Rambicure that the above described professional liability insurance would be provided.

97.     Despite its agreement with Rambicure, Miller Wells failed to maintain insurance coverage for Rambicure that provided coverage for acts of malpractice that occurred prior to Rambicure's employment with Miller Wells.

98.     By failing to maintain the scope of insurance promised to Rambicure in his employment agreement, Miller Wells breached the agreement and failed to confer a promised benefit upon Everest, a third-party beneficiary of the employment agreement.

99.     As a direct and proximate result of Miller Wells' breach of contract, Plaintiff has sustained compensable damages, in a precise amount to be proven at trial.

### COUNT VI – Fraud

### Everest v. Miller Wells

100.    Plaintiff realleges the foregoing paragraphs as though fully restated herein.

101.    Miller Wells falsely misrepresented or wrongfully concealed the fact that it had instructed Zurich to cancel Everest's malpractice claim against it. These misrepresentations and concealments were done purposely, and with the intention of causing Everest to rely upon such misrepresentations.

102.    On December 14, 2015 Mason Miller, managing member of Miller Wells, represented that he had spoken with Zurich who had "made it clear… there was/is/won't be any coverage" and apologized because Zurich had "made [Everest] put the package [of supporting documentation] together for naught."

103.    Upon information and belief, Mason Miller had instructed Zurich that Miller Wells was not seeking coverage under the Zurich malpractice policy and further instructed Zurich to "cancel" Everest's claim.

104.    From December 14, 2015, Miller Wells fraudulently concealed the fact that it had instructed Zurich to cancel Everest's claim. Miller Wells' motive for this concealment was so that Everest would assume that Zurich denied the claim based on the prior acts exclusion and not pursue the claim due to lack of coverage.

105.    After Zurich's May 27, 2016 production in response to Everest's subpoena, Miller Wells continued to conceal the fact that the claim had been cancelled by asserting that the all relevant documents that would reveal the cancellation were privileged.

106.    On October 6, 2016 Miller Wells affirmatively misrepresented that it was unaware of the claim's status by stating through counsel, "[w]e are working to confirm that it is Zurich's position that it will apply the [prior acts] exclusion in this case."

107.    On February 22, 2017, through counsel, Miller Wells fraudulently misrepresented that the Everest Claim was "cancelled" due to the prior act exclusion when it had in fact been cancelled at Miller Wells' direction.

108.    Miller Wells' misrepresentations and concealments were made with the intention of causing injury to Everest.

109.    Everest justifiably relied upon the misrepresentations and concealments intentionally and fraudulently made by Miller Wells, acted upon these misrepresentations and concealments, and incurred economic damage as a result of its reliance, and entitling Everest to both compensatory and punitive damages.

### COUNT VII –Fraud

### Everest v. Zurich

110.    Plaintiff realleges the foregoing paragraphs as though fully restated herein.

111.    Zurich owed Everest a duty to disclose the status of its claim and thereby was required to disclose the material fact that Miller Wells had instructed Zurich to cancel Everest's malpractice claim against it.

112.    Zurich falsely misrepresented or wrongfully concealed the fact that Miller Wells had instructed Zurich to cancel Everest's malpractice claim against it. These misrepresentations and concealments were done purposely, and with the intention of causing Everest to rely upon such misrepresentations.

113.    Everest justifiably relied upon the misrepresentations and concealments intentionally and fraudulently made by Zurich, acted upon these misrepresentations and concealments, and incurred economic damage as a result of its reliance, and entitling Everest to both compensatory and punitive damages.

### COUNT VIII – Conspiracy to Commit Fraud

### Everest v. Zurich

114.    Plaintiff realleges the foregoing paragraphs as though fully restated herein.

115.    Miller Wells and Zurich unlawfully combined their efforts to intentionally and fraudulently misrepresent or wrongfully conceal the fact that Miller Wells had instructed Zurich

to cancel Everest's malpractice claim against it. These misrepresentations and concealments were done purposely, and with the intention of causing Everest to rely upon such misrepresentations.

116.    Everest justifiably relied upon the misrepresentations and concealments intentionally and fraudulently made by Miller Wells and Zurich, and incurred economic damage as a result of its reliance, and entitling Everest to both compensatory and punitive damages.

### COUNT IX – Negligent Misrepresentation

#### Everest v. Miller Wells

117.    Plaintiff realleges the foregoing paragraphs as though fully restated herein.

118.    Miller Wells, in the course of business, supplied Everest false information regarding the status of Everest's malpractice claim.

119.    Miller Wells knew or reasonably should have known that Everest's claim status would direct Everest's future course of conduct.

120.    Miller Wells failed to exercise reasonable care in obtaining or communicating the false information regarding the status of Everest's malpractice claim.

121.    Everest justifiably relied upon the false information provided by Miller Wells, acted upon this false information, and incurred economic damage as a result of its reliance, entitling Everest to compensatory damages.

### COUNT X – Negligent Misrepresentation

#### Everest v. Zurich

122.    Plaintiff realleges the foregoing paragraphs as though fully restated herein.

123.    Zurich, in the course of business, supplied Everest false information regarding the status of Everest's malpractice claim.

124.    Zurich knew or reasonably should have known that Everest's claim status would direct Everest's future course of conduct.

125.    Zurich failed to exercise reasonable care in obtaining or communicating the false information regarding the status of Everest's malpractice claim.

126.    Everest justifiably relied upon the false information provided by Zurich, acted upon this false information, and incurred economic damage as a result of its reliance, entitling Everest to compensatory damages.

## COUNT XI – Bad Faith

### Everest v. Zurich

127.    Plaintiff realleges the foregoing paragraphs as though fully restated herein.

128.    Among other things, KRS §304.12-230, Kentucky's  Unfair Claims Settlement Practices Statutes, identify 17 insurance "claims practices" as explicitly "unfair"  including:

a.      Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

b.      Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

c.      Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;

d.      Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

e.      Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement;

129.    Zurich had an obligation under KRS 304.12-230 to conduct a reasonable, good faith, investigation of Everest's claims, independent of whether Zurich was obligated to pay the claim under the terms Miller Wells' policy.

130.    KRS §446.070 provides, "[a] person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation."

131.    Zurich colluded with Miller Wells to "cancel" Zurich's claim without conducting a reasonable investigation.

132.    Zurich misrepresented and/or concealed pertinent facts or insurance policy provisions relating to coverages at issue.

133.    Zurich failed to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies.

134.    Zurich failed to affirm or deny coverage of claims within a reasonable time after proof of loss statements had been completed.

135.    Zurich failed to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

136.    The purpose of Zurich's conduct was to intentionally deceive Everest with respect to the applicable coverage.

137.    Because Zurich failed to give timely notice of its decision to "cancel" Everest's claim, and because this failure misled Everest to its detriment, Zurich is therefore estopped from using an exclusion to deny coverage.

138.    The acts and conduct of Zurich complained of herein constitute unfair settlement practices within the meaning of KRS §304.12-230 *et seq.*

139.    Everest is entitled to contractual, consequential, compensatory and punitive damages against Zurich.

140.     Pursuant to KRS §304.12-235, Everest is entitled to a reasonable attorney's fees and reimbursement of litigation costs and expenses.

WHEREFORE, plaintiff prays for judgment of the Court against the defendants for the following relief:

a.     Compensatory damages against defendants in an amount in excess of $75,000 to be proven at trial;

b.     Forfeiture of fees paid to defendants;

c.     Punitive damages pursuant to KRS §304.12-235 and common law;

d.     Reimbursement of attorney's fees pursuant to KRS §304.12-235; and

e.     Such other relief as the Court deems just and equitable, including interest, costs and attorney's fees.

Respectfully submitted,

/s/ Christopher D. Cathey
Christopher D. Cathey (89787)
Christopher J. Dutton (92291)
PORTER, WRIGHT, MORRIS &ARTHUR LLP
250 East Fifth Street, Suite 2200
Cincinnati, Ohio 45202
(513) 369-4214 direct dial
(513) 421-0991 facsimile
ccathey@porterwright.com
Trial Attorneys for Plaintiff Everest Stables, Inc.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 22, 2017, a true and exact copy of the foregoing was filed electronically and notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt, as follows:

R. Gregg Hovious
Rebecca Grady Jennings
Kevin L. Chlarson
MIDDLETON REUTLINGER
401 South Fourth Street - Suite 2600
Louisville, Kentucky 40202
Telephone: (502) 584-1135
Facsimile: (502) 561-0442
Email: rjennings@middletonlaw.com
ghovious@middletonlaw.com
kchlarson@middletonlaw.com
swardle@middletonlaw.com
*Counsel for Defendants William C.*
*Rambicure, Rambicure Law Group*
*and Miller Wells, PLLC*

*/s/ Christopher D. Cathey*
Christopher D. Cathey (89787)

CINCINNATI/248743v.1

31

Case 3:15-cv-00576-GNS-CHL   Document 87-1   Filed 12/07/17   Page 1 of 3 PageID #: 1806
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 220 of 316
Case 3:15-cv-00576-DJH   Document 1-1   Filed 07/01/15   Page 1 of 3 PageID #: 24

# EXHIBIT 1

Case 3:15-cv-00576-GNS-CHL   Document 87-1   Filed 12/07/17   Page 2 of 3 PageID #: 1807
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 221 of 316
Case 3:15-cv-00576-DJH   Document 1-1   Filed 07/01/15   Page 2 of 3 PageID #: 25

Subject:   RE: Crestwood Farm / Everest Stables

From:      Thomas W. Pahl (tpahl@foleymansfield.com)

To:        rambicure@rlglex.com;

Date:      Monday, April 16, 2012 3:05 PM


Bill, Jeff has determined that he cannot go forward with you acting as local counsel in this matter or any other pending matters. The Court's Memorandum Opinion and Order guts much of the essential legal advice and opinions that he (and Sue) relied upon.

Before you file substitution or termination of counsel papers, would you kindly agree to remain of record until I find successor counsel in advance of the May 7 hearing?

Tom


Thomas W. Pahl
Partner

250 Marquette Avenue
Suite 1200
Minneapolis, MN 55401
P: 612-338-8788 / F: 612-338-8690 / tpahl@foleymansfield.com

Foley & Mansfield, PLLP
Chicago - Detroit - Los Angeles - Miami - Minneapolis
New York - Oakland - Seattle - St. Louis

Confidential Information: This message contains confidential information and may be subject to protection by the laws or terms of applicable confidentiality agreements, and is intended only for the message recipient(s). If you are not the intended recipient you are hereby notified that any dissemination, distribution, or copying of this e-mail is strictly prohibited. If you are not the intended recipient indicated in this message (or responsible for delivery of the message to such person), notify tpahl@foleymansfield.com immediately and delete this e-mail from your system. Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

E-mail transmissions cannot be guaranteed to be safe, secure, or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender and Foley & Mansfield, PLLP therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version.


-----Original Message-----


From: Bill Rambicure [mailto:rambicure@rlglex.com]

Case 3:15-cv-00576-GNS-CHL   Document 87-1   Filed 12/07/17   Page 3 of 3 PageID #: 1808
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 222 of 316
Case 3:15-cv-00576-DJH   Document 1-1   Filed 07/01/15   Page 3 of 3 PageID #: 26

To: Jamie_Chrisman@kyed.uscourts.gov; amendiondo@ksattorneys.com; bstilz@ksattorneys.com; frank@beckerattorney.com; Chris Rambicure; Thomas W. Pahl; Aaron M. Ninnemann; knelson@foleymansfield.com
Subject: RE: Crestwood Farm . Everest Stables

Jamie:

I'm available on either date and have no preference. I'll be participating in the call as local counsel for Everest Stables, and can be reached at (859) 253-6713. Tom Pahl is lead counsel on this matter for Everest Stables.

William C. Rambicure
RAMBICURE LAW GROUP, PSC
219 East High Street
PO Box 34188
Lexington, KY 40588-4188
Tel: (859) 253-6713
Fax:(859) 233-7565
email: rambicure@rlglex.com


-----Original Message-----
From: Jamie_Chrisman@kyed.uscourts.gov [mailto:Jamie_Chrisman@kyed.uscourts.gov]
Sent: Monday, April 16, 2012 9:46 AM
To: amendiondo@ksattorneys.com; bstilz@ksattorneys.com; frank@beckerattorney.com; Chris Rambicure; tpahl@foleymansfield.com; Bill Rambicure; aninnemann@foleymansfield.com; knelson@foleymansfield.com
Subject: Crestwood Farm . Everest Stables


Counsel:

We need to schedule a telephone conference regarding the status of this case. Judge Caldwell has available on her calendar May 7 after 11:00 a.m. or May 8 before 1:00 p.m. Since there are multiple counsel for the parties, when responding to this email, please advise as to who will be participating in the call and a number where you can be reached. Your prompt response is appreciated. Thanks.

Jamie Chrisman
Judicial Assistant to Judge Karen Caldwell
United States District Court
Eastern District of Kentucky
Lexington, Kentucky
Ph: 859.233.2828

EXHIBIT 2

Case 3:15-cv-00576-GNS-CHL   Document 87-2   Filed 12/07/17   Page 2 of 16 PageID #: 1810
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 224 of 316
Case 3:15-cv-00576-DJH   Document 1-2   Filed 07/01/15   Page 2 of 16 PageID #: 28
CASE 0:09-cv-02436-MJD-JSM   Document 18-1   Filed 10/26/09   Page 1 of 19

EXHIBIT

_A_

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT, made and entered into effective this 1st day of November, 2008, by and between Everest Stables, Inc., 100 Village Center Drive, North Oaks, MN 55127, a Minnesota corporation (hereinafter referred to as "Everest") and Crestwood Farm Bloodstock LLC, a Kentucky limited liability company, 3933 Spurr Road, Lexington, KY 40511 (hereinafter referred to as "Crestwood").

NOW THEREFORE, in consideration of the mutual promises and agreements as hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Everest and Crestwood hereby agree as follows:

1. **TRANSFER/TITLE.** As soon as practicable after execution of this Agreement, Everest shall execute and deliver to Crestwood the applicable Jockey Club Certificates of Foal Registration, breeding certificates and such other documents as may appear to be reasonably necessary to transfer the ownership of and the registration papers for the thoroughbred horses identified in **Exhibit Numbers 1, 2, 3, 4, 5, and 6** attached hereto (except for ISLAND FASHION, in foal to GHOSTZAPPER, and the 2008 STORM CAT/ISLAND FASHION filly) (hereinafter referred to as the "Subject Horses") out of Everest's name and into Crestwood's name, effective as of November 1, 2008 (the "Effective Date" of this Agreement).

Notwithstanding the foregoing, the parties agree that Everest shall retain title and ownership to ISLAND FASHION, in foal to GHOSTZAPPER, and to the 2008 STORM CAT/ISLAND FASHION filly, from the Effective Date of this Agreement through the sale of said horses at public auction or otherwise.

Subject to the foregoing paragraph, Everest represents and warrants to Crestwood that Crestwood will receive clear ownership and title to each of the Subject Horses, free and clear of any liens and/or encumbrances, except for all unpaid stallion service obligations associated with or arising from the Subject Horses described on the Exhibits upon which the Subject Horses are identified, which will either be the responsibility of Everest or, in the case of the ELUSIVE QUALITY stallion service obligation, will be deducted from auction sales proceeds by Keeneland Association Inc. (hereinafter "Keeneland").

2. **RESPONSIBILITY FOR EXPENSES.** Except as otherwise provided herein, and subject to the terms and conditions of this Agreement, from and after the Effective Date of this Agreement, Crestwood shall be considered to be and shall be the owner of, and shall assume sole responsibility for and shall pay, and shall indemnify and hold Everest harmless from any and all claims relating to, any and all out-of-pocket expenses of any kind or nature relating to or associated with the Subject Horses, including, but not limited to board expenses, farrier/blacksmith expenses, veterinary expenses, vanning or transportation expenses, sales preparation expenses, and sales entry expenses, subject to the following additional terms, conditions and agreements. Although Everest shall retain title and ownership of ISLAND FASHION, in foal to GHOSTZAPPER, and the 2008 STORM CAT/ISLAND FASHION filly from the Effective Date through their sale at public auction or otherwise in accordance with this Agreement, Crestwood shall nevertheless be solely responsible for any and all such out-of-pocket expenses for said horses, from and after the Effective Date through their sale, including certain casualty

1

Case 3:15-cv-00576-GNS-CHL   Document 87-2   Filed 12/07/17   Page 3 of 16 PageID #: 1811
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 225 of 316
Case 3:15-cv-00576-DJH   Document 1-2   Filed 07/01/15   Page 3 of 16 PageID #: 29
CASE 0:09-cv-02436-MJD-JSM   Document 18-1   Filed 10/26/09   Page 2 of 19

insurance premium expenses, as provided in Section 18 herein.

3. CONSIGNMENT TO KEENELAND SALE. The parties hereto agree that Crestwood shall consign for sale and shall offer for sale and shall sell at the Keeneland January, 2009 Mixed Sale, the following horses:

(20) PM

A. The twenty-one (21) thoroughbred broodmares identified in Exhibit No. 1 hereto (i.e. – the "A" Group mares). The parties acknowledge that DANZIGS FASHION has been deleted from Exhibit No. 1, and the parties agree that both DANZIGS FASHION and DANZIGS FASHION's 2009 foal shall be consigned for sale, offered for sale, and sold at the Keeneland November 2009 Breeding Stock Sale, and the net sale proceeds for each said horse shall be split 50% to Everest and 50% to Crestwood. Crestwood shall assume responsibility for and shall pay all out-of-pocket expenses of any kind and nature, including any 2009 stallion service expenses for stallions other than PETIONVILLE, with respect to DANZIGS FASHION and DANZIGS FASHION's 2009 foal, from and after November 1, 2008.

B. The eighteen (18) thoroughbred broodmares identified in Exhibit No. 2 hereto (i.e. – the "B" Group mares);

C. The forty-four (44) thoroughbred yearling horses identified in Exhibit No. 4 hereto (i.e. – the Everest foals of 2007). Crestwood may in its discretion determine that up to twenty (20) of the Subject Horses described on Exhibit 4 should not be sold in the 2009 Keeneland January Mixed Sale because their sales proceeds are not anticipated to exceed 75% of their carrying costs to the time of sale; provided, however, that no such Subject Horse shall be one whose stallion service fee was $5,000 or more  with the exception of PETIONVILLE. In such event, Crestwood may decide not to sell such Subject Horse(s) in such sale. If Crestwood so decides, the following additional terms shall arise in respect of each such Subject Horse:  (a) Crestwood, promptly following its decision to not enter or withdraw the Subject Horse from the sale, shall notify Everest of such decision; (b) Everest shall have the option for a period of 10 calendar days following its receipt of notice of withdrawal from Crestwood to reacquire the Horse from Crestwood, without financial consideration to Crestwood; (c) if such option is not exercised by Everest, Crestwood shall either (1) attempt to sell privately or (2)  give away such Subject Horse otherwise on the terms described in Section 6 hereof.  Should Everest choose to exercise its option to reacquire Subject Horses under subsection (b) above, Crestwood shall take such action as is necessary to transfer title to the Subject Horse to Everest and Everest shall thereafter bear all carrying costs for boarding and keeping the Subject Horse at Crestwood or such other location as Everest deems appropriate. Other than the (up to) twenty (20) horses that Crestwood may, pursuant to the foregoing, remove from the 2009 Keeneland January Mixed Sale, any other horses proposed to be removed from said sale shall only be removed by mutual written agreement of Everest and Crestwood.

D. The thoroughbred horse identified in Exhibit No. 6 hereto (FAME AND FASHION, a two-year-old Gr/Roan filly by PETIONVILLE out of DANZIGS FASHION).

4. CONSIGNMENT TO PUBLIC AUCTION SALE. The parties hereto further agree that

2

DM

Case 3:15-cv-00576-GNS-CHL Document 87-2 Filed 12/07/17 Page 4 of 16 PageID #: 1812
CASE 0:21-cv-02289-JWB-JFD Doc. 1-1 Filed 10/15/21 Page 226 of 316
Case 3:15-cv-00576-DJH Document 1-2 Filed 07/01/15 Page 4 of 16 PageID #: 30
CASE 0:09-cv-02436-MJD-JSM Document 18-1 Filed 10/26/09 Page 3 of 19

Crestwood shall consign for sale and shall offer for sale and sell at recognized 2009 Kentucky public auction sale(s), as mutually agreed and determined between Everest and Crestwood, the forty-one (41) thoroughbred weanling horses identified in Exhibit No. 5 hereto (i.e. – the Everest foals of 2008). Crestwood may in its discretion determine that up to twenty (20) of the Subject Horses described on Exhibit 5 should not be sold in the 2009 Keeneland September Yearling Sale because their sales proceeds are not anticipated to exceed 75% of their carrying costs to the time of sale; provided, however, that no such Subject Horse shall be one whose stallion service fee was $5,000 or more with the exception of PETIONVILLE. In such event, Crestwood may decide not to sell such Subject Horse(s) in such sale. If Crestwood so decides, the following additional terms shall arise in respect of each such Subject Horse: (a) Crestwood, promptly following its decision to not enter or withdraw the Subject Horse from the sale, shall notify Everest of such decision; (b) Everest shall have the option for a period of 10 calendar days following its receipt of notice of withdrawal from Crestwood to reacquire the Horse from Crestwood, without financial consideration to Crestwood; (c) if such option is not exercised by Everest, Crestwood shall either (1) attempt to sell privately or (2) give away such Subject Horse otherwise on the terms described in Section 6 hereof. Should Everest choose to exercise its option to reacquire Subject Horses under subsection (b) above, Crestwood shall take such action as is necessary to transfer title to the Subject Horse to Everest and Everest shall thereafter bear all carrying costs for boarding and keeping the Subject Horse at Crestwood or such other location as Everest deems appropriate. Other than the (up to) twenty (20) horses that Crestwood may, pursuant to the foregoing, remove from recognized 2009 Kentucky public auction sale(s), any other horses proposed to be removed from said sale(s) shall only be by mutual written agreement of Everest and Crestwood.

5. **PRIVATE SALE OR DISPOSITION OF CERTAIN HORSES.** The parties hereto further agree that Crestwood shall sell or otherwise dispose of privately, the twenty (20) thoroughbred broodmares identified in Exhibit No. 3 hereto (the "C" Group mares). The terms and conditions of such sales shall be determined by mutual agreement between Everest and Crestwood. The parties acknowledge that the following Everest horses are already consigned for sale by Crestwood at the November 2008 Keeneland Sale: JUST A WISH, SISTER GIRL BLUES '08, BALLDO '08, BIRDS NEST, IN TRIPLACATE, and IT'S SILENT. The parties agree that if any of said horses fail to sell at said November 2008 Keeneland Sale, such horses shall be added to Exhibit No. 3 and shall be sold or otherwise disposed of privately by Crestwood under all the same terms and conditions applicable to the horses on Exhibit No. 3 under this Agreement.

6. **ALTERNATIVE FOR PRIVATE SALE BY MUTUAL AGREEMENT.** The parties specifically understand and agree, with respect to each of the horses identified in Exhibit Numbers 4, 5, and 6 hereto, that Everest and Crestwood may, by mutual, written agreement signed by both Everest and Crestwood, agree to make other arrangements for the ultimate sale or disposition of any such horse.

7. **CRESTWOOD'S DUTIES AND RESPONSIBILITIES.** Crestwood shall exercise all commercially reasonable efforts, with the utmost good faith, for and on behalf of both Crestwood and Everest, to properly prepare the Subject Horses for sale, and to market, offer for sale and to sell the Subject Horses, either at public auction or in private sales, in order to maximize the sales prices for each such horse. For all horses to be sold at public auction, Crestwood agrees and covenants that each horse shall be sold with no reserve, RNA, or buyback price. Crestwood shall sell, at auction or by private sale, only to unaffiliated third parties. The parties agree that in the event any Subject Horse is either unsold after auction or attempts to privately sell hereunder, title to such Subject Horse shall remain with Crestwood without additional consideration.

3

Case 3:15-cv-00576-GNS-CHL   Document 87-2   Filed 12/07/17   Page 5 of 16 PageID #: 1813
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 227 of 316
Case 3:15-cv-00576-DJH   Document 1-2   Filed 07/01/15   Page 5 of 16 PageID #: 31
11/04/2009 16:10   8592556586   CRESTWOOD FARM   PAGE 05
CASE 0:09-cv-02496-MJD-JSM   Document 13-1   Filed 10/26/09   Page 4 of 19

8. **PURCHASE PRICE.** The purchase price(s) for the Subject Horses shall be determined as follows:

A. As the purchase price for each of the horses identified on Exhibit No. 1, Everest shall be entitled to and shall be paid by Crestwood seventy-five percent (75%) of the net sales proceeds for each such individual horse offered for sale and sold at the January 2009 Keeneland Mixed Sale. For purposes of this Agreement, the term "net sales proceeds" for any of the Subject Horses selling at public auction shall mean the "fall of the hammer" sales price for each such horse, after deduction of the thoroughbred auction company's standard sales commission, without any credits or offsets whatsoever. Provided, however, that with respect to the sale of ISLAND FASHION, in foal to GHOSTZAPPER, the net sales proceeds will be divided after the amount of the 2008 GHOSTZAPPER stallion season expense and tax has been credited to Everest. With respect to the sale of ISLAND FASHION, in foal to GHOSTZAPPER, the parties further agree that any net sales proceeds exceeding $2 Million shall be paid 100% to Everest. With respect to the 2008 GHOSTZAPPER/DOWNTOWN BLUES stallion season, and the 2008 ARCH stallion season, Everest shall be responsible to pay for said seasons, including tax. Such payment of the purchase price(s) by Crestwood to Everest shall be conditioned upon and shall occur promptly following Crestwood's receipt of such proceeds from Keeneland or other purchaser(s) of the Subject Horse(s).

B. As the purchase price for each of the horses identified on Exhibit Numbers 2, 4, 5, and 6, Everest shall be entitled to and shall be paid by Crestwood fifty percent (50%) of the net sales proceeds for each such individual horse offered for sale and sold at the January 2009 Keeneland Mixed Sale, or such other recognized thoroughbred public auction, as applicable under this Agreement. Provided, however, that Everest shall be entitled to and shall be paid by Crestwood seventy-five percent (75%) of the net sales proceeds for the 2008 filly, STORM CAT/ISLAND FASHION, listed on Exhibit No. 5, and any net sales proceeds for said filly exceeding $1 Million shall be paid 100% to Everest. Provided, further, that with respect to the 2008 Colt, ELUSIVE QUALITY/DOWNTOWN BLUES and the 2008 Filly, ELUSIVE QUALITY/FLASH OF FASHION identified on Exhibit No. 5, if and when the net sales proceeds exceeds $100,000 for each or either horse, the net sales proceeds of either such horses exceeding $100,000 shall be paid 50% to Everest and 50% to Crestwood, after deduction by Keeneland of the Elusive Quality stallion season expense and tax. Such payment of the purchase price(s) by Crestwood to Everest shall be conditioned upon and shall occur promptly following Crestwood's receipt of such proceeds from Keeneland, other public auction companies, or private purchaser(s) of the Subject Horse(s), as applicable.

C. As purchase price for any horse from Exhibit Numbers 3, 4, 5, or 6 sold privately, by mutual agreement of the parties, as provided herein, Everest shall be entitled to and shall be paid by Crestwood fifty percent (50%) of the net sales proceeds received for each individual horse (except that Everest shall be entitled to and shall be paid seventy-five percent (75%) of the net sales proceeds received for the 2008 STORM CAT/ISLAND FASHION filly, as described above). For purposes of this Agreement, the parties agree that the "net sales proceeds" for any of the Subject Horses sold privately shall mean the sales proceeds for any such horse, reduced by the amount of the sales commission, if any, payable to an unaffiliated third party, consistent with the provisions of Paragraph 12 below. Such payment of purchase price(s) by Crestwood to Everest shall be conditioned upon and shall occur promptly following Crestwood's receipt of such proceeds from the private purchaser(s) of the Subject Horse(s).

D. Notwithstanding the foregoing, Crestwood shall be entitled to offset from amounts payable under subsections A through C above, any undisputed board bills ~~or other undisputed maintenance~~ *PMR* ~~expenses or reimbursable fees or expenses~~ due and payable to it by Everest at the time such payments are

4

Case 3:15-cv-00576-GNS-CHL   Document 87-2   Filed 12/07/17   Page 6 of 16 PageID #: 1814
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 228 of 316
Case 3:15-cv-00576-DJH   Document 1-2   Filed 07/01/15   Page 6 of 16 PageID #: 32
CASE 0:09-cv-02436-MJD-JSM   Document 18-1   Filed 10/26/09   Page 5 of 19

to be made under such sections.

9. **PAYMENT.** Crestwood shall be required to fully account for and pay Everest's portion of the net sales proceeds from the auction sales of any of the Subject Horses, calculated with respect to each individual horse pursuant to Paragraph 8 above, without any credit or offset whatsoever, except as provided herein with respect to certain stallion season expenses, within five (5) business days following Crestwood's receipt of the applicable net sales proceeds from the public auction sales company. Crestwood shall be required to fully account for and pay Everest's portion of the sales proceeds from the private sale or disposition of any of the Subject Horses, with respect to each individual horse, within five (5) business days following Crestwood's receipt of the applicable sales proceeds for such horse. It is the intention of the parties that the sale or other disposition of each individual horse under this Agreement shall be treated and accounted for as a separate sale transaction. The parties agree and acknowledge that the private sale of any of the Subject Horses shall be all-cash transaction(s), and that each private sale shall be properly documented with a Bill of Sale or other similar documents identifying the horse being sold, the sale price, the date of sale, the buyer and seller, the identity of any third party/agent, the amount of any commission or other compensation payable to any third party/agent, and other customary information.

10. **RISK OF LOSS, POSSESSION.** Crestwood agrees that it shall take possession of the Subject Horses as of November 1, 2008, at their current location at Crestwood Farm in Lexington, Kentucky. As of said date, all risk of loss shall pass from Everest to Crestwood, except with respect to ISLAND FASHION, in foal to GHOSTZAPPER, and the 2008 STORM CAT/ISLAND FASHION filly, as otherwise provided in Section 1 above.

11. **DISCLAIMER OF WARRANTIES. EVEREST MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO ANY OF THE SUBJECT HORSES, SPECIFICALLY AND WITHOUT LIMITATION, EVEREST MAKES NO WARRANTIES THAT ANY OF THE SUBJECT HORSES ARE SUITABLE FOR RACING OR BREEDING PURPOSES.**

12. **COMMISSION.** Other than the standard thoroughbred sales company commissions, the parties represent and warrant to each other that no sales fees or commissions are or will be owing or payable to anyone in connection with this sale transaction, and the parties indemnify and hold each other harmless from any claims for sales fees or commissions from any parties. Crestwood represents and warrants that other than receiving its share of sales proceeds from the public auction or private sale of the Subject Horses, it will not charge or be entitled to any sale or consignment fees or commissions. Notwithstanding the foregoing, Crestwood, in its sole discretion, may in any private sale of a Subject Horse pay a sales commission of up to 10% to any third party associated with the transaction, provided that such third party is not affiliated with Crestwood. In such event, Crestwood shall account in reasonable detail to Everest as to payment of same, including the identity of the recipient(s) of any such commissions.

13. **ACCOUNTING.** Crestwood shall promptly (within 48 hours) notify Everest of the sale or disposition of each of the Subject Horses. In addition, not later than the tenth (10th) day of each calendar month, Crestwood shall provide to Everest a full accounting of the horses sold or otherwise disposed of

5

Case 3:15-cv-00576-GNS-CHL    Document 87-2    Filed 12/07/17    Page 7 of 16 PageID #: 1815
CASE 0:21-cv-02289-JWB-JFD    Doc. 1-1    Filed 10/15/21    Page 229 of 316
Case 3:15-cv-00576-DJH    Document 1-2    Filed 07/01/15    Page 7 of 16 PageID #: 33
CASE 0:09-cv-02436-MJD-JSM    Document 18-1    Filed 10/26/09    Page 6 of 19

during the previous month (and the horses remaining unsold), with information including the name of each horse sold or disposed of, the type of disposition, the date of sale or disposition, the sale price of each horse, the date of receipt of the sales price, and the name and address of each buyer/transferee. Crestwood shall also provide prompt written confirmation to Everest of the nomination of and acceptance of any of the Subject Horses to the Keeneland January 2009 sale or other recognized public auctions, as applicable under this Agreement. Upon request, Crestwood shall provide Everest copies of Bills of Sale and/or other documents pertaining to sale or disposition of any of the Subject Horses.

14. **FACSIMILE.** The parties hereto agree that a facsimile of a counterpart of this signed Agreement constitutes an original counterpart and shall be a valid and binding document for all legal and other purposes.

15. **COUNTERPARTS.** This Agreement may be executed in multiple counterparts by the parties hereto. All of such counterparts shall be construed as if all signatures were appended to one document.

16. **MERGER.** This Agreement contains the entire agreement of the parties and any prior or concurrent written or oral understandings are deemed merged into this Agreement.

17. **GOVERNING LAW.** The terms of this Agreement shall be enforced and construed in accordance with the laws of the Commonwealth of Kentucky.

18. **INSURANCE.** Everest acknowledges that Crestwood shall be under no obligation to obtain insurance of any kind on the Subject Horses or renew any existing policy on a Subject Horse. Everest agrees and covenants to maintain its existing casualty insurance coverage on ISLAND FASHION, in foal to GHOSTZAPPER. Crestwood shall reimburse Everest the pro rata cost of insurance premiums necessary to maintain said existing casualty insurance coverage from the Effective Date until said horse is sold at public auction or otherwise. In the event of a casualty loss of said horse prior to its sale, Crestwood shall pay Everest such additional sums as are necessary so that Crestwood has paid Everest a total of twenty-five percent (25%) of the total of all insurance premiums required to collect the total insurable value upon such loss, and, accordingly, Crestwood shall be entitled to receive from Everest the sum of 25% of the insurance loss proceeds received by Everest and Everest shall be entitled to retain 75% of the insurance loss proceeds received by Everest. In no event shall Everest be required to pay to Crestwood more than 25% of the insurance loss proceeds received by Everest.

19. **BINDING EFFECT.** This Agreement shall be binding upon the parties hereto, their heirs, personal representatives, successors and assigns.

20. **ATTORNEY'S FEES.** In the event of any action or proceeding to declare or enforce the terms of this Agreement, the prevailing party or parties shall be entitled to recover its or their reasonable attorney's fees and other costs, in addition to any other relief to which it may be entitled.

/
/
/
/
/
/

Case 3:15-cv-00576-GNS-CHL   Document 87-2   Filed 12/07/17   Page 8 of 16 PageID #: 1816
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 230 of 316
Case 3:15-cv-00576-DJH   Document 1-2   Filed 07/01/15   Page 8 of 16 PageID #: 34
CASE 0:09-cv-02436-MJD-JSM   Document 18-1   Filed 10/26/09   Page 7 of 19

IN WITNESS WHEREOF, the parties have executed this Agreement as of the dates indicated below.

EVEREST STABLES, INC.

By: _____           DATE: __11/4/08__
     Jeffrey L. Nielsen

Its:  President

CRESTWOOD FARM BLOODSTOCK LLC

By: _____           DATE: __11/4/08__
     Pope McLean

Its: _____

7

Case 3:15-cv-00576-GNS-CHL   Document 87-2   Filed 12/07/17   Page 9 of 16 PageID #: 1817
Case 3:15-cv-00576-JWB-JFD   Document 1-2   Filed 07/01/15   Page 9 of 16 PageID #: 35
CASE 0:09-cv-02436-MJD-JSM   Document 18-1   Filed 10/26/09   Page 8 of 19

# EXHIBIT 1

A Group

Bayou Boots

Big Shoes

Cat News

Cayman Sunset

~~Gaslight Fashion~~

Downtown Blues

Flash of Fashion

Harbor Blues

Isla Cozzene

Island Escape

Island Fashion

Out of Step

Purely Excessive

Quiet Whisper

Royal Deception

Sister Girl Blues

Six Zeros

Texas Kitty

Two To Waltz

Untangled

White Angelica

# EXHIBIT 2

B Group

Automatic Appeal

Badinage

Baildo

Boot Um Bertie

Cinnful Bride

Discreet Account

Dreams and Desires

Enthusiastic

Follow the Clues

Forest Cat

Jungle Storm

Mini Dee

Regal Boot

Shawshank Lady

Silent Storm

Tamara

Taurus Moon

Voodoo's Sister



Case 3:15-cv-00576-GNS-CHL   Document 87-2   Filed 12/07/17   Page 11 of 16 PageID #: 1819
CASE 0:21-cv-02895-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 11 of 16 PageID #: 37
CASE 0:09-cv-02436-MJD-JSM   Document 18-1   Filed 10/26/09   Page 10 of 19   PAGE   11

# EXHIBIT 3

C Group

Eleganta Chica                    Minimum Security

Glitz                             No No Perdomo

Happy Hostage                     Political Hostage

Held Hostage                      Salted With Fire

Hushed                            Sidonia

Ijada                             So Emotional

Inflammatory                      Stricter Sister

Look to Heaven                    Vertical Ascent

Love at Lunch                     Wing It

Mighty Might                      Wish for Gold

EXHIBIT 4

## EVEREST STABLES - YEARLINGS

| Horse Name | Horse Type | Sire | Dam | Color | Sex | DOB |
|---|---|---|---|---|---|---|
| Abbreviated Career '07 | Yearling | Petionville | Abbreviated Career | Bay | Colt | 4/3/2007 |
| Airlift '07 | Yearling | Service Stripe | Airlift | Bay | Filly | 3/28/2007 |
| Annual Report '07 | Yearling | Petionville | Annual Report | Dk B/Br | Filly | 3/15/2007 |
| Badinage '07 | Yearling | Petionville | Badinage | Bay | Filly | 5/22/2007 |
| Bayou Boots '07 | Yearling | Petionville | Bayou Boots | Chestnut | Filly | 5/3/2007 |
| Boot Um Bertie '07 | Yearling | Petionville | Boot Um Bertie | Dk B/Br | Colt | 4/28/2007 |
| Cat News '07 | Yearling | Petionville | Cat News | Chestnut | Colt | 4/19/2007 |
| Cayman Sunset '07 | Yearling | Petionville | Cayman Sunset | Dk B/Br | Filly | 5/21/2007 |
| Danzigs Fashion '07 | Yearling | Petionville | Danzigs Fashion | Gr/Roan | Filly | 3/11/2007 |
| Downtown Blues '07 | Yearling | Ghostzapper | Downtown Blues | Bay | Colt | 2/26/2007 |
| Dreams and Desires '07 | Yearling | Petionville | Dreams and Desires | Chestnut | Filly | 2/9/2007 |
| Elegante Chica '07 | Yearling | Petionville | Elegante Chica | Chestnut | Filly | 2/5/2007 |
| Enthusiastic '07 | Yearling | Petionville | Enthusiastic | Bay | Filly | 3/16/2007 |
| Forest Cat '07 | Yearling | Petionville | Forest Cat | Chestnut | Colt | 5/12/2007 |
| Haitian Vacation '07 | Yearling | Hold For Gold | Haitian Vacation | Chestnut | Colt | 4/21/2007 |
| Harbor Blues '07 | Yearling | Forestry | Harbor Blues | Bay | Filly | 1/26/2007 |
| Hushed '07 | Yearling | Petionville | Hushed | Chestnut | Filly | 3/7/2007 |
| Inflammatory '07 | Yearling | Petionville | Inflammatory | Chestnut | Colt | 5/2/2007 |
| Isla Cozzene '07 | Yearling | Petionville | Isla Cozzene | Chestnut | Colt | 4/11/2007 |
| Isla Mujeres '07 | Yearling | Maria's Mon | Isla Mujeres | Gr/Roan | Colt | 3/14/2007 |
| Just A Wish '07 | Yearling | Petionville | Just A Wish | Chestnut | Filly | 3/4/2007 |
| Karaoke Kid '07 | Yearling | Street Cry (Ire) | Karaoke Kid | Chestnut | Colt | 4/6/2007 |
| Latin Lust '07 | Yearling | Storm Boot | Latin Lust | Dk B/Br | Filly | 2/9/2007 |
| Look To Heaven '07 | Yearling | Petionville | Look To Heaven | Dk B/Br | Colt | 4/13/2007 |
| Mighty Might '07 | Yearling | Petionville | Mighty Might | Gr/Roan | Filly | 5/25/2007 |
| Minimum Security '07 | Yearling | Petionville | Minimum Security | Dk B/Br | Colt | 2/19/2007 |
| No No Perdomo '07 | Yearling | Petionville | No No Perdomo | Chestnut | Colt | 2/14/2007 |
| Out Of Step '07 | Yearling | Petionville | Out Of Step | Chestnut | Filly | 5/23/2007 |
| Peaceful Place '07 | Yearling | Pleasant Tap | Peaceful Place | Dk B/Br | Colt | 3/6/2007 |
| Quiet Whisper '07 | Yearling | Petionville | Quiet Whisper | Bay | Colt | 5/17/2007 |
| Regal Boot '07 | Yearling | Petionville | Regal Boot | Dk B/Br | Colt | 3/14/2007 |
| Salted With Fire '07 | Yearling | Petionville | Salted With Fire | Dk B/Br | Colt | 4/23/2007 |
| Sidonia '07 | Yearling | Petionville | Sidonia | Bay | Colt | 4/17/2007 |
| Silent Storm '07 | Yearling | Petionville | Silent Storm | Dk B/Br | Filly | 3/11/2007 |
| Slewtress '07 | Yearling | Petionville | Slewtress | Dk B/Br | Filly | 3/8/2007 |
| Stricter Sister '07 | Yearling | Petionville | Stricter Sister | Chestnut | Filly | 2/1/2007 |
| Taurus Moon '07 | Yearling | Petionville | Taurus Moon | Chestnut | Colt | 4/16/2007 |
| Two To Waltz '07 | Yearling | Petionville | Two To Waltz | Chestnut | Colt | 5/27/2007 |
| Vertical Ascent '07 | Yearling | Mizzen Mast | Vertical Ascent | Gr/Roan | Filly | 2/8/2007 |

Case 3:15-cv-00576-GNS-CHL   Document 87-2   Filed 12/07/17   Page 13 of 16 PageID #: 1821
Case 3:15-cv-00576-DJH   Document 1-2   Filed 07/01/15   Page 13 of 16 PageID #: 39
CASE 0:09-cv-02436-MJD-JSM   Document 18-1   Filed 10/26/09   Page 12 of 19

## EVEREST STABLES - YEARLINGS

| | | | | | | |
|---|---|---|---|---|---|---|
| Voodoo's Sister '07 | Yearling | Petionville | Voodoo's Sister | Chestnut | Colt | 2/23/2007 |
| White Angelica '07 | Yearling | Petionville | White Angelica | Dk B/Br | Filly | 5/10/2007 |
| Wing It '07 | Yearling | Petionville | Wing It | Chestnut | Colt | 5/4/2007 |
| Winze '07 | Yearling | Hold For Gold | Winze | Chestnut | Colt | 3/5/2007 |
| Wish For Gold '07 | Yearling | Petionville | Wish For Gold | Dk B/Br | Filly | 2/28/2007 |

Case 3:15-cv-00576-GNS-CHL   Document 87-2   Filed 12/07/17   Page 14 of 16 PageID #: 1822
Case 0:21-cv-02289-JWB-JFD   Document 1-2   Filed 07/01/15   Page 14 of 16 PageID #: 40
CASE 0:09-cv-02436-MJD-JSM   Document 18-1   Filed 10/26/09   Page 13 of 19

## EXHIBIT 5

### EVEREST STABLES - WEANLINGS

| Horse Name | Horse Type | Sire | Dam | Color | Sex | DOB |
|---|---|---|---|---|---|---|
| Abbreviated Career '08 | Weanling | Petionville | Abbreviated Career | Bay | Colt | 4/27/20 |
| Badinage '08 | Foal | Petionville | Badinage | Chestnut | Filly | 5/14/20 |
| Big Shoes '08 | Weanling | Giant's Causeway | Big Shoes | Bay | Colt | 2/15/20 |
| Boot Um Bertie '08 | Foal | Petionville | Boot Um Bertie | Dk B/Br | Colt | 5/7/20 |
| Danzig Fashion '08 | Weanling | Petionville | Danzig Fashion | Dk B/Br | Colt | 3/31/20 |
| Discreet Account '08 | Weanling | Petionville | Discreet Account | Dk B/Br | Filly | 4/10/20 |
| Downtown Blues '08 | Weanling | Elusive Quality | Downtown Blues | Bay | Colt | 3/7/20 |
| Dreams and Desires '08 | Weanling | Petionville | Dreams and Desires | Dk B/Br | Colt | 2/24/20 |
| Elegante Chica '08 | Weanling | Petionville | Elegante Chica | Chestnut | Filly | 2/15/20 |
| Flash of Fashion '08 | Weanling | Elusive Quality | Flash Of Fashion | Bay | Filly | 2/12/20 |
| Forest Cat '08 | Foal | Petionville | Forest Cat | Chestnut | Colt | 5/3/20 |
| Houston's Piano '08 | Weanling | Petionville | Houston's Piano | Bay | Filly | 2/20/20 |
| Hushed '08 | Weanling | Petionville | Hushed | Bay | Colt | 3/25/20 |
| Inflammatory '08 | Foal | Petionville | Inflammatory | Chestnut | Colt | 5/5/20 |
| Isla Cozzene '08 | Foal | Petionville | Isla Cozzene | Dk B/Br | Filly | 4/30/20 |
| Isla Mujeres '08 | Weanling | Petionville | Isla Mujeres | Bay | Filly | 3/11/20 |
| Island Fashion '08 | Weanling | Storm Cat | Island Fashion | Dk B/Br | Filly | 2/4/20 |
| It's Silent '05 | Weanling | Petionville | It's Silent | Dk B/Br | Colt | 3/8/20 |
| Just A Wish '08 | Foal | Petionville | Just A Wish | Chestnut | Colt | 5/9/20 |
| Look To Heaven '08 | Foal | Petionville | Look To Heaven | Bay | Colt | 4/13/20 |
| Mighty Might '08 | Weanling | Petionville | Mighty Might | Dk B/Br | Colt | 5/27/20 |
| Mini Dee '08 | Foal | Petionville | Mini Dee | Dk B/Br | Colt | 5/21/20 |
| Minimum Security '08 | Weanling | Petionville | Minimum Security | Dk B/Br | Filly | 3/13/20 |
| No No Pardomo '08 | Foal | Petionville | No No Pardomo | Dk B/Br | Filly | 2/10/20 |
| Out Of Step '08 | Foal | Petionville | Out Of Step | Bay | Filly | 5/18/20 |
| Political Hostage '08 | Weanling | Petionville | Political Hostage | Dk B/Br | Colt | 2/11/20 |
| Purely Excessive '08 | Foal | Petionville | Purely Excessive | Dk B/Br | Colt | 4/20/20 |
| Quiet Whisper '08 | Foal | Petionville | Quiet Whisper | Bay | Filly | 5/19/20 |
| Regal Boot '08 | Weanling | Petionville | Regal Boot | Chestnut | Colt | 3/11/20 |
| Royal Deception '08 | Foal | Petionville | Royal Deception | Dk B/Br | Filly | 4/17/20 |
| Salted With Fire '08 | Foal | Petionville | Salted With Fire | Chestnut | Colt | 5/5/20 |
| Shawshank Lady '08 | Weanling | Petionville | Shawshank Lady | Bay | Colt | 3/17/20 |
| Silent Storm '08 | Weanling | Petionville | Silent Storm | Dk B/Br | Filly | 3/13/20 |
| Six Zeroes '08 | Weanling | Pleasant Tap | Six Zeroes | Dk B/Br | Filly | 3/13/20 |
| So Emotional '08 | Weanling | Petionville | So Emotional | Chestnut | Colt | 4/1/20 |
| Stricter Sister '08 | Weanling | Petionville | Stricter Sister | Chestnut | Filly | 3/2/20 |
| Taurus Moon '08 | Foal | Petionville | Taurus Moon | Dk B/Br | Filly | 4/26/20 |
| Two To Waltz '08 | Foal | Petionville | Two To Waltz | Chestnut | Colt | 5/19/20 |
| Untangled '08 | Weanling | Petionville | Untangled | Chestnut | Colt | 3/24/20 |

Case 3:15-cv-00576-GNS-CHL   Document 87-2   Filed 12/07/17   Page 15 of 16 PageID #: 1823
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 237 of 316
CASE 0:09-cv-02436-MJD-JSM   Document 18-1   Filed 10/26/09   Page 14 of 19

## EVEREST STABLES - WEANLINGS

| Vertical Ascent '08 | Foal | Petionville | Vertical Ascent | Chestnut | Colt | 5/4/2008 |
| Voodoo's Sister '08 | Weanling | Petionville | Voodoo's Sister | Dk B/Br | Colt | 3/12/2008 |

Case 3:15-cv-00576-GNS-CHL   Document 87-2   Filed 12/07/17   Page 16 of 16 PageID #: 1824
CASE 0:21-cv-02289-JWB-JFD   Document 12   Filed 10/15/21   Page 238 of 316
CASE 0:09-cv-02436-MJD-JSM   Document 18-1   Filed 10/26/09   Page 15 of 19

# EXHIBIT 6

| EVEREST STABLES - TWO YEAR OLDS | | | | | | |
|---|---|---|---|---|---|---|
| Fame and Fashion | 2 Yr Old | Petionville | Danzigs Fashion | Gr/Roan | Filly | 2/21/2006 |

# EXHIBIT 3

Case 3:15-cv-00576-GNS-CHL   Document 87-3   Filed 12/07/17   Page 2 of 33 PageID #: 1826
Case 3:15-cv-00576-DJH   Document 1-1   Filed 07/01/19   Page 2 of 33 PageID #: 44
CASE 0:21-cv-02289-JWB-JFD   Doc 1-1   Filed 10/15/21   Page 240 of 316

Page 1

WILLIAM C. RAMBICURE  -  7/7/11
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
at LEXINGTON

---------------------------------------------------

CRESTWOOD FARM BLOODSTOCK, LLC,

        Plaintiff,

    vs.        Civil Action No. 5:09-CV-317-KKC

EVEREST STABLES, INC. and
JEFFREY L. NIELSEN,
        Defendants.

---------------------------------------------------

EVEREST STABLES, INC.,
        Plaintiff,
    vs.        Civil Action No. 5:10-CV-72
LEWIS POPE McLEAN, SR., CRESTWOOD
FARM BLOODSTOCK, LLC, McLEAN
HOLDINGS, LLC and CRESTWOOD FARM,
LLC,

        Defendants.

---------------------------------------------------

DEPOSITION

    The following is the deposition of
WILLIAM C. RAMBICURE, taken before Patricia K. Carl,
RPR, Notary Public, pursuant to Notice of Taking
Deposition, at 301 East Main Street, Lexington,
Kentucky, commencing at approximately 1:10 p.m.,
July 7, 2011.

\* \* \* \* \*

Case 3:15-cv-00576-GNS-CHL   Document 87-3   Filed 12/07/17   Page 3 of 33 PageID #: 1827
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 241 of 316
Case 3:15-cv-00576-DJH   Document 1-3   Filed 07/01/15   Page 3 of 33 PageID #: 45

William C. Rambicure  -  7/7/2011
Crestwood Farm Bloodstock, LLC vs. Everest Stables, Inc., et al.

## Page 2

1    WILLIAM C. RAMBICURE - 7/7/11
2  APPEARANCES:
3
4     On Behalf of Everest Stables, Inc., and
      Jeffrey L. Nielsen:
5         Thomas W. Pahl, Esquire
          FOLEY & MANSFIELD, PLLP
6         250 Marquette Avenue
          Suite 1200
7         Minneapolis, Minnesota 55401
          (612) 338-8788
8         tpahl@foleymansfield.com
9
10    On Behalf of Crestwood Farm Bloodstock, LLC:
11        D. Barry Stilz, Esquire
          KINKEAD & STILZ
12        National City Plaza
          301 East Main Street
13        Suite 800
          Lexington, Kentucky 40507-1520
14        (859) 296-2300
          bstilz@ksattorneys.com
15
16             * * * * *
17
18
19
20
21
22
23
24
25

## Page 3

1    WILLIAM C. RAMBICURE - 7/7/11
2
3    DEPOSITION REFERENCE INDEX
4
5  EXAMINATION
6  By Mr. Stilz: 4
7
8  OBJECTIONS
9  By Mr. Pahl: 34
10
11
12        EXHIBIT INDEX
13  EXHIBIT NO. 266 MARKED, Purchase and Sale
          Agreement dated 11/1/08.................11
14  EXHIBIT NO. 267 MARKED, 11/4/08 e-mail series re:
          Everest/Crestwood Revised Agreement -
15        11-04-08, 9:10 AM, MDT Draft.............31
    EXHIBIT NO. 268 MARKED, 11/4/08 e-mail series re:
16        Everest/Crestwood Revised Agreement......46
    EXHIBIT NO. 269 MARKED, Purchase and Sale Agreement
17        and Bill of Sale.........................51
    EXHIBIT NO. 270 MARKED, 7/31/09 e-mail series re:
18        Yearling Sale Information................53
19
20
21
22
23
24
25

## Page 4

1    WILLIAM C. RAMBICURE - 7/7/11
2          PROCEEDINGS
3      Whereupon, the deposition of WILLIAM C.
4  RAMBICURE was commenced at 1:10 p.m. as follows:
5
6          WILLIAM C. RAMBICURE,
7      after having been first duly sworn,
8      deposes and says under oath as follows:
9             * * *
10
11         EXAMINATION
12  BY MR. STILZ:
13     Q.   Good afternoon, Mr. Rambicure.
14     A.   Mr. Stilz.
15     Q.   Thank you for coming today.  I know you
16  are appearing here pursuant to the notice of
17  deposition that we sent, and Mr. Pahl and I have an
18  agreement, a gentleman's agreement that it will be
19  treated as if you were subpoenaed for your protection
20  and everybody else's protection in this case.
21     A.   Okay.
22     Q.   I want to ask you several questions
23  today.  I'm not going to go through the normal spiel
24  that I would do with a normal witness because I assume
25  you have given a deposition before or at least

## Page 5

1    WILLIAM C. RAMBICURE - 7/7/11
2  participated in a deposition before.
3     A.   I have been deposed before.  I have
4  taken lots of depositions.
5        MR. PAHL:  Before we proceed much
6  further, I do want to make clear, as I think I also
7  indicated in an e-mail at some point, that Everest
8  Stables and Jeff Nielsen have not and are not
9  intending to waive the attorney-client privilege.  I
10  have conveyed that instruction to Mr. Rambicure.
11        There may be instances where we get
12  close and I have told him to, if there is any
13  question, error to the side of either taking a break
14  or at least letting me offer some compromise solution
15  to a yes or a no, but no explanation.  And I just
16  wanted to make sure that you were aware of that in
17  advance.
18        I'm not here as his counsel.  He is a
19  big enough and smart enough lawyer to act as his own
20  counsel, though there is some saying that comes to
21  mind when one does that.  But I am here to make sure
22  and to insure that the attorney-client privilege and
23  work product privileges are both protected.
24  BY MR. STILZ:
25     Q.   I understand that, Mr. Pahl.  It's not

2 (Pages 2 to 5)

Case 3:15-cv-00576-GNS-CHL   Document 87-3   Filed 12/07/17   Page 4 of 33 PageID #: 1828
Case 3:15-cv-00576-DJH   Document 1-3   Filed 07/01/15   Page 4 of 33 PageID #: 46
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 242 of 316

**William C. Rambicure – 7/7/2011**
**Crestwood Farm Bloodstock, LLC vs. Everest Stables, Inc., et al.**

---

**Page 6**

WILLIAM C. RAMBICURE – 7/7/11

1
2  my intention to delve into that today.  If I do get
3  close, I would hope you would remind me.  It's not my
4  intention to get close or make you do something that
5  you feel untoward.
6      A.   I appreciate that.
7      Q.   I don't think we will be very long
8  because of that, Bill.  If I do refer to you as Bill,
9  please do not take that as a slight.
10     A.   I take it as a compliment.
11     Q.   We practiced law together for 22 years
12  now approximately, and if I do slip into calling you
13  Bill rather than Mr. Rambicure, it's only because of
14  that.
15     A.   However you want to call me, I will
16  answer to whatever you call me.
17     Q.   Okay.  All right.  Will you state your
18  name, please.
19     A.   William C. Rambicure.
20     Q.   Mr. Rambicure, what is your address?
21     A.   Home address is 427 West Third Street,
22  Lexington, Kentucky, 40508.  Office address is 219
23  East High Street, Lexington, Kentucky, 40507.
24     Q.   How long have you been a practicing
25  attorney in Kentucky?

---

**Page 7**

WILLIAM C. RAMBICURE – 7/7/11

1
2      A.   Since 1981.
3      Q.   Did you go to the University of
4  Kentucky?
5      A.   I did.
6      Q.   Graduated from the University of
7  Kentucky law school?
8      A.   Yes, sir.
9      Q.   Also the University of Kentucky
10  undergrad?
11     A.   Yes.
12     Q.   Mr. Rambicure, is it fair to say that
13  you have practiced extensively in the equine industry
14  during your practice as a lawyer?
15     A.   I have done a lot of horse work, yes.
16     Q.   You have been involved in several
17  different law firms in Lexington, is that right?
18     A.   Yes, I have.
19     Q.   Could you list the law firms that you
20  have been involved in?
21     A.   Sure.  From 1981 through the end of
22  1989 I was with what was originally Sturgill, Turner
23  and Truitt until 1988 when it became Ogden, Sturgill
24  and Welch.  I left Ogden, Sturgill and Welch in
25  January of 1990 to form a firm named Newberry,

---

**Page 8**

WILLIAM C. RAMBICURE – 7/7/11

1
2  Hargrove and Rambicure.  I was with that firm from
3  January of '90 through probably May or June of 1998
4  and left that firm and started another firm which was
5  initially Rambicure, Miller and Kuebler, PSC.  That
6  firm became for a period of time Rambicure, Miller,
7  Kuebler and Pisacano, PSC.  And then it became
8  Rambicure, Miller and Pisacano, PSC.  And then
9  Rambicure and Miller, PSC.  And is now, it's the same
10  corporate entity but is now known as Rambicure Law
11  Group, PSC.
12     Q.   Thank you.  I didn't mean to make you
13  go through all of that but I appreciate that.  How
14  many horse-related cases would you say that you have
15  been involved in in your 30 years of practice?
16     A.   Barry, I haven't --
17     Q.   Estimate?
18     A.   I haven't counted.
19     Q.   Sure.
20     A.   And in terms of -- most of my practice
21  has been in the litigation side of the horse business.
22  Some, not much on the transactional side.  Hundreds
23  of -- when you include the litigation matters and the
24  transactional deals, it would be in the hundreds.
25     Q.   You have been the chairman of the

---

**Page 9**

WILLIAM C. RAMBICURE – 7/7/11

1
2  equine law section of the Kentucky Bar Association in
3  the past, is that correct?
4      A.   For a very short period of time, yes.
5      Q.   Also chairman of the equine law section
6  of the Fayette County Bar Association?
7      A.   I think that is correct, yes.
8      Q.   I kind of think I may have succeeded
9  Bill in that position.  In your practice, Bill, have
10  you represented both large and small commercial
11  breeders?
12     A.   I would say more tending towards the
13  small than the large.
14     Q.   And you represented commercial boarding
15  farms?
16     A.   Yes.
17     Q.   Plus commercial stallion farms?
18     A.   Yes.
19     Q.   Who are some of your commercial
20  boarding farm clients that you have represented in the
21  past?
22     A.   Oh, gosh, well, you've got boarding and
23  kind of sales prep.
24     Q.   Right.
25     A.   So you've got Claire Reese at Rockwell.

---

3 (Pages 6 to 9)

Case 3:15-cv-00576-GNS-CHL   Document 87-3   Filed 12/07/17   Page 5 of 33 PageID #: 1829
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 243 of 316
Case 3:15-cv-00576-DJH   Document 1-3   Filed 07/01/15   Page 5 of 93 PageID #: 47

William C. Rambicure  -  7/7/2011
Crestwood Farm Bloodstock, LLC vs. Everest Stables, Inc., et al.

---

**Page 10**

WILLIAM C. RAMBICURE - 7/7/11

1
2   You have, going back to the very early days, I did
3   legal work for, mainly through Don Sturgill, but
4   worked for Spendthrift. Some work for Airdrie stud.
5   Some work for a number of saddlebred operations, and
6   Linda Johnson when she was in the horse business.
7   Right now it's more individuals as opposed to boarding
8   farms or breeding farms.
9        Q.   What brings us here today is a dispute
10  between Jeffrey Nielsen, Everest Stables, Inc. and the
11  Crestwood parties, Crestwood Farm Bloodstock, LLC,
12  Pope McLean, Senior, and I believe an entity known as
13  McLean Holdings, LLC.  As I understand you are counsel
14  for, local counsel for Mr. Nielsen?
15       A.   Yes.
16       Q.   And Everest Stables, Inc., is that
17  correct?
18       A.   That is correct.
19       Q.   You have given testimony in this case
20  at a preliminary injunction hearing, is that correct?
21       A.   Yes.
22       Q.   Back in May, I think May 26 of 2010,
23  does that sound about right?
24       A.   That sounds about right.
25       Q.   Have you had a chance to review that

---

**Page 11**

WILLIAM C. RAMBICURE - 7/7/11

1
2   testimony in preparation for today's deposition?
3        A.   I read through my portion of the
4   testimony this morning.
5        Q.   I understand there were other people
6   that gave testimony, but you just read your portion of
7   it?
8        A.   Yes.
9        Q.   I am not going to try to retell any
10  ground, I may have to a little bit, but primarily I
11  was just going to go over a couple of things with you
12  and we'll try to get out of here in fairly short
13  order.
14       Before we started, you know you and I
15  have practiced some cases together before and know I
16  can be fairly brief and not too long.  I will try to
17  do that and I do appreciate your time, of taking your
18  time out of a busy schedule to be here today.
19       A.   Sure.
20       (Whereupon, Rambicure Deposition
21       Exhibit No. 266 was marked for
22       identification.)
23  BY MR. STILZ:
24       Q.   Mr. Rambicure, I have given you what
25  has been marked as Exhibit 266, which is a purchase

---

**Page 12**

WILLIAM C. RAMBICURE - 7/7/11

1
2   and sale agreement dated, actually on the front it's
3   dated November 1st, 2008, but I think the actual
4   execution date of it was November 4th, 2008?
5        A.   Yes.
6        Q.   Are you familiar with that document,
7   Mr. Rambicure?
8        A.   Yes.  I have seen it before.
9        Q.   In fact, you assisted in drafting that
10  document, is that correct?
11       A.   Yes, I did, although I didn't -- at the
12  bottom of each of the pages it has Longenecker.
13       Q.   I understand that.  I understand that.
14  This is a duplicative document.  I believe the other
15  document may have been Exhibit 55, and I couldn't lay
16  my hands on that today, so we marked this as Exhibit
17  266 for the purposes of your deposition.
18       A.   Sure.
19       Q.   The actual way this document looks may
20  differ slightly from that document.  The other one may
21  not have a Longenecker Bates stamp number here.
22       A.   Okay.
23       Q.   You were engaged by Everest Stables and
24  Jeffrey Nielsen to assist in the drafting of this
25  document, is that correct?

---

**Page 13**

WILLIAM C. RAMBICURE - 7/7/11

1
2        A.   In part, yes, um-hum.
3        Q.   In part, what do you mean by "in part"?
4        A.   Well, I was engaged initially in early
5   October of 2008 to assist in connection with Everest's
6   business decisions to begin reducing the amount of its
7   holdings and horses in an orderly fashion.  That
8   included but was not limited to this agreement.  There
9   were other transactions that were also part of that
10  engagement.
11       Q.   I may ask you about some of those that
12  may come up in a little bit, but I'm referring to this
13  transaction.
14       A.   This was part of -- part of the --
15  ultimately part of the engagement.
16       Q.   Okay.  Who engaged you?
17       A.   Mr. Nielsen individually and on behalf
18  of Everest Stables, Inc.
19       Q.   He actually was the one that engaged
20  you?
21       A.   Yes.
22       Q.   Had you done prior work for Mr.
23  Nielsen?
24       A.   I had.
25       Q.   How often or how many times prior to

---

4  (Pages 10 to 13)

Case 3:15-cv-00576-GNS-CHL Document 87-3 Filed 12/07/17 Page 6 of 33 PageID #: 1830
CASE 0:21-cv-02289-JWB-JFD Doc. 1-1 Filed 10/15/21 Page 244 of 316
Case 3:15-cv-00576-DJH Document 1-3 Filed 07/01/15 Page 6 of 33 PageID #: 48

William C. Rambicure - 7/7/2011
Crestwood Farm Bloodstock, LLC vs. Everest Stables, Inc., et al.

Page 14

```
 1        WILLIAM C. RAMBICURE - 7/7/11
 2   October of 2008 had you done legal work for Mr.
 3   Nielsen or Everest Stables?
 4        A.   The first time that I did work for Mr.
 5   Nielsen and Everest was, I want to say it goes back
 6   into the 1990's time period.  My recollection is that
 7   the first matter that I was engaged to assist him on
 8   was a matter involving a fellow by the name of William
 9   Robinson, some pending, already pending litigation in
10   Fayette Circuit Court that he asked me to take over
11   the representation of Everest Stables and him from Jim
12   Philpott.
13        Then I also assisted at Mr. Pahl's
14   request, as I recall, in some other litigation that
15   kind of flowed out of the Robinson litigation in which
16   Mr. Pahl was lead counsel in the matter involving Rick
17   Trontz in terms of providing information and
18   documentation from the underlying Robinson litigation,
19   and ultimately I was a witness in that case as well.
20        Jeff otherwise would periodically call
21   me up from time to time on just legal advice in
22   connection with the horse business related matters,
23   but I think that this current issues that we are
24   dealing with would probably be the third formal
25   engagement in which I had been retained to represent
```

Page 15

```
 1        WILLIAM C. RAMBICURE - 7/7/11
 2   Jeff and Everest.
 3        Q.   Okay.  So you were involved in
 4   litigation involving Rick Trontz?
 5        A.   Yeah, but my recollection, Barry, is
 6   that was not as counsel or local counsel.  It was in
 7   the context of a witness and also providing
 8   information and documentation relating to the
 9   Robinson, portions of the Robinson litigation that
10   related to the Trontz litigation.
11        Q.   Going back to the matter involving
12   William Robinson, you took over from Jim Philpott?
13        A.   I did.
14        Q.   Did you act as counsel; I believe there
15   was some sort of arbitration?
16        A.   I did.  There was an arbitration
17   proceeding before Frank Becker.
18        Q.   Frank Becker.  And you were counsel for
19   Mr. Nielsen or Everest Stables in that matter, is that
20   correct?
21        A.   Yes.
22        Q.   Mr. Rambicure, do you remember when
23   that arbitration was?
24        A.   I really don't, Barry.  It was back
25   probably --
```

Page 16

```
 1        WILLIAM C. RAMBICURE - 7/7/11
 2        Q.   Late '90's?
 3        A.   Late '90's or early 2000's.  I don't
 4   recall the specific date.  I remember that we actually
 5   had an arbitration, trial or hearing in front of Mr.
 6   Becker, and then we filed State Court proceedings
 7   after that to try to set aside some of his rulings,
 8   and then at some point in that process, Mr. Pahl
 9   became involved and the post arbitration hearing Court
10   proceedings on behalf of Everest.
11        Q.   But over the years since that
12   involvement with Bill Robinson, you have acted on a
13   periodic basis for Mr. Nielsen or Everest Stables, is
14   that correct?
15        A.   On an as-needed basis.
16        Q.   Do you know how many times he might
17   have contacted you?
18        A.   I don't because in terms of billing
19   matters, where I would submit a bill to him for
20   services rendered, I think those occasions are limited
21   to the Robinson engagement, the -- I don't believe on
22   the Trontz matter that was a legal engagement for
23   which I could bill or did bill.  I think that was more
24   in the nature of just a witness again, and then this
25   matter, and then this litigation that flowed from this
```

Page 17

```
 1        WILLIAM C. RAMBICURE - 7/7/11
 2   engagement back in October of '08.
 3        So that to me was a discrete and
 4   separate representation that flowed out of the earlier
 5   representation in connection with the drafting of the
 6   agreement.
 7        Q.   So those are the three you are talking
 8   about, is the Robinson?
 9        A.   Yes, and Tom may refresh me.  I think
10   that is it.
11        Q.   I am just trying to get at what you
12   remember.  The Robinson engagement, the drafting of
13   the November 4th agreement, we'll call it?
14        A.   Right.
15        Q.   And litigation?
16        A.   And then the litigation matter, and
17   that came -- I was contacted on the latter in June I
18   think of 2009 to assist at that point in time Mr.
19   Nielsen and Everest had been, were continuing to be
20   represented by George Eck, another attorney from
21   Minneapolis, and then Tom got involved in it at some
22   point in time after that I believe.  I couldn't tell
23   you when.  But those are the three discrete matters.
24        Q.   I don't get to ask him questions.
25        MR. PAHL:  I will tell you.
```

Depo International, Inc.
(763) 591-0535 or (800) 591-9722 admin@depointernational.com

Case 3:15-cv-00576-GNS-CHL   Document 87-3   Filed 12/07/17   Page 7 of 33 PageID #: 1831
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 245 of 316
Case 3:15-cv-00576-DJH   Document 1-3   Filed 07/01/15   Page 7 of 33 PageID #: 49

William C. Rambicure  -  7/7/2011
Crestwood Farm Bloodstock, LLC vs. Everest Stables, Inc., et al.

Page 18

1     WILLIAM C. RAMBICURE - 7/7/11
2     THE WITNESS:  Those are the three
3  discrete matters that come to mind for which I had
4  opened a file.
5  BY MR. STILZ:
6     Q.   That is what I'm looking for, are the
7  matters.  I'm not looking for if he called you
8  periodically over time.  There is no way you could
9  probably remember that.
10    A.   Right.
11    Q.   Going back to your engagement in
12  October of 2008, what was your task, what were you
13  tasked with; were you involved in the negotiation of
14  the November 4th agreement?
15    A.   No.  I was not tasked with the
16  negotiation.  Initially I was, as I viewed it, I was
17  kind of hired to serve as a -- to provide legal advice
18  when and as needed as it related to assisting and
19  accomplishing the plan, so to speak, of reducing the
20  horse ownership interest and the associated duties and
21  responsibilities both from a management perspective
22  and from a financial perspective of Everest Stables.
23  And so that would have included assisting not in the
24  negotiation of the deals.  My take and my
25  understanding is that Jeff Nielsen was the negotiator.

Page 19

1     WILLIAM C. RAMBICURE - 7/7/11
2  He's a businessman and very strong negotiator, and
3  then I would be informed in terms of what the deal
4  was, and then I would try to draft an agreement
5  consistent with what had been communicated to me in
6  terms of what the deal was.
7     So my role was as a scrivener in large
8  part and also to try to, from a legal standpoint,
9  protect Mr. Nielsen's and Everest Stables' interest in
10  connection with the contemplated transaction.  And
11  this was part, but not all of the contemplated
12  transactions, so.
13    Q.   There were other transactions?
14    A.   There were other, there were other,
15  yes, there were other purchase and sale agreements
16  that were involved for other horses that were what I
17  would call non-Crestwood horses.  Mr. Nielsen and
18  Everest had horses in states other than Kentucky, such
19  as California that he was likewise in the process of
20  considering selling.  So there were drafting of
21  agreements relating to some of those other horses from
22  other states as well.
23    Q.   You mentioned California.  Were you
24  involved in a transaction involving Tommy Town
25  Thoroughbreds, is that what you are referring to?

Page 20

1     WILLIAM C. RAMBICURE - 7/7/11
2     A.   I remember the Tommy Town, Barry,
3  and I think that that was one of the agreements that I
4  reviewed.  I don't think that I drafted that
5  agreement.
6     Q.   What about an agreement or a proposed
7  agreement involving Jimmy and Meg Miranda?
8     A.   I remember reviewing and commenting on
9  it and making suggested revisions to that agreement.
10    Q.   But you didn't have anything to do with
11  the drafting of it per se?
12    A.   I think on both of those instances, I
13  think that I was provided with a preliminary draft,
14  and as I recall Tim Nelson e-mailed it to me on both
15  occasions and that I reviewed and commented on and
16  made proposed revisions to both of those agreements,
17  but in terms of was I a drafter, I guess I was a
18  partial drafter.
19    Q.   Right.  Okay.  Other than the Tommy
20  Town transaction or the California transaction,
21  California Tommy Town transaction, the Miranda
22  transaction and Crestwood transaction, were there
23  other transactions in October of 2008?
24    A.   There was a $2 million horse sale
25  transaction that I remember the same kind of deal,

Page 21

1     WILLIAM C. RAMBICURE - 7/7/11
2  receiving a preliminary draft of an agreement and
3  commenting on and making proposed revisions to that
4  one.
5     Q.   Did that involve the horse TWO-STEP
6  SALSA?
7     A.   That is the one, yes.
8     Q.   I can't remember the gentleman's name
9  that purchased the horse, Jesus Avilla?
10    A.   Avilla.
11    Q.   Were there also some transactions
12  involving Rogelio Canani in October of 2008?
13    A.   Yes, I believe there were.  But I
14  couldn't tell you which horse.
15    Q.   Is that some of the California
16  transactions you are referring to?
17    A.   Yes.
18    Q.   I don't want to just limit the
19  California transactions to the Tommy Town.
20    A.   I understand there were other horses.
21    Q.   You are talking about TWO STEP SALSA
22  and couple of other race horses?
23    A.   For instance, there was another
24  agreement, and I can't even remember the name of the
25  buyers, one involving 39 mares and 13 foals, I think.

6  (Pages 18 to 21)

Case 3:15-cv-00576-GNS-CHL   Document 87-3   Filed 12/07/17   Page 8 of 33 PageID #: 1832
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 246 of 316
Case 3:15-cv-00576-DJH   Document 1-3   Filed 07/01/15   Page 8 of 93 PageID #: 50

William C. Rambicure  -  7/7/2011
Crestwood Farm Bloodstock, LLC vs. Everest Stables, Inc., et al.

## Page 22

```
 1    WILLIAM C. RAMBICURE - 7/7/11
 2  I can't even remember who.
 3    Q.   Would that be the Tommy Town?
 4    A.   That may be the Tommy Town one.
 5    Q.   If I told you a guy by the name of Mike
 6  Allen, does that sound familiar?
 7    A.   Yeah, that sounds familiar.
 8    Q.   Was that a transaction involving Mr.
 9  Allen?
10    A.   Barry, I would have to go back and pull
11  the documents.  That rings a bell, but I just don't
12  know if that was that particular transaction or not.
13    Q.   With regard to that transaction, did
14  you do any of the drafting of the document?
15    A.   The same sort of a deal, I would get a
16  draft of an agreement that would be either faxed or
17  e-mailed to me for review and comment.  I would review
18  and comment and then return that, and then, so to that
19  extent I would have had input into the drafting, but I
20  don't believe that I would have been the scrivener,
21  the real drafter of that document, of those documents.
22    Q.   Is it fair to say that you were more
23  involved in the drafting of Exhibit 266 than you were
24  in those other documents or in those other
25  transactions?
```

## Page 23

```
 1    WILLIAM C. RAMBICURE - 7/7/11
 2    A.   I think that is fair to say, yes.
 3    Q.   I believe that you testified in your
 4  prior testimony in this case that what is marked as
 5  Exhibit 266 being the final signed version of the
 6  purchase and sale agreement, went through several
 7  drafts, is that correct?
 8    A.   Yes, it did.
 9    Q.   How many drafts do you recall?
10    A.   One, two, three, four, at least four
11  before this.
12    Q.   Four before that?
13    A.   Yes.
14    Q.   Okay.  Were the drafts resulting from
15  comments from Crestwood, the Crestwood parties?
16    A.   Well, I'm not sure.
17    Q.   Let me withdraw that question.  That is
18  a bad question.
19         Did you have any, and I think you
20  testified to this, Bill, but I want to make sure, did
21  you have any contact with anybody from Crestwood, the
22  Crestwood parties during the time leading up to the
23  execution of the purchase and sale agreement, 266?
24    A.   The only contact that I can recall
25  having, Barry, was there were two things as this
```

## Page 24

```
 1    WILLIAM C. RAMBICURE - 7/7/11
 2  evolved.  One was we needed to get a list of the
 3  horses from Crestwood.  And I remember that there was
 4  a preliminary communication that I am fairly certain
 5  that I spoke with Pope Senior to get a copy or to
 6  request a copy of a listing of all of the horses that
 7  were Everest horses that were out there at Crestwood.
 8  And so in response to that, there was a fax from Pope
 9  or Crestwood on or about October 14th with a listing
10  of some 160 horses.  I don't recall any negotiations
11  or communications that I participated in with Pope
12  Senior or Pope Junior.  I don't think I ever even
13  talked to Pope Junior at any point in time throughout
14  this process.
15         The bulk of my communications would
16  have been with Mr. Nielsen, again him telling me what.
17    Q.   I don't want you to tell me what he
18  said or didn't say.  Most of, the bulk of your
19  communications would have been Mr. Nielsen?
20    A.   Yes.
21    Q.   Did you also communicate with Tim
22  Nelson?
23    A.   Yes.  There were communications with
24  Tim as well.
25    Q.   Who is Tim Nelson?
```

## Page 25

```
 1    WILLIAM C. RAMBICURE - 7/7/11
 2    A.   Tim Nelson is a Colorado resident, I
 3  believe.  He is at least from my view of the world
 4  kind of an advisor and confidante of Jeff Nielsen's.
 5  Tim is a lawyer or was a lawyer.  I don't know if he
 6  still is a lawyer.  But I know he was a lawyer, that
 7  he was licensed to practice law.  I don't think that
 8  he is actively practicing law and hasn't for some
 9  time, but I kind of view Tim as one of Jeff's, if not
10  Jeff's only, one of his main right-hand guys.
11    Q.   That was going to be the follow-up
12  question.  I think you described him in prior
13  testimony as his right-hand man?
14    A.   Yes.
15    Q.   Is that your still your understanding?
16    A.   Yes.  I think that is fair to say,
17  although he didn't physically operate out of the
18  Everest offices in Minneapolis or Minnesota, excuse
19  me.
20    Q.   I think you just testified that you
21  don't recall being involved in any discussions,
22  communications with Pope Senior or Pope Junior with
23  regard to the negotiation of this November 4th
24  agreement?
25    A.   I don't recall any.  I guess it's
```

7 (Pages 22 to 25)

Case 3:15-cv-00576-GNS-CHL Document 87-3 Filed 12/07/17 Page 9 of 33 PageID #: 1833
CASE 0:21-cv-02289-JWB-JFD Doc. 1-1 Filed 10/15/21 Page 247 of 316
Case 3:15-cv-00576-DJH Document 1-3 Filed 07/01/15 Page 9 of 33 PageID #: 51

William C. Rambicure - 7/7/2011
Crestwood Farm Bloodstock, LLC vs. Everest Stables, Inc., et al.

| Page 26 | Page 28 |
|---|---|

**Page 26**

WILLIAM C. RAMBICURE - 7/7/11

1  conceivable that there may have been a conference call
2  between Pope, Jeff and me, but I don't recall any
3  negotiations, so to speak, that I participated in with
4  Pope or anybody else from Crestwood.
5
6      Q.   There was some testimony yesterday in
7  Mr. McLean Senior's deposition, I know you weren't
8  here for that, but he seemed to recall once or twice
9  being on a conference call with you and Jeff Nielsen
10  where the terms or certain of these terms in this
11  November 4th agreement were negotiated?
12      A.   He may be right. I don't remember
13  that. He may be right.
14      Q.   I am guessing if you don't remember the
15  call, you don't remember what was said, is that
16  correct?
17      A.   No. I mean, and here's part of the
18  problem, is I'm not sure if it came directly from Pope
19  in a conference call with Jeff or if it came in
20  something Jeff told me. I do have a general
21  recollection of Pope -- pushing back may not be the
22  right word, but expressing some reluctance about this
23  deal without some sort of minimum guaranties. So I do
24  remember that, and that may have been in a conference
25  call with Pope and Jeff, but it may have just been in

**Page 27**

WILLIAM C. RAMBICURE - 7/7/11

1  a call between me and Jeff. I don't know.
2          MR. PAHL:  Because it is uncertainty, I
3  can interrupt it, but my point is we are getting close to
4  the line.
5          MR. STILZ:  I understand, Mr. Pahl if
6  there is an inadvertent waiver, I'm certainly not
7  going to delve into that. That is not my intention at
8  all.
9          MR. PAHL:  I appreciate that, Barry.
10  BY MR. STILZ:
11      Q.   When you say Mr. McLean Senior was
12  pushing back, do you have any recollection of ever
13  hearing that personally from Mr. McLean Senior; as you
14  sit here today do you have a recollection?
15      A.   I have some vague memory of him, and
16  pushing back may not be the exact right verbiage. I
17  mean what I remember was an expression of concern in
18  terms of the risk that they would be taking and
19  offsetting that risk in some fashion with guaranties.
20      Q.   Did you ever hear Mr. McLean Senior, do
21  you have a recollection of Mr. McLean Senior saying
22  "Why don't we just go back to the way we used to do
23  it, where you pay the board bills and pay the
24  commissions," is that something you may have heard?

**Page 28**

WILLIAM C. RAMBICURE - 7/7/11

1
2      A.   I don't recall that, Barry. I don't
3  recall that.
4      Q.   Words to that effect?
5      A.   I don't recall that. But if Pope and
6  Jeff recall that, I would not say that they are wrong.
7  I just don't recall that.
8      Q.   Were there drafts of this purchase and
9  sale agreement that were prepared and were not sent to
10  Crestwood or Crestwood parties for their review, do
11  you recall?
12      A.   I know that there were drafts prepared.
13  I know that I prepared an initial draft on October
14  14th, and I know that I did not send that draft to
15  Pope or to anybody at Crestwood. I know that I did
16  e-mail that draft.
17      Q.   Understand. You e-mailed that to your
18  client, I'm sure?
19      A.   I e-mailed the draft to the client, and
20  I know that there were -- from October 14th through
21  maybe the 17th, there were three more drafts,
22  different drafts, revised drafts that were prepared,
23  and likewise, e-mailed to the client, but not, again,
24  I did not, I was not asked -- I did not e-mail or send
25  any of those very preliminary drafts to Crestwood or

**Page 29**

WILLIAM C. RAMBICURE - 7/7/11

1
2  to any representative of Crestwood.
3      Q.   To your knowledge, and I'm not asking
4  -- off the record.
5          (Discussion had off the record.)
6  BY MR. STILZ:
7      Q.   Mr. Rambicure, you have just testified
8  that there were possibly three more preliminary drafts
9  done of this purchase and sale agreement that we are
10  talking about here?
11      A.   Yes.
12      Q.   Between the Crestwood parties and
13  Everest Stables?
14      A.   Yes.
15      Q.   Between October 14th and October 17th?
16      A.   That is correct.
17      Q.   Roughly.
18      A.   Roughly, in that general time period.
19  Maybe the 18th, but I think it was the 14th through
20  the 18th.
21      Q.   To your knowledge, Mr. Rambicure, did
22  you see any comments from anyone connected with the
23  Crestwood parties that resulted in changes being made
24  in those drafts?
25      A.   I saw no comments, no, I saw no

8 (Pages 26 to 29)

Case 3:15-cv-00576-GNS-CHL   Document 87-3   Filed 12/07/17   Page 10 of 33 PageID #: 1834
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 248 of 316
Case 3:15-cv-00576-DJH   Document 1-3   Filed 07/01/15   Page 10 of 93 PageID #: 52

William C. Rambicure  -  7/7/2011
Crestwood Farm Bloodstock, LLC vs. Everest Stables, Inc., et al.

| Page 30 | Page 32 |
|---|---|

**Page 30**

1  WILLIAM C. RAMBICURE - 7/7/11
2  comments. In other words --
3      Q.   From Crestwood parties?
4      A.   From Crestwood or the Crestwood
5  parties. I was not in direct contact with or
6  communication with the Crestwood parties.
7          MR. PAHL:  Or even indirect, someone
8  sharing Crestwood's comments in writing.
9          THE WITNESS:  That is where you get in.
10         MR. STILZ:  I think that may be
11  violating.
12         MR. PAHL:  But in writing.
13  BY MR. STILZ:
14     Q.   In writing. Okay. I will add that
15  caveat.
16     A.   I don't recall seeing anything in
17  writing setting forth Crestwood's comments.
18     Q.   And you had no contact with anyone
19  representing or on behalf of Crestwood parties?
20     A.   Other than what I just mentioned to
21  you, and then the only other one that I was going to
22  -- I started going down the path of was on November
23  4th I did see comments, written comments via an e-mail
24  that had been forwarded, it was David Longenecker's
25  e-mail with his comments that had been sent to Pope or

**Page 31**

1  WILLIAM C. RAMBICURE - 7/7/11
2  Pope Senior or Junior, and in turn had been sent to
3  Mr. Nelson, and then I in turn saw those comments.
4
5          (Whereupon, Rambicure Deposition
6          Exhibit No. 267 was marked for
7          identification.)
8  BY MR. STILZ:
9      Q.   Mr. Rambicure, I hand you a document
10  marked Exhibit 267 and ask you if you would review
11  that?
12     A.   Yes. That is the one I am referring
13  to.
14     Q.   Is that the document you are referring
15  to?
16     A.   Yes.
17     Q.   These documents were provided to me by
18  Mr. Pahl on behalf of his client in this case.
19     A.   Okay. Very good.
20     Q.   Those are the documents that you said
21  you first saw or comments you say that you saw on
22  November 4th, 2008?
23     A.   Yes.
24     Q.   The only other contact that you
25  directly had with anybody on behalf of Crestwood

**Page 32**

1  WILLIAM C. RAMBICURE - 7/7/11
2  parties was sometime in mid October when you called to
3  get a list of mares, that you recall?
4      A.   That is all that I recall.
5      Q.   I think you testified that you could
6  have possibly been on some conference calls with Mr.
7  Nielsen and Mr. McLean Senior, you just don't recall?
8      A.   I just don't recall. I do recall there
9  was so much going on at this point in time, and so
10  many calls while I was doing other work for other
11  clients, that I don't -- sometimes they merge into one
12  another. And so that is part of the problem. I may
13  very well have had another conference call with Pope
14  and Jeff and I just don't specifically recall it.
15     Q.   Okay. With regard to these three prior
16  drafts that you prepared of this document between
17  October 14th and October 18th, 2008, do you know,
18  sitting here today, whether those were forwarded on to
19  anyone at Crestwood?
20     A.   I do not know the answer to that.
21     Q.   Consequently, I want to ask you one
22  question that I'm sure Mr. Pahl is going to object to
23  and we may move on if he does: Do you know if those
24  were, those drafts were significantly different in
25  terms of percentages that went to various parties, and

**Page 33**

1  WILLIAM C. RAMBICURE - 7/7/11
2  he may object if he wants to?
3          MR. PAHL:  Well, what I'm struggling
4  with, Barry, is that precise question may not
5  constitute for the purpose of securing legal advice.
6  So I think --
7          MR. STILZ:  Maybe I can ask it a
8  different way because I think Mr. Nielsen testified,
9  if I am remembering his testimony, that there were
10  drafts that had I think 5 percent initially to
11  Crestwood and there was one that went to 10 and one
12  that went to 20.
13         MR. PAHL:  What I was really going to
14  say is I think he can answer your question yes or no,
15  but he can't answer beyond that. Here's the question,
16  let me just repeat it for you: "Do you know if those
17  were, those drafts were significantly different in
18  terms of percentages that went to the various parties,
19  and he may object if he wants to." I think he can
20  answer that, yes or no.
21         MR. STILZ:  Okay.
22         THE WITNESS:  Then I think the answer
23  to that is yes.
24  BY MR. STILZ:
25     Q.   Mr. Nielsen has testified in this case

9  (Pages 30 to 33)

Depo International, Inc.
(763) 591-0535 or (800) 591-9722 admin@depointernational.com

Case 3:15-cv-00576-GNS-CHL   Document 87-3   Filed 12/07/17   Page 11 of 33 PageID #: 1835
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 249 of 316
Case 3:15-cv-00576-DJH   Document 1-3   Filed 07/01/15   Page 11 of 33 PageID #: 53

William C. Rambicure - 7/7/2011
Crestwood Farm Bloodstock, LLC vs. Everest Stables, Inc., et al.

**Page 34**

```
1              WILLIAM C. RAMBICURE - 7/7/11
2   it's his recollection that there were drafts, one
3   draft that included a 5 percent distribution to
4   Crestwood, another that included 10 percent
5   distribution to Crestwood, and another one that
6   included a 20 percent distribution to Crestwood.
7           MR. PAHL: I'm going to object to the
8   extent that it characterizes Mr. Nielsen's testimony,
9   and I will give you one, I believe he testified that
10  the discussions he had with Pope Senior went from 5 to
11  10 to 20, and so if you couch it as the discussions, I
12  won't have a problem with that.  He may have said
13  "drafts," but I don't think so.
14          MR. STILZ: I thought it was drafts.
15  If you want to object to that, just object and we'll
16  move on.  What do you want him to do?  And I'm doing
17  this I hope, Tom, you understand I'm doing this out of
18  respect for the attorney-client privilege, and I don't
19  want there to be some waiver, but it's my recollection
20  he testified, as to what those drafts contained.
21          MR. PAHL:  Off the record.
22          (Discussion had off the record.)
23          MR. PAHL:  I am going to let him answer
24  that question with the understanding that it's not a
25  waiver.
```

**Page 35**

```
1             WILLIAM C. RAMBICURE - 7/7/11
2           MR. STILZ: Yes, sir.
3           THE WITNESS: Okay. To the extent that
4   is what Jeff testified to, that would be consistent
5   with my recollection of what happened.
6   BY MR. STILZ:
7       Q.   Those were those three drafts that
8   occurred between October 14th and 18th of 2008?
9       A.   I also want to say that I have a
10  recollection of an 80/20 split that was for some
11  horses, and a smaller split, the 5 percent split for
12  other horses that I believe was in the initial draft.
13      Q.   Okay.  I have not been provided those
14  drafts.
15      A.   I understand.
16      Q.   On the basis of the attorney-client
17  privilege, and I respect that, and I am not going to
18  delve into that too much.  I'm not trying to pick
19  around and get you to say something that you don't
20  need to say, and I hope you understand that.  I'm just
21  trying to see what, if you were called at trial, what
22  you would tell this jury.
23      A.   Well, I would tell the jury what I just
24  told you, and that my recollection is consistent with
25  what Mr. Nielsen's recollection was, as you generally
```

**Page 36**

```
1             WILLIAM C. RAMBICURE - 7/7/11
2   described it, that the percentages increased from
3   draft to draft to draft.  The guaranties, even in the
4   initial draft there were guaranties, but I think those
5   were a moving target, too.
6       Q.   I don't want you to testify to the
7   guaranties or lack thereof or what, because I don't
8   think Mr. Nielsen testified to that.  If he did, I
9   don't recall it.  I think he may have --
10          MR. PAHL: He did.
11  BY MR. STILZ:
12      Q.   -- generally have said something about
13  it, but I certainly don't want you to delve into the
14  specifics of what those were.
15          Mr. Rambicure, do you recall when the
16  first draft of this purchase and sale agreement to
17  your knowledge was sent to Crestwood?
18      A.   I don't know the answer to that, Barry.
19  My guess it would be late October, but I don't know
20  specifically because I wasn't copied on whatever was
21  transmitted, however that was transmitted.
22      Q.   Okay.  Fair enough.  Looking at Exhibit
23  266, I think you gave a significant amount of
24  testimony at the preliminary injunction hearing
25  regarding paragraph 7?
```

**Page 37**

```
1            WILLIAM C. RAMBICURE - 7/7/11
2       A.   Yes.
3       Q.   Of that document.  With regard to the
4   abilities or lack of abilities to RNA or buy back
5   certain horses?
6       A.   Yes.
7       Q.   And I think your testimony was that
8   Crestwood was prohibited from RNA'g or buying back
9   horses because Mr. Nielsen wanted to insure that there
10  was an amount of proceeds that he could get his
11  percentage out of, is that correct, that is a rough
12  characterization?
13      A.   That is a rough characterization but
14  pretty close to what I was saying.
15      Q.   I think it was your testimony that
16  Everest or Mr. Nielsen wasn't prohibited from RNA'g at
17  least the two horses that title was not transferred
18  to, is that correct?
19      A.   That is correct, those two horses being
20  ISLAND FASHION and 2008 STORM CAT ISLAND FASHION
21  filly.
22      Q.   Right.
23      A.   Yes.
24      Q.   You understand, do you not, Mr.
25  Rambicure, from drafting this document, that Crestwood
```

10  (Pages 34 to 37)

Depo International, Inc.
(763) 591-0535 or (800) 591-9722 admin@depointernational.com

Case 3:15-cv-00576-GNS-CHL   Document 87-3   Filed 12/07/17   Page 12 of 33 PageID #: 1836
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 250 of 316
Case 3:15-cv-00576-DJH   Document 1-3   Filed 07/01/15   Page 12 of 33 PageID #: 54

William C. Rambicure - 7/7/2011
Crestwood Farm Bloodstock, LLC vs. Everest Stables, Inc., et al.

## Page 38

WILLIAM C. RAMBICURE - 7/7/11

1 was to receive a certain percentage from the sale of
2 ISLAND FASHION and the 2008 STORM CAT ISLAND FASHION?
3
4     A.   I understood that should those horses
5 be sold and should there be net proceeds from the sale
6 of those, that they would be entitled to their
7 percentage, yes.
8     Q.   And that percentage was 25 percent, Mr.
9 Nielsen received 75 percent up to a point and then he
10 received 100 percent I believe over a million dollars?
11     A.   I think it depends on which of the two
12 horses.
13     Q.   With regard to the 2008 STORM CAT?
14     A.   The 2008 STORM CAT as I recall it,
15 anything over a million dollars in net sale proceeds,
16 100 percent of that was to go to Everest.  Up to that
17 one million was to be split 75/25, 25 going to
18 Crestwood.
19     Q.   Now, this document, this November 4th
20 agreement, Exhibit 266, called for Crestwood to pay
21 all expenses of these horses, correct, from November
22 4th, 2008, until they were sold?
23     A.   I believe that is correct.  That was
24 kind of a fundamental underpining of this agreement,
25 was that Crestwood would assume and pay all of the

## Page 39

WILLIAM C. RAMBICURE - 7/7/11

1
2 out-of-pocket expenses associated with the care and
3 upkeep of these horses, all of the subject horses
4 under the terms of the agreement, and that they would
5 hold Everest and Mr. Nielsen harmless from those
6 expenses and costs.
7     Q.   And that included the expenses on the
8 two horses that were not transferred, title was not
9 transferred to them, is that correct?
10     A.   That is correct.
11     Q.   That including the ISLAND FASHION and
12 her 2008 STORM CAT?
13     A.   That is correct I guess the only other
14 point, I don't even know if I need to make it, all of
15 this was subject to the entire terms and conditions
16 and provisions of this agreement, which included, but
17 not limited to, Crestwood being required to exercise
18 all commercially reasonable efforts with utmost good
19 faith on behalf of both Everest and Crestwood to
20 properly prepare the horses for sale and market the
21 horses, and to market, offer for sale and to sell the
22 subject horses, either at public auction or in private
23 sales, in order to maximize the sales price for each
24 such horse.
25     The agreement has to be read as a

## Page 40

WILLIAM C. RAMBICURE - 7/7/11

1 whole.
2
3     Q.   I understand that.  It was to each
4 party's benefit to maximize the sales price of these
5 particular horses, is that correct?
6     A.   Assuming that both sides are acting in
7 good faith, that is correct.
8     Q.   Do you have concerns that either party
9 were not acting in good faith?
10     A.   Not at the time that I was drafting the
11 agreement, but I think the underlying assumption was
12 that both parties would act with utmost good faith
13 towards the other, particularly given the length and
14 the dealings that they had, length of the history of
15 the relationship.
16     At the same time, as a drafter or
17 scrivener of an agreement, what you want to do is to
18 try to build in protections for your client in the
19 event that something that you don't really anticipate
20 happening happens.  And so that was part of -- a big
21 part of the reasons for the language in paragraph 7.
22     And I don't know where it is right now,
23 Barry, but there were some other provisions about not
24 being able to sell to affiliated third parties, that
25 was also part of that.  We are trying to be smart and

## Page 41

WILLIAM C. RAMBICURE - 7/7/11

1 I think you have already seen my testimony on that
2 point from the injunction hearing.  I don't think I
3 need to repeat it here.  But you want to, you want to
4 protect your client from somebody taking advantage of
5 them.
6     Q.   I think your testimony at the
7 injunction hearing was that one of the reasons that
8 Section 7 is drafted the way it is, you were trying to
9 protect your client to insure there were sales
10 proceeds to be divided or from which he would get his
11 percentage interest?
12     A.   Particularly on the horses where the
13 title and ownership was being transferred over,
14 because if you look at the last sentence in paragraph
15 7, that basically Crestwood doesn't have to provide
16 any further consideration and title remains in that.
17     So with the exception of the two horses
18 that title wasn't transferred to, title and ownership
19 of all of these other horses with the exceptions of
20 ISLAND FASHION and her 2008 STORM CAT filly, were
21 being placed into Crestwood's name, and they were
22 effectively the owner of those horses from that day
23 forward, subject to the sales proceeds being divided.
24     But if, for instance, Crestwood had the

11 (Pages 38 to 41)

Case 3:15-cv-00576-GNS-CHL   Document 87-3   Filed 12/07/17   Page 13 of 33 PageID #: 1837
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 251 of 316
Case 3:15-cv-00576-DJH   Document 1-3   Filed 07/01/15   Page 13 of 33 PageID #: 55

William C. Rambicure  -  7/7/2011
Crestwood Farm Bloodstock, LLC vs. Everest Stables, Inc., et al.

Page 42

WILLIAM C. RAMBICURE - 7/7/11

1
2  ability to RNA a horse on its own or to have some
3  third-party bid it in and have some deal with that
4  other third-party, and then where -- a very nice price
5  for Crestwood, but not a very good price for Everest,
6  that is what we were trying to avoid.  We were hoping
7  to eliminate what might be natural greed that may come
8  into play in horse dealings.
9        What I was wanting to accomplish was to
10  make sure that Crestwood could not RNA the horse and
11  effectively have a no sale, yet still have title to
12  those horses that title had been transferred to them.
13  They now would have a horse that may have some
14  significant value and there is nothing there for
15  Everest to get money back from.  And that would not
16  have been a good deal for Everest.  That would have
17  been a nightmare.
18        Q.    Wouldn't the converse be true though,
19  if Mr. Nielsen or Everest Stables RNA'd horses, there
20  would be no moneys for Crestwood to recoup its
21  expenses, realize its benefit of the bargain?
22        A.    Well, remember that this agreement
23  contemplated all of these horses being sold at some
24  point in time.  Of course it also contemplated utmost
25  good faith and trying to maximize and get the absolute

Page 43

WILLIAM C. RAMBICURE - 7/7/11

1
2  top value.
3        The reality of what we were seeing
4  almost the very day, the very day, Barry, that this
5  deal went, was signed, the sales were down 48 percent
6  that very day.  And they continued to go down from
7  that point forward.  So you've got a declining market,
8  yet you've got horses, some of which have truly
9  significant value, that you don't necessarily want to
10  sell in the middle of the worst market, and you want
11  to hold until you can sell it at a later date when the
12  market conditions improve.  When you factor this in
13  with the guaranties that were provided, there was at
14  least the downside risk for your folks, for the
15  Crestwood folks were at least from my perspective more
16  than adequately covered by the guaranties.
17        Q.    Go ahead, I'm sorry.
18        A.    And Everest protections were the
19  ability to RNA those horses and come back at a later
20  date and sell them.  And then I think that had
21  everything been hunky dory, had everybody acted with
22  the utmost good faith towards one another, I think
23  that we wouldn't be sitting here today.
24        Q.    Tell me what you mean by guaranties in
25  this agreement to Crestwood, Mr. Rambicure.

Page 44

WILLIAM C. RAMBICURE - 7/7/11

1
2        A.    Well, let me look.  I may be confusing
3  this one with some of the earlier drafts, Barry.  Let
4  me look through here.
5        MR. PAHL:  Do you want to take a break
6  right now?
7        MR. STILZ:  Sure.
8        (Recess taken.)
9  BY MR. STILZ:
10        Q.    Mr. Rambicure, what guaranties are you
11  referring to in that document to Crestwood?
12        A.    I am thinking of earlier documents,
13  Barry.  I don't see -- my recollection now is that the
14  percentages increased on the percentages that
15  Crestwood was to receive from the sale of the various
16  horses significantly from the prior drafts.  With that
17  increase of the percentages came the limitation of the
18  minimum guaranties that were provided for in the
19  earlier drafts.
20        Q.    You have had an opportunity to review
21  Exhibit 266 and you don't see any guaranties in that
22  document, is that correct?
23        A.    Yes.  The only other thing I see, not a
24  guarantee, there are the protections that are built
25  in, I think for instance they had the ability to

Page 45

WILLIAM C. RAMBICURE - 7/7/11

1
2  select out X number of horses from group A, for
3  instance, the 44 thoroughbred yearling horses that
4  were going to be consigned, Crestwood had the ability
5  to essentially deselect essentially 20 of those
6  horses, and the same thing with respect to the
7  weanling horses, 41 of those, and they had the
8  opportunity to deselect 20 of those.  So there were
9  other protections built in.  I think that -- I was
10  just mistaken on the guaranties.
11        Q.    Sure.  I understand.  You were
12  testifying just a second ago, Mr. Rambicure, that on
13  the day this document was signed, sales were down 48
14  percent, is that correct?
15        A.    Yeah.  My recollection is that very
16  very day.  Later that afternoon, I'm not sure what
17  time this agreement was actually signed, Barry, but by
18  late that afternoon I had heard from other sources
19  that the sales had declined 48 percent from the
20  preceding year for that opening day, for the November
21  agreement.
22        Q.    Would that have been the November 3
23  session it was down 48 percent, the day before?
24        A.    Yes, the day before.
25        Q.    Off the record.

12  (Pages 42 to 45)

Case 3:15-cv-00576-GNS-CHL   Document 87-3   Filed 12/07/17   Page 14 of 33 PageID #: 1838
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 252 of 316
Case 3:15-cv-00576-DJH   Document 1-1   Filed 07/01/15   Page 14 of 33 PageID #: 56

William C. Rambicure  -  7/7/2011
Crestwood Farm Bloodstock, LLC vs. Everest Stables, Inc., et al.

Page 46

1  WILLIAM C. RAMBICURE - 7/7/11
2  (Discussion had off the record.)
3  (Whereupon, Rambicure Deposition
4  Exhibit No. 268 was marked for
5  identification.)
6  BY MR. STILZ:
7  Q.   Mr. Rambicure, I have given you Exhibit
8  268. It appears to be a chain of e-mails, the first, the top
9  one is from Tim Nelson to Pope McLean Junior and you
10  were CC'd on that document?
11  A.   Yes.
12  Q.   And then the other document appears to
13  be a chain of e-mails. One is from you to Tim Nelson
14  and CC'ing the S horse account at aol.com?
15  A.   Yes.
16  Q.   And there is another one from Tim
17  Nelson to Pope McLean Junior CC'ing you and Jeff
18  Nielsen?
19  A.   Yes.
20  MR. PAHL: Mr. Stilz correctly pointed
21  out that this second page of Exhibit 268, the top
22  portion of that document appears to be a communication
23  between attorney and client. This last production was
24  done in haste I was departing from town. It may have
25  been inadvertently produced. I don't think it is

Page 47

1  WILLIAM C. RAMBICURE - 7/7/11
2  earth shattering. To the extent that Mr. Stilz will
3  agree, I won't request its return so long as this is
4  not a waiver, other than an inadvertent one.
5  MR. STILZ: Absolutely.
6  MR. PAHL: Of the attorney-client
7  privilege.
8  MR. STILZ: I will agree to that.
9  MR. PAHL: Thank you.
10  BY MR. STILZ:
11  Q.   Mr. Rambicure, these appear to be
12  e-mails that I just received from Everest Stables?
13  A.   Um-hum.
14  Q.   Dealing with revisions of the draft
15  agreement that we have been talking about, the
16  executed document which is in front of you is Exhibit
17  266?
18  A.   Yes.
19  Q.   You recall receiving or sending these
20  e-mails?
21  A.   Yes, I do.
22  Q.   The second page of that document, 268,
23  you reflect that yesterday was off 48 percent, so it's
24  not pretty.
25  A.   Yes.

Page 48

1  WILLIAM C. RAMBICURE - 7/7/11
2  Q.   Is that what you were referring to?
3  A.   That is what I was referring to. Sales
4  were plummeting at that point in time.
5  Q.   In fact, most everyone in the horse
6  business knew that was plummeting or the sales of
7  horses were going down?
8  A.   Can't speak for everyone in the horse
9  business, but anyone that was at that sale certainly
10  knew that.
11  Q.   In fact, fall, early fall, late fall of
12  2008 was not a pretty time in the economic history of
13  the United States?
14  A.   That is very true.
15  Q.   And from what we know now, the horse
16  business was not immune to that downturn, was it?
17  A.   No. It was certainly not immune.
18  Q.   In fact, I'm sure that you have
19  probably had clients, like I have had clients, that
20  have been in the horse business that have been
21  affected by that mightily?
22  A.   Yes, I have. I could also say that it
23  has affected us mightily.
24  Q.   That is true. Correct. Correct me if
25  I'm wrong, but I believe you testified in prior

Page 49

1  WILLIAM C. RAMBICURE - 7/7/11
2  testimony in this case in the injunction hearing that
3  after the execution of this November 4th agreement,
4  you were kind of out of the picture until June of '09,
5  I believe is what you said?
6  A.   That is correct.
7  Q.   You received no other phone calls or
8  inquiries from Everest or Mr. Nielsen?
9  A.   I recall no phone calls from Mr.
10  Nielsen until June of '09.
11  Q.   Were you aware, I think you testified
12  to this, but I'm just going to ask it, were you aware
13  of discussions of rescinding the November 4th
14  agreement between the parties?
15  A.   At the time that those discussions were
16  going on?
17  Q.   At the time, yes.
18  A.   No, I was not aware of that.
19  Q.   And I am not asking for since you have
20  become aware of?
21  A.   At the time I was not aware of that.
22  Q.   You were in Lexington in January of
23  2009?
24  A.   I'm sure I was, but I'm not sure if I
25  was in Lexington for the entirety of that month, and I

13 (Pages 46 to 49)

Case 3:15-cv-00576-GNS-CHL   Document 87-3   Filed 12/07/17   Page 15 of 33 PageID #: 1839
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 253 of 316
Case 3:15-cv-00576-DJH   Document 1-3   Filed 07/01/15   Page 15 of 53 PageID #: 57

William C. Rambicure  -  7/7/2011
Crestwood Farm Bloodstock, LLC vs. Everest Stables, Inc., et al.

## Page 50

```
 1        WILLIAM C. RAMBICURE - 7/7/11
 2   would have to pull out my calendar and my time sheets
 3   to figure out where I was.
 4        Q.    Do you have any reason to believe that
 5   you were out of Lexington or out of the ability to be
 6   contacted by your office during the first part of
 7   January of '09?
 8        A.    I don't know, Barry, but if you want to
 9   give me dates, I could check my calendar and let you
10   know.  My guess is around the first part of the year
11   in January we may have been down at our lake house for
12   a period of time in Jamestown, but again, I would need
13   to go back and look at my calendar and my time
14   records.
15        Q.    Do you recall being in town during the
16   time of the January 2009 sale, Keeneland January of
17   2009 sale?
18        A.    I don't remember that.
19        Q.    Do you carry a cell phone?
20        A.    When I want to.
21        MR. PAHL:  These are all under oath, I
22   want you guys to know.
23   BY MR. STILZ:
24        Q.    You can be contacted by your office if
25   a client is looking for you, is that correct?
```

## Page 51

```
 1        WILLIAM C. RAMBICURE - 7/7/11
 2        A.    Most of the time.  Most of the time.
 3        Q.    You recall no efforts by Mr. Nielsen or
 4   Everest Stables to contact you in say late December of
 5   2008 or early January of 2009 with regard to this
 6   November 4th agreement?
 7        A.    I don't have any recollection of any
 8   efforts to call.  The last thing I knew was November
 9   5th I knew that the agreement had been signed.  Then
10   from November 5th through June, I can't even tell you
11   what day in June, it was sometime in June of '09, I
12   don't remember any other contact with Mr. Nielsen or
13   Mr. Nelson or any other representative of Everest.
14        (Whereupon, Rambicure Deposition
15         Exhibit No. 269 was marked for
16         identification.)
17   BY MR. STILZ:
18        Q.    I'm not going to ask you a whole lot of
19   questions about this, Mr. Rambicure.  I just want to
20   know, I have handed you Exhibit 269.  It appears to be
21   a purchase and sale agreement and bill of sale?
22        A.    Yes.
23        Q.    Between the Everest Stables, Inc. and
24   Jimmy and Meg Miranda DBA Rapid Run Farm?
25        A.    Yes.
```

## Page 52

```
 1        WILLIAM C. RAMBICURE - 7/7/11
 2        Q.    Have you seen this document before?
 3        A.    Yes.
 4        Q.    Is this a document that you think you
 5   reviewed and commented upon?
 6        A.    Yes.  I am fairly confident I did not
 7   draft this.
 8        Q.    This is the one you were referring to
 9   earlier in your testimony?
10        A.    Yes, sir.
11        Q.    Or at least to the best of your
12   recollection.  Were there prior drafts of this
13   document that you saw, or do you remember just seeing
14   one draft?
15        A.    I'm not sure I can answer that, Barry.
16   I think I saw the one draft and commented on it.  As I
17   sit here today, I don't remember seeing any subsequent
18   drafts.  I don't remember seeing a final executed
19   document.  That doesn't mean -- that would not
20   necessarily mean that they didn't come across my desk.
21   I just don't remember.
22        Q.    Let's take about five minutes.  I think
23   I'm getting fairly close to being done.
24        (Recess taken.)
25
```

## Page 53

```
 1        WILLIAM C. RAMBICURE - 7/7/11
 2        (Whereupon, Rambicure Deposition
 3         Exhibit No. 270 was marked for
 4         identification.)
 5   BY MR. STILZ:
 6        Q.    Mr. Rambicure, tell me when you are
 7   ready.  I don't have a whole lot of questions but I
 8   have just a few.
 9        A.    Okay.
10        Q.    I have handed you a document, Exhibit
11   No. 270, appears to be several e-mail chains with a
12   letter attached to it?
13        A.    Yes.
14        Q.    Do you recall ever seeing this document
15   before or these e-mails and that document attached?
16        A.    Yes.  I believe I sent the attached
17   letter to Pope from Jeff Nielsen at Mr. Nielsen's
18   request, attached that to my e-mail I think at the top
19   of this string.
20        Q.    You sent it to David Longenecker, is
21   that correct?
22        A.    That is right, excuse me.
23        Q.    You sent this letter to Mr. McLean at
24   the behest of Mr. Nielsen, or Mr. Longenecker to
25   forward?
```

14  (Pages 50 to 53)

Case 3:15-cv-00576-GNS-CHL   Document 87-3   Filed 12/07/17   Page 16 of 33 PageID #: 1840
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 254 of 316
Case 3:15-cv-00576-DJH   Document 1-3   Filed 07/01/15   Page 16 of 93 PageID #: 58

William C. Rambicure – 7/7/2011
Crestwood Farm Bloodstock, LLC vs. Everest Stables, Inc., et al.

Page 54

WILLIAM C. RAMBICURE - 7/7/11
1
2      A.   I sent it to Mr. Longenecker asking
3   that it be forwarded on to Pope because Jeff had been
4   directed not to have any further direct communications
5   with Pope. So I did as I was requested to do.
6      Q.   Does that appear to be the same
7   document that you sent to Mr. Longenecker?
8      A.   Yes, I think so.
9      Q.   Mr. Rambicure?
10     A.   Was that it for 270?
11     Q.   How much percentage of your
12  practice is devoted to equine-related activities?
13     A.   I don't know, Barry.
14     Q.   Does it vary from time to time?
15     A.   It varies from time to time. Anywhere
16  from 10 to 20 percent I would say.
17     Q.   Have you ever lectured at the UK Equine
18  Law Seminar?
19     A.   I have on several occasions, yes.
20     Q.   I think originally at the beginning of
21  this you testified that you took over -- the first
22  time that you became engaged by Everest Stables and
23  Jeff Nielsen was sometime in late 1990's, early 2000's
24  in a William Robinson matter?
25     A.   Yes.

Page 55

WILLIAM C. RAMBICURE - 7/7/11
1
2      Q.   And you took over that representation
3   from Jim Philpott?
4      A.   Yes. Jim referred Jeff to me.
5      Q.   Do you have any clue as to why Mr.
6   Philpott got out of the representation?
7      A.   My understanding was that --
8      Q.   I'm not asking you anything Mr. Nielsen
9   told you.
10     A.   I understand that. I understand that.
11  What I understood from Jim was that he is more of a
12  transactional guy than a litigation guy and doesn't
13  like litigation, and thought that this one might turn
14  to be a nasty piece of litigation, and wanted to send
15  it to a nasty fellow like me who gets off on nasty
16  pieces of litigation.
17     Q.   Mr. Rambicure, that is all I have
18  today. I appreciate it.
19     A.   Thank you, Barry. Appreciate it.
20         MR. STILZ: Mr. Pahl, do you have any
21  questions?
22         MR. PAHL: No, I don't have any
23  questions, and because I don't represent Mr.
24  Rambicure, we probably both should tell him he knows
25  the drill at the end of this, but you have the right

Page 56

WILLIAM C. RAMBICURE - 7/7/11
1
2   to read and sign, and that is entirely your right and
3   neither Mr. Stilz nor I will recommend one way or
4   another because you can decide yourself.
5         THE WITNESS: I would be delighted to
6   waive that right.
7   BY MR. STILZ:
8      Q.   I have one more question.
9      A.   Still licensed to practice, yes.
10     Q.   You will be intending to be at the
11  trial in case you need to be called as a witness?
12     A.   I was hoping to be as a lawyer.
13     Q.   Yes. I understand. You will be there
14  at the trial?
15     A.   I will be there.
16     Q.   Assuming you haven't gotten --
17     A.   I won't run away. I will make myself,
18  if I'm not sitting at counsel as co-counsel, I will
19  make myself available and y'all tell me what you want
20  me to do.
21     Q.   I appreciate your time and effort and
22  hope it wasn't too arduous.
23     A.   Not at all. I appreciate your courtesy
24  and professionalism.
25     Q.   Thank you.

Page 57

WILLIAM C. RAMBICURE - 7/7/11
1
2      (Whereupon, the deposition of
3   WILLIAM C. RAMBICURE was
4   concluded at 2:47 p.m.)
5         ***
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

15  (Pages 54 to 57)

William C. Rambicure - 7/7/2011
Crestwood Farm Bloodstock, LLC vs. Everest Stables, Inc., et al.

Page 58

1    WILLIAM C. RAMBICURE - 7/7/11
2    I, WILLIAM C. RAMBICURE, do hereby certify that
3    I have read the foregoing deposition and found the
4    same to be true and correct except as follows (noting
5    the page and line number of the change or addition as
6    desired and the reason why):
7        Page    Line        Correction
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25    _____
         WILLIAM C. RAMBICURE

Page 59

1    WILLIAM C. RAMBICURE - 7/7/11
2    STATE OF MINNESOTA :
        :         CERTIFICATE
3    COUNTY OF HENNEPIN :
4        BE IT KNOWN, that I, Patricia K. Carl, RPR,
5    took the foregoing deposition of WILLIAM C. RAMBICURE,
6        That the witness, before testifying, was by me
7    first duly sworn to testify the whole truth and
8    nothing but the truth relative to said cause;
9        That the testimony of said witness was recorded
10    in shorthand by me and was reduced to typewriting
11    under my direction;
12        That the foregoing deposition is a true record
13    of the testimony given by said witness;
14        That the foregoing deposition, when
15    transcribed, was submitted for review;
16        That I am not related to any of the parties
17    hereto, nor an employee of them, nor interested in the
18    outcome of the action;
19        That the cost of the original has been charged
20    to the party who noticed the deposition, and that all
21    parties who ordered copies have been charged at the
22    same rate for such copies;
23        WITNESS MY HAND AND SEAL this 11th day of July,
        2011.
24
25    _____
         Patricia K. Carl, RPR, Notary Public

16 (Pages 58 to 59)

Case 3:15-cv-00576-GNS-CHL   Document 87-3   Filed 12/07/17   Page 18 of 33 PageID #: 1842
Case 3:15-cv-00576-DJH   Document 1-3   Filed 07/01/15   Page 18 of 93 PageID #: 60
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 256 of 316

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT, made and entered into effective this 1ˢᵗ day of November, 2008, by and between Everest Stables, Inc., 100 Village Center Drive, North Oaks, MN 55127, a Minnesota corporation (hereinafter referred to as "Everest") and Crestwood Farm Bloodstock LLC, a Kentucky limited liability company, 3933 Spurr Road, Lexington, KY 40511 (hereinafter referred to as "Crestwood"),

NOW THEREFORE, in consideration of the mutual promises and agreements as hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Everest and Crestwood hereby agree as follows:

1.  TRANSFER/TITLE.  As soon as practicable after execution of this Agreement, Everest shall execute and deliver to Crestwood the applicable Jockey Club Certificates of Foal Registration, breeding certificates and such other documents as may appear to be reasonably necessary to transfer the ownership of and the registration papers for the thoroughbred horses identified in Exhibit Numbers 1, 2, 3, 4, 5, and 6 attached hereto (except for ISLAND FASHION, in foal to GHOSTZAPPER, and the 2008 STORM CAT/ISLAND FASHION filly) (hereinafter referred to as the "Subject Horses") out of Everest's name and into Crestwood's name, effective as of November 1, 2008 (the "Effective Date" of this Agreement).

Notwithstanding the foregoing, the parties agree that Everest shall retain title and ownership to ISLAND FASHION, in foal to GHOSTZAPPER, and to the 2008 STORM CAT/ISLAND FASHION filly, from the Effective Date of this Agreement through the sale of said horses at public auction or otherwise.

Subject to the foregoing paragraph, Everest represents and warrants to Crestwood that Crestwood will receive clear ownership and title to each of the Subject Horses, free and clear of any liens and/or encumbrances, except for all unpaid stallion service obligations associated with or arising from the Subject Horses described on the Exhibits upon which the Subject Horses are identified, which will either be the responsibility of Everest or, in the case of the ELUSIVE QUALITY stallion service obligation, will be deducted from auction sales proceeds by Keeneland Association Inc. (hereinafter "Keeneland").

2.  RESPONSIBILITY FOR EXPENSES.  Except as otherwise provided herein, and subject to the terms and conditions of this Agreement, from and after the Effective Date of this Agreement, Crestwood shall be considered to be and shall be the owner of, and shall assume sole responsibility for and shall pay, and shall indemnify and hold Everest harmless from any and all claims relating to, any and all out-of-pocket expenses of any kind or nature relating to or associated with the Subject Horses, including, but not limited to board expenses, farrier/blacksmith expenses, veterinary expenses, vanning or transportation expenses, sales preparation expenses, and sales entry expenses, subject to the following additional terms, conditions and agreements. Although Everest shall retain title and ownership of ISLAND FASHION, in foal to GHOSTZAPPER, and the 2008 STORM CAT/ISLAND FASHION filly from the Effective Date through their sale at public auction or otherwise in accordance with this Agreement, Crestwood shall nevertheless be solely responsible for any and all such out-of-pocket expenses for said horses, from and after the Effective Date through their sale, including certain casualty

1

EXHIBIT
266 Pi
Ramlieue
PENGAD 800-631-6989

Longenecker Nov. Agree. 000001

Case 3:15-cv-00576-GNS-CHL   Document 87-3   Filed 12/07/17   Page 19 of 33 PageID #: 1843
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 257 of 316
Case 3:15-cv-00576-DJH   Document 1-3   Filed 07/01/15   Page 19 of 33 PageID #: 61

insurance premium expenses, as provided in Section 13 herein.

3.  CONSIGNMENT TO KEENELAND SALE.  The parties hereto agree that Crestwood shall consign for sale and shall offer for sale and sell at the Keeneland January, 2009 Mixed Sale, the following horses:

A.  The twenty-one (21) thoroughbred broodmares identified in Exhibit No. 1 hereto (i.e., – the "A" Group mares).  The parties acknowledge that DANZIGS FASHION has been deleted from Exhibit No. 1; and the parties agree that both DANZIGS FASHION and DANZIGS FASHION's 2009 foal shall be consigned for sale, offered for sale, and sold at the Keeneland November 2009 Breeding Stock Sale, and the net sale proceeds for each said horse shall be split 50% to Everest and 50% to Crestwood.  Crestwood shall assume responsibility for and shall pay all out-of-pocket expenses of any kind and nature, including any 2009 stallion service expenses for stallions other than PETIONVILLE, with respect to DANZIGS FASHION and DANZIGS FASHION's 2009 foal, from and after November 1, 2008.

B.  The eighteen (18) thoroughbred broodmares identified in Exhibit No. 2 hereto (i.e.,– the "B" Group mares);

C.  The forty-four (44) thoroughbred yearling horses identified in Exhibit No. 4 hereto (i.e. – the Everest foals of 2007).  Crestwood may in its discretion determine that up to twenty (20) of the Subject Horses described on Exhibit 4 should not be sold in the 2009 Keeneland January Mixed Sale because their sales proceeds are not anticipated to exceed 75% of their carrying costs to the time of sale; provided, however, that no such Subject Horse shall be one whose stallion service fee was $5,000 or more  with the exception of PETIONVILLE.  In such event, Crestwood may decide not to sell such Subject Horse(s) in such sale.  If Crestwood so decides, the following additional terms shall arise in respect of each such Subject Horse:  (a) Crestwood, promptly following its decision to not enter or withdraw the Subject Horse from the sale, shall notify Everest of such decision; (b) Everest shall have the option for a period of 10 calendar days following its receipt of notice of withdrawal from Crestwood to reacquire the Horse from Crestwood, without financial consideration to Crestwood; (c) if such option is not exercised by Everest, Crestwood shall either (1) attempt to sell privately or (2)  give away such Subject Horse otherwise on the terms described in Section 6 hereof.  Should Everest choose to exercise its option to reacquire Subject Horses under subsection (b) above, Crestwood shall take such action as is necessary to transfer title to the Subject Horse to Everest and Everest shall thereafter bear all carrying costs for boarding and keeping the Subject Horse at Crestwood or such other location as Everest deems appropriate.  Other than the (up to) twenty (20) horses that Crestwood may, pursuant to the foregoing, remove from the 2009 Keeneland January Mixed Sale, any other horses proposed to be removed from said sale shall only be removed by mutual written agreement of Everest and Crestwood.

D.  The thoroughbred horse identified in Exhibit No. 6 hereto (FAME AND FASHION, a two-year-old Gr/Roan filly by PETIONVILLE out of DANZIGS FASHION).

4.  CONSIGNMENT TO PUBLIC AUCTION SALE.  The parties hereto further agree that

2

Longenecker Nov. Agree. 000002

Crestwood shall consign for sale and shall offer for sale and sell at recognized 2009 Kentucky public auction sale(s), as mutually agreed and determined between Everest and Crestwood, the forty-one (41) thoroughbred weanling horses identified in Exhibit No. 5 hereto (i.e. – the Everest foals of 2008). Crestwood may in its discretion determine that up to twenty (20) of the Subject Horses described on Exhibit 5 should not be sold in the 2009 Keeneland September Yearling Sale because their sales proceeds are not anticipated to exceed 75% of their carrying costs at the time of sale; provided, however, that no such Subject Horse shall be one whose stallion service fee was $5,000 or more with the exception of PETIONVILLE. In such event, Crestwood may decide not to sell such Subject Horse(s) in such sale. If Crestwood so decides, the following additional terms shall arise in respect of each such Subject Horse: (a) Crestwood, promptly following its decision to not enter or withdraw the Subject Horse from the sale, shall notify Everest of such decision; (b) Everest shall have the option for a period of 10 calendar days following its receipt of notice of withdrawal from Crestwood to reacquire the Horse from Crestwood, without financial consideration to Crestwood; (c) if such option is not exercised by Everest, Crestwood shall either (1) attempt to sell privately or (2) give away such Subject Horse otherwise on the terms described in Section 6 hereof. Should Everest choose to exercise its option to reacquire Subject Horses under subsection (b) above, Crestwood shall take such action as is necessary to transfer title to the Subject Horse to Everest and Everest shall thereafter bear all carrying costs for boarding and keeping the Subject Horse at Crestwood or such other location as Everest deems appropriate. Other than the (up to) twenty (20) horses that Crestwood may, pursuant to the foregoing, remove from recognized 2009 Kentucky public auction sale(s), any other horses proposed to be removed from said sale(s) shall only be by mutual written agreement of Everest and Crestwood.

5.  PRIVATE SALE OR DISPOSITION OF CERTAIN HORSES.  The parties hereto further agree that Crestwood shall sell or otherwise dispose of privately, the twenty (20) thoroughbred broodmares identified in Exhibit No. 3 hereto (the "C" Group mares). The terms and conditions of such sales shall be determined by mutual agreement between Everest and Crestwood. The parties acknowledge that the following Everest horses are already consigned for sale by Crestwood at the November 2008 Keeneland Sale: JUST A WISH, SISTER GIRL BLUES '08, BALLDO '08, BIRDS NEST, IN TRIPLACATE, and IT'S SILENT. The parties agree that if any of said horses fail to sell at said November 2008 Keeneland Sale, such horses shall be added to Exhibit No. 3 and shall be sold or otherwise disposed of privately by Crestwood under all the same terms and conditions applicable to the horses on Exhibit No. 3 under this Agreement.

6.  ALTERNATIVE FOR PRIVATE SALE BY MUTUAL AGREEMENT.  The parties specifically understand and agree, with respect to each of the horses identified in Exhibit Numbers 4, 5, and 6 hereto, that Everest and Crestwood may, by mutual, written agreement signed by both Everest and Crestwood, agree to make other arrangements for the ultimate sale or disposition of any such horse.

7.  CRESTWOOD'S DUTIES AND RESPONSIBILITIES.  Crestwood shall exercise all commercially reasonable efforts, with the utmost good faith, for and on behalf of both Crestwood and Everest, to properly prepare the Subject Horses for sale; and to market, offer for sale and to sell the Subject Horses, either at public auction or in private sales, in order to maximize the sales prices for each such horse. For all horses to be sold at public auction, Crestwood agrees and covenants that each horse shall be sold with no reserve, RNA, or buyback price. Crestwood shall sell, at auction or by private sale, only to unaffiliated third parties. The parties agree that in the event any Subject Horse is either unsold after auction or attempts to privately sell hereunder, title to such Subject Horse shall remain with Crestwood without additional consideration.

3

01/09/2009  11:35    9592558699                    CRESTWOOD FARM              PAGE  04/07

                         9592558699                    CRESTWOOD FARM              PAGE  05

**2. PURCHASE PRICE.** The purchase price(s) for the Subject Horses shall be determined as follows:

A. As the purchase price for each of the horses identified on Exhibit No. 1, Everest shall be entitled to and shall be paid by Crestwood seventy-five percent (75%) of the net sales proceeds for each such individual horse offered for sale and sold at the January 2009 Keeneland Mixed Sale. For purposes of this Agreement, the term "net sales proceeds" for any of the Subject Horses selling at public auction shall mean the "fall of the hammer" sales price for each such horse, after deduction of the thoroughbred auction company's standard sales commission, without any credits or offsets whatsoever. Provided, however, that with respect to the sale of ISLAND FASHION, in foal to GHOSTZAPPER, the net sales proceeds will be divided after the amount of the 2008 GHOSTZAPPER stallion season expense and tax has been credited to Everest. With respect to the sale of ISLAND FASHION, in foal to GHOSTZAPPER, the parties further agree that any net sales proceeds exceeding $1 Million shall be paid 100% to Everest. With respect to the 2008 GHOSTZAPPER/DOWNTOWN BLUES stallion season, and the 2008 ARCH stallion season, Everest shall be responsible to pay for said seasons, including tax. Such payment of the purchase price(s) by Crestwood to Everest shall be conditioned upon and shall occur promptly following Crestwood's receipt of such proceeds from Keeneland or other purchaser(s) of the Subject Horse(s).

B. As the purchase price for each of the horses identified on Exhibit Numbers 2, 4, 5, and 6, Everest shall be entitled to and shall be paid by Crestwood fifty percent (50%) of the net sales proceeds for each such individual horse offered for sale and sold at the January 2009 Keeneland Mixed Sale, or such other recognized thoroughbred public auction, as applicable under this Agreement. Provided, however, that Everest shall be entitled to and shall be paid by Crestwood seventy-five percent (75%) of the net sales proceeds for the 2008 filly, STORM CAT/ISLAND FASHION, listed on Exhibit No. 5, and any net sales proceeds for said filly exceeding $1 Million shall be paid 100% to Everest. Provided, further, that with respect to the 2008 Colt, ELUSIVE QUALITY/DOWNTOWN BLUES and the 2008 filly, ELUSIVE QUALITY/FLASH OF FASHION identified on Exhibit No. 6, if and when the net sales proceeds exceeds $100,000 for each or either horse, the net sales proceeds of either such horses exceeding $100,000 shall be paid 50% to Everest and 50% to Crestwood, after deduction by Keeneland of the Elusive Quality stallion season expense and tax. Such payment of the purchase price(s) by Crestwood to Everest shall be conditioned upon and shall occur promptly following Crestwood's receipt of such proceeds from Keeneland, other public auction companies, or private purchaser(s) of the Subject Horse(s), as applicable.

C. As purchase price for any horse from Exhibit Numbers 3, 4, 5, or 6 sold privately, by mutual agreement of the parties, as provided herein, Everest shall be entitled to and shall be paid by Crestwood fifty percent (50%) of the net sales proceeds received for each individual horse (except that Everest shall be entitled to and shall be paid seventy-five percent (75%) of the net sales proceeds received for the 2008 STORM CAT/ISLAND FASHION filly, as described above). For purposes of this Agreement, the parties agree that the "net sales proceeds" for any of the Subject Horses sold privately shall mean the sales proceeds for any such horse, reduced by the amount of the sales commission, if any, payable to an unaffiliated third party, consistent with the provisions of Paragraph 12 below. Such payment of purchase price(s) by Crestwood to Everest shall be conditioned upon and shall occur promptly following Crestwood's receipt of such proceeds from the private purchaser(s) of the Subject Horse(s).

D. Notwithstanding the foregoing, Crestwood shall be entitled to offset from amounts payable under subsections A through C above, any undisputed board bills or other undisputed maintenance expenses or reimbursable fees or expenses due and payable to it by Everest at the time such payments are

4

Case 3:15-cv-00576-GNS-CHL   Document 87-3   Filed 12/07/17   Page 22 of 33 PageID #: 1846
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 260 of 316
Case 3:15-cv-00576-DJH   Document 1-3   Filed 07/01/15   Page 22 of 33 PageID #: 64

01/09/2009  11:35     8592558699          CRESTWOOD FARM          PAGE  06/07

1/04/2008  19:19     8592558699          CRESTWOOD FARM          PAGE  06

to be made under such sections.

9. PAYMENT.  Crestwood shall be required to fully account for and pay Everest's portion of the net sales proceeds from the auction sales of any of the Subject Horses, calculated with respect to each individual horse pursuant to Paragraph 8 above, without any credit or offset whatsoever, except as provided herein with respect to certain stallion season expenses, within five (5) business days following Crestwood's receipt of the applicable net sales proceeds from the public auction sales company. Crestwood shall be required to fully account for and pay Everest's portion of the sales proceeds from the private sale or disposition of any of the Subject Horses, with respect to each individual horse, within five (5) business days following Crestwood's receipt of the applicable sales proceeds for such horse. It is the intention of the parties that the sale or other disposition of each individual horse under this Agreement shall be treated and accounted for as a separate sale transaction.  The parties agree and acknowledge that the private sale of any of the Subject Horses shall be all-cash transaction(s), and that each private sale shall be properly documented with a Bill of Sale or other similar documents identifying the horse being sold, the sale price, the date of sale, the buyer and seller, the identity of any third party/agent, the amount of any commission or other compensation payable to any third party/agent, and other customary information.

10. RISK OF LOSS, POSSESSION.  Crestwood agrees that it shall take possession of the Subject Horses as of November 1, 2008, at their current location at Crestwood Farm in Lexington, Kentucky. As of said date, all risk of loss shall pass from Everest to Crestwood, except with respect to ISLAND FASHION, in foal to GHOSTZAPPER, and the 2008 STORM CAT/ISLAND FASHION filly, as otherwise provided in Section 1 above.

11. DISCLAIMER OF WARRANTIES. EVEREST MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO ANY OF THE SUBJECT HORSES, SPECIFICALLY AND WITHOUT LIMITATION, EVEREST MAKES NO WARRANTIES THAT ANY OF THE SUBJECT HORSES ARE SUITABLE FOR RACING OR BREEDING PURPOSES.

12. COMMISSION.  Other than the standard thoroughbred sales company commissions, the parties represent and warrant to each other that no sales fees or commissions are or will be owing or payable to anyone in connection with this sale transaction, and the parties indemnify and hold each other harmless from any claims for sales fees or commissions from any parties, Crestwood represents and warrants that other than receiving its share of sales proceeds from the public auction or private sale of the Subject Horses, it will not charge or be entitled to any sale or consignment fees or commissions. Notwithstanding the foregoing, Crestwood, in its sole discretion, may in any private sale of a Subject Horse pay a sales commission of up to 10% to any third party associated with the transaction, provided that such third party is not affiliated with Crestwood. In such event, Crestwood shall account in reasonable detail to Everest as to payment of same, including the identity of the recipient(s) of any such commissions.

13. ACCOUNTING. Crestwood shall promptly (within 48 hours) notify Everest of the sale or disposition of each of the Subject Horses. In addition, not later than the tenth (10th) day of each calendar month, Crestwood shall provide to Everest a full accounting of the horses sold or otherwise disposed of

5

Longenecker Nov. Agree. 000005

Case 3:15-cv-00576-GNS-CHL   Document 87-3   Filed 12/07/17   Page 23 of 33 PageID #: 1847
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 261 of 316
Case 3:15-cv-00576-DJH   Document 1-3   Filed 07/01/15   Page 23 of 33 PageID #: 65

81/09/2009  11:35   8592658699          CRESTWOOD FARM                PAGE  05/07
.1/04/2008  19:19   8592658699          CRESTWOOD FARM                PAGE  87

during the previous month (and the horses remaining unsold), with information including the name of each horse sold or disposed of, the type of disposition, the date of sale or disposition, the sale price of each horse, the date of receipt of the sales price, and the name and address of each buyer/transferee. Crestwood shall also provide prompt written confirmation to Everest of the nomination of and acceptance of any of the Subject Horses to the Keeneland January 2009 sale or other recognized public auctions, as applicable under this Agreement. Upon request, Crestwood shall provide Everest copies of Bills of Sale and/or other documents pertaining to sale or disposition of any of the Subject Horses.

14. FACSIMILE.  The parties hereto agree that a facsimile of a counterpart of this signed Agreement constitutes an original counterpart and shall be a valid and binding document for all legal and other purposes.

15. COUNTERPARTS.  This Agreement may be executed in multiple counterparts by the parties hereto. All of such counterparts shall be construed as if all signatures were appended to one document.

16. MERGER.  This Agreement contains the entire agreement of the parties and any prior or concurrent written or oral understandings are deemed merged into this Agreement.

17. GOVERNING LAW.  The terms of this Agreement shall be enforced and construed in accordance with the laws of the Commonwealth of Kentucky.

18. INSURANCE.  Everest acknowledges that Crestwood shall be under no obligation to obtain insurance of any kind on the Subject Horses or renew any existing policy on a Subject Horse. Everest agrees and covenants to maintain its existing casualty insurance coverage on ISLAND FASHION, in foal to GHOSTZAPPER.  Crestwood shall reimburse Everest the pro rata cost of insurance premiums necessary to maintain said existing casualty insurance coverage from the Effective Date until said horse is sold at public auction or otherwise.  In the event of a casualty loss of said horse prior to its sale, Crestwood shall pay Everest such additional sums as are necessary so that Crestwood has paid Everest a total of twenty-five percent (25%) of the total of all insurance premiums required to collect the total insurable value upon such loss, and, accordingly, Crestwood shall be entitled to receive from Everest the sum of 25% of the insurance loss proceeds received by Everest and Everest shall be entitled to retain 75% of the insurance loss proceeds received by Everest. In no event shall Everest be required to pay to Crestwood more than 25% of the insurance loss proceeds received by Everest.

19. BINDING EFFECT.  This Agreement shall be binding upon the parties hereto, their heirs, personal representatives, successors and assigns.

20. ATTORNEY'S FEES.  In the event of any action or proceeding to declare or enforce the terms of this Agreement, the prevailing party or parties shall be entitled to recover its or their reasonable attorney's fees and other costs, in addition to any other relief to which it may be entitled.

6

Longenecker Nov. Agree. 000006

| 01/09/2009  11:35    8592558699 | CRESTWOOD FARM | PAGE  07/07 |
|---|---|---|
| 11/04/2008  19:19    8692558699 | CRESTWOOD FARM | PAGE  88 |

IN WITNESS WHEREOF, the parties have executed this Agreement as of the dates indicated below.

EVEREST STABLES, INC.

By: _____    DATE: 11/4/08
    Jeffrey L. Nielsen

Its:  President

CRESTWOOD FARM BLOODSTOCK LLC

By: _____    DATE: 11/4/08
    Pope McLean

Its: _____

7

Longenecker Nov. Agree. 000007

Case 3:15-cv-00576-GNS-CHL   Document 87-3   Filed 12/07/17   Page 25 of 33 PageID #: 1849
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 263 of 316
Case 3:15-cv-00576-DJH   Document 1-3   Filed 07/01/15   Page 25 of 93 PageID #: 67

01/09/2009  16:56     8592558699          CRESTWOOD FARM              PAGE  01/08

1/04/2008  19:19      8592558699          CRESTWOOD FARM              PAGE  89

# EXHIBIT 1

A Group

Bayou Roots                                  Out of Step

Big Shots                                    Purely Economics

Cat News                                     Quiet Whisper

Cayman Sunset                                Royal Deception

Carriage Fashion                             Sister Girl Shoes

Downtown Blues                               Sky Bares

Flash of Fashion                             Texas Kitty

Harbor House                                 Time To Waltz

Jolie Cozzene                                Unpunished

Island Breeze                                White Angelita

Island Fashion

Longenecker Nov. Agree. 000008

01/09/2009 16:56 8592558699 CRESTWOOD FARM PAGE 02/08

2/04/2008 19:19 8592558699 CRESTWOOD FARM PAGE 18

## EXHIBIT 2

B Group                           Forest Cat

Automatic Appeal                  Jungle Storm

Bedlinage                         Mini Dee

Balldo                            Regal Rook

Boot Um Bertie                    Shawshank Lady

Chapel Bride                      Silent Storm

Discreet Account                  Ternard

Dreams and Desires                Tauria Moon

Enthusiastic                      Voodoo's Sister

Follow the Clues

Longenecker Nov. Agree. 000009

01/09/2009  16:56   8592558699          CRESTWOOD FARM          PAGE  03/08

1/04/2009  19:19   8592558699          CRESTWOOD FARM          PAGE  11

## EXHIBIT 3

E.S'cup                          Minimum Security
Elegante Chica                   No No Perdamo
Silka                            Political Hostage
Happy Hostage                    Saked With Fire
Held Hostage                     Biddnia
Hushed                           So Emotional
Uada                             Shitzer Sister
Inflammatory                     Vertical Ascent
Look to Heaven                   Wingit
Love at Lunch                    Wish for Gold
Mighty Might

Longenecker Nov. Agree. 000010

01/09/2009  16:55   8592558699                    CRESTWOOD FARM                    PAGE  04/08

01/04/2008  19:19   8592558699                    CRESTWOOD FARM                    PAGE  12

## EXHIBIT 4

### EVEREST STABLES - YEARLINGS

| Horse Name | Horse Type | Sire | Dam | Color | Sex | DOB |
|---|---|---|---|---|---|---|
| Abbreviated Career '07 | Yearling | Pollorville | Abbreviated Career | Bay | Colt | 4/3/2007 |
| Airlift '07 | Yearling | Service Stripe | Airlift | Bay | Filly | 3/28/2007 |
| Annual Report '07 | Yearling | Pollorville | Annual Report | Dk B/Br | Filly | 3/15/2007 |
| Badinage '07 | Yearling | Pollorville | Badinage | Bay | Colt | 5/27/2007 |
| Bayou Boots '07 | Yearling | Pollorville | Bayou Boots | Chestnut | Filly | 5/3/2007 |
| Boot Um Bertie '07 | Yearling | Pollorville | Boot Um Bertie | Dk B/Br | Colt | 4/25/2007 |
| Cat News '07 | Yearling | Pollorville | Cat News | Chestnut | Colt | 4/19/2007 |
| Cayman Sunset '07 | Yearling | Pollorville | Cayman Sunset | Dk B/Br | Filly | 5/31/2007 |
| Danzig's Fashion '07 | Yearling | Pollorville | Danzig's Fashion | Gr/Roan | Filly | 3/11/2007 |
| Downtown Blues '07 | Yearling | Ghostzapper | Downtown Blues | Bay | Colt | 2/26/2007 |
| Dreams and Desires '07 | Yearling | Pollorville | Dreams and Desires | Chestnut | Filly | 2/9/2007 |
| Elegante Chica '07 | Yearling | Pollorville | Elegante Chica | Chestnut | Filly | 2/5/2007 |
| Enthusiastic '07 | Yearling | Pollorville | Enthusiastic | Bay | Filly | 3/16/2007 |
| Forest Cat '07 | Yearling | Pollorville | Forest Cat | Chestnut | Colt | 5/13/2007 |
| Haitian Vacation '07 | Yearling | Hold For Gold | Haitian Vacation | Chestnut | Colt | 4/21/2007 |
| Harbor Blues '07 | Yearling | Forestry | Harbor Blues | Bay | Filly | 1/28/2007 |
| Hushed '07 | Yearling | Pollorville | Hushed | Chestnut | Filly | 5/7/2007 |
| Inflammatory '07 | Yearling | Pollorville | Inflammatory | Chestnut | Colt | 5/2/2007 |
| Isla Cozzene '07 | Yearling | Pollorville | Isla Cozzene | Chestnut | Colt | 4/11/2007 |
| Isla Mujeres '07 | Yearling | Maria's Mon | Isla Mujeres | Gr/Roan | Colt | 3/14/2007 |
| Just A Wish '07 | Yearling | Pollorville | Just A Wish | Chestnut | Filly | 3/4/2007 |
| Karaoke Kid '07 | Yearling | Street Cry (Ire) | Karaoke Kid | Chestnut | Colt | 4/6/2007 |
| Latin Lust '07 | Yearling | Storm Boot | Latin Lust | Dk B/Br | Filly | 2/9/2007 |
| Look To Heaven '07 | Yearling | Pollorville | Look To Heaven | Dk B/Br | Colt | 4/13/2007 |
| Mighty Might '07 | Yearling | Pollorville | Mighty Might | Gr/Roan | Filly | 5/25/2007 |
| Minimum Security '07 | Yearling | Pollorville | Minimum Security | Dk B/Br | Colt | 2/19/2007 |
| No No Pardona '07 | Yearling | Pollorville | No No Pardona | Chestnut | Colt | 2/14/2007 |
| Out Of Step '07 | Yearling | Pollorville | Out Of Step | Chestnut | Filly | 5/23/2007 |
| Peaceful Place '07 | Yearling | Pleasant Tap | Peaceful Place | Dk B/Br | Filly | 3/8/2007 |
| Quiet Whisper '07 | Yearling | Pollorville | Quiet Whisper | Bay | Colt | 5/17/2007 |
| Regal Boot '07 | Yearling | Pollorville | Regal Boot | Dk B/Br | Colt | 3/14/2007 |
| Salted With Fire '07 | Yearling | Pollorville | Salted With Fire | Dk B/Br | Colt | 4/23/2007 |
| Sidonia '07 | Yearling | Pollorville | Sidonia | Bay | Colt | 4/17/2007 |
| Silent Storm '07 | Yearling | Pollorville | Silent Storm | Dk B/Br | Filly | 3/11/2007 |
| Slewtress '07 | Yearling | Pollorville | Slewtress | Dk B/Br | Filly | 3/9/2007 |
| Stricter Sister '07 | Yearling | Pollorville | Stricter Sister | Chestnut | Filly | 2/1/2007 |
| Taurus Moon '07 | Yearling | Pollorville | Taurus Moon | Chestnut | Colt | 4/16/2007 |
| Two To Waltz '07 | Yearling | Pollorville | Two To Waltz | Chestnut | Colt | 5/27/2007 |
| Vertical Ascent '07 | Yearling | Mizzen Mast | Vertical Ascent | Gr/Roan | Filly | 2/9/2007 |

Longenecker Nov. Agree. 000011

Case 3:15-cv-00576-GNS-CHL   Document 87-3   Filed 12/07/17   Page 29 of 33 PageID #: 1853
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 267 of 316
Case 3:15-cv-00576-DJH   Document 1-3   Filed 07/01/15   Page 29 of 33 PageID #: 71

01/09/2009  16:56    8592558699              CRESTWOOD FARM              PAGE  05/08

/04/2008  19:19    8592558699              CRESTWOOD FARM              PAGE  13

## EVEREST STABLES - YEARLINGS

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | Veggeo's Sister | Chestnut | Colt | 2/28/2007 |
| Veggeo's Sister '07 | Yearling | Petervilla | White Angellos | Dk B/Br | Filly | 5/10/2007 |
| White Angellos '07 | Yearling | Petervilla | Wing It | Chestnut | Colt | 5/4/2007 |
| Wing It '07 | Yearling | Petervilla | Mirge | Chestnut | Colt | 2/5/2007 |
| Mirge '07 | Yearling | Hold For Gold | | | | |
| Wish For Gold '07 | Yearling | Petervilla | Wish For Gold | Dk B/Br | Filly | 2/28/2007 |

Longenecker Nov. Agree. 000012

Case 3:15-cv-00576-GNS-CHL   Document 87-3   Filed 12/07/17   Page 30 of 33 PageID #: 1854
Case 3:15-cv-00576-DJH   Document 1-3   Filed 07/01/15   Page 30 of 33 PageID #: 72
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 268 of 316

01/09/2009  16:55  8592558699          CRESTWOOD FARM          PAGE  06/08
1/04/2008  19:19  8592558699          CRESTWOOD FARM          PAGE  14

## EXHIBIT 5

### EVEREST STABLES - WEANLINGS

| Horse Name | Horse Type | Sire | Dam | Color | Sex | DOB |
|---|---|---|---|---|---|---|
| Abbreviated Career '08 | Weanling | Pollenville | Abbreviated Career | Bay | Colt | 4/27/2008 |
| Badinage '08 | Foal | Pollenville | Badinage | Chestnut | Filly | 5/14/2008 |
| Big Shoes '08 | Weanling | Glen's Causeway | Big Shoes | Bay | Colt | 2/15/2008 |
| Boot Um Bertie '08 | Foal | Pollenville | Boot Um Bertie | Dk B/Br | Colt | 5/7/2008 |
| Danziga Fashion '08 | Weanling | Pollenville | Danziga Fashion | Dk B/Br | Colt | 3/31/2008 |
| Discreet Account '08 | Weanling | Pollenville | Discreet Account | Dk B/Br | Filly | 4/10/2008 |
| Downtown Blues '08 | Weanling | Elusive Quality | Downtown Blues | Bay | Colt | 3/7/2008 |
| Dreams and Desires '08 | Weanling | Pollenville | Dreams and Desires | Dk B/Br | Colt | 2/24/2008 |
| Eleganta Chica '08 | Weanling | Pollenville | Eleganta Chica | Chestnut | Filly | 2/15/2008 |
| Flash of Fashion '08 | Weanling | Elusive Quality | Flash Of Fashion | Bay | Colt | 2/12/2008 |
| Forest Cat '08 | Foal | Pollenville | Forest Cat | Chestnut | Colt | 5/3/2008 |
| Houston's Piano '08 | Weanling | Pollenville | Houston's Piano | Bay | Filly | 2/20/2008 |
| Hushed '08 | Weanling | Pollenville | Hushed | Bay | Colt | 3/23/2008 |
| Inflammatory '08 | Foal | Pollenville | Inflammatory | Chestnut | Colt | 5/8/2008 |
| Isla Cozzene '08 | Foal | Pollenville | Isla Cozzene | Dk B/Br | Filly | 4/30/2008 |
| Isla Muleras '08 | Weanling | Pollenville | Isla Muleras | Bay | Filly | 3/11/2008 |
| Island Fashion '08 | Weanling | Storm Cat | Island Fashion | Dk B/Br | Filly | 2/4/2008 |
| It's Silent '08 | Weanling | Pollenville | It's Silent | Dk B/Br | Colt | 3/8/2008 |
| Just A Wish '08 | Foal | Pollenville | Just A Wish | Chestnut | Colt | 5/8/2008 |
| Look To Heaven '08 | Foal | Pollenville | Look To Heaven | Bay | Colt | 4/13/2008 |
| Mighty Might '08 | Weanling | Pollenville | Mighty Might | Dk B/Br | Colt | 3/27/2008 |
| Mini Dee '08 | Foal | Pollenville | Mini Dee | Dk B/Br | Colt | 5/21/2008 |
| Minimum Security '08 | Weanling | Pollenville | Minimum Security | Dk B/Br | Filly | 3/13/2008 |
| No No Pardimo '08 | Foal | Pollenville | No No Pardimo | Dk B/Br | Filly | 2/10/2008 |
| Out Of Step '08 | Foal | Pollenville | Out Of Step | Bay | Filly | 8/13/2008 |
| Political Hostage '08 | Weanling | Pollenville | Political Hostage | Dk B/Br | Colt | 3/11/2008 |
| Purely Excessive '08 | Foal | Pollenville | Purely Excessive | Dk B/Br | Colt | 4/20/2008 |
| Quiet Whisper '08 | Foal | Pollenville | Quiet Whisper | Bay | Filly | 5/18/2008 |
| Regal Boat '08 | Weanling | Pollenville | Regal Boat | Chestnut | Colt | 3/11/2008 |
| Royal Deception '08 | Foal | Pollenville | Royal Deception | Dk B/Br | Filly | 4/17/2008 |
| Salted With Fire '08 | Foal | Pollenville | Salted With Fire | Chestnut | Colt | 5/5/2008 |
| Shawshank Lady '08 | Weanling | Pollenville | Shawshank Lady | Bay | Colt | 3/17/2008 |
| Silent Storm '08 | Weanling | Pollenville | Silent Storm | Dk B/Br | Filly | 3/13/2008 |
| Six Zeroes '08 | Weanling | Pleasant Tap | Six Zeroes | Dk B/Br | Filly | 3/13/2008 |
| So Emotional '08 | Weanling | Pollenville | So Emotional | Chestnut | Colt | 4/11/2008 |
| Strider Sister '08 | Weanling | Pollenville | Strider Sister | Chestnut | Filly | 3/2/2008 |
| Taurus Moon '08 | Foal | Pollenville | Taurus Moon | Dk B/Br | Filly | 4/26/2008 |
| Two To Waltz '08 | Foal | Pollenville | Two To Waltz | Chestnut | Colt | 5/19/2008 |
| Untangled '08 | Weanling | Pollenville | Untangled | Chestnut | Colt | 3/24/2008 |

Longenecker Nov. Agree. 000013

Case 3:15-cv-00576-GNS-CHL   Document 87-3   Filed 12/07/17   Page 31 of 33 PageID #: 1855
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 269 of 316
Case 3:15-cv-00576-DJH   Document 1-3   Filed 07/01/15   Page 31 of 33 PageID #: 73

01/09/2009   16:56      8592558699          CRESTWOOD FARM              PAGE  07/08
1/04/2008   19:19      8592558699          CRESTWOOD FARM              PAGE  15

EVEREST STABLES - WEANLINGS

| Vertical Ascent '08 | Foal | Paris/ville | Vertical Ascent | Chestnut | Colt | 6/4/2008 |
|---|---|---|---|---|---|---|
| Voodoo's Sister '08 | Weanling | Paris/ville | Voodoo's Sister | Dk B/Br | Colt | 3/12/2009 |

Longenecker Nov. Agree. 000014

Case 3:15-cv-00576-GNS-CHL   Document 87-3   Filed 12/07/17   Page 32 of 33 PageID #: 1856
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 270 of 316
Case 3:15-cv-00576-DJH   Document 1-3   Filed 07/01/15   Page 32 of 33 PageID #: 74

01/09/2009  16:56    6592558699           CRESTWOOD FARM              PAGE  08/08

./24/2020  19:18    9592558699            CRESTWOOD FARM              PAGE  18

EXHIBIT 6

EVEREST STABLES  TWO YEAR OLDS

| Fame and Fashion | 2 Yr Old | Pattonville | Dancing Fashion | Gr/Roan | Filly | 2/31/2008 |
|---|---|---|---|---|---|---|

Longenecker Nov. Agree. 000015

Case 3:15-cv-00576-GNS-CHL   Document 87-3   Filed 12/07/17   Page 33 of 33 PageID #: 1857
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 271 of 316
Case 3:15-cv-00576-DJH   Document 1-3   Filed 07/01/15   Page 33 of 33 PageID #: 75

Page 1 of 1

Subj:     Re: Everest/Crestwood Revised Agreement - 11-04-08, 9:10 AM, MDT Draft
Date:     11/4/2008 10:50:08 A.M. Central Standard Time
From:     rambicure@rmplex.com
To:       timothynelson53@yahoo.com
CC:       shorse@aol.com

Looks good to me as revised. Hopefully, Pope will sign off on this and this matter can be put to bed. Just got a call from an agent/client at the Keeneland sales today. Yesterday was off 48% so it's not pretty.

----- Original Message -----
From: Tim Nelson
To: Pope Jr. McLean
Cc: Jeff Nielsen ; Bill Rambicure
Sent: Tuesday, November 04, 2008 11:16 AM
Subject: Everest/Crestwood Revised Agreement - 11-04-08, 9:10 AM, MDT Draft

Pope,

Attached for your review is a revised draft of Agreement between Everest Stables and Crestwood.

Tim

CONFIDENTIAL                    ESI009970

Case 3:15-cv-00576-GNS-CHL   Document 87-4   Filed 12/07/17   Page 1 of 34 PageID #: 1858
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 272 of 316
Case 3:15-cv-00576-DJH   Document 1-4   Filed 07/01/15   Page 1 of 34 PageID #: 76

# EXHIBIT 4

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

---

**Page 1**

```
 1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE EASTERN DISTRICT OF KENTUCKY
 2                           CENTRAL DIVISION AT LEXINGTON

 3   CRESTWOOD FARM BLOODSTOCK,     )
     LLC, et al.,                   )
 4                                  )
            Plaintiffs,             )   5:09-CV-317
 5                                  )   Lexington, Kentucky
           vs.                      )   May 26, 2010
 6                                  )   9:30 a.m.
     EVEREST STABLES, INC., et al.,)
 7                                  )   PRELIMINARY INJUNCTION
            Defendants.             )   HEARING
 8

 9                    TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE KAREN K. CALDWELL,
10                  UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:
13
     FOR THE PLAINTIFFS:      RICHARD A. GETTY, ESQ.
14                            DANIEL BROWN, ESQ.
                              Getty & Childers, PLLC
15                            250 West Main Street, Suite 1900
                              Lexington, KY  40507
16
     FOR THE DEFENDANTS:      THOMAS WILLIAM PAHL, ESQ.
17                            Foley & Mansfield, PLLP
                              250 Marquette Avenue, Suite 1200
18                            Minneapolis, MN  55401

19                            WILLIAM C. RAMBICURE, ESQ.
                              Rambicure & Miller, PSC
20                            219 East High Street
                              Lexington, KY  40507
21
     COURT REPORTER:          RHONDA S. SAMSON, RPR, CRR
22                            Federal Official Court Reporter
                              101 Barr Street, Room 412
23                            Lexington, KY  40507
                              859-619-3624
24
     Proceedings recorded by mechanical stenography, transcript
25   produced with computer.
```

---

**Page 2**

```
 1        (At 9:30 a.m. on May 26, 2010, with counsel for the parties
 2   and the parties present, the following proceedings were had.)
 3        THE HONORABLE KAREN K. CALDWELL:  Good morning.  Would
 4   the Clerk please call the matter to come before the Court.
 5        THE CLERK:  Yes, Your Honor.  Lexington Civil Matter
 6   5:09-CV-317, Crestwood Farm Bloodstock LLC, et al., versus
 7   Everest Stables, Inc., et al, called for a preliminary
 8   injunction hearing.
 9        THE COURT:  Would counsel for plaintiffs please make
10   their appearance for the record.
11        MR. GETTY:  Richard A. Getty, Getty & Childers.  Also
12   with me is Danielle Brown of our firm.
13        THE COURT:  Mr. Getty, Ms. Brown.  Thank you for being
14   here this morning.
15        Counsel for the defense.
16        MR. W. RAMBICURE:  Bill Rambicure, your Honor, and
17   Thomas Pahl, who is lead counsel.
18        THE COURT:  Mr. Rambicure, Mr. Pahl.
19        This matter is called for a hearing on Everest Stables'
20   motion for preliminary injunction.  So we will proceed with
21   the hearing on that matter.  As it is Everest Stables'
22   motion, I will hear from the defendant in this case.
23        MR. PAHL:  Thank you very much, your Honor.  Would you
24   prefer I be at the lectern?
25        THE COURT:  Yes, you may.
```

---

**Page 3**

Crestwood Farms v. Everest Stables, 5:09-CV-317

Preliminary Injunction Hearing (May 26, 2010)

```
 1        MR. PAHL:  Thank you.  May it please the Court.  Thank
 2   you very much for allowing me the privilege of being here this
 3   morning.  You are correct, that we are here on behalf of Everest
 4   Stables and its motion for a preliminary injunction.
 5        This is not the usual preliminary injunction, but I do
 6   think that it would help the Court if I were to be able to
 7   put on, I don't expect it to be more than five, maybe 15
 8   minutes at the most, of testimony in support of our motion.
 9        THE COURT:  You may.
10        MR. PAHL:  Thank you very much.  As the first witness,
11   Everest Stables calls Bill Rambicure.
12        THE COURT:  Mr. Rambicure, please come forward and be
13   sworn.
14        WILLIAM C. RAMBICURE, DEFENDANTS' WITNESS, SWORN
15        THE COURT:  Please proceed.
16        MR. PAHL:  Thank you very much, your Honor.
17                      DIRECT EXAMINATION
18   BY MR. PAHL:
19   Q.  Mr. Rambicure, please tell us your full name.
20   A.  William C. Rambicure.
21   Q.  Mr. Rambicure, how long have you been an attorney licensed
22   to practice in Kentucky?
23   A.  Since 1981.
24   Q.  And are you a member of the bar of the Federal District
25   Court here in Lexington?
```

---

**Page 4**

Crestwood Farms v. Everest Stables, 5:09-CV-317

Preliminary Injunction Hearing (May 26, 2010)

```
 1   A.  I am.
 2   Q.  Have you ever been disciplined, fined, or sanctioned by a
 3   Court in this Federal District?
 4   A.  No.
 5   Q.  Have you ever been sanctioned, fined, or disciplined by any
 6   Court at any time?
 7   A.  No.
 8   Q.  Before I ask my next line of questions, I do need to ask
 9   you --
10        MR. PAHL:  Your Honor, if you don't mind, this is a bit
11   directed to you, as well.  Mr. Rambicure is going to be asked
12   questions that I have no intention of delving into the
13   attorney-client privilege, even accidentally, and so I would
14   like the witness to be mindful of that.  I'll be mindful of
15   that.  And that is my intent, is to not divulge, even
16   unintentionally, any attorney-client privileged information.
17        THE COURT:  I understand, and I'm sure Mr. Rambicure
18   will be mindful.
19        MR. PAHL:  Thank you very much, your Honor.
20   BY MR. PAHL:
21   Q.  In the fall of 2008, Mr. Rambicure, were you engaged to
22   provide legal services by Jeffrey Nielsen for Everest Stables?
23   A.  Everest Stables, Inc.; yes, I was.  --
24   Q.  What services were you retained to provide?
25   A.  I was retained to assist in drafting an agreement that
```

Case 3:15-cv-00576-GNS-CHL   Document 87-4   Filed 12/07/17   Page 3 of 34 PageID #: 1860
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 274 of 316
Case 3:15-cv-00576-DJH   Document 1-4   Filed 07/01/15   Page 3 of 34 PageID #: 78

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

5

1   involved the transfer of a number of Mr. Nielsen's -- or I
2   should say Everest Stables, Inc.'s thoroughbred holdings in
3   order to enable Mr. Nielsen to reduce his holdings and to avoid
4   some administrative headaches associated with his wife and
5   children not being involved in the thoroughbred business, as he
6   was.
7        MR. PAHL: May I approach, your Honor?
8        THE COURT: You may.
9        MR. PAHL: Thank you.
10       THE COURT: We will proceed informally here today, so
11   counsel may approach witnesses for purposes of handing them
12   documents, if you would like.
13       MR. PAHL: That's for the Court. And that's Exhibit,
14   shall we call it A?
15       THE COURT: It's B to your previously filed motion.
16       MR. PAHL: Let's mark it B, to be consistent.
17       THE COURT: Very well.
18       MR. PAHL: Thank you very much.
19       (Defendants' Exhibit B was admitted into evidence.)
20   BY MR. PAHL:
21   Q.  Mr. Rambicure, I've put before you a document marked Exhibit
22   B and ask if you can identify that document.
23   A.  Yes. This is the final version, the executed version, of
24   the purchase and sale agreement that was entered into by and
25   between Everest Stables, Inc., and Crestwood Farm Bloodstock,

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

7

1   paragraph for that particular sentence?
2   A.  Well, this agreement contemplated that a number of these
3   horses -- or most of these horses, if not all of these horses,
4   were going to be sold at public auction. There was the ability
5   to sell some of them privately, as well.
6        But the idea here was, um, title to a number of these
7   horses was going to be transferred from Everest Stables,
8   Inc., to Crestwood. I'll just refer to it as Crestwood, if
9   that's okay, but the LLC. And then there would be a division
10   of the net sale proceeds from the public auction sales of
11   these horses.
12       There were a couple of horses that were specifically
13   excepted out from that. In other words, Island Fashion and
14   the 2008 Storm Cat-Island Fashion filly was specifically
15   excluded from the horses, the title that would be transferred
16   over to Crestwood.
17       Since title was being transferred of all the other horses
18   to Crestwood, the idea was to prevent Crestwood from setting
19   RNAs on the horses that it would be selling, because
20   Mr. Nielsen would not have any sale proceeds to look to to
21   get his percentage back from.
22       So this was specifically crafted so as to prevent
23   Crestwood from selling horses with no reserve, or from RNAing
24   horses, or from buying back horses that wouldn't generate
25   proceeds for I'll call it Mr. Nielsen, but truly Everest

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

6

1   LLC, on November 4, 2008.
2   Q.  What was your role in connection with this document?
3   A.  My role was essentially as a scrivener, a drafter of the
4   document that went through a number of prior drafts before this
5   one was finalized and executed. But that was my role.
6   Q.  Okay. I'd like to direct your attention to Paragraph 7,
7   which is found on Page 3 of Exhibit B.
8   A.  Yes, sir.
9   Q.  Who drafted or prepared that paragraph?
10  A.  I did.
11  Q.  And when you --
12  A.  With the -- with the exception that there was some language
13  revised at Mr. Longenecker's request or e-mail. He sent an
14  e-mail proposing a change to this paragraph on November 4, 2008,
15  to take out language that dealt with "best efforts" and to
16  substitute "all commercially reasonable efforts." But other
17  than that, this was what I drafted.
18  Q.  That's what you drafted?
19       I'd like to ask you to take a look, it's about in the
20  middle, and I apologize to both you and the Court. It's not
21  the greatest copy, I see. There's a sentence that begins
22  with the words "For all horses to be sold." Do you see that
23  sentence?
24  A.  I do.
25  Q.  What was the purpose, in your mind, when you drafted that

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

8

1   Stables. That was the idea.
2   Q.  Did you propose restricting Everest's ability to buy back,
3   RNA, or set reserves for any of the horses covered by this
4   agreement?
5   A.  No, that was not something that was specified in this
6   agreement at all.
7   Q.  And in fact, the agreement is silent, and it was not your
8   intent to restrict that?
9   A.  That's correct.
10  Q.  Now, you're one of the attorneys of record, along with
11  myself, for Everest Stables; is that right?
12  A.  Yes, sir.
13  Q.  And have you had an opportunity to review the opposition
14  memorandum that was filed in connection with this preliminary
15  injunction hearing?
16  A.  I have.
17  Q.  And in particular, that portion which states that Paragraph
18  7, quote: "Was specifically negotiated by Crestwood and agreed
19  by Everest and was included in order to prevent Everest from
20  placing unrealistic reserves on all of Everest's best horses."
21  A.  I'm familiar with that; yes, sir.
22  Q.  Is that true?
23  A.  No, that's not true. I'll tell you that prior to the
24  execution of this agreement I had no negotiations, no
25  communications with Crestwood or its representatives, or

Case 3:15-cv-00576-GNS-CHL   Document 87-4   Filed 12/07/17   Page 4 of 34 PageID #: 1861
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 275 of 316
Case 3:15-cv-00576-DJH   Document 1-4   Filed 07/01/15   Page 4 of 34 PageID #: 79

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

9

1  Mr. Longenecker.
2      The only thing that I had seen prior to the execution of
3  this agreement that dealt in any way with Crestwood's
4  position with respect to Paragraph 7 was a copy of an e-mail
5  that Mr. Longenecker sent to Pope McLean on November 4th in
6  which Mr. McLean, in turn, forwarded to either Tim Nelson or
7  Jeff Nielsen, which basically suggested that Mr. Longenecker
8  wanted to delete the "best efforts" language and substitute
9  "commercially reasonable efforts" language, and that was it.
10     That wasn't something that was negotiated, it was that he
11  wanted that in there. And I didn't see any difference
12  between "best efforts" and "commercially reasonable efforts"
13  that changed anything else in this agreement.
14         MR. PAHL: Your Honor, we're going to call this one A,
15  so that we don't have a skip.
16         THE COURT: Very well.
17      (Defendants' Exhibit A was admitted into evidence.)
18  BY MR. PAHL:
19  Q. Mr. Rambicure, I have handed you a document that's been
20  marked as Exhibit A for this hearing and ask if you can identify
21  this document.
22  A. Yes. This appears to be a copy of the fax transmittal to
23  Pope McLean -- McLean -- at Crestwood Farm dated October 31,
24  2008, from Tim Nelson, which was copied to Jeff Nielsen, and the
25  attached purchase and sale -- draft of the purchase and sale

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

10

1  agreement that was sent along with that.
2  Q. If you would turn to Exhibit A at Page 2 of the agreement, I
3  think it's Page 3 of the fax.
4  A. Yes, sir.
5  Q. You will see a Paragraph 7 in that document. Do you see
6  that, Mr. Rambicure?
7  A. Yes, I do.
8  Q. If you can, would you take a look and compare, side by side,
9  Paragraph 7 from Exhibit A to Paragraph 7 in Exhibit B?
10     And the first thing that jumps out at me is the title is
11  different.
12  A. The title is different. In the October 31st draft, it is
13  titled or headed "Best Efforts." In the final executed version,
14  it's headed "Crestwood's Duties and Responsibilities."
15  Q. Who made that change to the caption or title of this
16  Paragraph 7?
17  A. I suggested that change.
18  Q. And why did you do that?
19  A. It seemed to me that numbered Paragraph 7 dealt with more
20  than just best efforts, that "best efforts" was kind of a
21  limiting phrase, and I wanted to be clear that these were
22  Crestwood's duties and responsibilities to Everest under the
23  terms of this agreement.
24  Q. And why didn't you entitle it "Crestwood and Everest's
25  Duties?"

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

11

1  A. Because this was Crestwood's duties and responsibilities,
2  not Everest's.
3  Q. If you would, again, go to the final sentence in Exhibit A,
4  Paragraph 7. So that you're clear, I'm talking about the draft
5  October 31st version.
6  A. Yes, yes.
7  Q. The final -- the final sentence is actually -- in the final
8  version, it's two separate sentences about unaffiliated third
9  parties.
10  A. Yes.
11  Q. What were you intending when you drafted this? I gather
12  you're the author of the draft version, also.
13  A. Well, again, the concern was similar to the concern with
14  respect to RNA and so on. It -- the concern on not wanting
15  Crestwood to be able to sell to the affiliated third parties had
16  to do with the concept that these horses had been in Crestwood's
17  possession, care, custody, and control -- for the most part, all
18  of these horses had been in Crestwood's care, and
19  control here in Kentucky for quite some time.
20     Mr. Nielsen was up in Minnesota, and the thought was that
21  Crestwood had significantly more knowledge about the horses,
22  their condition, their health, that type of thing, than what
23  Mr. Nielsen might have.
24     And so the idea of not wanting them to sell to affiliated
25  third parties was that we didn't want Crestwood to be able to

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

12

1  somehow take steps that would lead to a purchaser that was
2  aligned with or associated with Crestwood getting a
3  tremendously good deal on the purchase price, to Everest
4  Stables' disadvantage.
5  Q. Self-dealing, if you will?
6  A. Self-dealing, if you will.
7         MR. PAHL: I have nothing further for the witness.
8  Thank you very much, your Honor.
9         THE COURT: Very well. And it's every lawyer's dream to
10  get to cross-examine another lawyer. So, Mr. Getty.
11         MR. GETTY: Not when he's such a good friend of mine, so
12  I'll have to try and go easy on him. I tell people he's one of
13  my best friends.
14      Your Honor, we have some exhibits in a binder which I
15  think could be passed around at this time. Could I hand it
16  to Mr. Rambicure?
17         THE COURT: You may.
18         MR. GETTY: I have one for your law clerk, too.
19         THE COURT: All right. Why don't you give that to the
20  Clerk to use during this.
21                    CROSS EXAMINATION
22  BY MR. GETTY:
23  Q. Mr. Rambicure, you understand that the focus of this hearing
24  today is very precise, do you not? That we're dealing with the
25  issue of the proceeds from the September 2009 sale and the

Case 3:15-cv-00576-GNS-CHL   Document 87-4   Filed 12/07/17   Page 5 of 34 PageID #: 1862
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 276 of 316
Case 3:15-cv-00576-DJH   Document 1-4   Filed 07/01/15   Page 5 of 34 PageID #: 80

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

13

1  holdback on the Island Fashion-Storm Cat filly?
2  A. Yes.
3  Q. So I want to try and keep the attention -- your attention
4  and that of the Court's -- on that precise issue, because that's
5  what we're really here to talk about, isn't it?
6  A. Well, I was asked to testify to what I testified to, yes.
7  Q. Whether it was -- whether it was appropriate to basically
8  put those funds into an escrow account and offset them because
9  Mr. Nielsen put an RNA in on the Island Fashion-Storm Cat filly.
10 You understand that's the main issue here, don't you?
11 A. I understood that one of the main issues, if not the
12 single-most important issue, was the construction of the
13 contract and what the contract provided.
14    But I also understood that it dealt with the proceeds
15 from the sale of the RNA that Everest believes had been
16 wrongfully withheld by Crestwood and deposited into an
17 interest-bearing CD.
18 Q. Right. I mean, basically what we're talking about here on
19 this motion is that Mr. Nielsen, through Steve Johnson from
20 Margaux Farms, RNA'd a horse for $900,000; and Crestwood takes
21 the position that under this contract, this November 2008
22 contract, that that was, with the fall of a hammer, a sale for
23 which they would be entitled their 25 percent.
24    Do you understand Crestwood's position is that?
25 A. Yeah. There were, I think, two questions in there. I

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

14

1  understand that that's Crestwood's position, yes.
2  Q. Okay. And you also understand that the funds were put in
3  CDs to draw the highest rate of interest possible by Crestwood,
4  don't you?
5  A. I understand that that is the position that Crestwood is
6  taking. My understanding is that that didn't happen until after
7  this motion was filed.
8  Q. They were placed in an escrow account originally bearing
9  interest, a money market fund, and then were placed in CDs. You
10 understand that's the steps, don't you?
11 A. I don't know what date that took place on.
12 Q. Well, I'll represent to you that that was the case.
13    Could we agree that the Court registry here, if you place
14 the funds into the Court, you will draw a lower interest rate
15 than a CD currently?
16 A. I think that's right.
17 Q. Okay. And in point of fact, since this motion was filed
18 Crestwood actually offered to go ahead and pay it into the
19 Court, even though there would be a lower interest rate. Right?
20 A. Yes, I saw a letter from you to that effect.
21 Q. I actually put it in a letter yesterday. And despite that
22 offer, Everest, Mr. Nielsen, has refused to have it placed in
23 the Court?
24 A. That's correct. Mr. Nielsen wanted to proceed with the
25 hearing on this motion.

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

15

1  Q. Okay. Let's go back and take a look, if we would -- first
2  of all, let's talk about the economic times. We all remember
3  September-October of 2008. People of our generation won't
4  forget it for a long time, will we?
5  A. No, that's correct.
6  Q. It was one of the worst economic downturns in our lifetime,
7  perhaps the worst, was it not?
8  A. It was a significant downturn, it was.
9  Q. And I believe you said that, in your testimony, Mr. Nielsen
10 wanted to reduce his holdings and eliminate some administrative
11 matters that would burden others; is that correct?
12 A. Yes, that's correct.
13 Q. I mean, basically, he was looking to disperse a major
14 portion of his herd and get out of the business, wasn't he?
15 A. I'm not sure that he was totally going to get out of the
16 business at that point in time. His --
17 Q. I'll correct it and say "substantially."
18 A. As I understood, his single biggest driving impetus was
19 driven by concerns for his health and concerns that his wife and
20 kids wouldn't be able to handle the administrative tasks
21 associated with remaining in the horse business. So he was
22 interested in getting -- in dispersing, in an orderly fashion,
23 his horses.
24 Q. Did you understand that economic matters, or the press of
25 economic matters, had something to do with that?

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

16

1  A. No.
2  Q. Were you aware of any kind of situation involving his
3  business that had had a downturn up in Minnesota or the Midwest?
4  A. No.
5  Q. Were you aware of his company losing a condemnation case?
6  A. No.
7  Q. Were you aware that he sued his own lawyers, Leonard,
8  Street, & Deinard, and threatened to pursue claims against them?
9  A. That's the first time I heard that; no, sir.
10 Q. But these were bad economic times in the midst of a
11 downturn?
12 A. They were -- they were bad economic times, absolutely.
13 Q. Who is Tim Nelson?
14    MR. GETTY: Your Honor, I may get these confused. It is
15 Jeff Nielsen who is in the courtroom today with Everest Stables,
16 and Tim Nelson --
17    THE WITNESS: Tim Nelson is in the courtroom today.
18 BY MR. GETTY:
19 Q. I'm sorry. Tim Nelson?
20 A. Tim Nelson is here. Mr. Nielsen was unable to be here
21 today.
22 Q. I got them confused, you're correct.
23    Tim Nelson, who is he?
24 A. As I understand it, Tim Nelson works for Mr. Nielsen,
25 although he lives in Colorado and Mr. Nielsen lives in

Case 3:15-cv-00576-GNS-CHL   Document 87-4   Filed 12/07/17   Page 6 of 34 PageID #: 1863
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 277 of 316
Case 3:15-cv-00576-DJH   Document 1-4   Filed 07/01/15   Page 6 of 54 PageID #: 81

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

| Crestwood Farms v. Everest Stables, 5:09-CV-317<br>Preliminary Injunction Hearing (May 26, 2010) | Crestwood Farms v. Everest Stables, 5:09-CV-317<br>Preliminary Injunction Hearing (May 26, 2010) |
|---|---|
| 17 | 19 |

**Page 17**

1  Minnesota. It's my understanding that Tim Nelson is kind of
2  Jeff's right-hand man.
3  Q.  Is he a lawyer?
4  A.  I understand that he is licensed to practice. I don't know
5  that he's actually a practicing lawyer.
6  Q.  He went to law school and he has a law degree, and he has a
7  license to practice law, right? But he doesn't practice law?
8  A.  I have never asked him, Rich, if he still has a license to
9  practice. I understand that he went to law school, I understand
10  he has a law degree. I understand that at some point he was
11  licensed. Whether he is still licensed or not, I don't know.
12  Q.  If you would, take a look at Exhibit A. It's dated October
13  31, 2008.
14  A.  Yes, sir.
15  Q.  It was handed to you by Mr. Pahl.
16  A.  Yes, sir.
17  Q.  It's from Mr. Nelson, who is here, to Jeff Nielsen --
18  technically, to Pope McLean. It's dated August 31st, and he has
19  a purchase and sale agreement attached. Right?
20  Q.  The date was October 31st, not August 31st.
21  Q.  Did I say August?
22  A.  I thought so.
23  Q.  I must be getting old. August and October.
24  It says October 31?
25  A.  Yes.

**Page 19**

1  A.  I would typically -- since Mr. Nelson was Jeff's kind of
2  right-hand man, my best recollection is that I would send them,
3  the drafts, to both Jeff Nielsen and Tim Nelson simultaneously,
4  by e-mail.
5  Q.  Okay. Take a look at Exhibit 1 in the book, the booklet
6  there.
7  A.  Yes, sir.
8  Q.  That is -- I guess October 31st would be a Friday. It
9  appears as though it was sent at 1:02 p.m., Exhibit A.
10  A.  I'm on -- I'm on Exhibit 1 in the binder; is that right?
11  Q.  No, I'm looking back at Exhibit A. That was sent on October
12  31st, it looks like at 1:02 in the afternoon on Friday, October
13  31st.
14  A.  Yes.
15  Q.  If you look at Exhibit 1 in the binder.
16  A.  Yes, sir.
17  Q.  It's another e-mail from Tim Nelson on Saturday, at 12:20 in
18  the afternoon, to Pope, Jr. That's Pope McLean, Jr.
19  A.  I see that; yes, sir.
20  Q.  Okay. And do you know which -- which McLean the Exhibit A
21  was sent to the day before? Was it Pope, Jr.?
22  A.  I think it just says "Pope McLean." It doesn't specify Jr.
23  or Sr. I have always associated Pope McLean as being Sr., but I
24  don't know.
25  Q.  Being as it designated the e-mail the next day to Pope, Jr.,

| Crestwood Farms v. Everest Stables, 5:09-CV-317<br>Preliminary Injunction Hearing (May 26, 2010) | Crestwood Farms v. Everest Stables, 5:09-CV-317<br>Preliminary Injunction Hearing (May 26, 2010) |
|---|---|
| 18 | 20 |

**Page 18**

1  Q.  It's not copied to you, is it?
2  A.  No.
3  Q.  Isn't it true that Mr. Nelson actually prepared the first
4  draft of this document?
5  A.  No, that's not true. I prepared several iterations of this
6  document, going back to I think the first draft that I prepared
7  would have been October 14th of 2008.
8  Q.  Can you explain why Mr. Nelson didn't send you a copy or
9  show you as having a copy?
10  A.  I assume -- you'll have to ask Mr. Nelson that. I wasn't
11  involved in the negotiations. My role was as a scrivener.
12  Q.  You were merely a scrivener, so you never really had any
13  discussions, either with Mr. Nielsen or with Pope McLean, Sr.?
14  A.  Without waiving the privilege, I think I can say that I had
15  a number of conversations with Mr. Nielsen. As for Mr. Nelson,
16  I never had any discussions with Pope McLean, Sr., or Pope
17  McLean, Jr., about this, except maybe to ask that they send a
18  list of horses that would be included in this agreement. I
19  actually think Tim Nelson asked for that to happen.
20  Q.  Did you ever have any discussions regarding the agreement
21  with Mr. Longenecker, who was representing the McLeans?
22  A.  Prior to the execution of the agreement, no.
23  Q.  And what were the nature of your discussions? I mean, you
24  would have prepared some drafts and sent them to Mr. Nielsen,
25  not Nelson?

**Page 20**

1  would it be fair to say that Pope, Jr., was the recipient of the
2  document? That would seem logical, wouldn't it?
3  A.  I don't know how to answer that, Richard. It could be that
4  anything could have happened here. It could be that either
5  Pope, Jr., or Pope, Sr., may have contacted Tim Nelson and asked
6  that this document, a Word version of the agreement, be e-mailed
7  so that they could work off the e-mail version and just sent it
8  to Pope, Jr. That would be my best guess, but I don't know.
9  Q.  You don't know, do you?
10  A.  No, I don't know.
11  Q.  Looking at Paragraph 7 of the agreement, I've highlighted
12  some portions here.
13  A.  Okay.
14  Q.  This paragraph is entitled "Best Efforts." It says:
15  "Crestwood should exercise its best efforts with the utmost good
16  faith, for and on behalf of both Crestwood and Everest, to
17  properly prepare the subject horses for sale and to market,
18  offer for sale, and to sell the subject horses either at public
19  auction or at private sales in order to maximize the sales
20  prices for each such horse."
21  A.  Yes.
22  Q.  It would be in the interest of both parties to maximize the
23  sales price, because there were splits being agreed to,
24  ultimately, under this agreement?
25  A.  Assuming that everybody's operating in good faith, I think

Case 3:15-cv-00576-GNS-CHL   Document 87-4   Filed 12/07/17   Page 7 of 34 PageID #: 1864
Case 3:15-cv-00576-DJH   Document 1-4   Filed 07/01/15   Page 7 of 34 PageID #: 82
Case 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 278 of 316

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

**Crestwood Farms v. Everest Stables, 5:09-CV-317**
**Preliminary Injunction Hearing (May 26, 2010)**

21

1  that's right. I think that's right.
2  Q. All right. And the phrase that you've testified to says,
3  "For all horses to be sold at public auction, Crestwood agrees
4  and covenants that each horse should be sold with no reserve,
5  RNA, or buyback price and will be allowed to sell at auction to
6  unaffiliated third parties." Right?
7  A. "And will be allowed to sell." Okay. I take that back. I
8  see what it says, but I don't think that's what they intended.
9  Q. And if you flip over, if you look at this agreement,
10  basically it lists a number of horses in different paragraphs
11  and how they are to be -- if they are sold, who gets what.
12  There's a schedule listed or referred to, is there not?
13  A. Hang on, Rich. I misspoke. I was misreading this. "Will
14  be allowed to sell at auction to unaffiliated third parties."
15  That was -- that was what was intended. I'm sorry. I was
16  reading "unaffiliated third parties."
17     Now, where are you?
18  Q. I want to go next to Exhibit 2.
19  A. Okay.
20  Q. That came several days later. And this was sent by Tim
21  Nelson, again, to Pope, Jr., and he's copying you now. So you
22  would have received Exhibit 2?
23  A. Yes.
24  Q. The e-mail with the attachment, correct?
25  A. Yes.

**Crestwood Farms v. Everest Stables, 5:09-CV-317**
**Preliminary Injunction Hearing (May 26, 2010)**

22

1  Q. And at that point in time, there's a change. "Crestwood's
2  Duties and Responsibilities" is the heading, right?
3  A. Yes. And numbered Paragraph 7 is bolded, yeah, and that was
4  my suggestion.
5  Q. Okay. And the language is still the same with respect to
6  best efforts, is it not?
7  A. Yes, with the utmost good faith, yes.
8  Q. And there's some language added at the end. The same
9  sentence is in there with respect to "covenants that each horse
10  shall be sold with no reserve, RNA, or buyback price. Crestwood
11  shall sell at auction or by private sale only to unaffiliated
12  third parties."
13     And it goes on to say: "The parties agree that in the event
14  any subject horses, either unsold after auction or attempts to
15  privately sell hereunder, title of such subject horse shall
16  remain with Crestwood without additional consideration."
17  A. Yes, that's what it says.
18  Q. So that's being added in this draft?
19  A. Yes, that was something -- that was something new.
20  Q. Do you know who suggested that?
21  A. Well, I don't, Rich, because I wasn't involved in any
22  communications directly with Pope, or Pope, Jr., or Dave
23  Longenecker. I thought that that was language that Tim Nelson --
24  wanted in there, but I don't know.
25  Q. You don't know that?

**Crestwood Farms v. Everest Stables, 5:09-CV-317**
**Preliminary Injunction Hearing (May 26, 2010)**

23

1  I'm just trying to follow the flow of how this developed.
2  If you look now at Exhibit 3, that's another version sent --
3  If you look at Exhibit 2, it was sent at 11:26 in the
4  morning, and then this came at 3:33 in the afternoon.
5  A. Okay.
6  Q. And between those two transmissions, if you look at
7  Paragraph 7 the heading remains the same but the language has
8  changed to say that "Crestwood shall exercise all commercially
9  reasonable efforts." Is that not right?
10  A. Yes, "with the utmost good faith."
11  Q. Isn't that a phrase that you learned -- did you not learn
12  that that phrase was insisted upon by Dave Longenecker, that he
13  thought "commercially reasonable" was a better description of
14  what Crestwood should do?
15  A. What I remember, Rich, and what I already testified to was
16  there was an e-mail from Dave Longenecker to Pope McLean, which
17  was forwarded in turn to Pope McLean -- I'm not sure if it was
18  Jr., or Sr., but by one of the McLeans. It was forwarded to Tim
19  Nelson, and he had that comment on that paragraph, the gist of
20  which was that he thought that "best efforts" had different
21  meanings for different people. He didn't like that and wanted
22  to substitute "commercially reasonable efforts."
23     I saw that was a change that he wanted, and it didn't
24  seem to be unreasonable to me. It didn't, to me,
25  significantly change what the parties were agreeing to.

**Crestwood Farms v. Everest Stables, 5:09-CV-317**
**Preliminary Injunction Hearing (May 26, 2010)**

24

1  Q. I want you to skip over -- we will get back to Exhibit 4,
2  but look at Exhibit 5 in the book, please.
3  A. Okay.
4  Q. I've highlighted different portions of the agreement.
5  A. Okay.
6     MR. GETTY: Do you have it, your Honor?
7     THE COURT: Yes.
8  BY MR. GETTY:
9  Q. First of all, this is the executed version of the purchase
10  and sale agreement that the parties agreed to, is it not?
11  A. Yes, it looks the same as we've already -- Everest has
12  already identified.
13  Q. It's just a little bit better version. You can read it a
14  little bit more clearly.
15  A. I appreciate that.
16  Q. If you look at the bottom of Page 2, the top of Page 3,
17  under "Consignment of Public Auction Sale," it says that
18  "Crestwood shall consign for sale and shall offer for sale and
19  sell at recognized 2009 Kentucky public auction sales as
20  mutually agreed and determined between Everest and Crestwood the
21  41 thoroughbred yearling horses identified in Exhibit No. 5."
22     Do you see that?
23  A. Yes, I do.
24  Q. The point of this agreement was that Mr. Nielsen was going
25  to sell or disperse a substantial portion of his herd.

Case 3:15-cv-00576-GNS-CHL   Document 87-4   Filed 12/07/17   Page 8 of 34 PageID #: 1865
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 279 of 316
Case 3:15-cv-00576-DJH   Document 1-4   Filed 07/01/15   Page 8 of 34 PageID #: 83

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

25

1  A.  This was a purchase and sale agreement.  He was intending to
2  sell the horses that were the subject matter of this agreement,
3  yes.
4  Q.  Didn't you understand that during this period of time that
5  certain horses were going to be sold in January of 2009; and
6  then there were also going to be some weanlings, which would be
7  yearlings, sold at the September 2009 sale?
8  A.  Yes.  As this agreement went through the different
9  iterations, yes, we understood that there was a January mixed
10  sale, I believe it was, at Keeneland that some of these horses
11  would be able to get into.  There were entry deadlines to comply
12  with in order to get them into those sales.
13      Some of these horses were not deemed appropriate for that
14  sale and would need to be sold at a later sale in September
15  at yearling sales.  So I think that this agreement
16  contemplated that some of these horses would be sold at
17  different times.
18  Q.  And some lesser horses might be sold privately --
19  A.  Yes.
20  Q.  -- so as to not place them in auctions and reduce average
21  prices?
22  A.  Yes.
23  Q.  If you have a good horse, you don't want to sell a
24  lesser-quality horse from the same stallion or mare, say, if you
25  are going to reduce the average price of that progeny.  Right?

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

26

1  A.  I guess it depends on what you're trying to accomplish at
2  the time.
3  Q.  All right.
4  A.  If -- If what you're trying to accomplish is to eliminate
5  some of the costs associated with maintaining these horses and
6  you are going to sell all of them, that's one thing.
7      If what you're trying to do is hope to hit the long ball
8  with the best of the litter, so to speak, it's all variable,
9  in my mind.
10  Q.  My point is:  This agreement dealt with the option of
11  selling some of them privately?
12  A.  Oh, yes, it did.  Certainly.
13  Q.  And the point here is everybody understood as part of this
14  agreement that this was an ongoing process.  Some of the horses
15  would be sold in January, the upcoming sale, and then other
16  horses would be kept and maintained by Crestwood -- boarded,
17  fed, cared for -- right up through September of 2009 and beyond.
18  Correct?
19  A.  Yeah.  This agreement contemplated that horses would be sold
20  at different sales and different time periods and that, um, the
21  out-of-pocket expenses associated with the care of those horses
22  that were the subject of this agreement would now be borne by
23  Crestwood.
24      Crestwood had historically boarded these horses for Everest
25  and had charged Everest for that at, you know, whatever the per

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

27

1  diem rate that they were charging, which presumably included
2  markup for profit.
3      What Crestwood was essentially doing here was, they were
4  agreeing to foot the bill for the out-of-pocket expenses for
5  these horses that were the subject matter, until such time as
6  they were sold.
7  Q.  Exactly.
8  A.  And they weren't going to be making --
9  Q.  And they agreed to certain splits; certain horses, if they
10  were sold, 50/50, at the fall of the hammer or whatever they got
11  at the sale; those horses, Crestwood gets 50 percent and Everest
12  gets 50 percent.  Right?
13  A.  Yeah, there were different splits for different horses.
14  Q.  And some of them were different.  Some horses were
15  specifically excepted, so it was 75/25, right?
16  A.  Yes, that's right.
17  Q.  And during this whole period of time, were you aware that
18  the board bills were around $100,000 a month for these horses,
19  for this whole herd?
20  A.  Yes, I was.  Believe me, I was aware that Jeff Nielsen or
21  Everest Stables was paying a significant amount of money each
22  month to Crestwood for boarding and caring for those horses.
23      Crestwood is -- I don't think charged itself for those
24  same boarding expenses, is the point I guess I'm trying to
25  make.

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

28

1  Q.  My point to you is, if you take November-December of 2008 --
2  A.  Right.
3  Q.  -- and then from January through September, that's 9, 10, 11
4  months, that's a million at $100,000 a month.
5  A.  That would be a million one if Jeff Nielsen was paying the
6  board charges that Crestwood would have been charging Everest.
7  That's a different critter.  Crestwood was not paying itself the
8  board.  They were foregoing the profit.  What they were -- what
9  they were eating were the out-of-pocket expenses that were
10  associated with the care of these horses.
11  Q.  Which were substantial for those eleven months?
12  A.  Well, it would be substantially less than a million one,
13  because all they are paying out of pocket, as I understood it,
14  it would be vet charges, farrier charges, blacksmith charges;
15  truly out-of-pocket expenses that they are reaching into their
16  pocket for.
17      What they are foregoing, what they gave up here, was the
18  profit they were making on the charging of the board bills.
19  That was certainly a significant issue for Jeff.
20  Q.  And a significant savings to Mr. Nielsen?
21  A.  Yeah, but when you compare the two, it was -- you know,
22  Crestwood presumably had, for the most part, the same operating
23  expenses to operate the farm.
24  Q.  Would you agree with me that it would be a significant
25  number, perhaps in excess of $500,000 or $600,000, to keep these

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

---

**Crestwood Farms v. Everest Stables, 5:09-CV-317**
**Preliminary Injunction Hearing (May 26, 2010)**

29

1    horses? You know what board bills are? You know what board
2    charges are, don't you?
3    A. Sure, but the board bills are just a fantasy in my mind,
4    because they weren't — I haven't seen it, and perhaps they
5    didn't, but I don't think Crestwood sent board bills to itself
6    charging the per diem rate it had charged Everest.
7         What they were paying, what they would have been
8    responsible for paying, would have been the vet expenses, the
9    farrier expenses, those types of out-of-pocket expenses. And
10   I don't think that those would have been all that
11   significant. It certainly would not have been multiple
12   hundreds of thousands, in my mind.
13   Q. You don't know?
14   A. At least, from the documents that I've seen to this point,
15   it would not have been anywhere close to that.
16   Q. But you would agree with me that they were foregoing some
17   factor that they would have gained as a result of continuing to
18   board these horses?
19   A. Sure, they were charging and collecting on the board for
20   these horses. What they were doing was getting their money on
21   the back end from the percentage allocations and profit
22   distributions.
23   Q. Would you agree when the horses occupied space on that farm
24   that they would eliminate the ability of Crestwood to put some
25   other horse at normal board rates within the market and then

---

**Crestwood Farms v. Everest Stables, 5:09-CV-317**
**Preliminary Injunction Hearing (May 26, 2010)**

30

1    forego that possibility?
2    A. I think the word "possibility" is the only word they've got.
3    I think that that's true. If they had other clients with other
4    horses that they could have brought out there, what they were
5    giving up was the profit on the board.
6    Q. Were you aware that the rates that Mr. Nielsen had were
7    below market, compared to the rates they charged their other
8    clients?
9    A. I understood that Crestwood is — that is the position they
10   have taken in this. I don't have enough knowledge to know what
11   they were actually charging their other clients, so I don't know
12   if it would differ or not. My understanding, from what they
13   submitted, is that some of the board rates for some of their
14   clients were higher; and others, for others of their clients,
15   were about the same.
16   Q. All right. Well, let's focus on this document and finish up
17   with that. If you look at Exhibit 5, the horse that is at issue
18   here — the Island Fashion-Storm Cat filly — is listed on
19   Exhibit 5, is it not?
20   A. Your Exhibit 5, yes. The first time it's listed is numbered
21   Paragraph 1 on Page 1, where it's agreed that Everest shall
22   "retain title and ownership to Island Fashion and the 2008 Storm
23   Cat-Island Fashion filly from the effective date of the
24   agreement to the sale of the horses, at public auction or
25   otherwise."

---

**Crestwood Farms v. Everest Stables, 5:09-CV-317**
**Preliminary Injunction Hearing (May 26, 2010)**

31

1         And then I think it's also included somewhere in one of
2    the exhibits.
3    Q. But it's referred — there's several horses like those two
4    that are referred to specifically, because there's a different
5    split. It's not a 50/50 split, like on other horses; there's a
6    75/25 split, where Everest gets something more.
7    A. That's part of it. The other significant thing to me was
8    that the Island Fashion mare and the 2008 Storm Cat-Island
9    Fashion filly were horses that title was not being transferred
10   to Everest for. In other words, Crestwood was retaining
11   ownership-slash-title to those two horses, unlike all the other
12   horses that were the subject matter of this agreement.
13        But certainly, as you have indicated, there were
14   different splits of the profits, as well.
15   Q. Well, look at Page 4, Paragraph A.
16   A. 4? Okay. Under "EA?"
17   Q. Yes, "EA," "Purchase Price." It says: "For purposes of
18   this agreement, the term 'net sales proceeds' for any of the
19   subject horses selling at public auction shall mean, quote, the
20   fall of the hammer."
21   A. Sales price.
22   Q. "The sales price for each such horse after the deduction of
23   the thoroughbred auction company's standard sales commission,
24   without any credits or offsets whatsoever."
25   A. Yes, that's correct.

---

**Crestwood Farms v. Everest Stables, 5:09-CV-317**
**Preliminary Injunction Hearing (May 26, 2010)**

32

1    Q. Do you see anything there or in any other part of this
2    agreement that says that these horses, other than that the
3    horse — the Storm Cat filly, Island Fashion-Storm Cat filly, is
4    to be treated any differently, other than the split being higher
5    to Everest?
6    A. Do I see anything in there?
7    Q. Let me be more pointed. Do you see anything in here that
8    specifically says that a reserve may be set on any horse by
9    Everest? It doesn't exist in the agreement, does it?
10   A. The agreement does not say that. It does say that Crestwood
11   shall not set reserve, shall not RNA, shall not buy back, under
12   the heading of "Crestwood's Duties and Responsibilities."
13        There is no similar provision, no similar heading of
14   Everest's duties and responsibilities, that says that Everest
15   can or cannot do that.
16   Q. Well, Paragraph 7 imposes obligations on both parties, not
17   just on Crestwood, doesn't it? Look at the last sentence: "The
18   parties agree that in the event any subject horse is either
19   unsold after auction or attempts to privately sell hereafter" —
20   "hereunder, title to such subject horse shall remain with
21   Crestwood, without additional consideration."
22   A. That's correct, that's what it says. But bear in mind when
23   it says "Title to such subject horse shall remain with
24   Crestwood," title to the Island Fashion and title to the 2008
25   Island Fashion foal never were transferred, under this

---

Case 3:15-cv-00576-GNS-CHL   Document 87-4   Filed 12/07/17   Page 10 of 34 PageID #: 1867
Case 3:15-cv-00576-DJH   Document 1-4   Filed 07/01/15   Page 10 of 34 PageID #: 85
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 281 of 316

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

33

1   agreement, to Crestwood by Everest.
2       And so, at least as I read that -- that sentence, it's
3   limited to those horses, the title to which have been
4   transferred under this agreement to Crestwood by Everest.
5       That's how I read it.
6   Q.   Look at Paragraph B on Page 4. There are a couple of
7   references to this Storm Cat-Island Fashion filly that I'd like
8   you to look at.
9   A.   Sure.
10  Q.   Do you see in the middle of B, it says: "Provided, however,
11  that Everest shall be entitled to and shall be paid by Crestwood
12  75 percent of the net sales proceeds to the 2008 filly, Storm
13  Cat-Island Fashion, listed on Exhibit No. 5, and any net sales
14  proceeds for said filly exceeding $1 million shall be paid 100
15  percent to Everest."
16  A.   Yes, that's correct.
17  Q.   I mean, in reading that sentence, would you not agree with
18  me that that contemplates that that horse is going to be sold?
19  It doesn't say, "This will happen, but if Everest decides to buy
20  it back something else is going to happen." It's unlimited in
21  its scope, isn't it?
22  A.   I guess I would have to say I disagree with that, Rich. I
23  think that this agreement has to be read in its entirety.
24  Q.   And it has to be construed against Everest, because the
25  draftsman initially was either you or Mr. Nelson?

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

34

1   A.   Well, in part, that's true. But, for instance, as you've
2   suggested, there were changes that were made at
3   Mr. Longenecker's suggestion, such as substituting the
4   commercially reasonable language for the best efforts language.
5       I guess my point would be that if you're -- he's
6   essentially the scrivener of that portion.
7   Q.   Let me ask you a question. Let me get right to the heart of
8   it.
9       Is it your position or is it Everest's position that,
10  with respect to any horse covered by this agreement, that
11  Mr. Nielsen and Everest could have RNA'd it, bought it back?
12  Yes or no?
13  A.   Well, that's a difficult question. Let me tell you how --
14  how I think I can best answer it.
15  Q.   Well, I would just like you to answer it --
16  A.   The way you want me to, I know.
17  Q.   -- yes or no. You can explain all you want. Do I
18  understand your position to be --
19      THE COURT: Counsel, counsel, counsel; talk, ask a
20  question, answer the question. Our court reporter is having
21  difficulty keeping up with the conversation.
22      MR. GETTY: I'm sorry.
23  BY MR. GETTY:
24  Q.   Bill, my question is simple. You understand, don't you,
25  that Everest has taken the position in this case that any

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

35

1   horse -- not just this Storm Cat filly, but any horse they could
2   have put -- they could have bought it back or RNA'd it?
3   A.   Well, I'm not sure that that's precisely Everest's position
4   in this case. My -- my take on it is this; that specifically
5   with respect to the horses which Everest remained the owner of,
6   okay? Didn't transfer title to. In other words, Island Fashion
7   and the 2008 Storm Cat-Island Fashion filly, that they
8   certainly, as I view it, had the right under the terms of this
9   agreement -- Everest had the right, I believe, to RNA it or to
10  buy it back, to do whatever it wanted to do.
11      I think it's more problematic, Rich, with respect to all
12  of the other horses that are the subject of this agreement,
13  the title to which have been transferred.
14  Q.   So --
15  A.   Because the -- let me finish this. Because, as I understand
16  the Keeneland rules and the applicable statutes, the owner of
17  the horse, as it goes through the auction, is the one with the
18  right to set reserves or not. Okay?
19      So here, since this agreement as I interpreted it,
20  Crestwood became the registered titled owner of all of these
21  horses, with the exception of Island Fashion and the 2008
22  Storm Cat-Island Fashion filly. That's one of the reasons
23  why we made the specific provision in Paragraph 7 that says
24  "For all horses to be sold at public auction, Crestwood
25  agrees and covenants that each horse shall be sold with no

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

36

1   reserve, RNA, or buyback.
2       That was for those horses whose title and ownership had
3   transferred over to Crestwood, because Everest did not want
4   them to be able to do something shady with respect to these
5   horses and not have -- and have the title to those horses
6   remain with Crestwood afterwards.
7   Q.   So --
8   A.   That would have been a --
9   Q.   So the two horses -- the two horses that were kept titled in
10  Everest's name were to be treated differently?
11  A.   I think so, yeah.
12  Q.   Would you agree with me that there is no specific reference
13  to their being treated differently in any page of this document?
14  A.   I would disagree with that. I think they are treated
15  differently in Paragraph 1, under "Transfer of Title." We have
16  already gone over that. That's huge.
17      They are treated differently, I think, under Paragraph 7,
18  the last sentence, where "Title to the subject horse shall
19  remain with Crestwood, without additional consideration."
20  Again, those two horses, title never went. There was nothing to
21  remain. So I think --
22  Q.   My point is, there is nothing in this agreement that says,
23  with respect to how they're sold, that they are to be treated
24  differently in terms of each horse shall be sold with no
25  reserve, RNA, or buyback price. That's the language.

Case 3:15-cv-00576-GNS-CHL   Document 87-4   Filed 12/07/17   Page 11 of 34 PageID #: 1868
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 282 of 316
Case 3:15-cv-00576-DJH   Document 1-4   Filed 07/01/15   Page 11 of 34 PageID #: 86

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

37

1   A.  No, it's not.
2   Q.  And Paragraph 7 says, "For all horses to be sold at public
3   auction."
4       Were these horses to be sold at public auction?
5   A.  You're leaving out, to me, the most significant and
6   operative language, which is that "Crestwood agrees and
7   covenants." That's "Crestwood agrees and covenants to Everest
8   that each horse shall be sold with no reserve, RNA, or buyback."
9   Q.  Just bear with me a minute. It says "For all horses to be
10  sold at public auction?
11  A.  That's correct.
12  Q.  Is there anything there that says, "Except for the two
13  horses noted above?" It doesn't say that, does it?
14  A.  If you read the agreement in its entirety, that's to me the
15  clear import.
16  Q.  It says that "Crestwood agrees and covenants," and then it
17  continues and says -- you know what "each" means, don't you?
18  A.  I would think so.
19  Q.  I wouldn't have to show the dictionary to you to have us
20  agree on what "each" means. It says: "Each horse shall be sold
21  with no reserve, RNA or buyback." It doesn't say "Each horse,
22  except for the Island Fashion-Storm Cat filly" or the other
23  horse, does it?
24  A.  It says: "Crestwood agrees and covenants that each horse
25  shall be sold with no reserve, RNA or buyback." It does not say

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

39

1   that's right, yes.
2   Q.  And not once, but down in C it says -- it talks about the 50
3   percent to Crestwood. But then it says, and it makes an
4   exception. It says: "Except that Everest shall be entitled to
5   and shall be paid 75 percent of the net sales proceeds received
6   for the 2008 Storm Cat-Island Fashion filly, as described
7   above."
8   A.  That's correct.
9   Q.  And that contemplates the sale of that horse, doesn't it?
10  A.  It contemplates that there will be net sales proceeds
11  available for distribution.
12  Q.  "Shall be entitled to and shall be paid 75 percent of the
13  net sales proceeds received from Storm Cat-Island Fashion?"
14  A.  Correct.
15  Q.  It's not talking about other horses. It means if that horse
16  is sold, they get 75 percent. Right?
17  A.  If that horse is sold; in other words, not RNA'd. If that
18  horse is sold, I will agree with you.
19  Q.  It doesn't say any limitation about the right not to sell
20  it. The whole agreement, if you read it as a whole,
21  contemplates that all these horses, including these horses, are
22  growing to be sold, and they are going to be sold with no
23  reserve and no RNA. Doesn't it?
24  A.  I can't agree with that statement.
25  Q.  The last question on this page and on this document. You

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

38

1   that Everest agrees and covenants that each horse shall be sold
2   with no reserve, RNA or buyback price.
3   Q.  And in Paragraph E, on Page 4, it's Paragraph 7, under
4   "Purchase Price," subparagraph B, in the middle. I read you
5   that sentence?
6   A.  Yes, yes.
7   Q.  It says: "Everest shall be entitled to and shall be paid by
8   Crestwood 75 percent of the net proceeds for the 2008 filly
9   Storm Cat-Island Fashion listed on Exhibit 5." And it says over
10  a million, they get everything over a million, right?
11  A.  Yeah, we've already gone over that.
12  Q.  It doesn't say if it's not sold because a reserve is set or
13  an RNA is established or buyback occurs on behalf of Everest,
14  does it?
15  A.  No, but it says the "net sales proceeds." As you know,
16  Rich, if an owner RNAs a horse, it's treated as a no-sale.
17  There are no sales proceeds that flow when an owner RNAs a
18  horse.
19  Q.  My simple point, Bill, is this: There's not a sentence
20  added to this agreement that says, "Everest has the right to RNA
21  or buy this horse back," is there?
22  A.  No.
23  Q.  It's treated no differently than any other horse. In point
24  of fact, it says if it's sold how you split the profit, right?
25  A.  It says they get 75 percent of the net sales proceeds;

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

40

1   see where D, it says: "Shall be entitled to offset from amounts
2   payable above any undisputed board bills?"
3   A.  Yes.
4   Q.  You understood that, at least in that term, there was a
5   right of offset contemplated on the part of Crestwood, did you
6   not?
7   A.  I understood that, but that it was limited to any undisputed
8   board bills, nothing -- nothing beyond that.
9   Q.  Flip back to Exhibit 4. Have you seen that? It's a
10  January 9, 2009, letter.
11  A.  Okay.
12  Q.  Were you involved, or were you aware of the discussions
13  leading up to the January sale in which after this November
14  agreement had been signed that Mr. Nielsen vacillated on whether
15  he wanted to go forward or not?
16  A.  No. My best recollection, Rich, is that after November 4th
17  or 5th, I think my last communication with either Jeff Nielsen
18  or Tim Nelson was when one of them sent an e-mail on the 5th
19  saying that the agreement had been signed on the 4th. I didn't
20  have any further involvement, to the best of my knowledge, until
21  sometime in June of 2009.
22  Q.  You were out of the picture?
23  A.  That's correct.
24  Q.  The January 9th letter sent by Pope McLean, Sr., directly to
25  Jeff Nielsen. You've seen it before, haven't you?

---

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

41

1   A.  Certainly since June of 2009, when I got reinvolved in this,
2   I've seen it, yes.
3   Q.  Well, the first paragraph -- I think this is an important
4   letter, so why don't you take a moment and read the whole thing.
5       (Witness reviews exhibit.)
6       THE WITNESS:  Okay.
7   BY MR. GETTY:
8   Q.  The first paragraph talks under the agreement about the
9   title of the horses being transferred to Crestwood and then how
10  the proceeds are going to be divided.  And it refers to
11  Crestwood receiving 25 percent of sales price of certain horses
12  and 50 percent of others.
13      And then I want you to focus your attention on the second
14  paragraph.  It says:  "Under the agreement, the horses were
15  to be sold without reserve."  It doesn't say only some of the
16  horses, it says "the horses," doesn't it?
17      MR. PAHL:  Your Honor, may I object?  I think
18  Mr. Rambicure has indicated he didn't receive a copy of this
19  document until the summer of 2009.  Mr. Getty is doing a fine
20  job of reading from the document.  I'm guessing that your Honor
21  has a chance to review it, and perhaps we will hear from
22  Mr. McLean as to what he meant by it.  But it doesn't seem to me
23  that Mr. Rambicure has the foundation for the questions put to
24  him by Mr. Getty.
25      MR. GETTY:  We'll never know until we ask him.

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

42

1       THE COURT:  I think he said that he didn't see the
2   letter, but I will let you lay a little more foundation.  I'm
3   inclined to sustain the objection, but proceed with the
4   foundation, Mr. Getty.
5   BY MR. GETTY:
6   Q.  You did see the letter later on, did you not?
7   A.  Sometime after June, early June of 2009, many months later.
8   Q.  Would you agree with me on the face of the letter itself
9   that Mr. McLean is basically saying that any effort by Everest
10  to place a reserve price on certain of the horses would require
11  an amendment to the agreement that had been signed?
12  A.  I understand that was the position that Mr. McLean is
13  taking in this letter, that that was the legal position that he
14  was taking.
15  Q.  And he also took the position that Crestwood would be
16  entitled to a sharing ratio on the purchase price, whether the
17  price was determined by a bid by Everest or an independent third
18  party, did you not?
19  A.  I think the letter says what it says and presumably means
20  what it says, Rich.
21  Q.  Did you become aware of the fact that Mr. Nielsen, right
22  before the very first horse went into the ring, had an
23  opportunity to -- up until that time had an opportunity to
24  rescind the November agreement and get out of it and go back to
25  just paying all the board bills and paying a commission on the

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

43

1   sale of the horses?
2   A.  You're asking me questions that, at the time, I wasn't privy
3   to or aware of.
4   Q.  I understand, but did you later -- did you later come to
5   know that he had been given that opportunity?
6   A.  I later became aware that there were verbal --
7       THE COURT:  Well, I'm not sure I can answer that without
8   getting into the privilege, your Honor.
9   BY MR. GETTY:
10  Q.  Well, let me ask you this question.  I'm specifically
11  interested in Exhibit 6.  It's a rescission agreement that the
12  evidence will show was presented to him which he declined to
13  accept.
14      Were you aware of it at the time it was presented to him?
15  A.  No, I was not aware of this at the time.
16  Q.  You subsequently --
17  A.  This was sometime after June of '09 when I would become
18  aware of this.
19  Q.  You subsequently learned of that?
20  A.  I subsequently saw this, yeah, many months later.  Sometime
21  after June of '09.
22  Q.  And you were out of the picture, so to speak, until you were
23  brought back into this situation, what, sometime in March of
24  2009?
25  A.  I think it was June of '09, Rich.  I think that -- I think

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

44

1   that at some point, and I don't know exactly when, but that
2   Mr. Nielsen was using other Minnesota counsel, a fellow by the
3   name of George Eck.  And that may have been in the March time
4   period, but I wasn't involved in it at that time.
5   Q.  But you did become aware that he had that option or
6   opportunity and did choose not to do so?
7   A.  I was, again, without -- I understood this is a document
8   that I've seen.  I've had communications with Mr. Nielsen about
9   it, and I don't feel like, without -- I think I would be
10  violating the privilege, and I don't have Mr. Nielsen's
11  authority to do that.
12      THE COURT:  The Court understands the purpose of the
13  question and the reason that the witness can't or won't answer.
14  I think we should move on.
15      MR. GETTY:  Yes.  I am finished, your Honor.  I would
16  move for the introduction of Exhibits 1, 2, 3, 5, and 5.
17      THE COURT:  Okay.  No. 5 is already in as Exhibit B.
18      MR. GETTY:  B.
19      THE COURT:  So 5 is already admitted.  So 1, 2, and 3,
20  Mr. Getty?  And do you want to introduce 4?
21      MR. GETTY:  No. 4 is the letter that -- I think I'll
22  have to put that in there --
23      THE COURT:  Through someone else?
24      MR. GETTY:  Through Mr. Nelson.
25      THE COURT:  So 1, 2, and 3 will be admitted, and 5 is

---

Case 3:15-cv-00576-GNS-CHL   Document 87-4   Filed 12/07/17   Page 13 of 34 PageID #: 1870
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 284 of 316
Case 3:15-cv-00576-DJH   Document 1-4   Filed 07/01/15   Page 13 of 34 PageID #: 88

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

45

1 already admitted as Exhibit C.
2       (Defendants' Exhibit C was admitted into evidence.)
3       (Plaintiffs' Exhibit Nos. 1, 2, and 3 were admitted into
4 evidence.)
5       MR. GETTY:  Can we put 5 in, because it's better?
6       THE COURT:  We will substitute it.
7       MR. PAHL:  I have no objection to 1, 2, and 3's
8 introduction, and 5.  Thank you for having a better copy,
9 Mr. Getty.
10       THE COURT:  We will substitute the best copy into the
11 record.
12       (Plaintiffs' Exhibit No. 5 was admitted into evidence.)
13       THE COURT:  Any redirect?
14       MR. PAHL:  I just have a few matters.  Bill, I said just
15 a few minutes, 5 to 15.  I'm sorry.
16       THE WITNESS:  That's how it works.
17       THE COURT:  It's lawyer time.  We all know how that
18 goes.
19       MR. PAHL:  Thank you, your Honor.  I learned long ago
20 not to say, "Just one more question."
21             REDIRECT EXAMINATION
22 BY MR. PAHL:
23 Q.  I'd like to begin by something you were asked about, which
24 was mainly the offer made by Crestwood to pay the money into the
25 Court registry.

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

47

1 catch up with me.  I'm looking at again Paragraph 7, and the
2 final sentence.  We were asked some questions by Mr. Getty
3 about that final sentence.
4 A.  Um-hum.
5 Q.  Is it your understanding that that was a sentence proposed
6 by Crestwood?
7 A.  I wasn't clear on that.  Again, I didn't have any
8 communications with anybody from Crestwood -- whether it was
9 Pope, Sr., Pope, Jr., or Dave Longenecker -- at any point in
10 time prior to the execution of this agreement, with the one and
11 only exception being that e-mail from Mr. Longenecker with the
12 best efforts thing.
13       My guess is, in reading it, that that -- that would
14 probably have been information or a provision that Crestwood
15 would have requested, but I don't -- I don't know that.
16 There may have been e-mails or other communications between
17 Tim Nelson and Crestwood that may answer this for us.
18       There we go.  Okay.
19 Q.  Mr. Rambicure, I have just handed you a document that's been
20 marked as Exhibit C, and I would like to direct your attention
21 to the second page of Exhibit C.
22 A.  Yes, sir.
23 Q.  Thankfully, Mr. Longenecker or Pope McLean, Jr., or somebody
24 used the same numbering system -- Paragraph 7, numbered 7.
25 A.  Yes.

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

46

1 A.  Yes.
2 Q.  Do you remember that we were both, you and I, were faxed
3 that offer by Mr. Getty at my time, quarter to 12:00, which I
4 presume is a quarter to 1:00 your time?
5 A.  Yes.
6 Q.  And you knew that certain of us were already en route to
7 this, and we did reply promptly to Mr. Getty?
8 A.  You did.
9 Q.  Yes.
10 A.  You sent a quick e-mail.
11 Q.  Thank you.
12       You were asked a question about Exhibit B and whether it
13 was fair to say that Pope McLean, Jr., is the recipient of --
14 I'm sorry, Exhibit A.  I misspoke.
15 A.  Yes.
16 Q.  Fair to say that when people want to refer to Pope McLean,
17 Jr., for the most part they know to call him Pope, Jr., as
18 opposed to Pope?
19 A.  That -- I don't know him well enough to say.  You know, I've
20 always referred to Pope McLean, Sr., as "Pope" and I've always
21 understood that his son goes by "Pope, Jr."  But that's the
22 extent of my knowledge.
23 Q.  Do you have Exhibit No. 2 in Mr. Getty's book?
24 A.  Yes.
25 Q.  And if you would -- and I'll allow you and the Court to

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

48

1 Q.  And you see at the very end it speaks about "Add a sentence
2 to address no-bid, no-sale horses?"
3 A.  Yes, I see that.
4 Q.  And that's the magic sentence that has now found its way
5 into the final agreement?
6 A.  Yes, that's correct.
7 Q.  It looks to me, if you go back up to the prior sentence that
8 begins with "Delete."
9 A.  Yes.
10 Q.  And "Will be allowed."  Do you see that sentence?
11 A.  Yes.
12 Q.  That looks to me like somebody was trying to -- trying to
13 delete the notion --
14       MR. GETTY:  Objection as to what it looks like to him.
15       THE COURT:  I will let the witness testify as to his
16 belief, and I'll just take it and give it to weight.  Go ahead.
17       MR. PAHL:  Thank you, your Honor.
18       THE WITNESS:  If I'm reading this correctly, it says,
19 "Delete," in quotes, "and will allow to sell at auction to
20 unaffiliated third parties from last sentence of paragraph."  So
21 that would seem to me to be that they're wanting -- when I say
22 "they," that Crestwood is wanting that language deleted from
23 that paragraph.
24 Q.  In other words, they want to be able to sell to affiliated

---

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

49

1   third parties?
2   A.  Yes.
3   Q.  And were you willing to have that make its way into the
4   agreement?
5   A.  No, but I will tell you that this is the first time that
6   I've seen this document.
7   Q.  Okay.
8   A.  No.  That was the whole idea, of not allowing them to sell
9   to affiliated third parties.
10  Q.  Okay.  While we're here with this particular document --
11  actually, no, let's go back to Exhibit 2.
12  A.  Okay.
13  Q.  And we were looking at Paragraph 7.
14  A.  Yes, sir.
15  Q.  We haven't talked a lot about this language.  It's in the
16  very first sentence, "With the utmost good faith."
17       MR. PAHL:  Do you have a glass of water, Mr. Ramblcure?
18  Do you need a glass of water?
19       THE WITNESS:  You're wearing me out.
20       THE COURT:  There's some right here.
21       THE WITNESS:  Okay.  I'm with you.
22  BY MR. PAHL:
23  Q.  When you -- were you the author or drafter of that language?
24  A.  Well, "With the utmost good faith?"
25 · Q.  Yes.

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

51

1   believe that the agreement allows -- or why does Everest have
2   that right?
3   A.  Well, first of all, there's Kentucky statute on point, I
4   think, that deals with auctions.  And unless they're announced
5   otherwise, they are to be with reserve; in other words, the
6   owner has the right to set reserve prices and to RNA horses.
7   That's, I think, KRS 330.220.
8       Second is that Keeneland, under its own conditions of
9   sale, I believe makes it pretty clear that all of their
10  auctions are with that right on the part of the owner or the
11  owner's authorized agent to set reserve prices, to RNA
12  horses, or to buy back horses.
13      So clearly, at least to me, the right is there by law.
14  It's there by Keeneland's conditions of sale.  And as I read
15  this agreement, certainly with respect to those two horses,
16  anyway -- if not all of them -- whoever the owner was, in my
17  opinion, would have had the right to set a reserve price
18  unless the agreement made it clear otherwise.
19  Q.  I'd like to make sure.  I think the Court and your testimony
20  is clear that as to the two horses that were excepted and title
21  remained with Everest, Everest as the owner had that right to
22  RNA.  Would that be a fair encapsulation?
23  A.  Yes.
24  Q.  As to the other 60 -- I think it's 63 or maybe 64 horses for
25  which title was transferred to Crestwood; as Everest did not own

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

50

1   A.  Well, again, I'm not -- Mr. Longenecker was the author of
2   "Exercise its best efforts."  I was the author of "Utmost good
3   faith."
4   Q.  And what were you intending to convey by the use of those
5   words in this paragraph?
6   A.  Well, "Utmost good faith," I mean, that's pretty standard
7   fiduciary kind of language.  At least, in my mind, we wanted to
8   ensure that Crestwood was acting at all times as a fiduciary to
9   Everest, with -- with the idea of getting these horses prepared,
10  marketed, and sold in order to maximize the sales price.
11      And that was at least the driving part of this, was we
12  wanted the fiduciary duties to be inherent -- not only
13  inherent, but stated in this agreement.
14  Q.  There was quite a bit of colloquy between yourself and
15  Mr. Getty about out-of-pocket expenses and board bills.
16  A.  Yes.
17  Q.  Are you aware that requests for the actual out-of-pocket
18  expenses and the detail and support have been made of Crestwood
19  in this matter?
20  A.  Yes, I understand that requests -- numerous requests have
21  been made for that information.
22  Q.  And has Crestwood provided that information?
23  A.  To my knowledge, no.
24  Q.  You were asked some questions, and I believe your testimony
25  was that a reserve or RNA may be set by Everest.  Why do you

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

52

1   title, in theory it didn't have the right to RNA.  Would that be
2   kind of extenuating or rather extending your thought process?
3   A.  Yes.  Well, that was the thought process, because that's why
4   you want the language in Paragraph 7 that keeps Crestwood from
5   being able to RNA or buy back horses.  That's the precise reason
6   for that.
7   Q.  Because if Crestwood RNA'd any one of the 64 horses in which
8   it held title, without that restriction who would become the
9   owner?
10  A.  Well, particularly, when you look at the language in the
11  last sentence of Paragraph 7, title would remain with Crestwood,
12  and Crestwood would then own those horses and Everest would
13  receive nothing for them.
14  Q.  Because the subject horse, if you're looking at the last
15  sentence of Paragraph 7, that any subject horse is either unsold
16  after auction, so an RNA --
17  A.  Is unsold.
18  Q.  Title would immediately vest and remain forever with
19  Crestwood?
20  A.  That was the concern; that's correct.
21  Q.  There, I suppose, is a third option, maybe even a fourth
22  option; that is, if Crestwood was the agent for Everest then
23  Crestwood could, on behalf of Everest, buy back, assuming the
24  two parties could meet -- reach an agreement.
25  A.  Sure.

Case 3:15-cv-00576-GNS-CHL   Document 87-4   Filed 12/07/17   Page 15 of 34 PageID #: 1872
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 286 of 316
Case 3:15-cv-00576-DJH   Document 1-4   Filed 07/01/15   Page 15 of 34 PageID #: 90

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

53

1   Q.   Were there other paragraphs in this agreement in which the
2   parties kind of were going to work in good faith, a mutual
3   agreement type of thing?
4   A.   Yeah, I think that this agreement was replete with those
5   types of things.  I mean, it gave -- it gave Crestwood the right
6   to privately sell some of these horses.  It gave Crestwood the
7   right to make some decisions in the event that they decided that
8   some of the horses weren't worth it, to do something different.
9        I think that there were numerous provisions in this that
10  the parties could mutually agree to do something different
11  down the road.
12  Q.   I will help you out a little, Mr. Rambicure.  I'm sorry.
13       Would you turn to Exhibit -- let's use Mr. Getty's
14  Exhibit 5.
15  A.   Okay.
16  Q.   And if you turn to the top of Page 3 --
17  A.   Yes, sir.
18  Q.   -- you'll see he's highlighted a portion that I want to talk
19  about, just the second line of that, where it speaks to, "As
20  mutually agreed and determined by Everest and Crestwood."  Is
21  that one of those examples?
22  A.   That's one of those examples.
23  Q.   They didn't agree to it at the time of this November 4th
24  Agreement, did they?
25  A.   No.

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

54

1   Q.   In fact, they contemplated that they were going to have to
2   reach some of these agreements with utmost good faith in the
3   future?
4   A.   I think that's correct.
5   Q.   How about we turn to Paragraph 5, the second sentence of
6   Paragraph 5.
7   A.   Yes.  "The terms and conditions of such sales shall be
8   determined by mutual agreement between Everest and Crestwood."
9   Q.   Those weren't known to be certain as of November 4, 2008,
10  were they?
11  A.   No, those -- that refers to the 24 bred brood mares at that
12  time in Exhibit No. 3.  So, no, it wasn't known at the time.  It
13  was something that was going to be worked out later.
14  Q.   So I'll just speak to Topic No. 6.  It even, if its title,
15  speaks about mutual agreement --
16  A.   Correct.
17  Q.   -- and the details of it.
18       My point, Mr. Rambicure, is not every single instance was
19  locked down that these two parties had agreed they would
20  mutually work together with utmost good faith?
21  A.   Yes, I think that that's correct.
22  Q.   In fact, they could have mutually agreed to, say, not use
23  RNA or not buy back, but simply withdraw horses from a sale?
24  A.   I think that this agreement, as written, gave them the
25  ability to do that.

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

55

1   Q.   You were asked a question about -- and I'll ask you to turn
2   the page to Page 4, down at the bottom, Paragraph 8(D).
3   A.   Um-hum; yes, sir.
4   Q.   And the right of offset.
5   A.   Yes.
6   Q.   Is it your understanding that the -- that the efforts or
7   actions taken by Crestwood to retain the $219,000 that is the
8   subject of this motion is pursuant to an undisputed board bill?
9   A.   Clearly not.
10       MR. PAHL:   That's all I have.  Thank you, your Honor.
11       THE COURT:   Very well.  Mr. Rambicure, you may step
12  down.
13       THE WITNESS:   Thank you, your Honor.
14       MR. GETTY:   May I just have one?
15       THE COURT:   You have one question?  Okay, I will hold
16  you to one.  It may be a really long question with lots of
17  parts, you understand?
18       MR. GETTY:   Could I get two?
19       THE COURT:   Okay, you may get two.  He always has to
20  bargain.
21                 RECROSS EXAMINATION
22  BY MR. GETTY:
23  Q.   There were a lot of questions asked of you about mutual
24  agreement, if the parties could reach a mutual additional
25  agreement.  Would you agree with me that no mutual agreement

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

56

1   allowing a buyback or an RNA was ever put in writing or agreed
2   to by the parties, confirming any right to do what we object to
3   having been done with respect to the Island Fashion-Storm Cat
4   filly?
5   A.   If I understand your question correctly, Rick -- Rich, I
6   have to disagree with you.  I think, under this agreement, the
7   only party that was prohibited from RNAing or buying back the
8   horses to which they retained title was Crestwood, not Everest.
9        So I don't think -- so I think that this agreement was a
10  mutual agreement between the parties.
11  Q.   And even though you weren't involved and weren't aware of it
12  at the time, I showed you -- I showed you a letter dated January
13  9th in which Crestwood put Everest on clear notice that if they
14  bought a horse back or they bid on a horse, they were taking the
15  position they were entitled to their fair share.
16  A.   You showed me that letter, and I agreed that the letter said
17  what it said and presumably meant what it said.
18       MR. GETTY:   And may I have one more question?
19       THE COURT:   One more.
20       MR. GETTY:   Okay.
21       THE COURT:   And that's it.
22       MR. GETTY:   All right.
23  BY MR. GETTY:
24  Q.   Let me show you, and we'll mark it Exhibit 16 -- actually,
25  I'm not sure we need to make it an exhibit.  It's a statute.

Case 3:15-cv-00576-GNS-CHL   Document 87-4   Filed 12/07/17   Page 16 of 34 PageID #: 1873

Case 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 287 of 316
Case 3:15-cv-00576-DJH   Document 1-4   Filed 07/01/15   Page 16 of 34 PageID #: 91

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

57

1     THE COURT: All right.
2     THE WITNESS: This is 330?
3     MR. GETTY: Yes.
4  BY MR. GETTY:
5     Q.  Would you agree with me that Paragraph 5 -- why don't you
6  read into the record?
7     THE COURT: Well, tell me what it is.
8     MR. GETTY: It's KRS 330.
9     THE WITNESS: 220, sub 5.
10    THE COURT: I can take judicial notice of Kentucky
11  statute.
12    THE WITNESS: Thank you.
13  BY MR. GETTY:
14    Q.  Were you aware that no reserves had been set with Keeneland
15  on any of these horses? I will represent to you that all the
16  horses --
17    A.  Are you talking about before the --
18    Q.  In September.
19    A.  September?
20    Q.  Were you aware that the Island Fashion-Storm Cat filly and
21  any of those other horses, there were no reserves set on any of
22  those horses with Keeneland?
23    A.  If I understand your question correctly, no written reserve
24  was placed on any of those September 2009 sales horses by
25  Everest or by Crestwood? My understanding is that the agent for

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

59

1  the bid being made on an RNA basis, nobody went to Keeneland and
2  said, "Here is a reserve." In fact, all those horses were set
3  without reserve, weren't they?
4     A.  No, I disagree with that. The inherent right on the part of
5  the owner to set reserves on consignment is publicized by
6  Keeneland.
7     Q.  No document was filed with Keeneland by anyone prior to
8  these horses being RNA'd or setting any reserve on it, nor were
9  any other reserves set. Can you agree with me, now that I have
10  been precise?
11    A.  Yes, I can agree with that.
12    MR. GETTY: That's all I have.
13    THE COURT: I will note for the record that was more
14  than two questions.
15    MR. GETTY: Note my thankfulness to the Court.
16    THE COURT: Yes, Mr. Pahl?
17    MR. PAHL: I don't want to ask Mr. Rambicure. I would
18  simply like the Court to take note that Exhibit 8 sets forth the
19  Keeneland sales summary. You can read it for yourself.
20    THE COURT: All right. Thank you.
21    I think you can step down this time, Mr. Rambicure.
22    (Witness leaves the witness stand.)
23    THE COURT: Can we take just about five minutes for a
24  brief recess?
25    (Recess taken from 11:00 a.m. to 11:09 a.m.)

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

58

1  Everest, Margaux Farms -- Steve Johnson at Margaux -- signed the
2  purchase agreement with Keeneland for that, the $900,000 sales
3  price, specifically denoting it as RNA.
4     Q.  That wasn't my question.
5     Were you aware of the fact that no reserves were -- that
6  Keeneland was not advised that any reserves on any of these
7  horses had been set by anyone?
8     A.  Well, Keeneland was certainly advised by the RNA document
9  from Mr. Johnson that there was an RNA. And Keeneland accepted
10  it, as I understand it.
11    So I will agree with you -- at least as I understand the
12  facts, Rich -- that prior to the Keeneland September sale no
13  document was submitted to Keeneland by Everest saying, "We're
14  going to RNA this horse" or "We're setting a reserve price."
15    Q.  That's my point. And you would agree with me the second
16  sentence of subsection 5 says: "An auction without reserve
17  means an absolute auction?"
18    A.  Well, you stepped away from me. But the statute says what
19  it says, and my understanding was that, under Keeneland's
20  conditions of sale, this was specifically permitted the owners or consignors to set reserve prices, by
21  permitted the owners or consignors to set reserve prices, by
22  their conditions. It was.
23    Q.  None were set with Keeneland, though, were they?
24    A.  I think I answered that.
25    Q.  You take the position that RNA was a reserve. But prior to

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

60

1     THE COURT: Very well. Mr. Pahl, are you going to call
2  another witness?
3     MR. PAHL: I am not, your Honor.
4     THE COURT: All right.
5     MR. PAHL: Thank you very much.
6     THE COURT: You can pull that podium around, if you want
7  to.
8     MR. PAHL: Great. We covered pretty much what needed to
9  get covered, both affirmatively and in Mr. Getty's
10  cross-examination. So if your Honor would like, we would ask at
11  this point to proceed on our motion, unless there's going to be
12  testimony in opposition.
13    THE COURT: All right.
14    MR. PAHL: However your Honor wants to proceed.
15    THE COURT: Mr. Getty, are you going to call any
16  witnesses?
17    MR. GETTY: Yes, one or two.
18    THE COURT: Let's go ahead and hear all the witnesses,
19  and then I'll hear counsels' argument. Yes, Mr. Getty?
20    MR. GETTY: We may be prepared to eliminate -- we are
21  prepared to call the underbidders on Storm Cat filly. There was
22  an underbid of $875,000 and an underbid of $850,000.
23    We are prepared to call the witnesses. We actually have
24  a tape that we can provide to the Court that shows there were
25  underbidders. Mr. Nielsen's agent, Mr. Johnson from Margaux

---

Case 3:15-cv-00576-GNS-CHL   Document 87-4   Filed 12/07/17   Page 17 of 34 PageID #: 1874
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 288 of 316
Case 3:15-cv-00576-DJH   Document 1-4   Filed 07/01/15   Page 17 of 34 PageID #: 92

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

61

1    Farms, RNA'd the horse in question at $900,000. Obviously,
2    my client takes the position that it's entitled to 25 percent
3    of the fall of the hammer. It's our position that the horse
4    could have been sold for $850,000 or $875,000 at the fall of
5    the hammer on underbids.
6        We are prepared to stipulate that those are the amounts,
7    and we can provide the tape to show you that that occurred.
8        THE COURT: Let me see if I can't sort of fine-tune what
9    we're going to talk about today. To me, there's two questions
10   that I need to resolve today. We are talking about the 200 and
11   some-odd thousand dollars that Crestwood had withheld, Everest
12   asserts, wrongly, and that has to do with whether or not Everest
13   retained the right to either place a reserve or RNA the sale of
14   one horse, Island filly. Is that correct?
15       MR. PAHL: That is correct, your Honor.
16       MR. GETTY: That's their position now. Their position
17   has changed, as Mr. Longenecker is prepared to testify, that
18   previously they took a position that they could RNA or reserve
19   any horse. Now, as I understand for the first time from
20   Mr. Rambicure, they're saying only these two specific horses,
21   even though there's no separate, specific language saying that
22   they are dealt with differently.
23       THE COURT: I understand that may be an issue in the
24   larger context of this litigation, but today we are talking
25   about $219,000 which deals with one horse, Island filly. And

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

62

1    today, Everest's position is that Everest did retain the right
2    to place a reserve or to RNA the sale of Island filly; is that
3    correct, Mr. Pahl?
4        MR. PAHL: It's the filly out of Island Fashion, but you
5    have got it.
6        THE COURT: I'm sorry I'm calling it the wrong name.
7    It's the Island Fashion filly. So that's what I'm concerned
8    about, and that is that Crestwood has retained $219,000 that it
9    says that it's entitled to because Everest wrongfully RNA'd or
10   stopped the sale. So we're talking about $219,000 with respect
11   to the sale of one horse.
12       So it doesn't matter what Everest's position is with
13   respect to its ability to RNA other horses for purposes of
14   our discussion today, so I have to determine whether there's
15   a likelihood of success on the merits as to this one horse
16   and whether or not Everest retained that right.
17       Then, the more important issue is, is this the kind of
18   case to which a movant is entitled to injunctive relief? In
19   this case, you are asking basically for money damages. As we
20   all know, that's not traditionally the kind of relief that
21   parties seek with use of an injunction.
22       I have identified some authority that says that if a
23   party can demonstrate that money damages that is entitled
24   to, if there isn't immediate injunctive relief that this
25   party will face immediate, irreparable, irrevocable financial

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

63

1    ruin. That's where I would like to refocus this discussion.
2        I recognize there is a much broader disagreement here.
3    But number one, the issue of the one horse and whether or not
4    the right to reserve or RNA was retained; and number two, is
5    this the kind of matter for which injunctive relief is
6    appropriate?
7        Now, does anybody think there's anything else we really
8    have to decide today?
9        MR. GETTY: No, I think you have precisely focused on
10   what we're here to deal with. And frankly, your Honor, you
11   know, we both have put on or will put on some limited testimony,
12   but I believe the Court can decide this issue simply by looking
13   at the contract itself and other documentation and interpreting
14   the contract, as it must do, against Everest in this instance.
15       It's our position that if there were exceptions to these
16   procedures, that if they were allowed to do this, then it
17   would have said so, and you have to adopt the broad language
18   that says no reserves, no RNAs, et cetera, et cetera.
19       My client believes that it was deprived under this
20   agreement of the opportunity to have someone else buy this
21   horse for $25,000 less.
22       And if you logically look at this, if they had an
23   opportunity, let's say either all horses or just this one
24   horse, if they had the opportunity to go and RNA every one of
25   these horses, then why would my client do it?

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

64

1        THE COURT: I understand that's your argument.
2        MR. GETTY: Right.
3        THE COURT: I guess my issue is is if you want to
4    present any more evidence today. And as I understand Everest's
5    argument, anything that Crestwood would have retained on the
6    Island filly would have been inappropriately withheld,
7    regardless whether it was $25,000 or $200,000, or in whatever
8    amount.
9        Is that your position, Mr. Pahl?
10       MR. PAHL: That is our position, your Honor.
11       THE COURT: I understand what you are saying, Mr. Getty;
12   if they would have sold the horse then Crestwood would have
13   gotten something, as opposed to nothing.
14       MR. GETTY: I think you have put your finger on it in
15   terms of the key issues here, one of which is to get this kind
16   of extraordinary relief, they have to show that they are about
17   to be faced with ruin. They haven't done that.
18       THE COURT: Well, I want to hear their arguments. What
19   I really want to know right now is, do we need any more
20   evidence? That's a simple question. If you want to put your
21   witnesses on, you can. But that sounds to me like that might be
22   something you can do another day unless you have them here today
23   and you want to put them on.        —
24       MR. GETTY: I would like to put Mr. Longenecker on, very
25   briefly.

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

65

1   THE COURT:  Go ahead.
2      MR. GETTY:  And give up the tape, and you can watch it
3   and make it a part of the record, if you chose to do so.  That
4   will save calling both Donato Lanni and another gentleman named
5   Shenk.
6      THE COURT:  Mr. Pahl?
7      MR. PAHL:  What I would propose in that respect, your
8   Honor, is that he can submit it.  I think it's been transcribed.
9      MR. GETTY:  You can't transcribe it.  It's a videotape
10  of the bid spotters taking the bids.
11     MR. PAHL:  If I could have a week to say to your
12  Honor --
13     THE COURT:  To object to it?
14     MR. PAHL:  Exactly.  I haven't seen it.
15     MR. GETTY:  My point is, I don't think there's any
16  question there were underbidders there.
17     THE COURT:  But I don't think it matters, from our
18  discussion today, is my point.  But I'll let you put it in, and
19  we can all agree to disagree about this later.
20     (Plaintiffs' Exhibit No. 14 was admitted into evidence.)
21     MR. GETTY:  All right.
22     THE COURT:  I will take it, as represented by the
23  defense, that there were underbidders that were present, and
24  that can be proved by a film.
25     Is that good for us today?

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

67

1   A.  Yes, I have helped Crestwood with equine transactions.
2   Q.  When did you first become involved with what ultimately
3   became the November agreement?
4   A.  It was Halloween night; October 31, 2008.
5   Q.  Halloween night?
6   A.  Yes.  I was preparing my house.  I have a little boy who, at
7   the time, was two and a half.  And we were -- Halloween is a big
8   deal in our neighborhood, so we were preparing for the onslaught
9   of a lot of trick-or-treaters.  And late in the afternoon, I got
10  a call regarding that there was a contract that I needed to
11  review in this matter.
12  Q.  You live in my wife's hometown, Danville?
13  A.  That's right.
14  Q.  What documentation?  What was the first documentation
15  provided to you?
16  A.  I think it's been admitted into evidence.  There was a
17  draft, a three-page draft of -- I forget the title of the
18  document, but it outlined the agreement of the parties to
19  transfer a number of equine assets from Everest to Crestwood for
20  the purpose of selling them.
21  Q.  What was your understanding of the reasons driving this
22  transaction?
23  A.  Saving costs.  Everest apparently owned a lot of horses.  It
24  had made a decision to get out of the business and wanted
25  Crestwood to oversee the dispersal of the herd and bear the cost

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

66

1      MR. GETTY:  That's good.
2      THE COURT:  All right.  Call your witness, Mr. Getty.
3      MR. GETTY:  We call David Longenecker.
4   DAVID E. LONGENECKER, PLAINTIFFS' WITNESS, SWORN
5      THE COURT:  You may proceed, Mr. Getty.
6      MR. GETTY:  Thank you, you your Honor.
7               DIRECT EXAMINATION
8   BY MR. GETTY:
9   Q.  Mr. Longenecker, I'm going to try to get through your
10  testimony pretty quickly, hopefully much more quickly than
11  Mr. Rambicure's.
12     Would you tell the Court your full name and what your
13  position is.
14  A.  My name is David E. Longenecker.  I'm an attorney with
15  Stites & Harbison here in Lexington, Kentucky.
16  Q.  And you graduated the law school here?
17  A.  '99 graduate of the law school.  I have practiced at Stites
18  since I graduated.
19  Q.  Would it be accurate to say that you spend a substantial
20  amount of your time dealing with equine-related matters,
21  including transactional matters?
22  A.  Yes.
23  Q.  Were you involved -- have you represented the McLean family
24  and Crestwood Farm for some time, including prior to this
25  instance involving the contract -- the November 2008 agreement?

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

68

1   of the herd until they were all sold.
2   Q.  Did you participate in the series of drafts that were
3   exchanged back and forth between the parties?
4   A.  I provided comments to the draft, it sounds like was
5   initially drafted by Bill and Everest, and then I might have
6   provided some additional comments to a subsequent draft that had
7   reflected the changes that I recommended Crestwood make.
8   Q.  Do you have the booklet?
9   A.  Yes.
10  Q.  Explain, if you would, using Exhibits 1, 2, 3, and the
11  ultimate agreement which was signed, which was Exhibit No. 5;
12  sort of explain to the Court the process that you went through
13  with respect to this agreement; in particular, Paragraph 7.
14  A.  So I received Exhibit 1 initially.  With respect to
15  Paragraph 7, I initially focused on the obligation of Crestwood
16  to provide its best efforts in connection with sales efforts.
17     I was hesitant to allow Crestwood to agree to the
18  standard, because I had become aware of an obligation in a
19  best-effort standard being used to apply upon a person an
20  obligation to do everything under the sun in performing the
21  action which was subject to the best-effort standard.
22     And I knew that some of the horses that were the subject
23  of the agreement were of lesser-value, which was part of the
24  reason why the agreement was structured the way it was, and
25  that conceivably it could require Crestwood to take actions

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

69

1  which weren't commercially reasonable, which would cause it
2  to have to suffer a loss in its efforts to sell horses. And
3  I didn't think that that was appropriate.
4  Q.  Could you give me an example of what was -- you understood
5  would be contemplated in that regard to protect Crestwood?
6  A.  Advertising efforts could be very expensive, and you
7  wouldn't want to have to assume an obligation to advertise a
8  specific horse and, you know, have to expend significant
9  expenditures on advertising a horse if you knew it wasn't of a
10  value to justify the expenditure.
11  Q.  Was there in fact a group of horses, I think they're
12  referred to as the C category, that were of lesser quality that
13  were to be sold, if possible, by private means?
14  A.  Yes, there were -- there was a group of horses that were
15  identified to have less value than others that were not going to
16  be sold publicly in an effort to protect the price of the -- or
17  the potential sales prices of the public consignment.
18  Q.  The language here that is at issue: "For all horses to be
19  sold at public auction, Crestwood agrees and covenants that each
20  horse shall be sold with no reserve, RNA, or buyback price and
21  will be allowed to sell at auction to unaffiliated third
22  parties."
23      Were you involved in the process of drafting and
24  discussing this?
25  A.  For purposes of the initial draft, no. It appeared and it

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

70

1  was present in the initial draft that I reviewed.
2  Q.  In the initial draft that you reviewed, that would have been
3  something prepared by Mr. Nelson on behalf of Everest -- Nelson
4  or Rambicure?
5  A.  Somebody other than Crestwood, I assumed.
6  Q.  And in the initial draft, was there any kind of exception
7  set forth which would delineate or specify that this clause did
8  not apply to all horses involved?
9  A.  No, there's not. I didn't read it that way, I don't read it
10  that way, and I never read it that way.
11  Q.  And there's been some discussion about the title. The
12  heading was "Best Efforts" and then later was changed to
13  "Crestwood's Duties and Responsibilities."
14      You heard Mr. Rambicure's testimony that that heading was
15  changed as a result of his request. Do you agree with that?
16  A.  I think that's a fair statement. I've read the pleadings
17  relating to that point, and I'm aware that Everest is attaching
18  some significance to the change in the title, and so --
19  Q.  Did --
20  A.  Which is interesting. I think it's motivated by the removal
21  of the best-efforts standard, in my view. When the best-effort
22  standard was deleted, it no longer made sense for the section to
23  be entitled "Best Effort." So it looks like Bill plugged
24  something else in it.
25  Q.  Did you ever understand that those duties or the imposition

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

71

1  of the requirement that there be no reserve, no RNA, et cetera,
2  was solely imposed with respect to Crestwood and not with
3  respect to Everest?
4  A.  No.
5  Q.  And what -- if you look at the agreement itself, which is
6  Exhibit No. 5, was there ever any change to the agreement that
7  would have clearly and precisely, unequivocally, have
8  articulated this separate right to RNA the horse in question, or
9  any other horse that was going to be sold on the part of
10  Everest?
11  A.  No.
12  Q.  If you look at the agreement itself, Mr. Longenecker, can
13  you identify other portions of the agreement where there have
14  been specific provisions dealing with either the Island
15  Fashion-Storm Cat or the Island Fashion-Ghostzapper horses?
16  A.  Yes.
17  Q.  And what are those?
18  A.  For example, in Section 1, outlining the transfer of title
19  to the horses, the Island Fashion mare and the 2008 Island
20  Fashion filly are excepted from the transfer. They are subject
21  to a different sharing ratio on their sale.
22  Q.  So throughout this process, there were exceptions that dealt
23  with these two particular horses?
24  A.  That's correct.
25  Q.  Why was that?

Crestwood Farms v. Everest Stables, 6:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

72

1  A.  It was my understanding that Everest -- or Mr. Nielsen had
2  an emotional attachment to the horses, and he wanted to own them
3  when they went through the ring.
4  Q.  Would it also be fair to say that of the entire herd, so to
5  speak, that these were two of the perceived to be better horses,
6  or hopefully horses that would sell for a better price?
7  A.  That's my understanding.
8  Q.  And --
9  A.  And I think that's why -- why Everest had negotiated a
10  lesser sharing ratio for those two.
11  Q.  For those horses, for all the other horses, Crestwood got a
12  50/50 split. For these horses they only got 25 percent, and
13  then they were capped over a certain amount.
14  A.  Clearly -- clearly --
15  Q.  As to the Storm Cat filly, it was a million dollars. If you
16  reached a million dollars, everything over the million went to
17  Everest. Right?
18  A.  Correct.
19  Q.  And did anyone, during the course of these discussions with
20  you, in any kind of written communication or oral communication,
21  ever raise the possibility that these two horses -- that this
22  horse that we are talking about now, and let's call it the Storm
23  Cat filly -- was to be treated any differently in terms of there
24  were no reserves, RNAs, or price buybacks capable on any of
25  these horses?

Case 3:15-cv-00576-GNS-CHL   Document 87-4   Filed 12/07/17   Page 20 of 34 PageID #: 1877
Case 3:15-cv-00576-DJH   Document 1-4   Filed 07/01/15   Page 20 of 34 PageID #: 95
Case 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 291 of 316

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

73

1  A.  No.  Not until all this started, no.
2  Q.  Did you ever understand that -- did you ever understand that
3  Everest had the right, with respect to the Storm Cat filly
4  that's at issue here, to prevent its sale to a third party by
5  buying it back or RNAing it?  "RNA," for the record, means
6  "reserve not attained," correct?
7  A.  Correct.  And no, I was not aware of that right.
8  Q.  Did you become aware of the fact that when all of these
9  horses -- well, first, let me go back a step.
10     In order to sell these horses at Keeneland, there's a
11  process that you have to go through, isn't there?
12  A.  Yes.
13  Q.  And you have to register the horses, do you not?  You have
14  to file papers with Keeneland giving their bloodline.  You have
15  to approve catalog sheets, all of those things, don't you?
16  A.  That's correct.
17  Q.  And with respect to all of these horses, do you understand
18  that that process was followed?
19  A.  Yes.
20  Q.  Did you understand that, with respect to these horses, that
21  all of them -- that none of them had a reserve set of any sort
22  with Keeneland?
23  A.  That's my understanding.
24  Q.  If you want to set a reserve, how do you go about doing that
25  with Keeneland, in your experience?

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

74

1  A.  I think you notify the Keeneland office prior to the sale.
2  Q.  And with respect to these, you've been involved in this
3  process with respect to other horses that were sold at Keeneland
4  for other clients, right?
5  A.  Yes.
6  Q.  And to your knowledge, was any reserve ever set for this
7  Storm Cat filly?
8  A.  Not to my knowledge.  Not until we learned after the sale
9  that the ticket had been signed "RNA."
10  Q.  In fact, signing the ticket "RNA" would not be an accurate
11  description if no reserve had been set, would there?
12  A.  It's unusual.
13  Q.  Were you involved in the discussions that took place with
14  Keeneland after this occurred and with Mr. Everest --
15  Mr. Nielsen and Everest?
16  A.  You know, I don't remember.  I believe I was.  Yeah, I was a
17  participant in the conversation, either directly or with
18  Crestwood.
19  Q.  Are you aware that Keeneland took the position that no RNAs
20  took place after this?
21     MR. PAHL:  Objection, your Honor.  Hearsay.
22     THE COURT:  I will permit it and give it whatever weight
23  it deserves.  Please proceed.
24     THE WITNESS:  Say that again?
25  BY MR. GETTY:

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

75

1  Q.  Were you aware that Keeneland, after this matter was brought
2  to its attention by Crestwood, took the position that they would
3  not accept RNAs on any other additional horses?
4  A.  Yes, I'm aware of it.
5  Q.  With respect to the use of an RNA with regard to a Storm Cat
6  filly, what do you understand that act to be in terms of the
7  November 2008 agreement?
8     Let me rephrase it.
9     Is there any provision which specifically excepts out or
10  allows a reserve to be set or an RNA to occur with respect to
11  either the Storm Cat filly or any other horse under this
12  agreement?
13  A.  No.  I -- I think the agreement is very clear.  It says, in
14  very clear language, that the horses that are the subject of the
15  agreement are to be sold without reserve and are not to be
16  bought back.
17     I think the agreement has very clear language on this
18  point.
19     THE COURT:  That goes to my question, in looking at
20  Paragraph 1, this definition of the subject horses.  Those are
21  set forth in Exhibits 1, 2, 3, 4, and 5 of the agreement, and
22  then also I note that the Island Fashion filly and the
23  Ghostzapper -- the Island Fashion horse and foal and the
24  Ghostzapper are excepted out.
25     Is it your intention that those two horses are within the

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

76

1  definition of the subject horses?
2     THE WITNESS:  Yes, your Honor.
3     THE COURT:  I'm sorry, Mr. Getty, I just wanted to get
4  to what this means.
5     MR. GETTY:  That's a good point.
6     THE WITNESS:  Yes, that is a good point.  When I
7  initially read the agreement, I paused at the same spot.  I
8  think specifically what the exception in Paragraph 1 is in
9  respect of is the obligation to transfer title.
10     As counsel for Everest had made clear, these horses -- and I
11  think Crestwood would not quarrel with this point.  These horses
12  were not to have transferred -- have title transferred to
13  Crestwood; however, they are subject horses to be sold under the
14  agreement.
15     THE COURT:  All right.
16     THE WITNESS:  And I think, in the context of the rest of
17  the agreement and the obligation of Crestwood to Everest with
18  respect to those horses and preparing them for sale, I think
19  it's the only fair reading of the agreement.
20     THE COURT:  All right.
21     MR. GETTY:  In fact, your Honor -- and I'll point
22  Mr. Longenecker's attention to it -- the actual horse at issue
23  here, the Island Fashion-Storm Cat, is treated no differently.
24  It's one of many horses listed on Exhibit 5.
25  BY MR. GETTY:

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

77

1  Q.  Is that correct, Mr. Longenecker?
2  A.  That's correct.
3  Q.  It's actually 1, 2, 3, 4, 5, 6, 7, 8 -- 17 entries down on
4  the list, is it not?
5  A.  It is.
6  Q.  I want to ask you about Exhibit No. 4, which is the letter
7  that Pope McLean, Sr., wrote on January -- dated January 9th,
8  but I believe it was sent January 12th.
9       Prior to the January sale, were you involved in some
10  discussions that took place concerning the possibility of
11  negating the signed, agreed-to document which had been signed
12  in November of 2008?
13  A.  I became aware, yes.
14  Q.  Okay.  And were you asked to undertake an assignment
15  regarding preparing an agreement to rescind the purchase and
16  sale agreement entered into in November?
17  A.  I was.
18  Q.  All right.  Can you identify Exhibit No. 6 as the exhibit
19  that -- as the agreement to rescind which you prepared with
20  respect to that possibility?
21  A.  I do.
22  Q.  And were there discussions that led up to the sale itself
23  which took place on I believe, what, January 14th was the first
24  day?
25  A.  I'm not sure I remember exactly.

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

79

1  including through this letter, that reserves could not be set?
2  A.  Yes.
3  Q.  Was he also informed that if he bought back or RNA'd a horse
4  that the sharing ratio on that horse in the agreement would be
5  followed with respect to Crestwood?
6  A.  Yes.
7  Q.  All right.  The second paragraph here indicates that an
8  amendment to the agreement would be considered.  Did Mr. Nielsen
9  ever agree to any amendment to the November agreement?
10  A.  Not to my knowledge.
11  Q.  What point -- what, in actuality, happened on the first day
12  of the sale on January 14th -- I'm sorry, January 12th?
13  A.  As I understand it, the first horse went through the ring.
14  This was -- equine sales at the time were very interesting.  As
15  anybody --
16  Q.  That's a good word, "interesting."
17  A.  Anybody that reads the newspapers knows what was going on in
18  the equine industry at the time was catastrophic, an apocalyptic
19  economic downturn.  And so nobody knew what was going to happen
20  in January.  Nobody knew whether the sales were going to be
21  awful, like the rest of the economy.
22  Q.  We had a sale in November?
23  A.  The November sales were very bad.
24  Q.  What were the results then?
25  A.  Poor.

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

78

1  Q.  All right.  I'll represent to you that's my knowledge or
2  understanding.
3       MR. PAHL:  I don't want the record to be inaccurate
4  here.  It was January 12th, Mr. Getty.
5       MR. GETTY:  I'm sorry.  Okay.
6  BY MR. GETTY:
7  Q.  January 12th was the first day.  And of your own personal
8  knowledge, are you aware that this document was actually sent or
9  presented to Mr. Nielsen at the sale?
10  A.  I think it is presented in advance of the sale.
11  Q.  In advance of the sale?
12       Did you play a role in preparing it?
13  A.  Yes, I did.
14  Q.  Okay.  Are you the draftsman of this document?
15  A.  Yes.
16  Q.  Okay.  And what was the purpose for which you drafted it?
17  A.  To explain my belief to Crestwood on the proper
18  interpretation of the agreement as it related to reserves.
19  Q.  All right.
20  A.  And so they could communicate that to Mr. Nielsen.
21  Q.  How had this issue come up, as you came to understand it?
22  A.  As I understand it, Mr. Nielsen had raised the possibility
23  of setting reserves on the horses, on the horses that were to be
24  sold in January.
25  Q.  And to your knowledge was he informed by Crestwood,

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

80

1  Q.  50 percent down?
2  A.  Yes; very, very poor.  Really, the rug was being pulled out
3  from under.  Everybody who was operating in the equine world had
4  so much uncertainty.  Nobody knew what to expect.
5       So as I understood it, both Crestwood and Mr. Nielsen
6  shared the concern as to what was going to happen with all
7  these horses.  They were both -- they shared an interest
8  under the agreement in seeing these horses sold for a
9  lot of money, and both were concerned about what would
10  happen.
11       As I understood it, Mr. Nielsen had expressed the desire
12  to either renegotiate the terms of the agreement, rescind it.
13  He had stayed where he was.  He hadn't come to any firm
14  understanding of his desire as it related to whether or not
15  he was going to stay with this agreement.
16       Crestwood contacted me and said, "You may want to change
17  the terms, and so draft the revision agreement," which has
18  been admitted into evidence, which I did in preparation for
19  the sale.
20       And I was on call the whole time, prepared to act if
21  needed on a moment's notice to redocument the deal, if
22  necessary.
23  Q.  What did Mr. Nielsen choose to do?
24  A.  Well, the first horse went through the ring.  As I
25  understand it, Crestwood executed a copy of the rescission

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

81

1  agreement which had been provided to Mr. Nielsen in advance of
2  the sale, which he never executed.
3      The first horse that went through the ring, which was a
4  fairly well-bred horse, sold for $10,000.
5  Q. Was it Island Fashion?
6  A. Maybe a sibling. I forget. A horse that was expected to
7  sell for good money. And, you know, like I said, the sales were
8  really bad at the time. Nobody knew what was going to happen.
9      Based on the indication of the first sale, the horse not
10 selling well, or whatever reasons he may have been taking into
11 account, Mr. Nielsen decided not to amend the agreement.
12 Q. And stuck with the agreement?
13 A. Correct.
14 Q. And then with respect to the January 9th letter that was in
15 his hands by January 12th, marked as Exhibit 4, do you believe
16 that you made it clear that there were to be no reserves, RNAs,
17 or buybacks?
18 A. I would hope so. I think it reads fairly clearly.
19 Q. Do you believe you clearly stated to Mr. Nielsen that if --
20 if a horse was RNA'd or bought back that Crestwood was entitled
21 to its share?
22 A. Yes.
23 Q. Incidentally, what incentive would exist, given your
24 involvement in this transaction or transactions and exposure to
25 drafting the actual documents, what if any incentive would exist

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

83

1  have borne the expenses of entering the horse into the sale; you
2  know, the cost of getting the horse to the sale, which are
3  significant costs. For real people, having to forfeit a cost of
4  a $1,000 entry fee to Keeneland means something.
5      So there's a disincentive for Crestwood in entering into
6  an agreement that would allow Everest to unilaterally decide
7  not to sell this or any other horse, because Crestwood was
8  paying the bills on the horse, whether or not Everest owned
9  it.
10     Crestwood -- the agreement is very clear, in that
11 Crestwood -- irrespective of whether Crestwood owns it,
12 Crestwood bears the costs.
13 Q. Generally, when you were involved in these kinds of
14 transactions, were you kept apprised of the results of the
15 sales?
16 A. I monitored them.
17 Q. In January and in September?
18 A. Yes.
19 And, um, in January 2009, this first sale that Mr. --
20 Mr. Nielsen decided to let the horses be sold and stick with the
21 agreement, what was the amount of the check that he got as a
22 result of that sale?
23 A. It was significant. More than a million dollars.
24 Q. If I told you it was one million eight plus, would that
25 sound accurate to you?

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

82

1  on the part of Crestwood to allow any of these horses to be
2  bought back or RNA'd?
3  A. It would be foolish of them to enter into an agreement on
4  those terms. They -- under the terms of the agreement, they
5  were bearing the expenses of the horses. They are carrying the
6  costs of the horses, which are significant, anyway.
7  Q. How many employees are out there?
8  A. That's it, exactly.
9  Q. 25?
10 A. The land costs a lot. At the time, you know, a gallon of
11 milk cost $5 at the grocery store. The price of hay had
12 exponentially increased over a very short period of time. Every
13 cost went up, like everything else was going up.
14     So the cost of hay was going up and the sales were going
15 down, and there was significant risk. So Crestwood assumed all
16 of that risk for this horse specifically and for every other
17 horse under the November agreement.
18     For this horse specifically, if Everest could have placed
19 a reserve on it, it would have meant Crestwood -- placed a
20 reserve on it and obtained ownership rights without any
21 further obligation to Crestwood after RNAing the horse, which
22 it did.
23 Q. You said "Crestwood." Did you mean "Everest?"          --
24 A. Which Crestwood did. Crestwood would have borne all the
25 carrying costs of the horse until the time of sale. It would

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

84

1  A. It would sound about right.
2  Q. Specifically, $1,879,269.99. Does that refresh your
3  recollection that that's the amount of the check that was
4  actually sent to Mr. Nielsen as a result of the January sale?
5  A. It does.
6  Q. And I'll represent to you that Crestwood got a check for
7  $792,710. According to your understanding and knowledge of what
8  it takes to -- as an equine lawyer, what it takes to board, care
9  for, et cetera, would a substantial portion of that $700,000
10 have been spent with respect to caring for and boarding these
11 horses?
12     MR. PAHL: Your Honor, I would object. I don't think a
13 foundation has been laid for this witness.
14     MR. GETTY: I will withdraw the question.
15     THE COURT: Very well. That will be sustained.
16 BY MR. GETTY:
17 Q. Did the same situation continue to exist right through the
18 September sale, when the Storm Cat-Island Fashion filly was
19 RNA'd by Mr. Nielsen?
20 A. Which -- which situation?
21 Q. Did Crestwood continue to bear the cost and expense for
22 another nine months, through September of 2009, with respect to
23 all these horses?
24 A. Yes. I think the exception might be -- wasn't the horse
25 moved prior to the September sale, a month prior to the

Case 3:15-cv-00576-GNS-CHL   Document 87-4   Filed 12/07/17   Page 23 of 34 PageID #: 1880
Case 3:15-cv-00576-DJH   Document 1-4   Filed 07/01/15   Page 23 of 34 PageID #: 98
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 294 of 316

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

85

1  September sale?
2  Q. Yes.
3  A. So maybe other than a month leading up to the sale --
4  Q. Right.
5  A. -- Crestwood bore the expenses.
6  Q. If there had been any understanding that these two horses,
7  including the Storm Cat filly, were to be treated any
8  differently with respect to the prohibition on a reserve, an
9  RNA, or a buyback, do you believe there would have been a
10  specific clause or clauses that would have articulated that
11  exception or that right differently than the broad clause that
12  I've referred you to?
13  A. Like I said, I think the language is very clear. If -- if
14  conduct was intended to be permitted, in contravention of what
15  to me is very clear language, I would have expected it to be
16  very clearly stated. And it is not.
17  Q. Did you ever -- did anyone ever bring to your attention that
18  that was ever even an issue with respect to these two horses?
19  A. No, not until all this started.
20  Q. Do you believe my buddy, Bill Rambicure, is a highly skilled
21  and competent equine lawyer?
22  A. I do.
23  MR. PAHL: We will so stipulate.
24  BY MR. GETTY:
25  Q. Do you believe that Mr. Nielsen was represented by able and

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

87

1  Q. The thing is, if this horse had gone through the sale,
2  Crestwood could not have put a reserve on it because Crestwood
3  didn't hold the title to it, did it?
4  A. I would have to know more about Crestwood. Crestwood, as
5  the authorized consignor, had some consignor rights as related
6  to Nielsen.
7  Q. But absent some specific authority as an agent or
8  consignor --
9  A. Yeah. No.
10  Q. -- Crestwood had no authority to put a reserve on a horse it
11  doesn't own?
12  A. Right.
13  THE COURT: All right. Thank you.
14  All right. Please proceed.
15  MR. PAHL: I hope -- and maybe it makes more sense to
16  talk logistics in advance for both your Honor and maybe the
17  Court personnel's purposes. I may have certainly ten minutes.
18  THE COURT: Okay.
19  MR. PAHL: That's going to bring us to the noontime.
20  I presume you still want to hear some --
21  THE COURT: I'd like to hear arguments from counsel.
22  MR. PAHL: About the two issues that you've identified.
23  I didn't get a chance to agree, but those are the two issues,
24  and I just want to know whether your Honor wants to do that
25  before or after the break.

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

86

1  competent counsel, both in Mr. Nelson and in the form of
2  Mr. Rambicure?
3  A. I do.
4  Q. And as a result of their representation, did any kind of
5  specific, separate exception saying that Mr. Nielsen could RNA
6  its Storm Cat filly appear in any of the drafts that were
7  brought to your attention during this process, from beginning to
8  end?
9  A. No.
10  Q. Do you think, if they meant to do that, these careful,
11  skillful, experienced lawyers would have done so?
12  A. Yes.
13  MR. GETTY: I have no further questions. Thank you.
14  THE COURT: I have a question for this witness.
15  EXAMINATION
16  BY THE COURT:
17  Q. If the Storm Cat-Island filly -- Island -- I'll get this
18  straight before the hearing is over.
19  MR. GETTY: Fashion. Island Fashion is the mare and
20  Storm Cat is the sire.
21  THE COURT: The sire.
22  MR. GETTY: It would be okay just to call it the Storm
23  Cat filly.
24  THE COURT: Okay.
25  BY THE COURT:

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

88

1  THE COURT: All right. It might make sense for us,
2  unless there's anyone here who doesn't have time for us to have
3  a quick lunch break, and then I will come back and hear from
4  you. That way, you all can collect your thoughts about the
5  testimony that's been given here in court.
6  MR. PAHL: Great. Then may I will continue with
7  Mr. Longenecker?
8  THE COURT: Please proceed.
9  CROSS EXAMINATION
10  BY MR. PAHL:
11  Q. Mr. Longenecker, we have exchanged communications, but this
12  is the first time we've met. Correct?
13  A. That's right.
14  Q. I don't think I will be too long with you. What I would,
15  however, ask you to start with is, you got the first
16  communication about this matter on Halloween eve?
17  A. Right.
18  Q. Or actually Halloween night?
19  A. Right.
20  Q. You didn't have any prior notice of the almost month-long
21  communications that had been going on between Mr. Nielsen and
22  Pope McLean, Sr.?
23  A. That's correct.
24  Q. And you didn't have any idea about the work product that
25  Mr. -- the fine work product, we have so stipulated, of

Case 3:15-cv-00576-GNS-CHL   Document 87-4   Filed 12/07/17   Page 24 of 34 PageID #: 1881
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 295 of 316
Case 3:15-cv-00576-DJH   Document 1-4   Filed 07/01/15   Page 24 of 34 PageID #: 99

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

89

1   Mr. Rambicure that had been done in advance of your receipt on
2   October 31st, did you?
3   A.  No.
4   Q.  Did you know, since you're an equine attorney, the
5   nomination deadline for the January mixed sale? Do you know
6   when that typically is?
7   A.  I think it's November 1st.
8   Q.  November 1st? And so you got this agreement, really, on the
9   eve of that nomination deadline, didn't you?
10  A.  Yes.
11  Q.  And in fact, I think I've been lucky enough to figure out
12  that November 1st was a Saturday, November 2nd was a Sunday, and
13  then ultimately this agreement got signed on the 4th of
14  November. Is that right?
15  A.  Yes. I think so, yes.
16  Q.  So really, this thing got compressed pretty quickly on you?
17  A.  Right.
18  Q.  And you didn't know about some of the prior history and
19  dealings and discussions beforehand?
20  A.  That's correct.
21  Q.  You never have spoken -- and let me just pick a period of
22  time. Before January 12th, 2009, had you ever spoken to Jeffrey
23  Nielsen?
24  A.  I've never spoken to Jeffrey Nielsen.
25  Q.  Period?

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

91

1   you have to run all across the country. You've got to figure
2   out personnel, you've got to figure out pricing, you've got to
3   figure out cash management?
4   A.  You have to figure out how to keep the lights on. It's a
5   lot.
6   Q.  It's a lot. And each horse requires kind of the same -- a
7   lot, doesn't it? Well, you're an equine attorney. You have
8   familiarity with that process, do you not?
9   A.  Yes.
10  Q.  So would you agree with me that it requires a lot of
11  attention to those kinds of details?
12  A.  Absolutely.
13  Q.  Okay. How about we've talked about Mr. Nielsen, that you
14  never spoke to Mr. Nielsen ever. How about Mr. Nelson? Have
15  you had a conversation ever with Mr. Nelson?
16  A.  I don't think I have had a conversation. I have -- I have
17  corresponded.
18  Q.  Via e-mail?
19  A.  Or letters.
20  Q.  Okay. Very good. And you said that it was your
21  understanding that Mr. Nielsen had an emotional attachment to
22  the two horses that were the exception. Do you remember that
23  testimony?
24  A.  I do.
25  Q.  Okay. And since you never spoke to Mr. Nielsen about that,

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

90

1   A.  Period.
2   Q.  Ever?
3   A.  Ever.
4   Q.  All of the information that you have been telling us in
5   Court today has come from either your e-mail communications or
6   your discussions with one of the McLeans; is that fair?
7   A.  Or for personal -- to the extent that I've been personally
8   present for the things that I've stated, then it's from personal
9   experience. But....
10  Q.  You told the Court that Mr. Nielsen, it was your
11  understanding, had gleaned -- you had gleaned from the McLeans
12  that Mr. Nielsen was getting out of the horse business; is that
13  fair to say?
14  A.  Yes, sir.
15  Q.  Where was Petionville going to go? Where was Petionville in
16  this agreement? Where were the other horses of Everest's that
17  were across the country in racing stables in California and
18  Pennsylvania and Maryland, where were those horses going to go?
19  A.  It was my understanding that they were getting out of the
20  horse business, so they were going to be sold, too, presumably.
21  Q.  Is it possible that he was simply trying to minimize the
22  number of individual what I call mini-businesses? Each horse
23  was like owning a franchise store, right?  ——
24  A.  Yes.
25  Q.  Like a Dairy Queen, right? You've got 250 Dairy Queens that

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

92

1   and you only corresponded in writing with Mr. Nelson -- and I
2   don't remember seeing anything to this effect -- is it fair to
3   say that your understanding about Mr. Nielsen's emotional
4   attachment came from the McLeans?
5   A.  Yes.
6   Q.  Is it -- have you talked to the McLeans about whether Pope
7   McLean, Sr., has ever RNA'd a horse on behalf of Everest before?
8   A.  I believe he has.
9   Q.  Correct. Have you asked him whether he had filed in advance
10  a form that indicated the reserve price before he signed the
11  ticket "RNA?"
12  A.  No.
13  Q.  In fact, if he has done that, would you agree that just like
14  before, you said it was unusual; but it does in fact happen at
15  Keeneland, doesn't it, where an agent signs a ticket as an RNA
16  without first having filed a form setting a reserve?
17  A.  It's possible, but I would think Keeneland would be a better
18  source for that kind of information.
19  Q.  Sure. But you told us -- you told the Court, anyway, what
20  your understanding of Keeneland's response was, that they
21  weren't going to do this. Did you ever say, "Have you ever done
22  it before?" or "Why did you do it in this instance?"
23  A.  Say that again?
24  Q.  Did you ever ask Keeneland, "Why did you let this happen?"
25  A.  No.

---

фффIorii

Case 3:15-cv-00576-GNS-CHL   Document 87-4   Filed 12/07/17   Page 25 of 34 PageID #: 1882
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 296 of 316
Case 3:15-cv-00576-DJH   Document 1-4   Filed 07/01/15   Page 25 of 34 PageID #: 100

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

93

1  Q. You have seen the published results of the sale in
2  September, haven't you?
3  A. Yes.
4  Q. And does it not list the transaction relating to the 2008
5  filly out of Island Fashion as an RNA at $900,000?
6  A. I think it does, yes.
7  Q. And in fact, isn't it true, Mr. Longenecker, that the reason
8  Keeneland has told you or taken the position that they won't let
9  any more RNAs -- they wouldn't let any more RNAs; isn't that
10  because Crestwood sent them a letter after the filly was RNA'd?
11  A. It's possible.
12  Q. Oh, sure, it is.
13      Let's take at the binder that you have in front of
14  you. Let's take a look at Exhibit 12.
15  A. Okay.
16  Q. Did you help draft that document, sir?
17  A. Yes.
18  Q. In fact, let's just get something very clear from now and
19  forever in this lawsuit. When we see the little indications on
20  the bottom left of the first page, do you see those numbers?
21  A. I do.
22  Q. Help me understand them, because I believe --
23  A. That is an indication that Crestwood -- it's a client matter
24  code. You probably have these in your firm.
25  Q. I do.

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

94

1  A. So that's a client matter code indicating that it's
2  Crestwood relating to the Everest matter. There's a document
3  number and then the office where it was created.
4  Q. Okay. So just --
5  A. That's information Stites & Harbison puts on documents to
6  identify them as documents we have created.
7  Q. It's like a fingerprint?
8  A. Like a fingerprint.
9  Q. That's got your fingerprint on this document, does it not?
10  A. Yes.
11  Q. Okay. You drafted that document.
12      And would it be fair to say, Mr. Longenecker, that you
13  drafted that document after the Island Fashion filly had been
14  RNA'd?
15  A. Yes.
16  Q. In fact, if you were to look at that list, you can't find
17  the filly for Island Fashion because the transaction had already
18  taken place.
19  A. Yeah. We were concerned that Everest was going to try to do
20  this with some of the horses that were the subject of its
21  obligation not to act in that fashion. And so, as was clearly
22  explained to Everest in January, to the extent it wanted to buy
23  back horses under the agreement or place reserves on them, they
24  would be treated like any other sale.
25      And this letter was to notify Keeneland of our belief in

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

95

1  that respect.
2  Q. Would you turn to Page 2 of this exhibit?
3  A. Yes.
4  Q. And in fact, you told -- you drafted this letter for
5  Mr. McLean, Sr.'s signature, right?
6  A. I think Mr. McLean, Jr., signed this.
7  Q. I'm sorry, you're right.
8  A. Yeah.
9  Q. It says: "No party other than Crestwood and Pope McLean" --
10  Jr. or Sr., it's not clear -- "is authorized to enter a reserve
11  on any of those horses."
12      So isn't it your position, as you drafted it and
13  communicated it to Keeneland, that Crestwood still could
14  place a reserve on the horses that were enumerated here?
15  A. Well, it's a good question. I will tell you the reason why
16  we did that --
17  Q. Thank you very much.
18  A. -- is because you never know. You never know if
19  circumstances are going to change. For example, let's just say
20  that, somehow or another, Crestwood and Everest were able to
21  come to a deal. Because, as you probably know -- I think it was
22  before you got involved -- there were significant negotiations
23  to try to resolve this without a big fight.
24      So to the extent that there was any change in the
25  parties' agreement relating to either all the horses or some

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

96

1  of the horses which would allow them to later place a
2  reserve, Crestwood would do it. As the owner of the horses
3  under the November agreement and the consignor of those
4  horses, Crestwood would communicate that.
5      But absent a different agreement from the parties, no
6  reserve was going to be placed.
7  Q. I appreciate your response, but how about my question? You
8  communicated to Keeneland that only Crestwood had the right to
9  reserve these horses, did you not?
10  A. Yes.
11  Q. Okay. And in fact, if you will turn with me to Exhibit 13,
12  I'd just like to make it clear for the Court that this letter,
13  Exhibit 13 -- do you have that?
14  A. Yes.
15  Q. Exhibit 13 actually has a misdate to it, does it not?
16  A. You tell me.
17  Q. Well, I'm sorry. But it says on the re line -- this is
18  again, your fingerprint is on the bottom left side of this
19  document?
20      MR. GETTY: The cover sheet is accurate on the first
21  page.
22      THE WITNESS: Oh, I see; so it says January 2009 instead
23  of 2010?
24      MR. PAHL: I don't want the Court to be left with the
25  impression that somehow this was communicated in January of

Case 3:15-cv-00576-GNS-CHL   Document 87-4   Filed 12/07/21   Page 26 of 34 PageID #: 1883
Case 3:15-cv-00576-DJH   Document 1-4   Filed 07/01/15   Page 26 of 34 PageID #: 101
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 297 of 316

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

97

1  2009.
2      THE WITNESS:  Oh, yeah.
3  BY MR. PAHL:
4  Q.  This, in fact, was communicated in January of 2010; is that
5  right?
6  A.  That's my understanding, yes.
7  Q.  And again, you drafted this document, correct?
8  A.  You know, I don't — I don't know if I drafted this
9  specifically or whether the document that I drafted under 12 was
10  turned into something.
11  Q.  Somebody reusing your handiwork?
12  A.  Yeah, it's possible.
13  Q.  Okay.
14  A.  I don't know that.  I may have drafted it and, in error,
15  identified it as '09 instead of '10.
16  Q.  Not a problem, and I don't want to make a big issue out of
17  the date.
18  A.  That's all right.  If that's the first mistake I made today,
19  I'll be all right.
20  Q.  I want to turn to Page 2 -- actually, Page 3 of Exhibit 13.
21  A.  Okay.
22  Q.  Now, if we assume the date is correct, in that it's January
23  12, 2010, as opposed to the header saying 2009.
24  A.  Right.
25  Q.  You knew that there was no agreement that was going on

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

99

1  front of you, Mr. Longenecker?
2  A.  Yes.
3  Q.  You again can tell us this is your handiwork, that little
4  fingerprint at the bottom on the left?
5  A.  Yes.
6  Q.  And you never spoke to Mr. Nielsen about this document, did
7  you?
8  A.  No.
9  Q.  And in fact this didn't actually get delivered to
10  Mr. Nielsen until the 12th, even though it was dated the 9th?
11  A.  I think that's what's been pled.  I can't testify to that
12  because I don't know that, but that's my understanding.
13  Q.  All right.  Now, let's go to Exhibit 6 in that same book.
14  A.  Okay.
15  Q.  Exhibit 6 is another one of your drafted documents; is that
16  fair?
17  A.  Yes.
18  Q.  Okay.  And isn't it fair to say, Mr. Longenecker, that what
19  you were proposing in this agreement was not to terminate the
20  transfer of these horses from Everest to Crestwood.  You weren't
21  terminating that transfer.  The horses were going to remain in
22  Crestwood's name, right?
23  A.  You know, I would have to read it carefully to do that.  I'm
24  happy to, but I —
25  Q.  Well, let me ask you this.  You talked to the Court and told

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

98

1  between Everest and Crestwood as of January 2010.  We were
2  bitterly embroiled in this litigation, were we not?
3  A.  Yes, I —
4  Q.  Okay.  And yet, you still wrote —
5      MR. GETTY:  Excuse me.  I think you interrupted him.
6      MR. PAHL:  He —
7      THE WITNESS:  Yes, I think it's a fair statement.  I
8  would have to sit around and thing about in January, what were
9  we doing.  But it's probable, I mean....
10  BY MR. PAHL:
11  Q.  You understood that we had cross motions filed in Minnesota
12  and here?
13  A.  Yes.
14  Q.  Okay.  My point is simply this:  This letter still indicates
15  that Crestwood was authorized to place a reserve on these
16  horses, and it so announced to Keeneland, did it not?
17  A.  The letter says what it says.
18  Q.  Thank you.  Here are the letters that were sent to
19  Keeneland, let's say, in advance of the September 2009 yearling
20  sale, before the Island Fashion filly?
21  A.  There are none.
22  Q.  How about in January of 2009?
23  A.  We weren't aware at that point that Everest was going to
24  disregard its obligations under the agreement.
25  Q.  The Exhibit 4 in this book; you've got a copy of that in

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

100

1  the Court that it was -- I forget exactly, it was apocalyptic or
2  cataclysmic, or something about the sale times in January of
3  2009.
4      One of the options was simply to withdraw all these horses
5  from the sale, was it not?
6  A.  You'd have to ask Crestwood that.
7  Q.  Yes.
8  A.  I mean, if the parties agreed, then I guess that would be an
9  option.  But as to whether it was something that was offered,
10  I'm not sure.
11  Q.  That wouldn't have yielded $792,000 to Crestwood, though,
12  correct?
13  A.  I don't know how the board bills would have added up and
14  what their portion under the -- you know, out of the preexisting
15  arrangements on division of proceeds from the sale, or whatever
16  they might have ended up agreeing to as an alternative to the
17  November agreement would have provided for them.  Who knows?
18  Q.  You were here, and you heard Mr. Rambicure explain that
19  out-of-pocket expense is a little different than the profit from
20  board fees or day rate?
21  A.  He gave a portion of it.
22  Q.  Sure.
23  A.  He gave a partial explanation.  I think there's a larger
24  picture to the story than he tried to paint.
25  Q.  Okay.  So let me -- let me tell you that if you used the

---

Case 3:15-cv-00576-GNS-CHL   Document 87-4   Filed 12/07/17   Page 27 of 34 PageID #: 1884
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 298 of 316
Case 3:15-cv-00576-DJH   Document 1-4   Filed 07/01/15   Page 27 of 34 PageID #: 102

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

101

1 rates that were in effect, the commission rates for Crestwood to
2 act as a consignor; same sale, $3 million in proceeds. If you
3 use the rates of 4 percent for the first $100,000, 3 percent for
4 the next $100,000, and then 2 percent for anything over that, do
5 you have any idea how much money Crestwood would have received
6 from the January '09 sale?
7 A. I'll bet you can tell me.
8 Q. I can. It's --
9 A. No, I don't. I'm not great with math, off the top of my
10 head.
11 Q. It's $63,000. Have you ever heard or tried to do that
12 calculation?
13 A. The calculation you just did?
14 Q. Yeah.
15 A. I feel like maybe I read it in your pleadings. But no, I've
16 not done it on my own.
17 Q. Have you ever provided Everest, or do you know if Crestwood
18 provided Everest, with the details or support for the
19 out-of-pocket expenses?
20 A. I don't believe they have.
21 Q. In fact, we've requested it a number of times?
22 A. A number of times.
23 Q. In fact, you're tired of getting letters from me about that?
24 A. That's a fair statement.
25 Q. That's good.

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

102

1 And if the fact is -- let's just use approximate numbers
2 here. $125,000, plus or minus, per month was the day rate
3 for all of Everest's horses at Crestwood. There were half of
4 them that was the subject of the January sale, okay? So
5 you've got to take that 125 and you have got to divide it by
6 half. But that's inclusive of profit, okay?
7 A. No, I didn't follow that part.
8 Q. Sure. You understand that when Crestwood picks its board
9 rates there's some implicit factor of profitability in there?
10 A. You said it. I mean, I would hope so, but I don't know.
11 Q. Well, my point is, if we use half of the number of 125 as
12 even the, quote, expense that Crestwood incurred.
13 A. That's a pretty -- I mean, how many Wall Street businesses
14 would trade huge multiples on a 50-percent profit margin?
15 That's a -- that's a pretty good leap you're making.
16 Q. No, half of the horses generated --
17 A. Oh, I see.
18 Q. All of the horses generated 125. Half of them, presumably
19 associated with half -- I'm just trying to make a point.
20 A. Okay.
21 Q. Two months, November and December, was what Crestwood
22 covered. Two months is $120,000, $125,000 of expenses. And for
23 that privilege, they received almost $800,000.
24 Does that sound like a good deal on the part of
25 Crestwood?

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

103

1 A. Well, okay, you asked the question.
2 So that's an interesting way to look at it. Another way
3 to look at it would be to look at it on November 1st, when
4 the stock market was dropping several hundred points a day.
5 The equine market was affected more significantly than the
6 stock market. And Crestwood was assuming the obligation to
7 feed and care for a huge number of horses for an indefinite
8 period of time and assume the obligation to try to sell them
9 in a terrible market.
10 And so, you know, it's very difficult -- and what you're
11 leaving out is that Crestwood continued to have an ownership
12 burden of a lot of other horses that it was going to have to
13 assume for a significantly longer period of time than the
14 horses that were sold in January, and during which Crestwood
15 was going to continue to bear the caring costs for the
16 remainder of the herd.
17 So I don't know. I mean, that's the point. You know,
18 this deal was negotiated and agreed. And looking back on it
19 in hindsight, you know, it may be easy for you and it appears
20 to be something that you're willing to do, and competently,
21 in trying to paint a picture of Crestwood getting a great
22 deal.
23 But looking back in hindsight, who knows? Crestwood
24 still owns horses under the agreement and is continuing to
25 pay for them.

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

104

1 Q. Have you ever heard, since you're an equine attorney, of
2 protecting the value of one's horses?
3 A. I think so, if you are saying to me --
4 Q. People use things like setting reserves, using RNA,
5 buy-bidding or buying back the horse. Those are all devices
6 with which someone protects the value of their horses, correct?
7 A. Correct.
8 Q. And you're aware --
9 A. Or protecting what they understand the value of the horse
10 is.
11 Q. Absolutely.
12 MR. GETTY: Your Honor, I haven't objected. I think I
13 objected once today. We are well beyond the scope of my
14 inquiry. I have tried to give Mr. Pahl all the leeway in the
15 world, but he is arguing with the witness.
16 THE COURT: Well, I think we have had a little bit of
17 that going on today. We have a roomful of lawyers. If you can
18 wrap it up and move on, Mr. Pahl, I would appreciate it.
19 MR. PAHL: Not a problem. I will move on to another
20 topic.
21 BY MR. PAHL:
22 Q. You're familiar with what an agister's lien is?
23 A. Yes.
24 Q. And I think the Court may be aware; but just in case, tell
25 us what it is.

Case 3:15-cv-00576-GNS-CHL   Document 87-4   Filed 12/07/17   Page 28 of 34 PageID #: 1885
Case 3:15-cv-00576-DJH   Document 1-4   Filed 07/01/15   Page 28 of 94 PageID #: 103
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 299 of 316

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

105

1   A.  It's that statutory lien given to someone who is boarding a
2   horse for someone else.
3          MR. PAHL:  Could you give her Honor the statute so that
4   she could take judicial notice?
5          THE COURT:  I'm familiar with the statute.
6   BY MR. PAHL:
7   Q.  Isn't it true, Mr. Longenecker, that you proposed to rescind
8   the purchase and sale agreement because you knew that the other
9   agreement, the original agreement, did not address that which
10  you were proposing; namely, that Everest didn't have the right
11  to buy back, set reserves, or RNA the horses?  And that's
12  exactly what Mr. Nielsen indicated he was going to do.
13  A.  That's the first time I've heard that.  I never heard that
14  before.
15         MR. PAHL:  I have nothing else.  Thank you very much,
16  your Honor.
17         THE COURT:  Very well.  Brief redirect.  I think I
18  understand both sides' points here.
19         MR. GETTY:  I don't intend to belabor it.
20         Before, just as a housekeeping matter, I would move to
21  introduce additionally Exhibits 4, 6, 7, 12, and 13, which have
22  been referred to and used either by me or by Mr. Pahl.
23         THE COURT:  Any objection?
24         MR. PAHL:  Your Honor, did he say 7?
25         MR. GETTY:  Yes.

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

106

1          MR. PAHL:  And what other ones?
2          MR. GETTY:  4, 6, 7, 12 and 13.
3          MR. PAHL:  I have no objections, your Honor.
4          THE COURT:  They will be admitted.
5          (Plaintiffs' Exhibit Nos. 4, 6, 7, 12, and 13 were admitted
6   into evidence.)
7                     REDIRECT EXAMINATION
8   BY MR. GETTY:
9   Q.  For the record, Mr. Longenecker, Exhibit No. 7 shows the
10  sale of the first horse for $10,000, does it not?
11  A.  Yes.
12  Q.  It's a Flash of Fashion, which I guess would be an Island
13  Fashion progeny also, correct?
14  A.  I'm not sure what the connection between Island Fashion and
15  Flash of Fashion is.  Island Fashion, Flash of Fashion may be a
16  sibling, but I'm not sure without seeing the full pedigree.
17  Q.  Mr. Pahl asked you a bunch of questions about whether you
18  were familiar with the prior history and the discussions that
19  took place with Mr. Nielsen and the McLeans or others.  And your
20  response was that you weren't involved in that, you were
21  involved in the drafting of this agreement.
22         Do you believe, if that prior history included an
23  important point of drawing up an exception to the restriction
24  on reserves, RNAs, and buybacks, that Mr. Nielsen and his
25  lawyers would have been capable of getting that point in the

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

107

1   document?
2   A.  I don't see why not.
3   Q.  And did that point ever -- was that point ever brought up to
4   you?
5   A.  No.
6   Q.  There was a question about whether Mr. McLean, himself, had
7   ever RNA'd a horse on behalf of a client.  Do you know whether
8   there was an agreement like this agreement that would have
9   restricted it when he RNA'd that horse?
10  A.  I don't know.
11  Q.  And in this instance, is there any clause at all that was
12  ever put in this agreement that alters the prohibition on RNAs,
13  reserves, or buybacks?
14  A.  No.
15  Q.  There was also a question about whether certain information,
16  data -- cost data, and so on and so forth -- has been asked for.
17         Is there any obligation under this agreement?  You have
18  read it from the four corners, from the beginning to the end.
19  Is there any obligation to provide any of that information?
20  A.  There's a specific provision on the accounting Crestwood is
21  obligated to provide in connection with the horses that are to
22  be sold under the agreement, and that type of information is not
23  required under that provision.
24  Q.  Has any information that's required under the agreement been
25  provided, according to your knowledge and understanding?

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

108

1   A.  The agreement that is required to be provided under the --
2   the information that is provided to be -- required to be
3   provided under the agreement has been provided.
4   Q.  Okay.  And with respect to any broader or additional
5   information, what position have you taken on behalf of
6   Crestwood?
7   A.  I think it's fair to say Crestwood has provided Everest with
8   significant amounts of information to try to satisfy Everest's
9   desires.  And what we have found is that, despite significant
10  amounts of information being provided about the horses and
11  Crestwood's efforts to try to sell them, it's never been enough.
12  Q.  Have you been peppered and bombarded with request after
13  request after request?
14  A.  Yes.
15  Q.  Have some of those requests, in fact, stated certain
16  assumptions that later proved to be totally false, which you
17  brought to the attention of Mr. Pahl?
18  A.  Yes.
19         MR. PAHL:  Your Honor, I'm not sure the point that we're
20  making here, other than a personal attack.  Mr. Getty is
21  perfectly --
22         MR. GETTY:  It's not a personal attack.
23         THE COURT:  I understand the disagreement between the
24  parties and that it far exceeds the scope and the purpose of
25  this hearing here today.  I know I'm going to hear a lot more

---

Case 3:15-cv-00576-GNS-CHL Document 87-4 Filed 12/07/17 Page 29 of 34 PageID #: 1886
CASE 0:21-cv-02289-JWB-JFD Doc. 1-1 Filed 10/15/21 Page 300 of 316
Case 3:15-cv-00576-DJH Document 1-4 Filed 07/01/15 Page 29 of 34 PageID #: 104

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

109

1  about it as this litigation proceeds.
2      MR. GETTY: I have two final questions.
3      THE COURT: All right. I will hold you to that this
4  time, Mr. Getty.
5      MR. GETTY: You can hold me to two.
6      THE COURT: All right.
7  BY MR. GETTY:
8  Q. Mr. Longenecker, according to your understanding, under this
9  agreement did Crestwood take the chance that the Everest horses
10  might sell in this market for unexpectedly low prices?
11  A. Most definitely.
12  Q. Did, according to your understanding, Crestwood ever
13  undertake the prospect that one or more of these horses could be
14  RNA'd, which would have prevented any sales and any income to
15  Crestwood whatsoever after carrying these horses for this period
16  of time?
17  A. No.
18      MR. GETTY: That's all I have, sir. Thank you.
19      THE COURT: Thank you all very much. You may step down.
20  (Witness leaves the witness stand.)
21      MR. GETTY: Your Honor, one other point. I don't intend
22  to call a witness. But you had asked a question about whether a
23  consignor can set a reserve. Mr. McLean, Jr. or Sr., would be
24  prepared to testify that can, in fact, be done, that it's
25  regularly done. That's my knowledge and experience, also, as an

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

110

1  equine attorney.
2      THE COURT: But the consignor would have some authority
3  on which to do that, there would be some demonstrated authority.
4      MR. GETTY: Yes, they are -- they are and were the
5  consignors for all these horses.
6      THE COURT: I understand that's your position,
7  Mr. Getty.
8      MR. PAHL: Your Honor, I have to tell you that to the
9  extent Mr. McLean, Jr. or Sr., have anything pertinent for your
10  Honor to consider, I would love an opportunity to talk to them
11  about it. I think this way that Mr. Getty has just proposed of
12  getting testimony is just a back-door way around the
13  cross-examination rule, and I object to it.
14      THE COURT: All right.
15      MR. GETTY: I'm just trying to shorten the proceedings.
16  I'll be very pointed about it. I just don't think they've met
17  their burden, and I intend to argue that. And frankly, I don't
18  intend to have a long argument. I'm prepared to do it now or
19  either way, depending on the Court's pleasure.
20      THE COURT: Let me just tell you what I'm thinking,
21  then, and you can all come back and argue against it.
22      I believe that, based on the testimony that I have heard
23  here with respect to the Storm Cat-Island Fashion filly, that
24  the terms of the November 2008 agreement would permit Everest
25  to retain the right to set a reserve or RNA the sale of Storm

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

111

1  Cat.
2      A titleholder retains the legal right to set reserves on
3  horses to which it holds title. In order to give up a legal
4  right, there would need to be an active agreement, such as
5  the one Crestwood entered into. It actively gave up the
6  right to set reserves on horses to which it held the title.
7      The agreement is silent as to Everest's right to set
8  reserves, but by virtue of being the titleholder it has that
9  legal right. Nothing in the agreement says that Everest
10  gives up that right.
11      In looking at the definition of the subject horses at
12  every point, the Storm Cat-Island Fashion filly is separated
13  and set forth. In looking at the agreement as a whole, it
14  talks about the difference in the grouping of the horses and
15  the way that they will be handled.
16      So from my perspective at this point in the proceeding --
17  and you're all welcome to argue otherwise -- when you
18  consider the legal implications of holding title to a horse,
19  the precision with which the groups of horses are identified
20  throughout the agreement, the precision with which the Storm
21  Cat-Island Fashion filly was excepted, the difference in the
22  profit-sharing agreement as to the Storm Cat-Island Fashion
23  filly, it's clear throughout this agreement that it was the
24  intent of both parties to treat two horses very differently
25  from all of the others.

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

112

1  I understand that both parties assumed certain risks in a
2  very uncertain market as to the sale of horses and also with
3  a seller that was motivated -- for whatever reason, by
4  financial need or estate planning purposes -- to sell.
5      Everyone had a mutual interest in trying to maximize the
6  value of the sale of these horses so that they would maximize
7  their own returns.
8      So I believe that, based on what I've heard today -- and
9  that's not to say that I wouldn't find differently with
10  respect to other horses. But that for purposes of
11  considering the injunction, that the movant has made its
12  burden on likelihood of success on the merits.
13      Where I do not see burden having been met is on the issue
14  with respect to injunctive relief being appropriate in this
15  case. I have not seen evidence of the kind of severe
16  financial hardship that, upon finding the requisite
17  likelihood of success, I could conclude a delay in granting
18  the relief would later render a judgment on the merits
19  meaningless.
20      So that's where I'm stuck. I just don't see anything
21  here. The money is not -- I don't see a risk of the money
22  being squandered. There's been no evidence on that.
23      And I accept your representation, Mr. Getty, that the
24  money is in a CD, that it is drawing interest. But on the
25  other hand, other than what's represented in your papers as

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

113

1  being the proof of the financial hardship, I don't see a
2  basis on which I could grant the injunctive relief.
3      So that's what I'm thinking at this point.  You all are
4  welcome to argue something different to me in a few minutes.
5  And I'm willing to give you a few minutes, if you want to go
6  ahead and argue and then be done, or if you want to come back
7  in an hour.
8      MR. GETTY:  I wish not to argue at all, your Honor.
9  When I said my argument was going to be very short, I was simply
10  going to focus on what you focused on, which is there's been no
11  proof whatsoever to meet this severe financial burden, prospect
12  of ruinous situation, et cetera.
13      So I don't want to say anything more.
14      THE COURT:  Okay.  I note that one lawyer knows when not
15  to say anything when he's ahead, so I will give you a chance,
16  Mr. Pahl.
17      MR. PAHL:  Not a problem, your Honor.
18      I will begin by telling you that when I started I think I
19  said this case is not the usual preliminary junction.  And I
20  agree with you wholeheartedly.  The usual one you have
21  handled and I have handled, a noncompete to keep an employee
22  from working at a particular competitor, stop a nuisance or a
23  trespass.
24      This is unique, but that does not mean it is not in favor
25  or not to be granted.  And the reason why, and we put forth

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

114

1  the affidavit of Mr. Nielsen, and I think you can read it
2  yourself; in particular, Paragraph 23 in the initial
3  affidavit of Jeffrey Nielsen.
4      And the problem we have is, this has sucked $220,000 out
5  of cash flow to a business that is already not what it was
6  two and-a-half years ago through the depletion and sale of
7  hundreds -- I think it is literally hundreds of horses, to
8  the point that this money is necessary to fund the continued
9  operations.
10      You know, I don't want to be blithe or flip with the
11  Court in saying it may well be that it files bankruptcy.  I'm
12  sure he doesn't want to, I'm sure that's the last thing in
13  the world.  But at some point, where do you draw the line?
14      And I believe we have put forth that evidence through his
15  affidavit, through the cases that we cited you where
16  financial insolvency or the risk of financial insolvency is
17  at jeopardy, it is sufficient to award money damages with the
18  specter or prospects of recovery of the monies that have been
19  paid later on.
20      It also shouldn't be lost here that I'm not saying that
21  Everest doesn't have some assets.  To be sure, we still have
22  horses; to be sure, we still own Petionville; to be sure, we
23  have purchased and bought back some of these horses during
24  the September sale.
25      They have given us something.  We have assets, we just

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

115

1  don't have the cash flow.  $220,000, you know, maybe a year
2  and-a-half ago or two years ago was a drop in the bucket.  We
3  were paying them $125,000 a month in board bills.  But when
4  you don't have the same assets generating income, $220,000 is
5  a significant sum of money.
6      We believe we have met the burden.  I would ask your
7  Honor to also keep in mind -- I believe, and I've spoken to
8  my now-stipulated good friend and attorney Mr. Rambicure --
9  that there is a notion of balancing when the strength of the
10  merits is so clear that the nature or amount of irreparable
11  injury that needs to be demonstrated is not as great.
12      And that balancing or sliding scale works both ways.
13  When the nature of the irreparable harm is high, then the
14  likelihood of success on the merits doesn't need to be so
15  high.
16      We feel strongly that that evidence is presented to your
17  Honor.  They've not really offered any contrary evidence,
18  other than to say, "Gee, if they are so precarious, then
19  won't we, Crestwood, suffer irreparable injury?"  And I don't
20  believe that's true, given that we do have assets.  We just
21  don't have cash flow.  We don't have cash flow to fund the
22  continued operations.
23      I believe that's put forth in the record, and we will
24  rest unless you have any other questions.
25      THE COURT:  All right.  So you are of the mind that,

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

116

1  based on the authority you cited, that the affidavit of
2  Mr. Nielsen is sufficient evidence, given the strength that you
3  are showing on the merits?
4      MR. PAHL:  Very good.  Thank you, your Honor.
5      THE COURT:  All right.  And what about the public
6  interest in what some people call self-help, whenever someone
7  that feels they're owed money, rightly or wrongly, attaches that
8  money for purposes of protecting themselves?
9      MR. PAHL:  And to me, your Honor, that plays perfectly
10  into the notion that there are laws that the Commonwealth
11  legislature has enacted that call for the standard for
12  prejudgment attachment.  What they did here was bypass that
13  legislative directive to achieve a prejudgment attachment and
14  simply help themselves.
15      And the public's interest lies in affording meaning to
16  what the legislature has adopted and deemed appropriate for
17  prejudgment attachment.  There's been no demonstration.  They
18  would have to do the flip side, if I understand Kentucky's
19  prejudgment attachment statute, in that they would have to
20  demonstrate a likelihood of success on the merits, which I
21  think we've shown is not so.
22      THE COURT:  All right.  Mr. Getty, tell me about this
23  self-help issue.  I know you've briefed it and I've read it, but
24  I'm interested in the points that Mr. Pahl just made.
25      MR. GETTY:  Well, given what Mr. Nielsen said about

---

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

Crestwood Farms v. Everest Stables, 6:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

117

1  precarious financial condition, all the more reason to have this
2  set aside where we're fully protected.
3     The burden is severe in terms of showing, where a
4  monetary injunction is involved, that there is a ruinous
5  nature or an immediate catastrophe that's going to happen.
6  Mr. -- Mr. Nielsen is a very successful, wealthy, real estate
7  developer.  They didn't bring him here today.  I was prepared
8  to cross-examine him extensively about his real estate
9  holdings and other matters that would demonstrate that he is
10  a wealthy individual and a successful individual.
11     But we don't even need to get to that point, because we
12  cited you cases.  If you look at our brief, on Page 21, we
13  cited you cases.  The Davis v. Bastin, it's a Western
14  District of Kentucky case.  It says:  "To establish
15  irreparable harm there must be actual, viable, presently
16  existing threat of serious harm.  A plaintiff must show that
17  injury is not remote or speculative but it is actual and
18  imminent."  We have none of that evidence here whatsoever.
19  We cited a Supreme Court case, the W. T. Grant case,
20  which says that the injury must be of such imminence that
21  there is a clear and immediate need for relief in order to
22  prevent harm.  That case cited an earlier case of Wisconsin
23  Gas v. Federal Energy Regulatory Commission.
24     We also cited at the bottom of the page this Performance,
25  Unlimited v. Questar Publishers; again, another case cited by

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

119

1  and what the PVA says, et cetera, et cetera.  He puts
2  Mr. Rambicure on the stand.  He brings Mr. Nelson, who
3  drafted the agreement, doesn't put him on the stand.  He
4  sends his lawyers down here, and he stays up in Minnesota.
5     He expects you on his shin, unsupported, simply basic
6  hearsay declaration to say that he should get this money
7  back.
8     If he files bankruptcy -- he has an adequate remedy at
9  law.  He can go file bankruptcy.  He can file a Chapter 11
10  and a trustee can take charge of these monies.  We would be
11  happy to pass it on to a trustee.
12     But they haven't met their burden.  You have focused on
13  the two issues here; this this money, it's not the kind of
14  thing subject to preliminary injunctive relief.  And it's
15  safe, and it's there.
16     And more importantly, the public interest points to being
17  in our interest to protect us.  What are we going to do if he
18  takes the money and then he ends up in bankruptcy?  We're
19  simply an unsecured creditor standing in line in bankruptcy
20  court.
21     Let me ask you this.  The Questar case, I think it's
22  interesting that you cited that case, because that was a case
23  where the judgment did issue for money damages.  That was
24  because I think the payment was the movant's largest source
25  of revenue.

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

118

1  Everest that actually supports us.  "As a general rule, a
2  movant has not established irreparable harm where damages
3  would adequately compensate the movant for the asserted
4  harm."  Damages would adequately compensate them.  The money
5  is going to be there.
6     So if they prevail or not prevail, when this is all over
7  the money has been set aside, bearing a higher rate of
8  interest in CDs.  We offered alternatively to pay it into the
9  Court so it's under someone else's control.  I think the
10  Court has put its finger on it, that both parties are better
11  off to have it in a higher-interest-rate vehicle where it's
12  safe and it's going to draw the highest rate of interest
13  here.
14     From our point of view, the public interest is implicated
15  because my client has to be protected, too, your Honor.  My
16  client is clearly at risk if this money -- we're talking
17  about money, not something that is in the nature of normal
18  injunctive relief; stop us from interfering, stop us from
19  defaming him, stop us from doing something that warrants
20  injunctive relief.  The money is there.
21     If he is in such -- you have an obligation of candor with
22  the Court.  We all do.  And Mr. Nielsen has an obligation,
23  too.  He could have come here and been very specific.  He
24  could have been subjected to cross-examination by me about
25  this project and its value, about that project and its value,

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

120

1  In this case, this is a dispersal sale.  It's different
2  than just a sale going in the ordinary course of business.
3  For whatever purpose, whether it's financial need or estate
4  planning, this owner, Mr. Nielsen, decided to reduce his
5  inventory of horses and change that over to cash.  He didn't
6  want any horseflesh anymore, something you didn't eat, which
7  a lot of people were doing at or about that time.
8     So does the dispersal sale make a difference in how this
9  Court should consider the monetary issue?  I will put that
10  question to Mr. Pahl, as well.
11     MR. GETTY:  I don't think it does, because, you know,
12  with respect to this, we have a contract that's at issue.  This
13  is not simply, "Take your horses over there."  We have a
14  situation where these two parties, we say, agreed that certain
15  things would be done.
16     It's our position -- I mean, we know that someone else
17  offered $875,000 for this horse.  Now, whether he could set a
18  reserve or not set a reserve, there's clearly the issue of
19  whether we were deprived of 25 percent of that $875,000 that
20  Mr. Shenk actually bid on behalf of his client.
21     So this is not the normal situation, where you are simply
22  looking at, "Oh, this guy wants to go and disperse his
23  horses."  He dispersed them, but he had certain contractual
24  obligations that restricted his activities, or what he could
25  do.

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

121

1  THE COURT:  But that 20 percent would have only been
2  $175,000, not $219,000.
3  MR. GETTY:  What's 25 percent of $875,000?
4  THE COURT:  Is it 25 percent?  I thought it was 20.
5  MR. GETTY:  It's 25 percent.  I'm the worst in the world
6  at math, but we had only set aside the amount that it would be.
7  There's a difference there.  We should have had 25 percent of
8  $900,000, so there would be a slight difference there.  There'd
9  be whatever --
10  THE COURT:  So it's not $50,000 or $60,000?
11  MR. GETTY:  No, it would be the difference between
12  $875,000 and $900,000, is the only difference.
13  THE COURT:  Okay.
14  MR. GETTY:  I think it would be too dangerous in this
15  situation.  One of the things the Court has to do is balance the
16  equities.  That's what the case law says.  I think the public
17  interest dictates that we have the right to protect ourselves.
18  We have done it in just the fashion that the cases say we should
19  do it:  We set it aside in a protected manner, drawing the
20  highest rate of interest.  We didn't simply take it and use it.
21  From the very beginning, we first put it in an escrow account
22  and a money fund.  Then, at our suggestion, we said, "Put it at
23  the highest rate of interest.  Put it in a CD."
24  I, for one, personally, I'm the one that suggested it,
25  because I don't know if the Court knows it or not, but I have

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

122

1  had $1,350,000 sitting in the Pike Circuit Court registry
2  drawing 1 and-a-half or 2 percent for 12 years.  So I
3  suggested that it be put in a higher rate of interest in a
4  CD, which I think more than adequately protects Mr. Nielsen
5  and Everest.
6  We are not protected in any way should this money be
7  dispersed, particularly given the statements that Mr. Pahl
8  here has represented to the Court.
9  THE COURT:  Thank you, Mr. Getty.
10  Mr. Pahl?
11  MR. PAHL:  Thank you so much, your Honor.  I believe I
12  can confine myself to three topics.  I can't say it's only three
13  sentences.
14  Let me start with the -- I can't say I'm shocked, because
15  if I have an affidavit to present to you it's because I
16  anticipated what Mr. Getty would say.  I'm disappointed, to
17  be sure.
18  I have marked as Exhibit D a matter.
19  (Defendants' Exhibit D admitted into evidence.)
20  BY MR. PAHL:
21  Q.  I think, if I can direct your attention to Paragraph 4, this
22  is the matter of utmost significance.  Mr. Nielsen's wife is in
23  advanced breast cancer.  She's currently in chemo.  He has to be
24  available for medical care or treatment.  She's currently
25  suffering the side effects.  I've seen her recently.  I know

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

123

1  that firsthand.
2  And for Mr. Getty to stand up here and blast Mr. Nielsen,
3  when he undertook the time to send me down here, to send
4  Mr. Nelson down here.  My apologies that you traveled all over
5  the world with Mr. Getty in his cross-examination of Bill
6  Rambicure.  I didn't have to cover everything that I needed
7  to get covered because it was covered via the
8  cross-examination.
9  The fact is, Mr. Nielsen recognizes the importance to
10  this Court, the importance of this matter, and it's not
11  hearsay that he has put forth to your Honor.
12  To say I'm disappointed is an understatement.
13  I did not hear him respond to your question about the
14  prejudgment attachment.  The fact is, he doesn't have the
15  right, under the prejudgment attachment statute, to get what
16  he wants or has done.  And moreover, the contract
17  specifically says you're entitled to offset under one
18  scenario, not the scenario that we are proceeding here under.
19  So I think it's significant that you didn't hear anything
20  in response.
21  And I do believe your Honor's question about the
22  dispersal, this being in connection with or part of a
23  dispersal, is a significant issue.  Because if you go back to
24  my analogy of this being 250 Dairy Queen franchises, what has
25  happened is the two, the one in the Empire State Building and

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

124

1  the other one in the Chase Building here in downtown
2  Lexington have been sold, but the proceeds have been kept by
3  the agent.
4  I need them to continue to operate the remaining
5  franchise Dairy Queen stores.  That's what this case turns
6  to.
7  I don't have the large assets or income-generating items
8  any longer.  That's why the injunctive relief and the need
9  for this cash is so critical.
10  And unless your Honor has any other questions, I thank
11  the Court, and especially the court reporter, for her time.
12  THE COURT:  Just one quick question.
13  MR. PAHL:  Please.
14  THE COURT:  Mr. Getty makes a point.  I mean, is there
15  some risk to his client in the event that things turn, there are
16  other claims and other issues in this litigation?  What response
17  do you offer to that, Mr. Pahl?
18  MR. PAHL:  Two things I would say in response to that.
19  First of all, their best day -- their best day -- is this
20  $220,000.  They've gotten all the other money.  And in fact,
21  right now they don't even, in theory, have damages, other than
22  by virtue of seeking declaratory relief.  But that's their best
23  day.
24  I can tell you, Petionville, we still own.  I don't know
25  the exact number of horses that we still own, I can tell you

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

125

1   that some of these horses are going to the track.
2       There are still four horses that are at Crestwood right
3   now, okay, one of which has improved its lot from the $1,000
4   value that Mr. McLean, Sr., provided us to recently a $25,000
5   value.
6       So things are looking good. But that doesn't pay the
7   bills. It doesn't pay the lights, house, or the utility
8   bills. Thanks.
9       THE COURT: All right. Thank you.
10      Anything quick, Mr. Getty?
11      MR. GETTY: Yeah, sure, very quick.
12      THE COURT: I mean, I've got to give him the last word.
13  He's going to get it, anyway, so I might as well give it to him.
14      MR. PAHL: I'm happy for him to have that.
15      MR. GETTY: I will be brief.
16      MR. PAHL: That's certainly one word.
17      MR. GETTY: I'm certainly terribly sorry to hear about
18  the situation with Mrs. Nielsen. I had no idea.
19      But nonetheless, your Honor, we have been deprived of the
20  right to bring out some of the evidence that we need to bring
21  out.
22      Let me just make one point here. The Questar case is not
23  our case. This is not the largest single source of revenue.
24  I mean, let's talk about what is right down here in Kentucky
25  right now. We have a horse called Petionville. To my

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

126

1   knowledge, there's no liens on that horse. I haven't had an
2   opportunity to go run and see if there's any UCCs that have
3   been put on this. That's supposedly, according to
4   Mr. Nielsen, a multi-million-dollar horse. This is the horse
5   he said that he wanted to syndicate and have an opportunity
6   to do with the Taylor boys over there at Taylor Made Farms.
7       If he has problems with the horse business, he can go to
8   Fifth Third -- let's pick another bank. I couldn't resist.
9       THE COURT: I will note for the record that was just an
10  irresistible impulse. Please proceed.
11      MR. GETTY: And borrow money on Petionville. What he's
12  trying to do is simply -- and I will tell you this. This
13  litigation has been ponderous in terms of the paper and the
14  kinds of requests and allegations.
15      Mr. Nielsen is, in his own words to Mr. McLean, a
16  professional litigator. He thrives on bringing people to ground
17  with litigation. It's his hobby.
18      Well, he has a horse over at Margaux Farms that could
19  clearly be encumbered to generate whatever amount is in
20  dispute here. There are other means that are available to
21  this gentleman that would make the relief that he had
22  requested, the extraordinary relief, totally appropriate.
23      And the public policy and the balancing of fairness and
24  equity to protect my client clearly indicates that your
25  ruling is correct and you should --

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

127

1       THE COURT: Well, I haven't ruled yet, I've just
2   expressed my concerns.
3       MR. GETTY: I'm sorry, I mean your preliminary
4   indications are appropriate under these circumstances and
5   clearly under the limited evidence which has been presented to
6   you here, your Honor. We have had no opportunity -- we don't
7   want to have to ask you to allow us to go take Mr. Nielsen's
8   deposition to put the things in that we would have done, if he
9   had been here today.
10      But they have not met their burden. I shouldn't have to
11  do that. And you should deny the request for preliminary
12  injunction seeking monetary relief which is extraordinary in
13  nature.
14      THE COURT: Oh, no, I have another one that has to have
15  the last word.
16      MR. PAHL: Oh, no, your Honor. You will find I'm a very
17  hospitable fellow.
18      I have two matters in particular that I would like to
19  address, just because I am here.
20      THE COURT: All right.
21      MR. PAHL: I know you sent out a scheduling order in
22  response to the Rule 26 report that we put together. I thought
23  I would ask now, versus six months from now. Is there any way
24  that we could move that date to say maybe November, or even
25  December 1st now, since it's 2011 we are talking about?

---

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

128

1       MR. GETTY: What are you talking about now?
2       MR. PAHL: Just the trial date. It's set for October
3   24th.
4       THE COURT: I would propose that what we do is suspend
5   the scheduling order at this point pending the Court's ruling on
6   the motion for preliminary injunction and that we reconvene by
7   telephone and revisit the deadline set in the scheduling order.
8       MR. PAHL: I needed to make sure I am clear. I'm
9   talking about 2011, so a year and-a-half from now. So I don't
10  know that we need to suspend anything, other than the trial date
11  which is October 2011. And we can convene, and I can give
12  Mr. Getty an opportunity --
13      THE COURT: I'm not sure why we're worried about that at
14  this point.
15      MR. PAHL: Only because I have a conflict.
16      THE COURT: Oh, we have a conflict? Okay, I'm sorry.
17      MR. GETTY: We have worked well together and we can
18  accommodate each other, so long as we don't interfere with the
19  sales of September and November.
20      MR. PAHL: I think it's December --
21      THE COURT: You want to concentrate on the trial date
22  alone? Okay. That's not a problem.
23      MR. PAHL: Just the trial date.
24      MR. GETTY: We might even be able to move it up earlier
25  if the Court's schedule permits that.

Case 3:15-cv-00576-BJH   Document 1-4   Filed 07/01/15   Page 34 of 54 PageID #: 109

5:09-CV-317, Crestwood Farms v. Everest Stables (May 26, 2010)

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

129

1   MR. PAHL:  I assumed that moving it up wasn't possible,
2   because that's what we had asked for, a trial date on or after
3   August 1st, and then we got October 24th.
4       THE COURT:  I will set aside the trial date, and then we
5   will reconvene and get a trial date that's mutually convenient
6   for all the parties.
7       MR. GETTY:  This Court has always been accommodating.
8       THE COURT:  This is not a problem.  We will all be here,
9   still fighting, in 2011.
10      MR. PAHL:  Does that mean I got the last word, your
11  Honor?
12      THE COURT:  You got it.
13      MR. PAHL:  Thank you very much.
14      THE COURT:  Thank you very much.  It has been a
15  pleasure.  I just know that all the opportunities for
16  cross-examination of other lawyers in the community has been
17  just too much sport for the lawyers.  And I hope the litigants
18  here will excuse me for engaging in a little levity with the
19  lawyers.  It doesn't mean that we don't take these issues very,
20  very seriously, as do they.
21      I will render a written opinion as quickly as possible.
22      Thank you all for your arguments and your written
23  documents.  They are very good and very helpful.
24      MR. PAHL:  Thank you, your Honor.
25      THE COURT:  That concludes this proceeding.

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

130

1   (Proceedings concluded at 12:49 p.m.)
2       I certify that the foregoing is a correct transcript from
    the record of proceedings in the above-entitled matter.
3
4   /s/Rhonda S.Sansom              May 29, 2010
5   Rhonda S. Sansom, RPR, CRR          Date
6       ORIGINAL TRANSCRIPT FILED ELECTRONICALLY
7               I-N-D-E-X
8                   Page
9   Testimony of WILLIAM C. RAMBICURE:
        Direct Examination by Mr. Pahl          3
10      Cross Examination by Mr. Getty          12
        Redirect Examination by Mr. Pahl        45
11      Cross Examination by Mr. Getty          55
12  Testimony of DAVID E. LONGENECKER:
        Direct Examination by Mr. Getty         66
13      Examination by the Court                85
        Cross Examination by Mr. Pahl           88
14      Redirect Examination by Mr. Getty       106
15              E-X-H-I-B-I-T-S
16  Plaintiffs'                        Page
    Exhibit No.                        Admitted
17
18  No. 1 -  E-mail from Pope McLean, Jr., to
             D. Longenecker with Draft Agreement    45
19  No. 2 -  E-mail from Pope McLean, Jr., to
             D. Longenecker with Revised Agreement  45
20
21  No. 3 -  E-mail from Pope McLean, Jr., to
             D. Longenecker with Revised Agreement  45
22  No. 4 -  1/9/09 Letter, Pope McLean to
             Everest Stables                        106
23
24  No. 5 -  Executed Agreement between Crestwood
             and Everest Stables                    45
25  No. 6 -  Agreement to Rescind Purchase and
             Sale Agreement                         106

Crestwood Farms v. Everest Stables, 5:09-CV-317
Preliminary Injunction Hearing (May 26, 2010)

131

1   Plaintiffs'                        Page
    Exhibit No.                        Admitted
2
3   No. 7 -  Keeneland Sales Summary Search Results    106
4   No. 12 - 9/16/09 Letter to Keeneland Association
             from Pope McLean, Jr.                      106
5
    No. 13 - 1/12/10 Fax from Pope McLean, Jr., to
6            Geoffrey G. Russell at Keeneland           106
7   No. 14 - Video of 2009 Keeneland September Sale     65
8   Defendants'                        Page
    Exhibit No.                        Admitted
9
10  No. A -  10/31/08 Fax to Pope McLean from
             Tim Nelson with Draft Sales Agreement      9
11
12  No. B -  Executed Purchase and Sale Agreement
             between Crestwood Farm and Everest Stables  5
13
14  No. C -  Redacted e-mail from Pope McLean, Jr., to
             Tim Nelson                                 45
15  No. D -  Second Supplemental Affidavit of
             Jeffrey L. Nielsen in Support of
16           Everest Stables                            122
17
18
19
20
21
22
23
24
25

# EXHIBIT 5

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

**Kathryn Aubrey**

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

> Scott McCauley
> National City Bank of KY
> 301 E. Main St.
> Lexington, KY  40507

| | |
|---|---|
| Filed by: | Kentucky Secretary of State |
| Filing number: | 2002-1832703-08 action: 07 |
| Filing date: | 5/24/2004 4:30:00 PM |
| Status: | Active |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is ☐ to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| **2002-1832703-08** | |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT (full or partial):** Give name of assignee in item 7a or 7b and address of assignee in item 7c; also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.
☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c. ☐ DELETE name: Give record name to be deleted in item 6a or 6b. ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable)

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| McLean | Lewis | Pope | |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 7d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

8. **AMENDMENT (COLLATERAL CHANGE):** check only one box.

Describe collateral ☐ deleted or ☒ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

**100% interest in DIXIELAND HEAT, 1990 thoroughbred stallion by Dixieland Band out of Evening Silk**
**100% interest in THE NAME'S JIMMY, 1989 thoroughbred stallion by Encino out of Dancing at Dawn**
**100% interest in PETIONVILLE, 1992 thoroughbred stallion by Seeking the Gold out of Vana Turns**
**100% interest in EXPLICIT, 1997 thoroughbred stallion by Distant View out of Elegant Victress**

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **National City Bank of Kentucky** | | | |
| OR 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

10. OPTIONAL FILER REFERENCE DATA

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 07/29/98)

EXHIBIT 6

Case 3:15-cv-00576-GNS-CHL   Document 87-6   Filed 12/07/17   Page 2 of 3 PageID #: 1895
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 309 of 316
Case 3:15-cv-00576-DJH   Document 1-6   Filed 07/01/15   Page 2 of 3 PageID #: 113

From:      Pope McLean, Jr. [popejr@crestwoodfarm.com]
Sent:      Wednesday, December 03, 2008 6:18 PM
To:      Longenecker, David E.
Subject:      RE: RNA's

Thanks, I think we just need to think it through a bit more. Pope

-----Original Message-----
From: Longenecker, David E. [mailto:DLongenecker@stites.com]
Sent: Wednesday, December 03, 2008 6:08 PM
To: Pope McLean, Jr.
Subject: RE: RNA's

I will take a look at the contract and be ready to talk tomorrow.

David

This wireless message sent via Xpress Mail with GoodLink.
www.cingular.com

-----Original Message-----
From: Pope McLean, Jr. [mailto:popejr@crestwoodfarm.com]
Sent:      Wednesday, December 03, 2008 06:05 PM Eastern Standard Time
To:      Longenecker, David E.
Subject:      RNA's

David, Everest is now talking about possibly RNA'ing some of the mares that are being offered. The contract does not seem address this possibility at all, as we were negotiating in good faith that all horses entered would be sold without reserve. We think that in the event he buys back any horse, that he would be buying Crestwood out at that price. What is your view on this issue? I am sure that he is trying to find every possible loophole that he can right now. I will talk to you soon. Pope



EXHIBIT
289 A
Pope Jr

Longe RNA Emails 000192

DEPOEX000780

Page 1 of 1

From:     Longenecker, David E.
Sent:     Thursday, December 04, 2008 9:40 AM
To:       'Pope McLean, Jr.'
Subject:  RE: RNA's

The contract clearly contemplates and provides that the horses sold at auction are sold without reserve.  Section 7 says:
"For all horses to be sold at public auction, Crestwood agrees and covenants that each horse shall be sold with no reserve, RNA, or buyback price. "

Section 7 continues: "The parties agree that in the event any Subject Horse is either unsold after auction or attempts to privately sell hereunder, title to such Subject Horse shall remain with Crestwood without additional consideration.".

The horses sell without reserves under the contract.  If they go through and aren't sold, they remain property of Crestwood.

Everest is trying to change the contract and can't do what it wants without an amendment.  Based on what you're saying, I think we should respond that Crestwood will only agree to an amendment permitting Everest to set a reserve and get returned ownership of RNA-ed mares is if Everest agrees to pay Crestwood 50% of the reserve.

Let's discuss.

David

From: Pope McLean, Jr. [mailto:popejr@crestwoodfarm.com]
Sent: Wednesday, December 03, 2008 6:09 PM
To: Longenecker, David E.
Subject: RNA's

David, Everest is now talking about possibly RNA'ing some of the mares that are being offered.  The contract does not seem address this possibility at all, as we were negotiating in good faith that all horses entered would be sold without reserve.  We think that in the event he buys back any horse, that he would be buying Crestwood out at that price.  What is your view on this issue?  I am sure that he is trying to find every possible loophole that he can right now.  I will talk to you soon.  Pope



EXHIBIT

No. 335

Longe RNA Emails 000191

DEPOEX001100

Case 3:15-cv-00576-GNS-CHL   Document 87-7   Filed 12/07/17   Page 1 of 2 PageID #: 1897
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 311 of 316
Case 3:15-cv-00576-DJH   Document 1-7   Filed 07/01/15   Page 1 of 3 PageID #: 115

EXHIBIT 7

Case 3:15-cv-00576-GNS-CHL   Document 87-7   Filed 12/07/17   Page 2 of 2 PageID #: 1898
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 312 of 316
Case 3:15-cv-00576-GNS-CHL   Document 55-1   Filed 05/19/17   Page 3 of 10 PageID #: 586



(

JANUARY 9, 2009

EVEREST STABLES, LLC
Attention: Jeffrey L. Neilsen

  RE: Purchase and Sale Agreement dated November 1, 2008 (the "Agreement")

Dear Jeffrey: Je FF

  Under the Agreement, the title to a number of Everest's horses was transferred to Crestwood Farm Bloodstock, LLC to be followed by the public or private sale of those horses. Everest retained title to certain other horses that would also be sold publicly or privately. The proceeds from the sale of these horses would be divided among Crestwood and Everest in accordance with sharing ratios described in the Agreement, with Crestwood receiving 25% of the sales price of certain horses and 50% of the sales price of others.

  Under the Agreement, the horses were to be sold without reserve. You have informed us that Everest wishes to place a reserve price on certain of the horses entered for public sale. Doing so will require an amendment of the Agreement. Crestwood is willing to consider an amendment to the Agreement to permit reserves to be placed and proposes that, with respect to any such horse, should the reserve not be reached and title be transferred back to Everest, Crestwood will receive payment from Everest equal to the Crestwood's sharing percentage in respect of such horse multiplied by the price at the fall of the hammer.

  You have additionally informed us that Everest or affiliates of Everest may buy back certain of the horses entered in public sale. Under the Agreement, buybacks by Everest or an affiliate of Everest are treated no differently than any other purchase. Crestwood is entitled to its sharing ratio on the purchase price, whether the price is determined by a bid from you or an independent third party. Please advise of any alternative arrangement Everest may propose in respect of such situation.

    Very truly yours,

    Pope McLean

CX66:40176:307498:1:LEXINGTON



PLAINTIFF'S
EXHIBIT

WCRRLGMW_0000027

EXHIBIT 8

Case 3:15-cv-00576-GNS-CHL   Document 87-8   Filed 12/07/17   Page 2 of 4 PageID #: 1900
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 314 of 316
Case 3:15-cv-00576-DJH   Document 1-8   Filed 07/01/15   Page 2 of 4 PageID #: 119

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Jeffrey L. Nielsen, individually, and Everest Stables, Inc., a Minnesota corporation, | ) ) ) |
| | ) |
| Plaintiffs | ) ) |
| | ) |
| vs. | ) ) |
| Lewis Pope McLean, Sr., individually, and Crestwood Farm Bloodstock, LLC, a Kentucky limited liability company, McLean Holdings, LLC, a Kentucky limited liability company, and Crestwood Farm, LLC, a Kentucky limited liability company | ) ) ) ) ) ) ) ) ) |
| Defendants | ) ) |

Court File No. 09-2436-MJD-JSM

AFFIDAVIT OF WILLIAM C. RAMBICURE, ESQ.

The Affiant, William C. Rambicure, being duly sworn upon oath, state and declare as follows:

1. I respectfully submit this Declaration to the Court.

2. I am an attorney duly licensed to practice law in the State of Kentucky. My office is in Lexington Kentucky. I am a graduate of the University of Kentucky College of Law, having graduated in 1981. I am and have been a member of the bar of Kentucky since being admitted in 1981.

3. I am an attorney for Everest Stables, a Minnesota corporation and its principal, Jeff Nielsen.

1

4. As an attorney and officer of the Court, I believe that I am duty bound to submit this Declaration to the Court in Minnesota. I think it is important that I do so to advise the court that I was told directly by an attorney for Crestwood Farm shortly after this lawsuit was filed that he was disappointed and surprised that Mr. Nielsen had filed this lawsuit, that Mr. Nielsen was a controlling individual who controlled all aspects of the relationship between Crestwood Farm and Everest, that Crestwood Farm and other third party witnesses would confirm that Mr. Nielsen was in essence a control freak, and that Crestwood had already lined up a laundry list of prominent horse industry witnesses to ruin Mr. Nielsen's reputation, all of whom would testify that Mr. Nielsen was an "a...hole." These statements took place at my office on Sunday, October 4, 2009, when an attorney representing Crestwood Farm appeared at my office unexpectedly and unannounced when I was preparing for depositions in another case.

5. I believe in reading the Crestwood Farm's pleadings and in studying their witness list that Crestwood Farm is intent upon doing just that, i.e., attempting to destroy Mr. Nielsen's reputation. In my opinion, justice would not be served by allowing local cronyism to interfere with the clear presentation of the facts.

Further the affiant sayeth naught.

William C. Rambicure

STATE OF KENTUCKY     )
                      )
COUNTY OF FAYETTE     )

Subscribed, sworn to and acknowledged before me by William C. Rambicure, this the _9th_ day of November, 2009.

2

Case 3:15-cv-00576-GNS-CHL   Document 87-8   Filed 12/07/17   Page 4 of 4 PageID #: 1902
CASE 0:21-cv-02289-JWB-JFD   Doc. 1-1   Filed 10/15/21   Page 316 of 316
Case 3:15-cv-00576-DJH   Document 1-8   Filed 07/01/15   Page 4 of 4 PageID #: 121

My commission expires: _____11/7/2011_____,

_____
Notary Public, State at Large, KY

3