UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:15-CV-00576-GNS-CHL

EVEREST STABLES, INC.                                                    PLAINTIFF

v.

WILLIAM C. RAMBICURE, JR., et al.                                 DEFENDANTS


## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants Rambicure and Rambicure Law Group's Motion for Summary Judgment (DN 33), Defendant Miller & Wells, PLLC's Motion for Judgment on the Pleadings (DN 34), Defendant Zurich American Insurance Company's Motion to Dismiss (DN 98), Plaintiff's Objection to Magistrate Judge's Ruling (DN 60), Plaintiff's Renewed Motion to Compel (DN 61), Plaintiff's Motion for Summary Judgment (DN 77), Defendant Rambicure and Rambicure Law Group's Motions for Leave (DN 82, 84), and Plaintiff's Motion in Limine (DN 116). For the following reasons, Defendants Rambicure and Rambicure Law Group's Motion for Summary Judgment is **GRANTED**, Defendant Miller & Wells, PLLC's Motion for Judgment on the Pleadings is **GRANTED**, Defendant Zurich Insurance Company's Motion to Dismiss is **GRANTED**, Plaintiff's Objection is **OVERRULED AS MOOT**, Plaintiff's Renewed Motion to Compel is **DENIED AS MOOT**, Plaintiff's Motion for Summary Judgment is **DENIED**, Defendants' Motion for Leave to Amend is **DENIED AS MOOT**, Defendants' Motion for Leave to Seal is **GRANTED**, and Plaintiff's Motion in Limine is **DENIED AS MOOT**.

**EXHIBIT 3**
**Page 1 of 25**

# I.   **BACKGROUND**

This action follows a dispute between Plaintiff Everest Stables, Inc. ("Everest" or "Plaintiff") and Crestwood Farm Bloodstock, LLC ("Crestwood") resulting in litigation ("*Crestwood* litigation") which both the Eastern District of Kentucky and Sixth Circuit resolved in Crestwood's favor. *See Crestwood Farm Bloodstock, LLC v. Everest Stables, Inc.*, 864 F. Supp. 2d 629 (E.D. Ky. 2012) (*Crestwood I*); *Crestwood Farm Bloodstock, LLC v. Everest Stables, Inc.*, 751 F.3d 434 (6th Cir. 2014) (*Crestwood II*).  The *Crestwood* litigation centered upon a Purchase and Sale Agreement ("Agreement") executed on November 4, 2008, to govern Crestwood's management of a series of sales in Kentucky of thoroughbred horses owned by Everest.  (Second Am. Compl. ¶¶ 12-15, DN 87).  The contested thoroughbred sales began in January 2009 and continued through September 2009, including the sale of one horse over Everest's objection and another sale that was blocked by a separate Everest agent.  (Second Am. Compl. ¶¶ 27-34).  Everest sought legal advice during this period from its Kentucky attorney, Defendant William Rambicure ("Rambicure"), who participated in drafting the Agreement. (Second Am. Compl. ¶ 30).  Everest and its owner, Jeffrey Nielsen ("Nielsen"), allegedly believed at the time that the Agreement created a fiduciary and/or agency relationship between Crestwood and Everest.  (Second Am. Compl. ¶¶ 15-16).

In the *Crestwood* litigation, the U.S. District Court for the Eastern District of Kentucky held that the Agreement failed to create a fiduciary relationship, dismissed Everest's various tort law claims against Crestwood, and ruled in Crestwood's favor on the breach of contract claims. *See Crestwood I*, 864 F. Supp. 2d at 634, 639-42; *see also Crestwood II*, 751 F.3d at 439-44 (affirming the decision in *Crestwood I*).  Following Judge Caldwell's decision in *Crestwood I*, and before Everest's appeal to the Sixth Circuit, Everest fired Rambicure in April 2012.  (Second

**EXHIBIT 3**
**Page 2 of 25**

Am. Compl. ¶ 35).  Shortly after the Sixth Circuit affirmed *Crestwood I*, Everest and Rambicure

signed a tolling agreement on September 11, 2014.  (Defs.' Mem. Supp. Mot. Summ. J. 23, DN

33-1 [hereinafter Defs.' Mot. Summ. J.]).  Everest filed this suit against Rambicure, Rambicure

Law Group (jointly, "Rambicure Defendants"), and Miller & Wells, PLLC ("Miller Wells")[1] on

July 1, 2015.

In the present action, Everest asserts against Rambicure Defendants claims of legal

malpractice, negligent representation, breach of fiduciary duty, and breach of contract.  (Second

Am. Compl. ¶¶ 63-88).  Everest claims that Rambicure advised that Everest could set a

minimum bid[2] for a filly named Chase the Storm,[3] which Crestwood presented for auction on

behalf of Everest at Keeneland's September 2009 Yearling Sales.  Rambicure admits that he told

Everest that it had the legal right to RNA Chase the Storm, which it did by setting a minimum

price of $1.5 million.  When auction bidding topped out at $875,000, Everest cancelled the sale

and retained the horse.  Crestwood, however, maintained that it was entitled to a commission of

$219,000[4] based on the highest auction bid and prevailed on this claim in the *Crestwood*

litigation.  *See Crestwood I*, 864 F. Supp. 2d at 636, 642.  Everest now asserts that it should

recover the commission amount from Rambicure due to his professional negligence, in addition

to the net sales price Everest would have received from the cancelled sale, and $272,000 for

attorneys' fees Everest was required to pay to Crestwood in the prior action.  Everest further

---

[1]  Miller Wells is a law firm with which Rambicure became associated after the *Crestwood I*
decision.  (Second Am. Compl. ¶ 37).
[2]  This practice is referred to as "reserve not attained" or "RNA", which is also used as verb, as in
"RNA'd" or "RNAing".  (Expert Report 12, DN 77-5).  If the reserve price is not met at auction,
the sale is rejected and title to the horse does not pass.
[3]  Chase the Storm's sire was Storm Cat and the dam was Island Fashion, so that the horse is also
referred to as the Storm Cat/Island Fashion filly.
[4]  All dollar amounts have been rounded down to the nearest thousand.

**EXHIBIT 3**

**Page 3 of 25**

maintains that Rambicure negligently drafted the Agreement so that it failed to impose fiduciary duties on Crestwood in the marketing of Everest's horses.  (Second Am. Compl. ¶¶ 69, 72).

Everest has also asserted a claim for breach of contract against Miller Wells under the theory that the law firm agreed to provide Rambicure insurance coverage for Everest's malpractice claim when Rambicure associated with the firm and that Everest was a third-party beneficiary of that agreement, in addition to claims for fraud and negligent misrepresentation. (Second Am. Compl. ¶¶ 89-109, 117-21).[5]  Further, Everest asserts claims against Zurich for breach of its insurance contract with Miller Wells, bad faith, fraud, conspiracy to commit fraud, and negligent misrepresentation.  (Second Am. Compl. ¶¶ 110-16, 122-40).

In the present motions, Rambicure Defendants move for summary judgment on Plaintiff's claims, Miller Wells moves for judgment on the pleadings, Zurich has moved to dismiss for failure to state a claim, and Plaintiff moves for summary judgment on its claims against Rambicure Defendants.  (Defs.' Mot. Summ. J., DN 33; Def.'s Mot. J. Pleadings, DN 34; DN 98; Pl.'s Mot. Summ. J., DN 77).   In addition, Everest objects to the Magistrate Judge's ruling regarding documents which Zurich has claimed as privileged and moves to compel discovery. (Pl.'s Obj., DN 60; Pl.'s Mot. Compel Disc., DN 61).  All matters are ripe for decision.

---

[5] After Rambicure Defendants moved for summary judgment, the Court granted Everest leave to amend its Complaint for the second time to add claims against Miller Wells' malpractice insurance carrier, Zurich American Insurance Company ("Zurich").  (Order, DN 86; Second Am. Compl., DN 87).  Rambicure Defendants indicate that their pending dispositive motions are equally applicable to Plaintiff's Second Amended Complaint.   (Defs.' Notice Application Pending Dispositive Mot., DN 100).  The Court will therefore address Rambicure Defendants' arguments as if directed to the Second Amended Complaint.

**EXHIBIT 3**

**Page 4 of 25**

## II.      JURISDICTION

The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 as there is complete diversity between the parties and the amount in controversy exceeds the sum of $75,000.00.

## III.      DISCUSSION

### A.      Rambicure Defendants' Motion for Summary Judgment (DN 33)

Rambicure Defendants seek summary judgment on Plaintiff's claims against them on various bases including, *inter alia*, that the claims are barred by the applicable statute of limitations. (Defs.' Mot. Summ. J. 19-25). Of course, in ruling on a motion for summary judgment the Court must determine whether there is any genuine issue of material fact that would preclude entry of judgment for the moving party as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of stating the basis for the motion and identifying evidence in the record that demonstrates an absence of any material factual dispute. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party satisfies its burden, the non-moving party must then produce specific evidence establishing the existence of a genuine issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

While the Court must view the evidence in light most favorable to the non-moving party, the non-moving party must do more than merely show the existence of some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted). Rather, the non-moving party must present specific facts proving that a genuine factual issue exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving

EXHIBIT 3
Page 5 of 25

party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

### 1.    *Statute of Limitations*

First, Rambicure Defendants assert that the Court should dismiss Everest's legal malpractice claim based on the applicable statute of limitations, KRS 413.245.[6]  (Defs.' Mot. Summ. J. 19).  Everest maintains that its malpractice claim did not accrue until the Sixth Circuit's ruling in *Crestwood II* became final and was tolled by the subsequent tolling agreement.  (Pl.'s Resp. Defs.' Mot. Summ. J. 26-32, DN 55 [hereinafter Pl.'s Resp.]).

"To determine when or if a cause of action for legal malpractice accrued," courts "look to the relevant statute of limitations, KRS 413.245." *Doe v. Golden & Walters, PLLC*, 173 S.W.3d 260, 270 (Ky. App. 2005).  KRS 413.245 provides that an action for professional services negligence "shall be brought within one (1) year from the date of the occurrence or from the date when the cause of action was, or reasonably should have been, discovered by the party injured." In a recent decision, the Kentucky Court of Appeals explained:

> "Occurrence," as used in KRS 413.245, is synonymous with "cause of action[.]" "[T]he use of the word 'occurrence' in KRS 413.245 indicates a legislative policy that there should be some definable, readily ascertainable event which triggers the statute." The so-called "triggering event" is "the date of 'irrevocable non-speculative injury.'" An "occurrence" legal malpractice claim is ripe, and a cause of action has accrued, when both negligence and "reasonably ascertainable" damages have occurred.

*Saalwaechter v. Carroll*, No. 2015-CA-001799-MR, 2017 WL 1290620, at *4 (Ky. App. Apr. 7, 2017) (alteration in original) (internal citations omitted) (citation omitted).

With regard to the "occurrence" statute of limitations, Rambicure Defendants note that the allegedly negligent drafting of the Agreement occurred in 2008.  (*See* Defs.' Mot. Summ. J.

---

[6] The parties do not question that Everest's claims are governed by Kentucky law.

EXHIBIT 3
Page 6 of 25

2-3; Defs.' Reply Supp. Mot. Summ. J. 8, DN 59).  Rambicure Defendants further posit that Everest's claimed damages from the handling of the horse sales by Crestwood in 2009.  (Defs.' Mot. Summ. J. 6-7).  At that point, they argue, Rambicure's supposed malpractice had occurred and the damages were fixed and non-speculative.  *See Michels v. Sklavos*, 869 S.W.2d 728, 730 (Ky. 1994) (stating that a cause of action for legal malpractice accrues "where negligence and damages have both occurred . . . ."  (internal quotation marks omitted) (quoting *Nw. Nat'l Ins. Co. v. Osborne*, 610 F. Supp. 126, 128 (E.D. Ky. 1985))); *Queensway Fin. Holdings Ltd. v. Cotton & Allen, P.S.C.*, 237 S.W.3d 141, 147 (Ky. 2007) (holding that the occurrence limitations period is triggered by an "irrevocable non-speculative injury . . . ." (internal quotation marks omitted) (citing *Michels*, 869 S.W.2d at 730)).  Thus, according to Rambicure Defendants, the statute of limitations began to run upon completion of the horse sales in 2009, but in any case no later than the *Crestwood I* decision in March 2012, and would have expired long before the present action was filed in 2015.  (Defs.' Mot. Summ. J. 6-8).

Rambicure Defendants' argument ignores the triggering event which fixed the damages arising from the drafting of the Agreement and the horse sales.  In this regard, there is a crucial distinction between Everest's claims against Crestwood and its claims against Rambicure Defendants.  Everest's losses attributed to Crestwood were triggered by the horse sales in 2009—at that time any damages from improperly marketing the horses could have been calculated.  By contrast, Everest's claims against Rambicure are that his poor drafting of the Agreement prevented Everest from recovering from Crestwood—an outcome that was not evident until the finality of the *Crestwood* litigation.  At that point, Everest was foreclosed from recouping its claimed losses from Crestwood, which established for the first time the damage suffered by Everest from the failure of the Agreement to impose fiduciary duties upon

**EXHIBIT 3**
**Page 7 of 25**

Crestwood.  These are the losses Everest now blames on Rambicure, losses which became irrevocable and non-speculative only at the close of the prior litigation.  *See Queensway Fin. Holdings Ltd.*, 237 S.W.3d at 147 (citation omitted).  As a result, the statute of limitations did not begin running on the malpractice claim until the *Crestwood* litigation became final.[7]  *See Michels*, 869 S.W.2d at 728 (legal malpractice claim arising from the attorney's representation in a wrongful discharge lawsuit did not accrue until the termination of the underlying suit); *Alagia*, 882 S.W.2d at 125-26 (legal malpractice claim did not accrue until the amount owed to the IRS was determined through negotiations, which fixed the damages); *Meade Cty. Bank v. Wheatley*, 910 S.W.2d 233, 235 (Ky. 1995) (attorney's failure to disclose an outstanding mortgage in a title opinion constituted malpractice which loss "was not realized as damages until the sale of the property . . . .").

This Court is mindful of the Kentucky Supreme Court's closing remarks in *Pedigo v. Breen*, 169 S.W.3d 831 (Ky. 2004), where it stated:

> This case well illustrates the desirability of strictly construing the occurrence rule and requiring that all tort elements be fully developed.  As in *Alagia, Trautwein & Smith v. Broadbent*, *Hibbard v. Taylor*, and *Michels v. Sklavos*, sound public policy is best served by allowing parties an opportunity to seek mitigation of damages by pursuit of the underlying claim, and by leaving the professional negligence claim open until the underlying claim is concluded.

*Id.* at 834; *see also Taracido v. Perez-Abreu, Zamora & De La Fe, P.A.*, 705 So. 2d 41, 43 (Fla. Dist. Ct. App. 1997) ("The existence of legal malpractice is often difficult to ascertain.  A client should not be placed in the position of having to file a potentially baseless claim prematurely

---

[7] It is unnecessary to determine whether Rambicure's continuing representation of Everest tolled the statute of limitations.  *See Alagia, Day, Trautwein & Smith v. Broadbent*, 882 S.W.2d 121, 125 (Ky. 1994) ("The continuous representation rule is a branch of the discovery rule.  In substance, it says that by virtue of the attorney-client relationship, there can be no effective discovery of the negligence so long as the relationship prevails.").  By the time *Crestwood II* became final, Rambicure was no longer representing Everest.

8

EXHIBIT 3
Page 8 of 25

fearing that otherwise an action will be precluded by the statute of limitations. Thus we hold that a cause of action for legal malpractice based upon a prior transaction accrues at the conclusion of subsequent litigation between the client and a third party." (citations omitted)). Consistent with the Kentucky Supreme Court's directive, the statute of limitations on Everest's legal malpractice claim did not begin to run until the Sixth Circuit's decision in *Crestwood II* became final—*i.e.*, when the mandate issued on June 5, 2014. Everest and Rambicure entered into a tolling agreement on September 11, 2014, which was within the one-year statute of limitation and stayed further passage of the limitations period. Accordingly, Everest's assertion of its legal malpractice claim was timely when filed on July 1, 2015. The motion for summary judgment based on the statute of limitations will therefore be denied.

### 2. *Collateral Estoppel*

Rambicure Defendants also assert that they are entitled to summary judgment based on collateral estoppel.[8] (Defs.' Mot. Summ. J. 10-19). Ordinarily, federal law governs the preclusive effect of a prior federal-court judgment. *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008) (citation omitted); *J.Z.G. Res., Inc. v. Shelby Ins. Co.*, 84 F.3d 211, 213-14 (6th Cir. 1996). But where, as here, the prior case comes to federal court under diversity jurisdiction "federal law incorporates the rules of preclusion applied by the State in which the rendering court sits." *Taylor*, 553 U.S. at 891 n.4 (citing *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001)). Accordingly, Kentucky's collateral estoppel law is incorporated with federal common law.

---

[8] While Plaintiff opposed this motion, *inter alia*, on the basis that Defendants had failed to properly plead collateral estoppel as an affirmative defense in their Answer to the Amended Complaint, Defendants have since asserted the defenses of "res judicata, claim preclusion, issue preclusion, and/or collateral estoppel" in their Answer to the Second Amended Complaint. (Pl.'s Resp. 2, 18-20; Answer ¶ 158, DN 94).

**EXHIBIT 3**
**Page 9 of 25**

"Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States*, 440 U.S. 147, 153 (1979) (citations omitted).  For collateral estoppel to operate as a bar, the movant must show that:  (1) the issue in the second case is the same as the issue in the first case; (2) the issue was actually litigated; (3) the issue was actually decided in the prior action; and (4) the decision on the issue in the prior action was necessary to the court's judgment. *Yeoman v. Commonwealth Health Policy Bd.*, 983 S.W.2d 459, 465 (Ky. 1998) (citing Restatement (Second) of Judgments § 27 (1982)); *see also Ga.-Pac. Consumer Prods. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1098 (6th Cir. 2012) (citations omitted).  Further, Kentucky law holds that collateral estoppel "applies only if the party against whom it is sought to be applied had a realistically full and fair opportunity to litigate the issue . . . and if principles of justice and fairness would be served by its application." *Berrier v. Bizer*, 57 S.W.3d 271, 281 (Ky. 2001) (citations omitted).

Rambicure Defendants argue that Everest cannot prove the causation element of its malpractice claim because the *Crestwood* litigation effectively resolved the matter of damages and liability.  (Defs.' Mot. Summ. J. 10, 12-19).  They assert that collateral estoppel prevents Everest from re-litigating previously adjudicated claims of third-party liability under Kentucky's "suit within a suit" approach to legal malpractice cases.  (Defs.' Mot. Summ. J. 10-19).  Everest contends in opposition that collateral estoppel does not apply because this case differs from *Crestwood I*, as the case at bar focuses on Rambicure's negligent legal work, and does not require a showing of "third-party liability," nor does it require overruling the *Crestwood* litigation decisions.  (Pl.'s Resp. 20-23).  Everest explains that a "suit within a suit" is

EXHIBIT 3
Page 10 of 25

unnecessary because the claimed injury is not dependent on the merits of the *Crestwood* litigation and, even if it were necessary, Rambicure Defendants "fail to articulate why collateral estoppel is appropriate for those specific claims." (Pl.'s Resp. 23-26).

In *Crestwood I*, Everest claimed that Crestwood breached its fiduciary and agency duties to Everest by:

> [R]etaining net proceeds that rightfully belonged to Nielsen and Everest[,] . . . failing to follow the instructions given to [it] by Nielsen to set reserves, to RNA certain horses (such as the 2008 ISLAND FASHION filly), and buy back or remove certain horses under [the Agreement], . . . [as well as refusing Nielsen's] numerous requests for the actual records for the expenses and costs associated with all of the horses under the Agreement.

Defendants' Memorandum Supporting Motion for Partial Summary Judgment at 17-18, *Crestwood Farm Bloodstock, LLC v. Everest Stables, Inc.*, No. 5:09-CV-00317-KKC (E.D. Ky.), DN 154-1. Judge Caldwell held that Everest failed to establish any damages caused by Crestwood's actions—albeit after finding that the Agreement did not impose any fiduciary duties upon Crestwood. *See Crestwood I*, 864 F. Supp. 2d at 636, 638. In the present action, Everest blames Rambicure for not drafting the Agreement to explicitly make Crestwood a fiduciary which is a distinct claim from that answered by *Crestwood I*. This theory of recovery against Rambicure would not be barred by collateral estoppel because *Crestwood I* did not address the issue of Rambicure's negligent drafting, nor did the Court decide what additional actions may have been owed by Crestwood **if** it had been deemed a fiduciary. *See Yeoman*, 983 S.W.2d at 465; *Ga.-Pac. Consumer Prods.*, 701 F.3d at 1098. Instead, the Court simply held that no such fiduciary duty was owed, so that an alternative finding was unnecessary to the Court's opinion. For this reason, Everest's current claims are not barred by collateral estoppel.

**EXHIBIT 3**
**Page 11 of 25**

3. *Legal Malpractice*

Rambicure Defendants next assert that they are entitled to summary judgment as a matter of law on the merits (or lack thereof) of Everest's professional negligence and related claims. (Defs.' Mot. Summ. J. 25-28).  A cause of action for legal malpractice requires proof that:  (1) an employment agreement existed between the claimant and an attorney; (2) the attorney failed to exercise the ordinary care of a reasonably competent attorney; and (3) the attorney's negligence was the proximate cause of the client's damages.  *See Marrs v. Kelly*, 95 S.W.3d 856, 860 (Ky. 2003).  Rambicure Defendants first urge that Everest cannot establish that Rambicure's negligent drafting of the Agreement destroyed any preexisting fiduciary relationship between Crestwood and Everest.  Plaintiff responds that the underlying decisions in *Crestwood I* and *Crestwood II* include language that supports its legal theory.  (Pl.'s Resp. 33-35).  In essence, Plaintiff asserts that the *Crestwood* litigation held that the Agreement—rather than any preexisting relationship between Crestwood and Everest—governed the proper course of conduct for the contested horse sales, thereby negating any prior fiduciary and/or agency relationship in favor of the "commercially reasonable" standard contained in the Agreement.  (Pl.'s Resp. 33-35).

Although any preclusive effect from the *Crestwood* litigation against the Rambicure Defendants is doubtful given they were not parties to that action, the existence of a fiduciary duty created by the Agreement is a red herring.  As Everest conceded at oral argument, there is nothing that Crestwood failed to do in selling Everest's horses that resulted in lower prices for the horses than if Crestwood had been a fiduciary.[9]  In fact, just as in *Crestwood I*, the only

---

[9] During the motion hearing, the following exchange occurred between the Court and Everest's counsel:

> THE COURT:  [I]t's my understanding that in this case there hasn't been any attempt to establish by affidavit or otherwise that because the way this contract

EXHIBIT 3
Page 12 of 25

particular fault cited by Everest is Crestwood's refusal to set RNAs for the horses at auction, but the Agreement explicitly provided that Crestwood was **prohibited** from setting minimum prices. *See Crestwood I*, 864 F. Supp. 2d at 637 ("Other than allegations regarding the Island Fashion filly, Everest's Legal Analysis and Discussion does not cite to any evidence that supports its claim that Crestwood breached the [Agreement] . . . ."). Even a fiduciary cannot be faulted for performing in accordance with the terms of its engagement. As noted by *Black's Law Dictionary*, a "fiduciary" is "[a] person or institution who manages money or property for another and who must exercise a standard of care in such management activity imposed by law or contract. A trustee, for example, possesses a fiduciary responsibility to the beneficiaries of a trust **to follow the terms of the trust** and the requirements of applicable state law." Black's Law Dictionary 625 (6th ed. 1990) (emphasis added)); *see also 21C LLC v. Wyndham Mgmt. Corp.*, No. 3:05-CV-751-S, 2006 WL 1875512, at *4 (W.D. Ky. June 29, 2006) ("Under Kentucky law a fiduciary relationship is 'founded on trust and confidence reposed by one person in the integrity and fidelity of another . . . in which a duty is created in one person to act primarily for another's benefit in matters connected with [the] undertaking.' . . . Where a contract exists defining the scope of the principal-agent relationship, as is the case here, a limited agency relationship arises. [I]n that more limited setting, the existence and extent of the agent's duties are determined by the agreement between the parties." (internal citations omitted)

---

was drafted, that Everest got less money out of these horses than it would have gotten if Mr. Rambicure had achieved his stated purpose which was to impose fiduciary duties upon Crestwood.

Is there any such proof in the record?

MR. CATHEY: As to that issue, no.

(Mot. Hr'g Tr. 33:3-10, DN 114).

**EXHIBIT 3**
**Page 13 of 25**

(citation omitted)).  Thus, even if the Agreement had explicitly denominated Crestwood as a fiduciary, Crestwood could not have been faulted for refusing to RNA Chase the Storm because it was precluded from such action by the Agreement.[10]

The lack of a fiduciary duty imposed under the Agreement cannot sustain Everest's claim against Rambicure because Everest has not demonstrated that it was damaged by any supposed shortcomings in Crestwood's performance.  This deficiency was noted in *Crestwood I*, where the Court held that Everest had not proven any damages caused by Crestwood's alleged breach.  *See Crestwood I*, 864 F. Supp. 2d at 636-37.  This same deficiency persists in the present suit: none of the damages claimed against Rambicure have any connection to the absence of a fiduciary duty because there is **still no proof** that Crestwood caused Everest harm **regardless of the existence of any fiduciary standard**.[11]

Everest's expert identifies damages totaling $1.147 million, all of which is attributable to Rambicure's advice that Everest was entitled to RNA Chase the Storm and to the litigation expenses Everest was required to pay Crestwood under the Agreement as the prevailing party. (Expert Report 10).  Everest has not connected any of these damages to a breach of some fiduciary obligation which the Agreement should have imposed upon Crestwood. Thus, even if Rambicure was negligent in drafting the Agreement there is no viable claim because Everest has

---

[10] Everest's expert does not fault Rambicure for drafting the Agreement to prohibit Crestwood from setting reserves, which appears to have been an essential business term.  Crestwood was required to bear all costs of boarding, training, and preparing the horses for auction.  If Crestwood were also required to RNA the horses and turn down auction bids, it could have been forced to board the horses indefinitely without compensation.

[11] Everest's expert report contains the conclusory statement that "[Crestwood sold] horses in a manner that failed to maximize their sale prices.  As a result, the sales prices obtained for many horses were well below market value, even for that time."  (Expert Report 9).  Plaintiff's expert is an attorney without any demonstrated expertise in equine valuations.  (Expert Report 17-21). Moreover, she provides no opinions regarding valuations and identifies no basis for this assertion.

EXHIBIT 3
Page 14 of 25

not shown any resulting damages. *See Marrs*, 95 S.W.3d at 860 (stating one of the elements of a legal malpractice is that "the attorney's negligence was the proximate cause of damage to the client." (quoting *Stevens v. Denison*, 64 S.W.3d 297, 298-99 (Ky. App. 2001)). Having proven no damage from Crestwood's actions, Everest's claim that Rambicure negligently failed to draft the Agreement to impose a fiduciary duty on Crestwood fails as a matter of law.

Instead of connecting its claimed damages to the breach of a missing fiduciary duty, Everest has premised its damages primarily upon Rambicure's advice regarding the legality of placing an RNA on Chase the Storm. (Mot. Hr'g Tr. 5:14-19). According to Plaintiff's expert:

> When Plaintiff consulted Defendant Rambicure before RNA'ing Chase the Storm, Defendant Rambicure erroneously advised Plaintiff that it was within its rights to do so. Based on Defendant Rambicure's advice, Plaintiff bid on its own horse, resulting in the horse not being sold, which caused Crestwood to hold back $219,513.89 in proceeds from other horses, an action the Court ultimately determined Crestwood was entitled to take. In contrast, had Defendant Rambicure advised Plaintiff that it could not have bid on its own horse or otherwise set a reserve without breaching the Agreement, Everest would not have set a reserve and Chase the Storm would have sold to the highest third-party bidder at $875,000, resulting in proceeds to Plaintiff, net of Crestwood's commission, of $655,486.11. Further, Crestwood would not have withheld $219,513.89 in proceeds from other sales.
>
> Plaintiff continued to rely on Defendant Rambicure's advice that it was permitted to bid on its own horse and cause a no-sale, that Crestwood had breached the agreement, and Plaintiff pursued extensive litigation based on that advice. The result was the complete loss of the case and a $272,486.30 judgment against Plaintiff for Crestwood's attorneys' fees and costs to enforce its rights under the Agreement. Between the lost proceeds from Chase the Storm, the proceeds from other sales withheld by Crestwood and the judgment, Plaintiff sustained damages of at least $1,147,486.30 as a result of Defendant Rambicure's negligence.

(Expert Report 9-10). In sum, then, Everest's claimed damages against Rambicure consist of three components: $219,000 for the commission on Chase the Storm; $655,000 representing the net proceeds of the cancelled sale of Chase the Storm; and $272,000 for attorneys' fees Everest

**EXHIBIT 3**
**Page 15 of 25**

was required to pay Crestwood.  Examination of these components reveals that none has any merit.

First, Everest faults Rambicure for advising that it had the legal right to RNA Chase the Storm.[12]  According to Everest, it relied upon Rambicure's advice in deciding to place the RNA and but for that advice "Everest would not have set a reserve and Chase the Storm would have sold to the highest third-party bidder for $875,000 . . . ."  (Expert Report 9).  This admission reveals the fallacy of charging Rambicure for the sales commission:  by relying on Rambicure's advice Everest incurred the commission expense of $219,000 on the cancelled sale,[13] but without Rambicure's advice Crestwood would have allowed the sale to stand—**in which case Everest would have incurred the same $219,000 commission**.  The commission would have been owed either way.  Thus, Everest has failed to show that Rambicure's advice caused Everest any disadvantage.  *See Mitchell v. Transamerica Ins. Co.*, 551 S.W.2d 586, 587-88 (Ky. App. 1977); *Kirk v. Watts*, 62 S.W.3d 37, 44 (Ky. App. 2001); *Marrs*, 91 S.W.3d at 860.  This claim therefore fails as a matter of law.

The next element of damages makes even less sense.  Everest's legal expert opines that Rambicure's negligence caused damages equal to the entire net sales price from the cancelled

---

[12] Rambicure admits he told Everest it could legally set the reserve, which advice was partially vindicated in *Crestwood I*:  "In resolving this dispute, the Court must determine whether Everest had a legal right to nullify the sale of the Island Fashion filly.  The answer to that question is undisputedly 'yes'.  As the owner of the horse, Everest had the right to block the sale at auction." *Crestwood I*, 864 F. Supp. 2d at 635.  However, as further noted by Judge Caldwell, "[t]he Court must next consider whether in blocking the sale, Everest breached its obligations under the November 4 Agreement with Crestwood?  For reasons stated below, the answer is also 'yes'." *Id.*  There is a factual dispute whether Rambicure told Everest that it would not owe a commission to Crestwood if it chose to RNA the horse.  In light of the discussion below, this factual dispute is not material.

[13] The sale of Chase the Storm was cancelled, so there were no proceeds from which Crestwood could deduct its commission.  Crestwood withheld the commission from other Everest sales, which Judge Caldwell ruled it was entitled to do.  *See Crestwood I*, 864 F. Supp. 2d at 633-34, 636.

**EXHIBIT 3**
**Page 16 of 25**

sale of Chase the Storm or $655,000, calculated as the rejected bid of $875,000 minus the $219,000 commission.  (Expert Report 9).  This untenable claim ignores several crucial facts.  First, Everest set the RNA based on its belief that Chase the Storm was worth $1.5 million.  Thus, it would appear that RNAing the horse saved Everest nearly half a million dollars by preventing a sale for far less than Everest thought the horse was worth.[14]  Next, Chase the Storm suffered no physical damage from the failed sale.  Following the auction, the filly was taken by Everest's agent to a horse farm.  (Nielsen Decl. Ex. 4, DN 77-1).  Everest continues to this very day to own Chase the Storm, who has presumably been available for racing or breeding over the past nine years.  (Defs.' Reply Mot. Summ. J. Ex. B, at 8, DN 93-2; Mot. Hr'g Tr. 10:2-11).  Most importantly, Everest has not proven that Chase the Storm suffered any diminution in value due to the cancelled auction sale,[15] yet it seeks recovery as if the horse were worth nothing.

Any loss which Everest suffered by setting the RNA in reliance on Rambicure's advice could conceivably have been established by evidence that the horse had been injured or otherwise lost great value shortly after the cancelled sale under circumstances within Rambicure's control.  *See Gheens v. Bush*, 80 S.W.2d 581, 582 (Ky. 1935) (explaining that the proper measure of damages when personal property is not destroyed is "the value of the property immediately before and immediately after the injury."  (citation omitted)).  In such event, Rambicure could have been blamed for the lost opportunity to sell the horse.  Instead, as noted, Everest chose to keep Chase the Storm and has produced no evidence of any reduced value of

---

[14] A bid of $1.5 million less 25% commission would have yielded $1.125 million.  $1.125 million minus the $655,000 net price from the rejected bid equals $470,000.

[15] Everest claimed in interrogatory answers that Chase the Storm had a residual value of $100,000.  (Defs.' Reply Mot. Summ. J. Ex. B, at 7).  There was no explanation for this figure, and the answers were signed only by Everest's counsel.  At oral argument, Everest's counsel was asked:  "Is there anything else in the record besides that one unverified number in the interrogatory answers that were filed back in December regarding the value of Chase the Storm after September 9, 2009?"  His response:  "No."  (Mot. Hr'g Tr. 21:22-22:1).

EXHIBIT 3
Page 17 of 25

the horse related to its decision to turn down the third-party bid at the 2009 Keeneland auction. Everest's attempt to have its horse and ride it too by charging Rambicure for the entire net value of the sale it rejected is completely unfounded, and this claim is also dismissed.

The final component of Everest's damage claim is for $272,000 in attorneys' fees Everest was required to pay to the prevailing party in *Crestwood I*. The only proof offered in support of this claim is Everest's legal expert report which declares that Rambicure "gave his client incorrect legal advice" which related to the drafting of the Agreement and the decision to RNA Chase the Storm, i.e., advice that was clearly transactional in nature. (Expert Report 9). To recover the attorneys' fees Everest was required to pay Crestwood in the prior suit, however, Everest must prove it was Rambicure's fault that it lost the case. *See Scott v. Koch*, No. 5:07-373-JMH, 2008 U.S. Dist. LEXIS 58379, at *15-16 (E.D. Ky. Aug. 1, 2008) (internal citations omitted) (citation omitted); *see also Mitchell*, 551 S.W.2d at 588 ("[A] malpractice action against an attorney cannot be established in the absence of a showing that his wrongful conduct has deprived his client of something to which he would have otherwise been entitled."); *Kirk*, 62 S.W.3d at 44 (stating that a plaintiff must prove his attorney "caused him to lose something to which he would have otherwise been entitled . . . ."); *Marrs*, 95 S.W.3d at 860 ("[T]he plaintiff must show that he/she would have fared better in the underlying claim; that is, but for the attorney's negligence, the plaintiff would have been more likely successful.").

Since it has been established above that Everest has proven no damages from Rambicure's drafting of the Agreement or his RNA advice, Everest must show some connection between Rambicure's actions and the outcome of the *Crestwood* litigation. In this regard, Plaintiff has made no attempt to prove what Rambicure did in the *Crestwood* litigation but for

**EXHIBIT 3**
**Page 18 of 25**

which it would have been more likely to prevail.[16]  It is entirely unclear from the present record what role Rambicure played in the prior case, which Everest concedes began even before the auction of Chase the Storm.  (Pl.'s Mot. Summ. J. 9-10).  In reviewing Everest's dispositive motion and opposing memoranda in *Crestwood I*, it appears that a Minnesota lawyer, not Rambicure, was acting as lead counsel.  Defendants' Motion for Partial Summary Judgment, *Crestwood Farm Bloodstock, LLC v. Everest Stables, Inc.*, No. 5:09-CV-00317-KKC (E.D. Ky.), DN 154; Defendants' Response to Plaintiffs' Motion for Summary Judgment, *Crestwood Farm Bloodstock, LLC v. Everest Stables, Inc.*, No. 5:09-CV-00317-KKC (E.D. Ky.), DN 160.  Further, Everest has indicated that it is pursuing a malpractice action against the Minnesota attorney in a separate lawsuit.  (Mot. Hr'g Tr. 44:11-16).  Regardless, the substance of any claim for recovery against Rambicure based on the outcome of the *Crestwood* litigation would require evidence that it was Rambicure's fault that Everest lost the case.  Everest's legal expert points no such finger of blame.

It is appropriate to note that approximately one-half of all litigants who fight their case to a conclusion end up losing.  If the losers' attorneys were held strictly liable for the lost claims without a showing of fault, our civil justice system would consist entirely of pro se litigants; no lawyer could survive if all were guarantors of a favorable outcome to their clients.  As one court has explained:

---

[16] Perhaps recognizing this gap in its case, Everest cites to Nielsen's declaration that Rambicure repeatedly advised that Everest had the right to set reserves "[t]hroughout the course of representation of Everest in *Crestwood I* . . . ."  (Pl.'s Mot. Summ. J. 11).  Nielsen's declaration says no such thing.  Instead, it indicates Rambicure's "continuing advice" was limited to two e-mail messages Rambicure sent within a week of the September 2009 sale.  (Nielsen Decl. ¶ 25, DN 77-1).  Similarly, Everest's expert relates that Rambicure "continued to advise" regarding the RNA issue, citing only to "a series of September 2009 emails to Plaintiff . . . ."  (Expert Report 8).  Neither Nielsen's declaration nor Everest's expert report makes any mention of Rambicure's involvement in the *Crestwood* litigation.

EXHIBIT 3
Page 19 of 25

> [I]n order to prevail in a malpractice action against a lawyer, the plaintiff must establish not only his or her damages, but must additionally establish that, but for the negligence of the lawyer, he or she would not have suffered those damages.
>
> . . . Without the requisite causal connection between an attorney's malpractice and a loss to the client, a malpractice case simply cannot go forward.

*Calvert v. Scharf*, 619 S.E.2d 197, 208 (W. Va. 2005) (citation omitted).  Everest essentially seeks to impose a recovery upon Rambicure for a bad outcome without showing that Rambicure was responsible for decisions Everest made in the prior litigation, much less that such advice failed to meet the requisite standard of care.  Everest has produced no evidence that Rambicure committed malpractice in the course of the *Crestwood* litigation and it therefore has no basis for recovery against him for the attorneys' fees Everest was required to pay when it lost that case.

Everest has not proven any damages caused by Rambicure for the sales commission on Chase the Storm, the net sale proceeds from the cancelled auction of the filly, or the attorneys' fees assessed in the *Crestwood* litigation.  Therefore, Rambicure Defendants are entitled to summary judgment on Everest's professional malpractice claims.

### 4.    *Other Claims*

In addition to Everest's legal malpractice claim, it has also asserted claims against Rambicure Defendants for negligent misrepresentation, breach of fiduciary duty, and breach of contract.  (Second Am. Compl. ¶¶ 71-88).  Like Everest's legal malpractice claim, however, these other causes of action also require a causal connection between some wrongful act and its damages.  *See* Restatement (Second) of Torts § 552B ("The damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause . . . ."); *Baptist Physicians Lexington, Inc. v. New Lexington Clinic, P.S.C.*, 436 S.W.3d 189, 192 (Ky. 2013) ("[T]he basic elements of a breach-of-fiduciary-duty cause of action [include]: (1) the existence of a fiduciary duty; (2) the breach of

**EXHIBIT 3**
**Page 20 of 25**

that duty; (3) injury; and (4) causation."); *Metro Louisville/Jefferson Cty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. App. 2009) ("To prove a breach of contract, the complainant must establish . . . damages flowing from the breach of contract."  (citation omitted)).  Because the same fatal flaw—i.e., a lack of causation and damages—also infects these other claims, the Court will dismiss the claims of negligent misrepresentation, breach of fiduciary duty, and breach of contract.

### B.    Defendant's Motion for Judgment on the Pleadings (DN 34)

Miller Wells has moved for judgment on the pleadings on Everest's breach of contract claim against it under Fed. R. Civ. P. 12(c).  (Def.'s Mot. J. Pleadings, DN 34).  Everest asserts that it was an intended beneficiary of Miller Wells' promise to provide Rambicure malpractice insurance covering prior claims when Rambicure went to work at Miller Wells after his representation of Everest ended.  (Second Am. Compl. ¶¶ 95-96).  As set forth above, however, Everest has no viable claims against Rambicure.  Certainly, if Rambicure owes Everest nothing, the law firm he joined after *Crestwood I* can have no liability under Everest's theory of being an intended third-party beneficiary of an agreement between Rambicure and Miller Wells.  *See* 17B C.J.S. *Contracts* § 864 (2018) ("One seeking to take advantage of a contract made for his or her benefit by another must take it subject to its terms and conditions all legal defenses, and all inherent equities arising out of the contract, such as fraud of the party procuring it, the nonperformance of conditions, or the right to a set-off, unless the element of estoppel has entered.  . . . Generally, a promisor may assert against a third-party beneficiary any defense that the promisor could assert against the promisee if the promisee were suing on the contract."); 13 Samuel Williston & Richard A. Lord, *A Treatise on the Law on Contracts* § 37.57 (4th ed. 2018) ("[A]ny defense connected to the formation of the contract, such as lack of capacity, want of

**EXHIBIT 3**
**Page 21 of 25**

mutual assent, or consideration or any similar invalidating cause, can be raised by the promisor against the beneficiary."). Rambicure's successful defense of the claims against him operates in Miller Wells' favor on this breach of contract claim.

While Miller Wells has not moved to dismiss the additional claims of fraud and negligent misrepresentation, courts have the authority pursuant to Fed. R. Civ. P. 56 to grant summary judgment *sua sponte*. *See Shaw v. Donahoe*, 605 F. App'x 494, 500 (6th Cir. 2015) (citations omitted). Although trial courts must give formal notice of their intent to grant *sua sponte* decisions on summary judgment, "courts have made clear that 'where a legal issue has been fully developed, and the evidentiary record is complete, summary judgment is entirely appropriate even if no formal notice has been provided.'" *Addison Ins. Co. v. 4000 Island Boulevard Condo Ass'n, Inc.*, 263 F. Supp. 3d 1266, 1275 (S.D. Fla. 2016) (citations omitted).

Like the breach of contract claim, Everest cannot produce evidence that it incurred any damages to support its claims of fraud and negligent misrepresentation against Miller Wells. Having failed to prove damages caused by Rambicure's malpractice, there is no conceivable possibility that Everest could somehow connect a loss to the law firm which came into picture only after Rambicure was fired by Everest. Further, since Everest discharged Rambicure before he became associated with Miller Wells, Everest could not have relied upon any representation that was chargeable to Rambicure's new law firm. *See United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999); *Presnell Constr. Managers, Inc. v. EH Constr., LLC*, 134 S.W.3d 575, 580 (Ky. 2004). For these reasons, Everest's breach of contract, negligent misrepresentation, and fraud claims against Miller Wells are dismissed.

**EXHIBIT 3**

**Page 22 of 25**

C.    **Plaintiff's Motion for Summary Judgment (DN 77)/Defendants' Motions for Leave (DN 82, 84)**

Plaintiff has also moved for Summary Judgment on its claims against the Rambicure Defendants, and Rambicure Defendants have filed two motions for leave related to their response.  (Pl.'s Mot. Summ. J., DN 77; Defs.' Mot. Leave, DN 82; Defs.' Mot. Leave, DN 84). As the Court has determined that summary judgment is appropriate *against* Plaintiff on these claims, however, Plaintiff's dispositive motion (DN 77) will be denied, and Defendants' motion seeking leave to supplement (DN 84) will be denied as moot.  Rambicure Defendants' Motion for Leave (DN 82) relates to the sealing of confidential documents attached to their response to Plaintiff's dispositive motion.  Plaintiff did not object; therefore, the Court will grant the motion sealing those documents.

D.    **Zurich's Motion to Dismiss (DN 98)**

Finally, Zurich moved to dismiss Plaintiff's bad faith claim.  In particular, Zurich contends that there is no coverage for any malpractice claim against Rambicure because the insurance policy expressly excluded this claim from the policy's coverage.  Zurich has produced the Prior Acts Exclusion Endorsement for the malpractice insurance policy for Miller Wells, which clearly and unequivocally excludes coverage for any acts or omission by Rambicure before June 2012.  (Def.'s Mot. Dismiss Ex. 1, at 2, DN 98-2).  Under Kentucky law, policy exclusions will be enforced in accordance with their terms, and the exclusion in Zurich's policy is enforceable.  *Tower Ins. Co. of N.Y. v. Horn*, 472 S.W.3d 172, 173-74 (Ky. 2015) (citation omitted); *see Gen. Exch. Ins. Corp. v. Kinney*, 129 S.W.2d 1014, 1017 (Ky. 1939) ("Numerous authorities from this and other courts are cited by appellant to the effect that insurance companies may insert in their policies as many provisions restricting their liability as they deem proper, provided such provisions are not unreasonable or contrary to public policy.  There is no

**EXHIBIT 3**

**Page 23 of 25**

question whatever as to the soundness of this rule, and we have no doubt that the exclusionary provisions of the policy relied on by appellant are not unreasonable or contrary to public policy."); *Jefferson Standard Life Ins. Co. v. Hurt*, 72 S.W.2d 29, 22 (Ky. 1934) ("The liability of the insurer and the right of a recovery by the insured must be determined by the language of the policy, the same as a contract about any other subject-matter.  The parties may insert in it any provision they desire, or agree upon, limiting the liability of the company or the rights of the insured, provided it is not unreasonable, illegal, or contrary to public policy."  (internal citation omitted) (citations omitted)).  Further, Zurich correctly asserts that there can be no bad faith claim absent underlying coverage, so the bad faith claim is also without merit. *See Ky. Nat'l Ins. Co. v Shaffer*, 155 S.W.3d 738, 742 (Ky. App. 2004) ("[I]n absence of a contractual obligation in an insurance policy for coverage, there can be no claim for bad faith.").  Finally, Everest's fraud, conspiracy to commit fraud, and negligent misrepresentation claims likewise fail.  (Second Am. Comp. ¶¶ 110-16).  These causes of action are predicated upon the validity of the underlying actions against Rambicure just like the claims asserted against Miller Wells, only more attenuated.  Certainly, when Zurich's policy for Miller Wells did not become effective until October 2013, Everest could not have relied upon this coverage or any other representation by Zurich before it fired Rambicure in April 2012.  Since Everest has no viable claim against Rambicure Defendants, its fraud, conspiracy to commit fraud, and negligent misrepresentation claims against Zurich fail.

### E.    Plaintiff's Objection to Magistrate Judge's Ruling (DN 60)/Plaintiff's Renewed Motion to Compel (DN 61)

Plaintiff also objects to Magistrate Judge Lindsay's order addressing privilege issues and moves to compel production of documents.  (Pl.'s Obj., DN 60).  In light of this Court's

EXHIBIT 3
Page 24 of 25

dismissal of Plaintiff's claims, the Objection is overruled as moot, and the renewed motion to compel is denied as moot.

<h3 align="center">IV.   <u>CONCLUSION</u></h3>

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1.    Rambicure Defendants' Motion for Summary Judgment (DN 33) is **GRANTED**.

2.    Defendant Miller Wells' Motion for Judgment on the Pleadings (DN 34) is **GRANTED**.

3.    Plaintiff's Objection to Magistrate Judge's Ruling (DN 60) is **OVERRULED AS MOOT**, and Plaintiff's Renewed Motion to Compel (DN 61) is **DENIED AS MOOT**.

4.    Plaintiff's Motion for Summary Judgment (DN 77) is **DENIED**.

5.    Rambicure Defendants' Motion for Leave (DN 82) is **GRANTED**.

6.    Rambicure Defendants' Motion for Leave (DN 84) is **DENIED AS MOOT**.

7.    Defendant Zurich's Motion to Dismiss (DN 98) is **GRANTED**.

8.    Plaintiff's Motion in Limine (DN 116) is **DENIED AS MOOT**.

9.    Plaintiff's Second Amended Complaint is **DISMISSED WITH PREJUDICE**.

**Greg N. Stivers, Judge**
**United States District Court**

June 6, 2018

cc:    counsel of record

**EXHIBIT 3**
**Page 25 of 25**